# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **ex rel. COMFORT FRIDDLE** | ) | |
| **and STEPHANIE KENNEDY** | ) | |
| | ) | |
| **Relators,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **1:06-CV-3023-JEC** |
| **TAYLOR, BEAN & WHITAKER** | ) | |
| **MORTGAGE CORPORATION;** | ) | |
| **HOME AMERICA MORTGAGE,** | ) | |
| **INC.; GREGORY HICKS; DENNIS** | ) | |
| **MOSELEY; and CARL WRIGHT** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff-Relators Comfort Friddle ("Friddle") and Stephanie Kennedy ("Kennedy") (collectively "Relators") hereby file their First Amended Complaint against Defendants Taylor, Bean & Whitaker ("TBW"); Home America Mortgage, Inc. (Florida) ("HAM"); Gregory Hicks ("Hicks"); Dennis Moseley ("Moseley"); and Carl Wright ("Wright") (collectively referred to as "Defendants").

## INTRODUCTION

1.     This is an action by Relators, for themselves and on behalf of the United States, to recover damages and civil penalties arising from Defendants

knowingly presenting or causing to be presented false claims for payment or approval to the United States.  As set forth below, Defendants violated the False Claims Act by knowingly engaging in a pattern of fraudulent activity and business practices that resulted in false applications for mortgage guarantees being presented to the United States Department of Housing and Urban Development ("HUD").

2.      The Defendants' scheme was to falsify loan documents, manufacture documents, disregard  FHA and HUD regulations, ignore the complete absence of necessary documentation, and where necessary lie about their own employees' income in order to obtain financing or refinancing for a loan.  About thirty percent of these loans were government insured.  After the U.S. agreed to guarantee these fraudulent loans - based upon the false applications submitted by Defendants - some of the loans inevitably went into default because they were made in complete disregard of the qualifications set by the governmental programs.

3.      After these loans went into default, Defendants knowingly presented (or caused to be presented) a claim for payment of the loan to the government that was both false and based on false information.

4.     The Defendants' fraud caused HUD to guarantee loans that it otherwise would not, and to pay money to the Defendants that was not justly due nor owed.

5.     Additionally, Defendants were defrauding their customer homeowners by indicating that they had warranties and inspections on their properties that were fictional.

## Jurisdiction and Venue

6.     This is an action for damages and other relief arising under the laws of the United States, specifically the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. This Court has jurisdiction of this action by reason of 28 U.S.C. § 1331, and pursuant to 31 U.S.C. § 3732(a).

7.     Venue is proper in the United States District Court for the Northern District of Georgia, pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants TBW, HAM, and Hicks are deemed to reside in this judicial district and because their contacts are sufficient to subject them to personal jurisdiction in this judicial district.  Venue and personal jurisdiction are also proper in this District pursuant to 31 U.S.C. § 3732(a) because the Defendants transact business in this judicial district, and because part or all of the acts proscribed by 31 U.S.C. § 3729 occurred here.

## Parties

8.      Relator Comfort Friddle is a resident of the State of Georgia and is a United States citizen.  Friddle brings this action for violations of 31 U.S.C. § 3729(a) and 3730(h) for herself, and for the United States Government pursuant to 31 U.S.C. § 3730(b)(1).  Friddle was employed as a loan processor for Defendant HAM between December 2004 and August 2006. In that context, she observed first hand that loan conditions were disregarded, loans were underwritten by non-HUD qualified personnel, fraudulent activities pervaded HAM's business practices, and documents were created and falsified in order to obtain financing.

9.      Relator Stephanie Kennedy is a resident of the State of Georgia and is a United States citizen.  Kennedy brings this action for violations of 31 U.S.C. § 3729(a) and 3730(h) for herself, and for the United States Government pursuant to 31 U.S.C. § 3730(b)(1).   Between June 2002 and August 2006, Kennedy understood herself to be an employee of HAM, but later Defendant Hicks announced that she was actually an employee of TBW.   Kennedy was Vice President of Operations at HAM and served as the escalation point for the problems reported by processors like Friddle.   She undertook her own internal investigations, raised red flags with HAM, Hicks, and Moseley, and was not only rebuffed but ultimately fired for her activities.

4

10.    In 2006, Defendant TBW was a corporation organized and existing under the laws of the State of Florida, with its principal place of business located in Ocala, Florida.  TBW filed for Chapter 11 bankruptcy protection on August 24, 2009, with the U.S. Bankruptcy Court, Middle District of Florida (Jacksonville), Petition # 3:09-bk-07047-JAF.  TBW was transacting business in several states, including Georgia.  Upon information and belief, TBW was owned in part by Defendant Hicks.

11.    In 2006, Defendant HAM was a corporation organized and existing under the laws of the State of Florida, with its principal place of business located in Atlanta, Georgia.  HAM filed for Chapter 11 bankruptcy protection on November 25, 2009, with the U.S. Bankruptcy Court, Middle District of Florida (Jacksonville), Petition # 3:09-bk-10023-JAF.  The action was consolidated with the TBW bankruptcy action on January 19, 2010.  HAM was transacting business in several states, including Georgia.  At all times relevant to this Complaint, Defendant Hicks was the majority owner of HAM.  HAM had fourteen branch offices in four states.

12.    Defendant Hicks is a resident of the State of Georgia.  His home address is 5152 Legends Drive, Braselton, GA 30517-6277.  At all times material

hereto, Hicks was a majority owner of HAM and was HAM's principal operator. Upon information and belief, Hicks also had an ownership interest in TBW.

13.     At all times material hereto, Hicks headed up "The Hicks Team," a sub-group at HAM made up of loan officers, processors, and underwriters of Hicks' choosing, of whom Hicks boasted that they could "get any loan into closing." In his capacity with the Hicks Team, Hicks was responsible for hundreds, if not thousands, of fraudulent loan applications.

14.     Defendant Moseley is a resident of the State of Georgia.  His home address is 6350 Old Wood Hollow Way, Buford, GA 30518-6803.  Moseley was president of HAM and was a loan officer on the Hicks Team. As a loan officer, he created fraudulent documents to get loans to close and was also responsible for the vast numbers of fraudulent applications processed by HAM.

15.     Defendant Wright is a resident of the State of Georgia.  Wright served as closing attorney on many of HAM's federally insured loans, including some that included fraudulent statements and resulting in false claims. Wright has been disbarred and is no longer practicing law as a direct result of his guilty pleas to violations of 18 U.S.C. §§ 371 and 1957, offenses involving mortgage fraud and money laundering, and is awaiting sentencing.  *See U.S. v. Wright*, 1:10-cr-00354-WSD (N.D. Ga.).

16.    TBW's principal owner was Lee Farkas, a close personal friend of Hicks, with whom he shared ownership of both TBW and HAM. Farkas was indicted on June 15, 2010 and is now a convicted felon serving prison time for mortgage fraud in the Butner Correctional Complex in North Carolina.

**Factual Allegations**

17.    HAM was a now-defunct mortgage company that offered conventional and non-conventional home loans in Alabama, Florida, Georgia, Kentucky, North Carolina, and Tennessee.

18.    HAM offered loans for new home construction, home equity/home improvement, home purchase, and refinancing of existing mortgages.

19.    Prior to bankruptcy, HAM originated thousands of loans through various government-insured programs. As a result, in the HAM bankruptcy, the United States filed a proof of claim for more than $130,000,000 in damages.

20.    TBW is a now-defunct wholesale mortgage lender, which means that it provided financing to mortgage companies such as HAM.  TBW's annual production volume approached $25 billion and its assets exceeded $3 billion.

21.    About one third of the loans made by HAM were "government loans", which meant that they were insured by the Department of Housing and Urban Development ("HUD"), Federal Housing Administration ("FHA"), Veterans

Administration ("VA"), Rural Housing, Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the like.  Most of these loans were for people who were first-time homeowners, people with low income, or people who had issues with credit history.

22.    In order to qualify for a HUD guarantee against default, borrowers must meet criteria established by the individual programs.

23.    In order to ascertain whether a given borrower met the requirements for a given program, the loan officer must input a vast amount of borrower/property information into the application engine for the program to demonstrate that the loan is of sufficiently low risk to qualify for the program. For Freddie Mac loans, the application engine is "Loan Prospector" or "LP." For Fannie Mae mortgages, the application engine "Desktop Underwriter" or "DU" is used.

24.    The application engine evaluates the loan based on such factors as credit score, debt-to-asset-ratio, and income stream.

25.    In some instances, Defendants circumvented this safeguard by entering false information into the application engine

26.     After the data is entered, the application engine may provide a list of "approval conditions" that must be met before the loan can be approved for the program.

27.     In theory, the loan team would then work to meet those conditions – such as securing evidence to support the assets claimed by the borrower or further evidence as to employment.

28.     At HAM, these conditions were often ignored, or the necessary documentation was altered or even created whole cloth.

29.     On higher risk loans, the application engine will reject the loan and call it  a "Refer risk class," meaning it has identified weaknesses in the borrower's credit reputation and/or capacity to repay.

30.     In some cases, a result of Refer risk class is simply due to lack of data, such as cash-buyers without bank accounts or buyers with no credit history. In those rare cases, the safeguards are allowed to be manually overridden within very strict guidelines by having an FHA Direct Endorsement underwriter analyze the entire loan application to determine if the mortgage qualifies for FHA endorsement in accordance with the Online HUD Handbook 4155.1/4155.2.

31.     Although it took steps to conceal the fact that it had no underwriters of its own, HAM's loans were actually all underwritten "under the table" by TBW.

32.     At HAM, verification of employment, verification of deposits, and other documents were routinely altered or outright falsified in order to close the loan.  In some instances, HAM employees were ordered to close the loan without conditions being met (such as missing septic or well certification, etc.).  On other occasions, they were even asked to create the file after the loan has closed.

33.     Kennedy began working for HAM and/or TBW in 2002.  She was hired by Greg Hicks, who was the owner-operator of HAM, as a trainer.  Two weeks later she was promoted to manager of operations, and in November 2005 was promoted to Vice President of Operations.  Kennedy is a direct endorsed underwriter ("D.E. underwriter"), which means she is endorsed by HUD and can underwrite government loans.

34.     As VP of Operations, Kennedy's duties included making credit risk/exception decisions for all branch offices; managing payroll and incentives for the operations staff; and acting as intermediary for loan issues between operations and sales managers.  Kennedy also created and implemented a loan tracking report that was used throughout HAM.

35.     Friddle was hired by Kennedy in December 2004 to work as a loan processor for HAM.  As a loan processor, she was responsible for gathering

information requested by the underwriters in order for the loan to clear for a given program.

36.     During their time with HAM, Friddle and Kennedy both saw a breathtaking amount of fraud being perpetrated.  Some examples are set forth below, but this is by no means the end of the fraudulent practices that the two Relators uncovered.

37.     In one example, early in 2005, shortly after she began to work at HAM, Friddle began to notice certain errors regarding files sent for processing by two particular loan officers, Andre White ("White") and Jermaine Smith ("Smith").

38.     Smith was a "top producer" for HAM, and was ranked in the top 15 for fiscal year-end 2005.

39.     Files received from Smith and White seemed odd in that they were "mirrored" or identical.  The same property would be listed, and/or the profiles of the borrowers were identical.  Moreover, many of the borrowers were very young, in their early to mid-twenties, and all of the properties seemed to come from the same area in downtown Atlanta.

40.     This area (zip codes 30310, 30311, 30312, 30313 and 30314) encompass the area around Turner Field, where property values can vary wildly.

This makes it a prime target for "flipping" schemes, in which property is purchased at a fraudulently depressed price, alleged "improvements" (also fraudulent) are made, and the property is resold at a much higher value.

41.    Such flipping schemes are in violation of HUD guidelines. *See*, *e.g*. 24 C.F.R. Part 203.

42.    Friddle raised concerns with these loan officers (Smith and White) and with her manager, Kennedy.

43.    For example, she specifically raised concerns about a particular file (the "Dyson file").  The Dyson file showed a property in the Turner Field area that was apparently being sold for significantly more money than other properties in the area.

44.    Kennedy reviewed the Dyson file, checked comparable properties using the MLS system (a so-called "desk review" of the appraisal) and raised concerns with Moseley.  She asked that further appraisal review be done for other properties in the area before loans closed.  She pointed out that prior foreclosures were being sold for four times the amount paid by the seller.

45.    Kennedy pointed out to Moseley and to Hicks that TBW required desk reviews of appraisals, at a minimum.  Given the variation of values in the area, and the significant amounts of money that the properties were being resold

for, Kennedy advocated a "drive by" appraisal review, in which the second appraisal is actually conducted onsite to determine if the increase in value is real and warranted (and thus legal).

46. Kennedy was again rebuffed by Moseley and Hicks. When Kennedy reminded Hicks of the TBW regulations, she was told "F--- TBW's rules. Get these loans into closing."

47. The loans went into closing without the appraisal review recommended by Friddle and Kennedy. Kennedy was assured that any problems with the appraisals were "isolated" and told to leave the matter alone.

48. Kennedy attempted to order (in her capacity as VP of Operations) that all DeKalb/Fulton properties be given drive by appraisals, but Hicks kept overriding her orders.

49. When bills came in for second appraisals ordered by Kennedy, Hicks was furious and told Kennedy that if he got one more bill for appraisals, she would be fired.

50. At HAM, Hicks often ordered Stephanie Kennedy or Ginny Poore (both of whom were FHA direct endorsement underwriters) to approve the loan. Hicks threatened to fire Kennedy if she refused.

51.    When Kennedy balked at assisting with what she told Hicks point-blank was fraud, he and Moseley simply shifted the loans to Poore or, in some instances, HAM employees actually forged Stephanie Kennedy's electronic endorsement of the file by using her password without her knowledge or permission.

52.    Specifically, Kennedy discovered that Tim Halstead, then a HAM Vice President, had closed at least twenty-three FHA insured loans and used Kennedy's name. Halstead was himself an underwriter but not a D.E. underwriter and so could not close FHA loans.  When Kennedy protested, she was told that nothing could be done about it.

53.    Kennedy's suggestions that the system be changed so that only the logged-in person could add his or her own name were unheeded.

54.    In yet another example, in or around May of 2006, Kennedy and Friddle again raised the same concerns to Hicks and Moseley about certain files being underwritten by Smith and White.

55.    When Hicks refused to take action, Kennedy herself initiated an investigation and, along with Friddle and production manager Sandi Flagg, reviewed files and confirmed their concerns, which they then reported to Hicks and Moseley. Still, nothing was done about the suspicious files.

56.     When Kennedy inspected the files side by side, it was immediately apparent that the files from Jermaine Smith had all been signed in the same hand. The files also showed inflated values and other suspicious issues.

57.     Kennedy reported this problem to Hicks and Moseley.  Upon inquiry, Smith admitted to signing the files himself, but stated that in each instance he had obtained the borrower's permission.

58.     Far from being grateful, Hicks and Moseley berated Kennedy for the investigation.  Moseley told her that if she had "kept her mouth shut" HAM would not have lost the income Smith's fraudulent files were bringing.

59.     Kennedy, Friddle, and others also witnessed and internally reported fraud being conducted by the Greg Hicks-led "Hicks Team."

60.     For example, in or about July 2003, Allison Olson was underwriting a file from Hicks Team loan officer Justin Price when she discovered that Price had falsified the Verification of Deposit.

61.     Olsen reported Price's actions internally, but nothing was done.

62.     Shortly thereafter, Olson questioned an appraisal for another Hicks Team file, leading Hicks to call a meeting of the entire Hicks Team at which he interrogated Olson and chided her for questioning the appraisal.

63.     During Relators' tenure in the HAM offices, Hicks frequently boasted about his ability to get any file into closing.

64.     When Hicks was shown blatantly fraudulent files, rather than punish those responsible, he would explain how the fraud ought have been committed, in order to avoid detection.

65.     When a HAM employee, Melinda Luzier, filed for an FHA loan but was unable to qualify, Dennis Moseley personally created a new pay stub to reflect an inflated and fraudulent amount.

66.     Kennedy discovered a FICO score in a Hicks Team loan file that had been "whited out" using correction fluid.

67.     Kennedy complained about the fraud taking place within the Hicks Team to Greg Hicks, Tim Halstead, and Stephanie Gibbons (chief credit officer at TBW).

**The Freddie Mac Audit**

68.     In still another example of the pervasive fraudulent practices at HAM, in approximately May/June of 2006, just as Kennedy was launching her own investigation of Smith and White, HAM received notice that Freddie Mac wanted to audit certain files.  Such an audit may be triggered when a loan company has a

high percentage of loans that go into default and/or has a high percentage of loans in which the first payment on the loan is missed.

69.     The audit focused the same files that Friddle and Kennedy earlier had objected to closing without appraisal reviews, but that Hicks and Moseley had insisted on closing.  Since closing, there had been a high number of buy-backs based on first payment default.  Some of the properties had even been burned down.

70.     In fact, the list of files from Freddie Mac was so similar to Kennedy and Friddle's list of concerns that when Kennedy first was presented with the list from Freddie Mac, she thought that it was a copy of her own list of "problem" files.  Only later did she realize that it was a different list that had originated with Freddie Mac.

71.     On July 12, 2006, Hicks called Kennedy into Moseley's office and informed her that she was going to handle the Freddie Mac audit because she caused it, and then she was going to be fired as soon as she had done so.

72.     Kennedy reminded Hicks that these were the same files she had already told him were going to be problems because of his refusal to order appraisal verifications.

73.     Hicks screamed at Kennedy to get out, that he never wanted to see her again.

74.     Kennedy collected her belongings and left HAM.

75.     At no time during that altercation did Hicks indicate that Kennedy was an employee of TBW or that he lacked the power to fire her. Rather, he fired her on the spot.

76.     The next day, July 13, 2006, believing she had been terminated, Kennedy did not report to work.  Hicks held an all-staff meeting that day to inform the staff that Kennedy had quit and refused to return, and stated that HAM was having an "issue" but that it would all be worked out, because no one had done anything wrong.

77.     At that same meeting, Hick's emphasized to the entire staff that if collateral for loans was in place,  Hicks was not concerned about how the file got approved or with the state of the file itself.  In other words, Hicks didn't care if the file was fraudulent as long as the collateral was in place.

78.     After the meeting, Friddle went into Hicks' office and reminded him that she had already told him that the files in question were problematic.

79.     Hicks told Friddle that in the future, if there were any problems, she was to see Hicks and no one else.

80.     About an hour later, Hicks summoned Friddle to Moseley's office and stated that if Smith and White had stolen from him, he would see them both put in jail.

81.     Also on July 13, 2006, Hicks began calling Kennedy and leaving voice messages begging her to return to work and saying he "couldn't run the company without her" and that he would change his business practices if she would return.

82.     Kennedy eventually did agree to return, but only if (1) the company was required to follow her guidelines; (2) Hicks stopped undermining her in front of the staff; and (3) the existing issues were worked out and new procedures were agreed to by all parties.

83.     On July 14, 2006, Friddle was approached by Kennedy and Jan Kelly, who later became HAM's manager of Operations, at the direction of Hicks, and told that she was to be suspended with pay, pending an investigation of the Freddie Mac files.

84.     Friddle protested that far from having covered up any problems, she had in fact raised concerns about the files in question.

85.   Kelly told Friddle that "everyone knew" that she had done nothing wrong, but that since she had worked on the files she could not be present during the investigation.

86.   Friddle was sent home that same day and suspended with pay.

87.   For about three weeks after being placed on administrative leave, Friddle continued to receive her pay but had no calls from HAM.

88.   Around three weeks into her suspension, Friddle began to call HAM and leave voice mail messages, text messages, and emails for Moseley and Kennedy asking for an update on the status of the investigation.

89.   Moseley returned Friddle's calls and told her to consider it a "paid vacation."  Friddle was again assured that there was no chance of her being fired and that all was well.

90.   Meanwhile, Hicks and Moseley told Kennedy that if she contacted Friddle, she (Kennedy) would be fired. They stated that they would know if she called Friddle because HAM paid Kennedy's cell phone bill.

91.   Friddle waited another few weeks and then again attempted to contact HAM.  Receiving no response, Friddle finally contacted Hicks directly.  Hicks told Friddle that he was still in the middle of his investigation and would let her know the outcome.

92.    On August 4, 2006, Moseley called and informed Friddle that although they had found nothing in the investigation that pointed to wrongdoing on her part, they were going to terminate her employment but would pay Friddle a severance.

93.    Friddle immediately began to seek other employment.

94.    HAM initially deposited Friddle's check into her bank account, as was customary through direct deposit.  However, HAM then withdrew the money six days later, and forced Friddle to come to the office to collect a handwritten check.

95.    On August 25, 2006, HAM sent Friddle a full release and severance agreement for signature.  At that time, HAM informed her that she would not continue to receive a paycheck unless she signed the agreement. Moseley's offer to pay Friddle severance was rescinded when she refused to sign a full release on August 25, 2006.

96.    Friddle then received notice that her insurance had been cancelled, effective July 31, 2006, despite that fact that her separation papers (which she did not receive until August 31, 2006) showed that she had been terminated as of August 11, 2006.  HAM's back-dating of her insurance cancellation rendered it effectively impossible for her to obtain COBRA insurance.

97.    Despite her insurance being cancelled as of July 31, 2006, insurance money was deducted from each of the three checks paid to Friddle between July 14 and her ultimate termination in August.

98.    In the middle of July 2006, Hicks instructed Kennedy to sign off on a loan file that she did not think was appropriate.

99.    Hicks stated that nobody was going to leave the building until Kennedy cleared the conditions for closing on the file.

100.   When Kennedy refused because the borrower did not qualify, Hicks said that if she left without clearing the file, she would be terminated.

101.   Kennedy refused to sign off on the file and left the building.

102.   Hicks called Kennedy that night and left her a voicemail stating that she was not actually fired and asking her to return the next day.

103.   On August 4, 2006, the same day that Friddle was terminated by telephone call, Kennedy was working in her office at HAM on a home equity line of credit file with Allison Paul when Hicks stormed into her office and demanded to know why the file was not already closed.

104.   Kennedy attempted to tell Hicks what the problems with the file were. Hicks told Kennedy he wanted the file in closing "now."

105.   Kennedy refused to close the file because she thought some of the documents in the file were fraudulent. Kennedy had contacted the Internal Revenue Service, which had informed her that the tax returns in the borrower's loan file did not match the tax returns that the borrower had actually been filed with the IRS.

106.   Hicks demanded, "Did you just tell me 'no'?"  He stated that no one was to leave the office until that file was in closing.  Kennedy again refused.

107.   Hicks stormed out of the office, and minutes later, Moseley came into Kennedy's office and told her that Hicks did not want her working there anymore and that she was terminated.

108.   Hicks stated that he couldn't fire Kennedy, because he was not her employer, but that he didn't want to see her at the office any more.  Hicks then stormed out.

109.   This was the first indication Kennedy had that Hicks would contend that she was a TBW employee rather than a HAM employee.

110.   Within minutes, Moseley came over to ask Kennedy if she had been contacted by Stephanie Gibbons of TBW.  Kennedy said that she had not, and asked why Gibbons was expected to call her.  Moseley told Kennedy that Hicks did not want her working in the office any more.

111.   Kennedy contacted Gibbons, who informed Kennedy that she was being transferred to the Marietta location.  The Marietta location was more than fifty miles, one way, from Kennedy's home.

112.   Kennedy protested that transfer such a distance amounted to discharge.  She was then offered $115,000 for working six months at the Marietta location.

113.   On August 31, 2006, after numerous requests for termination papers, Kennedy tendered her letter acknowledging her termination from HAM.   In response, Hicks sent an email from Moseley's computer account, stating that she had always been a TBW employee.  That same day, her paycheck was withdrawn from her bank account.

114.   To date, neither HAM nor TBW has paid Kennedy for her vacation time or paid her the bonus due and owing under her prior contract.

115.   Hicks then engaged in a campaign to keep other mortgage companies in the area from hiring Kennedy.

116.   Hicks falsely stated that he had received a letter from attorneys representing Kennedy and that she was suing him and was a trouble maker.

117.   Hicks stated publicly that he was going to "make [Kennedy's] life a living hell."

118.   Hicks stated that he was suing Kennedy because "it is illegal for her to be working for two financial institutions at the same time."

119.   Hicks told Kennedy that he would "take you down" and "ruin your life" if she sued him.

120.   Hicks sent a letter denigrating Kennedy to Rob Young of TBW.

121.   Despite Hicks' efforts, Kennedy was able to obtain new employment. This did not stop Hicks' harassment, however.

122.   On or about August 29, 2006, Hicks called Kennedy's new boss and made ever effort to have her fired.  He told the new boss that Kennedy had stolen company documents and was a bad employee.

123.   Hicks has continued to retaliate against Kennedy through his ownership in TBW and his contacts in the mortgage industry.

124.   For example, Hicks caused TBW to attempt to force Kennedy to personally pick up a check for closings at her old place of employment.

125.   TBW refused to permit Kennedy to act as an underwriter for TBW loans after she found new employment. This was despite the fact that she was qualified, had been doing so for a number of years while with HAM, and did so with perfect ratings.

126.   TBW also refused to permit either Allison Paul (another former HAM employee) or Greg Shumate (who hired Kennedy) to underwrite TBW loans.

127.   When refusing to allow Kennedy, Paul, and Shumate to underwrite loans did not intimidate Kennedy's new company, Hicks used his influence to order that TBW do no further business with Kennedy's new employer.

128.   Mark Hammond, who was the national sales person for TBW, admitted to Kennedy's new employer that the decision was made by Hicks and Lee Farkas, who at the time was the other owner of TBW, in retaliation for having hired Kennedy.

129.   Hicks continued to retaliate by attempting to smear Kennedy's reputation.  He repeatedly and publicly stated that Kennedy was fired in part for writing a letter to Hicks' wife disclosing his affair with a TBW employee (whose child he is rumored to have fathered).  Kennedy has written no such letter.

130.   Hicks repeatedly and publicly continued to state that it is his intention to make Kennedy's life a "living hell."

**The HUD Audit**

131.   The HUD audit of HAM presents another example of HAM's conduct and demonstrates that the United States government and taxpayers were paying for Defendants' fraudulent acts.

132.    Kennedy was ordered by Hicks and Moseley to "handle" a HUD audit that lasted nearly a year.  The audit was triggered because of the number of "first payment defaults."  A first payment default occurs when the purchaser is unable to make even the first payment on the mortgage.  When even the first payment cannot be made, there is a high probability that the borrower ought not to have qualified in the first instance.

133.    In the course of preparing the written response to the HUD audit, Kennedy became aware of a number of HAM files that had actually gone into foreclosure.  She therefore has personal knowledge that false claims for payment for these loans were submitted to the U.S. government, thus triggering the audit. Such files include but are not limited to the following: Bratton, Bray, Bridenthal, Bullock, Bulman, Casper, Clayborne, Crawford, Cronil, Davis, Dixon, Drains, Duran, Green, Hardeman, Hatfield, James, Martin, and Medina.

**The Radloff  Scheme**

134.    Kennedy also discovered that Pam Radloff, a HAM loan officer specializing in manufactured homes, had developed a fraudulent scheme as well.

135.    In this scheme, the owner of a manufactured homes complex would come to HAM/Radloff for refinancing.

136.    Generally, refinancing requires "seasoning" – i.e. the price is based on appraisal.

137.    However, if the property was acquired less than six months before the refinancing, the acquisition/purchase price is used.

138.    Radloff would create a fictional HUD-1 settlement statement for the initial transaction showing that the property was acquired at a higher price than was actually paid.  The difference in the price on the HUD-1 and the actual price was recorded as if there had been a large down payment that had been received by the borrower as a gift.

139.    This affects the "loan to value" ratio, which is a percentage used by the lender to determine what rate should be given on the refinance and what paperwork should be required.

140.    Suspicious at the number of "gifts" and large down payments made by Radloff's clients, Kennedy requested to see the back up documentation on these transactions (i.e. that the file contain either the note or deed or similar documentation of original purchase price).

141.    When Radloff was unable to provide such documentation, Kennedy reported the issue to Moseley.

142.   Moseley flatly refused to investigate any further.  He stated "I don't want to take away someone's main source of business, if I call Pam out, she'll fail."

**Carl Wright's Loans**

143.   Carl Wright was the closing attorney for the TBW/HAM loans with the following FHA loan numbers:

| | | | |
|---|---|---|---|
| 1) | 105-1841921 | 14) | 105-0903849 |
| 2) | 105-2282276 | 15) | 105-2309799 |
| 3) | 105-1709399 | 16) | 105-0410693 |
| 4) | 105-1330789 | 17) | 105-2712625 |
| 5) | 105-2267834 | 18) | 105-1026927 |
| 6) | 105-2459694 | 19) | 105-2292288 |
| 7) | 105-0523509 | 20) | 105-1231731 |
| 8) | 105-1793067 | 21) | 105-2555822 |
| 9) | 105-1843808 | 22) | 105-1395399 |
| 10) | 105-0606148 | 23) | 105-0789089 |
| 11) | 105-2099995 | 24) | 105-1062034 |
| 12) | 105-2210093 | 25) | 105-0730836 |
| 13) | 105-2072391 | 26) | 105-0534474 |

| | | | | |
|---|---|---|---|---|
| 27) | 105-1887164 | | 46) | 105-0652716 |
| 28) | 105-1687842 | | 47) | 105-1161000 |
| 29) | 105-1919556 | | 48) | 105-1620306 |
| 30) | 105-1823986 | | 49) | 105-2255355 |
| 31) | 105-0553228 | | 50) | 105-0365621 |
| 32) | 105-0794428 | | 51) | 105-0678532 |
| 33) | 105-0652410 | | 52) | 105-1052507 |
| 34) | 105-1208035 | | 53) | 105-0686516 |
| 35) | 105-1608623 | | 54) | 105-2137180 |
| 36) | 105-2296121 | | 55) | 105-2237327 |
| 37) | 105-1148578 | | 56) | 105-0457395 |
| 38) | 105-1581009 | | 57) | 105-2032862 |
| 39) | 105-2326281 | | 58) | 105-1861847 |
| 40) | 105-1696736 | | 59) | 105-1745265 |
| 41) | 105-2600287 | | 60) | 105-1833620 |
| 42) | 105-1888760 | | 61) | 105-1036548 |
| 43) | 105-1754136 | | 62) | 105-0453539 |
| 44) | 105-1704429 | | 63) | 105-2815832 |
| 45) | 105-2116355 | | 64) | 105-1913530 |

| 65) | 011-5030444 | 78) | 105-1588564 |
|-----|-------------|-----|-------------|
| 66) | 105-2344075 | 79) | 105-1589048 |
| 67) | 105-1906648 | 80) | 105-1850923 |
| 68) | 105-2182354 | 81) | 105-1983396 |
| 69) | 105-2140115 | 82) | 105-1938418 |
| 70) | 105-1469121 | 83) | 105-1054832 |
| 71) | 105-2329481 | 84) | 105-1151140 |
| 72) | 105-0296713 | 85) | 105-0485055 |
| 73) | 105-1526582 | 86) | 106-1419075 |
| 74) | 105-0596036 | 87) | 105-1131123 |
| 75) | 105-0626512 | 88) | 105-1080181 |
| 76) | 105-0671579 | 89) | 105-1037601 |
| 77) | 105-1588252 |     |             |

144.  The eighty-nine loans listed in Paragraph 143 would not have closed without Carl Wright's fraudulent acts.

145.  The eighty-nine loans listed in Paragraph 143 resulted in more than $25,000,000 in damages claimed by the U.S. in its proof of claim in the TBW/HAM bankruptcy.

**Fraudulent Files and Claims**

146.   During their time at HAM/TBW, Relators observed dozens of examples of fraudulent files.

147.   The following fraudulent files formed a portion of the basis for the United States's proof of claim in the TBW/HAM bankruptcy:

| | | |
|---|---|---|
| 1) 461-3891422 | 15) | 105-2672272 |
| 2) 421-3830345 | 16) | 105-2648300 |
| 3) 106-1419075 | 17) | 105-2645849 |
| 4) 105-2815832 | 18) | 105-2632209 |
| 5) 105-2769364 | 19) | 105-2613353 |
| 6) 105-2743651 | 20) | 105-2600287 |
| 7) 105-2735258 | 21) | 105-2599058 |
| 8) 105-2729564 | 22) | 105-2597460 |
| 9) 105-2712625 | 23) | 105-2580167 |
| 10)    105-2698710 | 24) | 105-2563307 |
| 11)    105-2694363 | 25) | 105-2555822 |
| 12)    105-2681411 | 26) | 105-2544031 |
| 13)    105-2678223 | 27) | 105-2540306 |
| 14)    105-2673827 | 28) | 105-2509256 |

| 29) | 105-2507051 | 48) | 105-2328723 |
| 30) | 105-2473733 | 49) | 105-2327568 |
| 31) | 105-2473180 | 50) | 105-2326281 |
| 32) | 105-2459694 | 51) | 105-2326196 |
| 33) | 105-2450150 | 52) | 105-2320135 |
| 34) | 105-2447276 | 53) | 105-2320004 |
| 35) | 105-2433254 | 54) | 105-2317897 |
| 36) | 105-2419689 | 55) | 105-2310462 |
| 37) | 105-2413736 | 56) | 105-2309799 |
| 38) | 105-2410956 | 57) | 105-2302341 |
| 39) | 105-2403196 | 58) | 105-2296121 |
| 40) | 105-2399561 | 59) | 105-2292288 |
| 41) | 105-2380621 | 60) | 105-2291009 |
| 42) | 105-2370840 | 61) | 105-2288335 |
| 43) | 105-2344443 | 62) | 105-2285998 |
| 44) | 105-2344075 | 63) | 105-2285850 |
| 45) | 105-2338693 | 64) | 105-2284782 |
| 46) | 105-2334213 | 65) | 105-2282276 |
| 47) | 105-2329481 | 66) | 105-2281983 |

| | | | |
|---|---|---|---|
| 67) | 105-2279344 | 86) | 105-2217503 |
| 68) | 105-2279248 | 87) | 105-2214326 |
| 69) | 105-2278895 | 88) | 105-2210093 |
| 70) | 105-2277361 | 89) | 105-2202987 |
| 71) | 105-2271483 | 90) | 105-2197500 |
| 72) | 105-2269870 | 91) | 105-2182354 |
| 73) | 105-2267834 | 92) | 105-2181779 |
| 74) | 105-2265652 | 93) | 105-2172101 |
| 75) | 105-2262078 | 94) | 105-2159003 |
| 76) | 105-2258832 | 95) | 105-2147772 |
| 77) | 105-2255355 | 96) | 105-2140115 |
| 78) | 105-2249433 | 97) | 105-2137180 |
| 79) | 105-2247251 | 98) | 105-2125074 |
| 80) | 105-2243686 | 99) | 105-2124345 |
| 81) | 105-2241770 | 100) | 105-2121282 |
| 82) | 105-2237928 | 101) | 105-2116355 |
| 83) | 105-2237327 | 102) | 105-2116201 |
| 84) | 105-2234179 | 103) | 105-2111364 |
| 85) | 105-2221803 | 104) | 105-2109377 |

| | | | | |
|---|---|---|---|---|
| 105) | 105-2105107 | | 124) | 105-1983396 |
| 106) | 105-2102799 | | 125) | 105-1962373 |
| 107) | 105-2099995 | | 126) | 105-1959316 |
| 108) | 105-2094476 | | 127) | 105-1938418 |
| 109) | 105-2088855 | | 128) | 105-1936084 |
| 110) | 105-2076306 | | 129) | 105-1934626 |
| 111) | 105-2074777 | | 130) | 105-1932114 |
| 112) | 105-2072391 | | 131) | 105-1931330 |
| 113) | 105-2059582 | | 132) | 105-1926137 |
| 114) | 105-2046878 | | 133) | 105-1919556 |
| 115) | 105-2044927 | | 134) | 105-1917316 |
| 116) | 105-2040665 | | 135) | 105-1913813 |
| 117) | 105-2034568 | | 136) | 105-1913530 |
| 118) | 105-2032862 | | 137) | 105-1912853 |
| 119) | 105-2027199 | | 138) | 105-1908212 |
| 120) | 105-2020415 | | 139) | 105-1906648 |
| 121) | 105-2005713 | | 140) | 105-1905137 |
| 122) | 105-1985736 | | 141) | 105-1903963 |
| 123) | 105-1984152 | | 142) | 105-1901309 |

| | | | |
|---|---|---|---|
| 143) | 105-1901214 | 162) | 105-1823986 |
| 144) | 105-1898462 | 163) | 105-1822997 |
| 145) | 105-1891084 | 164) | 105-1810766 |
| 146) | 105-1889238 | 165) | 105-1806828 |
| 147) | 105-1888760 | 166) | 105-1799234 |
| 148) | 105-1887164 | 167) | 105-1793067 |
| 149) | 105-1879361 | 168) | 105-1788622 |
| 150) | 105-1865776 | 169) | 105-1787560 |
| 151) | 105-1861847 | 170) | 105-1776437 |
| 152) | 105-1860030 | 171) | 105-1762067 |
| 153) | 105-1850923 | 172) | 105-1754606 |
| 154) | 105-1850453 | 173) | 105-1754136 |
| 155) | 105-1850447 | 174) | 105-1750939 |
| 156) | 105-1845726 | 175) | 105-1749868 |
| 157) | 105-1844878 | 176) | 105-1745373 |
| 158) | 105-1843808 | 177) | 105-1745265 |
| 159) | 105-1841921 | 178) | 105-1743967 |
| 160) | 105-1840847 | 179) | 105-1738451 |
| 161) | 105-1833620 | 180) | 105-1737876 |

181) 105-1735382

182) 105-1730379

183) 105-1723168

184) 105-1720149

185) 105-1717562

186) 105-1716768

187) 105-1714403

188) 105-1710345

189) 105-1710193

190) 105-1709399

191) 105-1704429

192) 105-1704009

193) 105-1698897

194) 105-1697760

195) 105-1696736

196) 105-1696289

197) 105-1692353

198) 105-1691955

199) 105-1688883

200) 105-1687842

201) 105-1685421

202) 105-1675686

203) 105-1674537

204) 105-1674225

205) 105-1668452

206) 105-1667681

207) 105-1663166

208) 105-1661839

209) 105-1659155

210) 105-1640918

211) 105-1640086

212) 105-1639797

213) 105-1635800

214) 105-1635159

215) 105-1631793

216) 105-1626134

217) 105-1620306

218) 105-1613328

| 219) | 105-1610186 | 238) | 105-1505497 |
|------|-------------|------|-------------|
| 220) | 105-1609966 | 239) | 105-1486720 |
| 221) | 105-1608623 | 240) | 105-1475212 |
| 222) | 105-1592126 | 241) | 105-1469121 |
| 223) | 105-1589048 | 242) | 105-1469013 |
| 224) | 105-1588564 | 243) | 105-1450075 |
| 225) | 105-1588410 | 244) | 105-1449734 |
| 226) | 105-1588252 | 245) | 105-1441963 |
| 227) | 105-1584460 | 246) | 105-1440735 |
| 228) | 105-1581009 | 247) | 105-1439280 |
| 229) | 105-1569542 | 248) | 105-1420680 |
| 230) | 105-1569197 | 249) | 105-1405030 |
| 231) | 105-1567824 | 250) | 105-1395399 |
| 232) | 105-1566829 | 251) | 105-1395347 |
| 233) | 105-1552973 | 252) | 105-1388159 |
| 234) | 105-1537086 | 253) | 105-1387284 |
| 235) | 105-1526582 | 254) | 105-1354893 |
| 236) | 105-1519286 | 255) | 105-1331437 |
| 237) | 105-1510728 | 256) | 105-1330789 |

257)  105-1321344

258)  105-1317096

259)  105-1310154

260)  105-1305726

261)  105-1280545

262)  105-1257196

263)  105-1231731

264)  105-1228574

265)  105-1218706

266)  105-1215404

267)  105-1212942

268)  105-1208035

269)  105-1161000

270)  105-1151140

271)  105-1150927

272)  105-1148578

273)  105-1131123

274)  105-1129086

275)  105-1128328

276)  105-1126356

277)  105-1124411

278)  105-1120511

279)  105-1114601

280)  105-1110878

281)  105-1110616

282)  105-1096680

283)  105-1080181

284)  105-1064852

285)  105-1064318

286)  105-1062034

287)  105-1055946

288)  105-1054832

289)  105-1052507

290)  105-1037601

291)  105-1036548

292)  105-1035719

293)  105-1032808

294)  105-1028668

295) 105-1028435

296) 105-1026927

297) 105-1025031

298) 105-1020142

299) 105-1006729

300) 105-1004894

301) 105-0998806

302) 105-0995136

303) 105-0985008

304) 105-0984104

305) 105-0976534

306) 105-0969331

307) 105-0963813

308) 105-0956517

309) 105-0949052

310) 105-0931993

311) 105-0919776

312) 105-0918396

313) 105-0917752

314) 105-0903849

315) 105-0903826

316) 105-0897772

317) 105-0895771

318) 105-0859196

319) 105-0849465

320) 105-0840928

321) 105-0826747

322) 105-0806243

323) 105-0803825

324) 105-0802389

325) 105-0799300

326) 105-0794428

327) 105-0792173

328) 105-0789089

329) 105-0787013

330) 105-0783142

331) 105-0783005

332) 105-0780299

| | | | |
|---|---|---|---|
| 333) | 105-0774604 | 352) | 105-0652410 |
| 334) | 105-0736250 | 353) | 105-0647150 |
| 335) | 105-0730836 | 354) | 105-0639279 |
| 336) | 105-0721364 | 355) | 105-0634452 |
| 337) | 105-0720491 | 356) | 105-0632019 |
| 338) | 105-0715612 | 357) | 105-0626978 |
| 339) | 105-0713952 | 358) | 105-0626512 |
| 340) | 105-0695813 | 359) | 105-0622136 |
| 341) | 105-0686516 | 360) | 105-0615106 |
| 342) | 105-0683476 | 361) | 105-0608916 |
| 343) | 105-0682697 | 362) | 105-0607523 |
| 344) | 105-0680463 | 363) | 105-0606148 |
| 345) | 105-0678532 | 364) | 105-0597416 |
| 346) | 105-0671579 | 365) | 105-0596036 |
| 347) | 105-0662728 | 366) | 105-0564418 |
| 348) | 105-0661940 | 367) | 105-0553228 |
| 349) | 105-0660627 | 368) | 105-0551516 |
| 350) | 105-0653786 | 369) | 105-0544203 |
| 351) | 105-0652716 | 370) | 105-0534474 |

371)  105-0523509

372)  105-0512115

373)  105-0507867

374)  105-0507780

375)  105-0497920

376)  105-0485055

377)  105-0462264

378)  105-0457395

379)  105-0453539

380)  105-0437985

381)  105-0422599

382)  105-0419033

383)  105-0410693

384)  105-0396419

385)  105-0395669

386)  105-0384824

387)  105-0365621

388)  105-0338888

389)  105-0313863

390)  105-0297328

391)  105-0296713

392)  105-0229372

393)  105-0219206

394)  105-0197730

395)  105-0197356

396)  105-0190971

397)  105-0123919

398)  105-0099219

399)  105-0022652

400)  101-9923897

401)  101-9909461

402)  101-9761952

403)  101-9723137

404)  101-9696293

405)  101-9667093

406)  011-5512518

407)  011-5509685

408)  011-5433937

| | |
|---|---|
| 409)  011-5390854 | 420)  011-5201456 |
| 410)  011-5342690 | 421)  011-5166847 |
| 411)  011-5314631 | 422)  011-5166780 |
| 412)  011-5303849 | 423)  011-5151241 |
| 413)  011-5287933 | 424)  011-5119695 |
| 414)  011-5287898 | 425)  011-5030444 |
| 415)  011-5285593 | 426)  011-5027859 |
| 416)  011-5283694 | 427)  011-5019665 |
| 417)  011-5271513 | 428)  011-4999709 |
| 418)  011-5263115 | 429)  011-4962245 |
| 419)  011-5203095 | 430)  011-4913766 |

148.   The loans listed in Paragraph 147 were fraudulent in various respects.

149.   For example, in numerous other instances, Hicks and Moseley put loans into closing under a residential home loan, when the properties, in fact, were commercial.

150.   Other home loans (for example, the Edmondson loan) were closed as "owner occupied" when it was actually for an investment property.  In some instances, this led to a single person with five or six "owner occupied" properties.

151.   At one time, Hicks himself had five "owner occupied" properties.

152.   Although breathtaking in their number and scope, this Complaint sets forth only a sampling of the types of fraud that had been at work at HAM, including the following examples of false claims:

      a.   FHA No. 101-9696293, closed on February 28, 2001, claim submitted on November 18, 2008, $176,937.98 paid. Greg Hicks was the loan officer on this file. Hicks entered into LP that the borrower had $11,445.00 in assets, but the documentation shows that the borrower had $1,458 after closing, as shown in LP Finding G1.

      b.   FHA No. 105-1330789, closed on June 30, 2003, claim submitted on December 15, 2006, $193,095.50 paid. This file was a Refer risk class. The Hicks Team prepared the file and Carl Wright was the closing attorney. The borrower claimed child support, but provided no documentation as to how long such payment would continue. The borrower had no assets, no checking account, no savings account and an incomplete full Verification of Employment. The borrower received $1,500 in cash back on the HUD-1 settlement document, but there was no documentation supporting that she had spent any money on the property.

c.  FHA No. 105-1674225, closed on November 25, 2003, claim
submitted on May 14, 2008, $178,468.49 paid. Greg Hicks was the
loan officer for this file and Dennis Moseley signed for HAM. In
this case, HAM/TBW sought to obtain HUD insurance for the loan
more than sixty days after closing. Accordingly, they provided a
"late" letter showing that the borrowers had been timely with their
payments up to that point. The letter provided duly stated that the
borrowers had been timely with their previous six payments –
when in fact only two payments had been made. Moreover, the
direct deposit source changed on the borrower's statement just
prior to the loan application, but there are no W-2's or paystubs as
of or after the date of this direct deposit, indicating that the
borrower likely changed jobs. HAM increased the down payment
assistance amount three times, and correspondingly increased the
sale price.

d.  FHA No. 105-2234179, closed on February 28, 2005, claim
submitted on July 9, 2009, $182,916.84 paid. This file was a Refer
risk class and Greg Hicks was the loan officer. The borrower had
no assets beyond gift documentation for down payment assistance,

no savings account, approximately $200/month in income after bills, and bad credit history. Moreover, the appraisal states that the property is in a flood zone, but no flood insurance was purchased for the property or appears on the HUD, and the cost of flood insurance was not factored into the ratio.

e. FHA No. 105-2282276, closed on March 18, 2005, claim submitted on April 7, 2009, $192,943.59 paid. Greg Hicks himself is listed as the loan officer on this file, and the closing attorney was Carl Wright. The application was entered into the DU by the loan officer, Greg Hicks, indicating that the borrower had four months of reserves which remained a part of the approval, but there was absolutely no supporting documentation in the file. Moreover, this file was processed as an owner-occupied property pursuant to HUD 4155, Section 1-1, but pay-stubs, including state income tax deductions, show that the borrower lived and worked in New Jersey. The file included a note from HAM employee Missy Hall suggesting that the borrower was transferring, but no such documentation verifying a transfer was in the file. Moreover, the property was in Snellville, Georgia and the nearest office of the

purchaser's employer was in Augusta, Georgia, over 135 miles away.

f.  FHA No. 105-2597460, closed on February 16, 2006, claim paid in the amount of $193,923.98. The file was prepared by the Hicks Team. The Mortgage Credit Analysis Worksheet ("MCAW") has no comments and is unsigned. Large deposits in the borrower's file had no documentation of their source. The file documentation actually shows that borrowers' income was $400 less than shown on the unsigned MCAW. The borrowers already had an FHA loan, with no documentation as to exceptional circumstances that would qualify them for a second FHA loan. The borrowers had just refinanced the first FHA loan in November 2005, for which they would have had to remain owner-occupiers of the property.

g.  FHA No. 105-2267834, closed on March 23, 2005, claim submitted on October 9, 2008, $181,119.84 paid. The loan officer on this file was Amy Hager, a member of the Hicks team, and Carl Wright was the closing attorney. The LP does not match the borrowers' documented income. The co-borrower was a 1099 employee with no tax returns in the file.

h.  FHA No. 105-2580167, closed on February 7, 2006, claim paid in the amount of $233,135.20. This Hicks Team file was a Refer risk class, but had no comments on the MCAW. The borrower had multiple large debts in collections that needed to be paid off. Moreover, there is no documentation as to the source of the borrower's supposed assets or deposits. The file was missing all income documents including thirty-day pay stubs and W-2s.

i.  FHA No. 105-1709399, closed on January 8, 2004, claim submitted on April 25, 2008, $206,992.26 paid. This file was a Refer risk class. Greg Hicks was the loan officer and Carl Wright was the closing attorney. Because the borrower did not have any credit history or credit score, he was supposed to have three "alternative" indicators of credit. The first was his power bill, but he provided only three months of history and had been late on two of the three payments. The second alternative credit indicator was a Verification of Rent, but the borrower paid an individual landlord and provided no proof that he had made timely payments. In this case, the seller also paid off the borrower's debts that were in collections.

j.  FHA No. 105-2403196, closed on July 1, 2005, claim submitted on February 5, 2009, $206,874.71 paid. This file was prepared by the Hicks Team. These borrowers had a preexisting FHA loan, and had been delinquent on at least one payment on that loan, with no documentation as to exceptional circumstances that would qualify them for a second FHA loan as per HUD 4155 Chapter 1, 1-1 through 1-2. HAM calculated the borrowers' debt without including this first mortgage. A letter in the file stated that the first FHA loan now belonged to the borrower's ex-spouse as the result of a divorce, but there was neither a divorce decree or assumption agreement and deed as part of the file. There was no documentation of any assets in this file beyond gift documentation for down payment assistance.

k.  FHA No. 105-387284, closed on July 11, 2003, claim submitted on January 18, 2005, $4,837.00 paid. This file was a Refer risk class and Greg Hicks was the loan officer. The appraisal on this file was almost certainly falsified: this mobile home was purchased in August of 2002 for $49,000, but was sold in this transaction for $134,000 in June 2003. The borrower had no assets or reserves.

The borrower had no checking and no savings. Even though no assets were shown, earnest money was supposedly paid (without documentation).

l.  FHA No. 105-2410956, closed on August 3, 2005, claim submitted on February 28, 2008, $188,246.14 paid. The MCAW was not signed. There was no thirty day paystub – in fact, the file indicates that the borrower had just started a new job. The Verification of Employment was incomplete, but still used to calculate income. There were no assets in the file. There is no documentation to show that the borrower had any money at all. The borrower was given a $500 earnest money credit, but there was no documentation that the borrower ever paid any earnest money. In fact, according to the HUD-1 settlement document, the borrower received the $500 back at closing.

m. FHA No. 105-1331437, closed on March 1, 2004, claim submitted on April 25, 2008, $178,981.60. The loan officer on this loan was Lisa Stocks, a member of the Hicks Team. The borrowers' debt calculation failed to include the co-borrower's student loans, with no documentation that they were in deferral. Moreover, the file

50

contained insufficient information to calculate the co-borrower's income - although the co-borrower was paid differently from month to month, ranging from as low as $400 to as high as $1300, the file indicated that he regularly earned $1,300 per month. Finally, there is no indication that the co-borrower, who is a member of the military, even knew that his credit was being used to purchase the property because a power of attorney used.

n. FHA No. 105-2288335, closed on March 31, 2005, claim submitted on October 9, 2008, $181,884.95 paid. The borrower's income was calculated using a single paystub and a W2 from 2003. There is no source documentation for a large ($3,600) deposit.

o. FHA No. 105-2338693, closed on May 25, 2005, claim submitted on March 24, 2009, $220,044.16 paid. All of the documents in this Hicks Team file indicate that the borrower lived and worked in Florida at the time of closing. Nevertheless, it was processed as an owner-occupied property in Georgia in violation of HUD 4155, Section 1-1.

p. FHA No. 105-0507867, closed on April 26, 2002, claim submitted on March 17, 2008, $182,440.14 paid. This file included income

from separate jobs at Taco Bell and McDonald's, neither of which the borrower had had for two years. Using only one income makes the ratios too high to qualify for the loan. Moreover, the W-2s in the file were not from either McDonald's or Taco Bell, and the employment dates did not match the borrower's representations.

q. FHA No. 105-2743651, closed on July 31, 2006, claim submitted on October 8, 2008, $192,531.68 paid. This file was a Refer risk class, but the paperwork clearly showed that the borrower had five large debts in collection, bad credit. Moreover, although there was no documentation showing that the borrower spent any money for the purchase of the property, he was paid money on the HUD-1 settlement document.

r. FHA No. 105-1891084, closed on April 28, 2004, claim submitted on December 5, 2008, $182,191.23 paid. There is no documentation or attempted explanation as to how the co-borrowers are related. One borrower is married, and the other is single. They live at different addresses. There was a fraud alert issued with a co-borrower's credit report that raised questions as to the validity of her social security number that was never cleared.

The co-borrowers applied jointly and had their credit pulled jointly. There was no "borrower" identifying information on the bank statements, yet assets were used for down payment. Most income and asset documents were faxed from an unidentified source. All evidence points to this being a straw man purchase.

s. FHA No. 105-1860030, closed on March 30, 2004, claim submitted on November 6, 2007, $202,941.02. This file was a Refer risk class and contained a large deposit with no documentation to indicate the source. This borrower had five instances of checks returned for non-sufficient funds with no explanation. There are no paystubs in the file, and the borrower's income and deposits do not match.

t. FHA No. 105-1710193, closed on December 30, 2003, claim submitted on April 1, 2009, $184,491.44 paid. This borrower lacked a credit history or credit score. The borrower provided a Verification of Rent with no proof of timely payments. When calculating the front ratio (mortgage payments to monthly income), city taxes were included at $1/month instead of the $55/month that the city charged at that time. The borrower had only $502 in his

checking account, making it impossible for him to have paid the $1,000 earnest payment credit that is recorded on the HUD-1 (but not documented). Notably, the borrower then received $793 cash back at closing.

u. FHA No. 105-1696289, closed on June 30, 2003, claim submitted on December 14, 2006, $197,497.14 paid. Five large deposits have no documentation as to their source. Two years of employment was not documented and the full Verification of Employment was not signed or dated by the employer.

v. FHA No. 105-1879361, closed on April 22, 2004, claim submitted on December 13, 2007, $177,882.51 paid. One of the co-borrowers used her maiden name on all of the application documents and for the credit report. She had no credit history and a fraud alert was issued with the borrower's credit report. There is no documentation indicating that this alert was cleared. The borrower was asked by HAM to sign her maiden name to all of the documents even though she had been married for more than six months prior to the application. Moreover, because she had no credit or assets, she

added nothing to the application, indicating that this was likely a straw buyer.

w. FHA No. 105-2237928, closed on February 11, 2005, claim submitted on March 7, 2006, $204,991.97 paid. This file was a Refer risk class. The seller of the property and the loan officer for the borrower's file were the same person. The file shows that the borrower had unpaid collections. This file had a single day's printout with a single large deposit rather than a sixty day statement, and no documentation indicating the source of the deposit.

x. FHA No. 105-2147772, closed on December 15, 2004, claim submitted on February 26, 2008, $181,265.77 paid. This file was a Refer risk class. The file shows a front ratio of 42. The borrower also was required to have $3,445 at closing, but there was only $282 verified by the file.

y. FHA No. 105-2074777, closed on September 29, 2004, claim submitted on November 12, 2008, $217,056.42 paid. This file also contained a large, un-sourced deposit. The borrower also stated

that he used a lease to offset the current mortgage payment, but the file contained no lease.

153.   The loans listed in Paragraph 147 should not have been federally insured because they did not meet program guidelines.

154.   Nonetheless, the loans listed in Paragraph 147 were federally-insured and claims for payment were made when the loans defaulted.

155.   The loans listed in Paragraph 147 would not have been federally-insured without the actions of Greg Hicks.

156.   The loans listed in Paragraph 147 would not have been federally-insured without the actions of Dennis Moseley.

157.   The loans listed in Paragraph 147 would not have been federally-insured without the actions of Carl Wright.

158.   The loans listed in Paragraph 147 would not have been federally-insured without the actions of HAM.

159.   The loans listed in Paragraph 147 would not have been federally-insured without the actions of TBW.

## COUNT I

## False Claims Act Violations
## 31 U.S.C. § 3729

160.   The allegations of the preceding paragraphs are incorporated herein by reference.

161.   The Defendants engaged in a pattern of mortgage fraud, by which they submitted fraudulent files to be insured by the United States government.

162.   When the purchasers defaulted on these government-insured loans, then Defendants, individually or by and through their officers, agents, supervisors and employees,   presented or caused to be presented to the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

163.   The Defendants, individually and/or by and through their officers, agents, supervisors, and employees, knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(2).

164.   In presenting or causing to be submitted claims as set forth above, Defendants acted "knowingly" as that term is defined in 31 U.C.S. § 3729, in that they acted in deliberate ignorance or in reckless disregard of the truth or falsity of the information submitted in connection with the claims.

165.  The Defendants, individually and/or by and through their officers, agents, supervisors, and employees, conspired to defraud the Government by getting a false or fraudulent claim allowed or paid in violation of 31 U.S.C. § 3729(a)(3).

166.  The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial.  The United States is entitled to this sum as reimbursement for monies obtained by Defendants for fraudulent claims submitted to the United States.

167.  The United States is entitled to three times the total damages sustained as a result of Defendants' violations of 31 U.S.C. § 3729(a)(1) – (3).

168.  The United States is entitled to a civil penalty of between $5500 and $11,000 as required by 31 U.S.C. § 3729(a) for each of Defendants' false and/or fraudulent claims.

169.  Relators are entitled to reasonable costs and attorneys' fees pursuant to 31 U.S.C. 3730(d)(1).

## COUNT II
### False Claims Act Retaliation Against Kennedy

170.  The allegations of the preceding paragraphs are incorporated herein by reference.

171.  As set forth at length above, Kennedy was terminated from her employment for investigating fraudulent practices at HAM and TBW, in violation of 31 U.S.C. § 3730(h).

172.  Even after her termination, Kennedy has been subjected to ongoing harassment and retaliation in violation of 31 U.S.C. § 3730(h).

173.  Money rightfully due to Kennedy under her contract with HAM/TBW (including vacation pay and bonus pay) has not been paid in retaliation, in violation of 31 U.S.C. § 3730(h).

174.  Pursuant to this statute, Kennedy is entitled to be reinstated at the same level of seniority she would have enjoyed absent Defendants' illegal acts; an award of two times the amount of back pay (including bonus) plus interest; compensation for special damages; and litigation costs and reasonable attorneys' fees.

## COUNT III
### Retaliation as Against Friddle

175.  The allegations of the preceding paragraphs are incorporated herein by reference.

176.  As set forth at length above, Friddle was terminated from her employment for investigating fraudulent practices at HAM and TBW, in violation of 31 U.S.C. § 3730(h).

177.   Pursuant to this statute, Friddle is entitled to be reinstated at the same level of seniority she would have enjoyed absent Defendants' illegal acts; an award of two times the amount of back pay (including bonus) plus interest; compensation for special damages; and litigation costs and reasonable attorneys' fees.

## COUNT IV
## Breach of Contract

178.   In September 2005, Kennedy was heavily recruited by SunTrust to join their practice.

179.   Hicks begged Kennedy not to leave HAM.  He offered to promote her to vice president of operations, to increase her compensation, to award her sales options, and to pay her bonuses.

180.   Kennedy accepted these terms and refused the job at SunTrust.

181.   Hicks did change Kennedy's title to vice president.   However, nobody, including Hicks, HAM, and TBW, ever paid her the agreed upon bonuses (although they were acknowledged by Hicks as being owed) or awarded her the sales options.

182.   Defendants breached this employment contract with Kennedy by failing to pay bonuses and failing to award sales options.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray for Judgment against the Defendants, and each of them:

(a)    Ordering Defendants to pay the United States three times its actual damage resulting from each of the false claims presented or caused to be presented plus interest; and to pay Relator her attorney's fees and costs;

(b)    Ordering Defendants to pay the United States government a civil penalty of $11,000 as required by law to be assessed against Defendants for each of the false claims presented or caused to be presented;

(c)    Awarding Relators not less than 25% nor more than 30% of the proceeds of this action or the settlement of any such claim;

(d)    Ordering Defendants to reinstate Relators with the levels of seniority they would have enjoyed but for the retaliation; pay two times the amount of back pay due to Relators plus interest; compensate Relators for special damages, litigation costs and reasonable attorneys' fees;

(e)    Awarding Relator Kennedy damages for Defendants HAM, TBW, and Hicks's breach of contract; and

(f)    granting such other relief as the Court may deem just and proper.

Respectfully submitted this 23rd day of April, 2012.


_/s/ Julie Bracker_____
Julie Keeton Bracker
Georgia Bar No. 073803
Julie@BBV-law.com
Mike Bothwell
Georgia Bar No. 069920
Mike@BBV-law.com
Attorneys for Relators



304 Macy Drive
Roswell, GA  30075
(770) 643-1606 (Telephone)
(770) 643-1442 (Fax)