# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. COMFORT FRIDDLE | ) | |
| and STEPHANIE KENNEDY | ) | |
| | ) | |
| Relators, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:06-CV-3023-JEC |
| TAYLOR, BEAN & WHITAKER | ) | |
| MORTGAGE CORPORATION; | ) | |
| HOME AMERICA MORTGAGE, | ) | |
| INC.; GREGORY HICKS; CARL | ) | |
| WRIGHT; and JOHN DOE | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT
## AGAINST DEFENDANT GREGORY HICKS

Mike Bothwell
Julie K. Bracker
Jason Marcus

BOTHWELL
BRACKER
ATTORNEYS AT LAW

304 Macy Drive
Roswell, Georgia  30076
Phone:  (770) 643-1606
Fax: (770) 643-1442
Jason@WhistleblowerLaw.com

Relators Comfort Friddle and Stephanie Kennedy move the Court pursuant to Fed. R. Civ. P. 56 to enter summary judgment in favor of themselves and the United States and against individual defendant Gregory Hicks in the above-captioned matter.[1]

## I.  FACTUAL BACKGROUND

Home America Mortgage, Inc. ("Home America") is a defunct mortgage company that, prior to bankruptcy, originated thousands of loans through various government-insured programs, resulting in damages to the United States that HUD estimated at $131,000,000. Relators' Statement of Undisputed Material Facts ("SOF") at 1. Home America's loans were underwritten by Taylor, Bean &

---

[1] As the Court is aware, the United States is pursuing these claims (and many others) against the corporate defendants. The intervened portion of the case has been stayed through at least October 7, 2013 to enable the Government and the bankrupt entities to liquidate the claims. Accordingly, this Motion is only as against Mr. Hicks, the architect of the fraud, who is jointly and severally liable for the enormous fraud he caused to be perpetrated on the Government.

Pursuant to subpoena, HUD has produced the files for the loans that it used in the bankruptcy proceedings to support its proofs of claim. SOF 32-35. In other words, HUD believes that the misstatements and errors in those files warrant payment of more than $300,000,000 in damages.

Relators have herein identified 25 files illustrative of the types of false claims that the individual defendants submitted or caused to be submitted, and will explain why summary judgment is warranted as to each such file. Together, these 25 files total $13,495,669.05 in damages – a drop in the bucket of actual damages.

Whitaker Mortgage Corporation ("Taylor Bean"). SOF 2. Taylor Bean is in bankruptcy as well, and the Government has filed a proof of claim in that action for nearly $200,000,000. SOF 3. Taylor Bean's principal owner, Lee Farkas, was convicted of mortgage fraud on June 15, 2010, and is serving a 38-year prison sentence. SOF 4.

Greg Hicks owned 90% of Home America and was its principal operator, with Taylor Bean and Lee Farkas owning the other 10%.[2] SOF 5, 6. He also headed up the "Hicks Team," a sub-group at Home America made up of Hicks's hand-picked loan officers, which Hicks boasted could "get any loan into closing." SOF 7.

Defendants' scheme was simple: trick the Government into insuring bad loans by hiding or falsifying data material to the borrower's ability to repay or eligibility. When the loans defaulted, the burden of the mortgage fell on the Government rather than on the mortgagor. In this fashion, Hicks pawned off hundreds of millions of dollars in bad loans onto the federal government.

Relators filed this action on December 12, 2006 and for several years thereafter assisted with the Government's subsequent investigation, including

---

[2] Hicks sold his shares in Home America back to Taylor Bean on January 6, 2009 for $20,894,448 in consideration. SOF 8.

interviews with the United States attorney's office, the FBI, and representatives from Freddie Mac. Dkt. 1. On August 3, 2009, the FBI raided the corporate headquarters of Taylor Bean in Ocala, Florida. SOF 26. Shortly thereafter, on August 24, 2009, Taylor Bean declared bankruptcy. SOF 27. On November 25, 2009, Home America followed suit. SOF 28. The U.S. government filed a $178 million proof of claim against Taylor Bean and a $131 million proof of claim against Home America for the very loan files at issue here. SOF 29.

On September 14, 2010, the Government intervened against the corporate defendants [Dkt. 49], and it is negotiating with counsel for the bankrupt entities to liquidate these and other claims against the corporate defendants. Dkt. 100.

*The Loan Application Process*

The loans in question in this action were processed as follows. In order to qualify for a HUD guarantee, borrowers must meet criteria established by an individual program (such as Freddie Mac, Fannie Mae, the VA, etc.). SOF 9. As a first step, Home America employees input borrower/property information into an application engine to demonstrate that the proposed loan qualified for the

selected program.[3] SOF 10. The application engine evaluated the loan based on factors like credit score, debt-to-asset-ratio, and income. SOF 11. This presented the first opportunity for fraud: as shown below, Hicks entered (or had others enter on his behalf) false information into the application engine. SOF 12, 70.

After the data was entered, the application was either approved, or the application engine provided a list of "approval conditions" that had to be met. SOF 13. In theory, the loan team then worked to meet those conditions, e.g., securing evidence to support claimed assets or verifying employment. SOF 14. As shown below, at Home America, this created two more opportunities for fraud. Sometimes the conditions were ignored. In other instances, requested documentation was altered or even created whole cloth. SOF 15.[4]

On higher risk loans, the application engine returned a "Refer risk class" designation, meaning it identified weaknesses in the borrower's credit and/or capacity to repay and rejected the loan. SOF 16. In some cases, this occurred simply for lack of data, such as cash-buyers without bank accounts or buyers

---

[3] For Freddie Mac loans, for example, the application engine is "Loan Prospector" or "LP." For Fannie Mae mortgages, the application engine "Desktop Underwriter" or "DU" is used. SOF 10.

[4] Dennis Moseley, former president of Home America, admitted that it is fraud to manufacture documents or alter documents for a mortgage loan. SOF 93.

with no credit history. SOF 17. In those rare cases, the safeguards could be manually overridden within very strict guidelines by having a Federal Housing Administration ("FHA") Direct Endorsement underwriter analyze the entire loan application to determine if the mortgage qualified for FHA endorsement in accordance with HUD's Mortgage Credit Analysis Handbook, HUD 4155.1 ("HUD 4155," Exhibit K herein). *Id.*

At Home America, this was a fourth method of fraudulently closing a loan. Hicks instructed underwriters to ignore these guidelines. SOF 18-23. When Relator Kennedy refused to do so, Hicks used other underwriters to close the loans. SOF 18-19. Eventually, Hicks simply overrode the safeguards by using Kennedy's underwriter log-in without her permission. *Id.*

*Home America is the Lender, Taylor Bean is the Sponsor*

A third-party originator ("TPO")[5] is an entity that is not itself certified as a Direct Endorsement Lender ("DE Lender"), but which originates FHA loans as a DE Lender for an FHA-approved sponsoring mortgagee. 24 C.F.R. 202.8(a). Home America was a TPO; Taylor Bean was its sponsor. SOF 91. Home America

---

[5] "A third-party originator… may not purchase or hold loans but is authorized to originate… mortgage loans for sale or transfer to a sponsor… subject to the sponsor determining that the third-party originator has met the eligibility criteria of paragraph (b) of this section." 24 C.F.R. 202.8(a).

not only originated loans, it also funded them from a line of credit. SOF 97. When the loan closed, Home America owned it. *Id*. Approximately ten days after closing, Home America would sell the loan to Taylor Bean, who had agreed to purchase it in advance. *Id*. In other words, the two companies worked in tandem: Home America performed the origination, processing, and initial lending, and Taylor Bean performed the underwriting, purchased the loan from Home America, and submitted the application for mortgage insurance.

Because it profited from every loan that closed (SOF 94), and because the loans were federally-insured and sold to Taylor Bean, Home America had incentive to do whatever necessary to get even the worst loans closed:

> [By] lending on an interim basis, [the defendant originator] was able to make considerable profits with very little risk and with a limited use of capital. In the nature of economic life, once FHA mortgage insurance has been procured only low down payments are required, a permanent lender is readily available to purchase the mortgage from the interim lender, and if the mortgage goes into foreclosure the interim lender knows that the FHA will pay virtually full value on the outstanding loan so that there is no great risk of foreclosure. The risk is, in fact, for all practical purposes after assorted points are charged, close to zero.

*U.S. v. Bernstein*, 533 F.2d 775, 781 (2d Cir. 1976); *see also LaBoy v. Better Homes Depot, Inc.*, 2004 U.S. Dist. LEXIS 30091, at *4 (E.D.N.Y. July 14, 2004) ("If the FHA secures a loan, the FHA insurance becomes the security interest and the lender's incentive to have an honest valuation of property as a way to protect its own

loan decreases."). By blatantly disregarding regulations for government-insured programs, Hicks successfully perpetrated a costly fraud on the U.S. taxpayers.

## II. STANDARD OF REVIEW

Summary judgment must be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "After the movant has carried his burden, the nonmoving party is then required to 'go beyond the pleadings' and present competent evidence designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* If the evidence that the nonmovant presents, however, is "not significantly probative" or "merely colorable," summary judgment may be granted. *Id.* at 249. Rule 56(d) allows a court to grant partial summary judgment, thereby reducing the number of facts at issue in a trial. Fed. R. Civ. P. 56(d).

## III. ARGUMENT

Taylor Bean could not underwrite a bad loan unless Home America originated a bad loan. The importance of this fact cannot be overstated: if Greg

Hicks operated an honest and competent loan origination company, there would have been no bad loans for Taylor Bean to underwrite. Taylor Bean had no incentive to create or submit false or fraudulent statements for loans that were eligible to be federally-insured on their own merits. Every bad loan at issue here must have started with, at the least, gross negligence on the part of Greg Hicks.

As discussed below, Hicks and his former company are liable for originating false loans. Home America created false loan files and the fraudulent documentation contained therein, for the sole purpose of filling Hicks's pockets. Hicks is liable under the False Claims Act for causing false loans to be submitted pursuant to § 3729(a)(1), causing to be made or used false records to get false claims paid pursuant to § 3729(a)(2), and conspiring with Taylor Bean and the other defendants to defraud the Government by getting bad loans insured, pursuant to § 3729(a)(3).

## A. Defendants Had A Duty To The Government

Home America was the FHA-approved lender for the files at issue in this case.[6] SOF 106-107. As such, it had statutory, regulatory, and common law obligations to "turn square corners when they deal with the Government" by

---

[6] More than half of Home America's home loans were government-insured. SOF 80.

performing sufficient due diligence when originating and closing Government insured loans. *See Rock Island, A. & L. R. Co. v. U.S.*, 254 U.S. 141, 143 (1920); SOF 92, 106. The DE Lender process and the responsibilities of the DE Lender are detailed in recent opinions with allegations similar to the instant action:

> FHA provides mortgage insurance on loans made by approved lenders throughout the United States, including mortgages on single family housing. FHA mortgage insurance provides lenders with protection against losses when mortgagors default. FHA approved lenders, known as Direct Endorsement Lenders, are required to ensure that loans meet strict underwriting criteria in order to be eligible for insurance, including income verification, credit analysis, and property appraisal. By reducing risk to lenders, the FHA insurance program stimulates lenders to make home loans.
>
> Direct Endorsement Lenders are required to comply with pertinent FHA Handbooks and Mortgagee Letters, including handbooks issued by the Department of Housing and Urban Development (HUD Handbooks). Further, Direct Endorsement Lenders must maintain a functioning quality control program that complies with FHA standards. Direct Endorsement Lenders and their underwriters are required to certify to FHA that each loan complies with FHA requirements in order to obtain FHA mortgage insurance.

*U.S. v. Bank of Am.*, 2013 U.S. Dist. LEXIS 18527, at *9-10 (D.D.C. Feb. 12, 2013)(internal citations omitted); *see also U.S. v. Wells Fargo Bank*, 2013 U.S. Dist. LEXIS 136539, at *5-8 (S.D.N.Y. Sept. 24, 2013); *accord* SOF 77, 92, 106.[7]

---

[7] Taylor Bean, as the sponsor, "is responsible for compliance with FHA requirements in all aspects of an FHA loan transaction, whether performed by

A DE Lender owes the FHA a common law and regulatory duty of due diligence, requiring that it "exercise the same level of care which it would exercise in obtaining and verifying information for a loan" that is not FHA-insured. *Wells Fargo*, at *6 ("HUD requires Direct Endorsement Lenders to conduct due diligence before issuing FHA-insured mortgages.") (*quoting* 24 C.F.R. § 203.5(c)); *see also* SOF 92 (Moseley acknowledging responsibility to perform "sufficient due diligence"); 48 Fed. Reg. 11928, 11932 (Mar. 22, 1983) ("The duty of due diligence owed [HUD] by approved mortgagees is based not only on these regulatory requirements, but also on civil case law."); *id.* ("HUD considers the exercise of due diligence an affirmative duty on the part of mortgagees participating in the program."); *Bernstein*, 533 F.2d at 797 ("The entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the

---

the sponsoring lender or the TPO" and shall ensure that Home America adheres "to all applicable federal… requirements governing their FHA loan origination and processing activities." HUD 4155.2, Lender's Guide to the Single Family Mortgage Insurance Process, 2.B.6.d-e. Although the HUD Handbook explains that the sponsor is **also** liable for the actions of the TPO, it does not excuse the TPO from liability for its own actions. Like a parent who is legally responsible for the acts of his child, or a corporate entity that is legally responsible for the acts of its origination division, both the sponsor and the originator are liable for the acts of the originator.

initial judgment to lend in good faith after due consideration of the facts found."). Home America **and Greg Hicks personally**, as corporate officer and as leader of the Hicks Team (discussed below), had duties "to investigate" and "to use good credit judgment" when submitting loans for federal insurance. *Id.*

Specifically, HUD regulations require that "[a]ll FHA approved mortgagees, including loan correspondents, must implement and continuously have in place a Quality Control Plan for the origination and/or servicing of insured mortgages as a condition of receiving and maintaining FHA approval." HUD 4060.1, Mortgagee Approval Handbook, 7-1.[8] Stated goals of the quality control plan include to "[a]ssure compliance with FHA's and the mortgagee's own origination or servicing requirements throughout its operations" and to "[g]uard against errors, omissions and fraud." *Id.* at 7-2.

It is indisputable that at all times relevant to this action, Home America

---

[8] Insofar as Hicks contends that Home America engaged Taylor Bean to perform its Quality Control function, FHA guidelines clearly state that utilizing an outside firm as quality control in no way relieves Home America of liability: "A mortgagee contracting out any part of its Quality Control function is responsible for ensuring that the outside source is meeting HUD's requirements." *Id.* at 7-3.2. Moreover, Hicks and Home America annually submitted declarations to auditors which stated "We acknowledge **our responsibility** for the design and implementation of programs and **controls to provide reassurance that fraud is prevented and detected**." SOF 30 (emphasis added).

was the FHA-approved mortgagee on the fraudulent loans identified in this matter. SOF 106-107. Furthermore, it is indisputable as a matter of law that FHA approved mortgagees, including Home America, were obligated to abide by HUD's rules and regulations. SOF 77, 92, 106.[9] In fact, as detailed below, Home America expressly certified to having performed the due diligence required by HUD when originating their loans.

The HUD/VA Addendums to the Uniform Residential Loan Applications (HUD-92900-A), which were submitted as part of the loan application packages to the Government, state that Home America is the lender and Taylor Bean is the sponsor.[10] SOF 112. A representative for Home America – usually the loan officer, and sometimes Greg Hicks himself – signed a "Lender's Certification" that certified, *inter alia*, that (a) the information in the loan application was true to the best of Home America's knowledge and belief; (b) the verifications of employment and deposits "were requested and received" by Home America and are true to the best of Home America's knowledge and belief; and (c) the

---

[9] Even if Greg Hicks were to deny that these regulations apply to Home America, this is a legal question for the Court to decide and not a question of fact.
[10] Exhibit L, HUD006635-HUD006638, is an example of one of the HUD/VA Addendums, taken from loan file FHA No. 105-1674225. Every file includes an Addendum, and every Addendum includes the language cited herein.

proposed loan "meets the income and credit requirements of the governing law in the judgment" of Home America. SOF 113. These certifications are expressly made "to induce [the VA or HUD] to issue a firm commitment for mortgage insurance." *Id*.

The HUD/VA Addendums also include a second Lender's Certificate, signed by the same individual which states, *inter alia*, the following:

> The undersigned certifies that to the best of its knowledge: (a) The statements made in its application for insurance and in this Certificate are true and correct…; (e) No charge has been made to or paid by the borrower except as permitted under HUD regulations; [and] the undersigned, as authorized representative of [Home America Mortgage, Inc./Taylor Bean & Whitaker Mortgage Corp.], mortgagee at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

SOF 114;[11] *see also Wells Fargo*, at *7.[12]

---

[11] On the second page of all the Addendums, Home America is listed as the lender, and Taylor Bean is listed as the sponsor, but there is no consistency to signature for these certifications. For example, on the Addendum to FHA No. 105-1674225, Greg Hicks signed both certifications, and the lender is listed on both certifications on behalf of Home America. SOF 38. On other files, such as FHA 105-2234179, a mortgage officer from Home America signed the first certification on behalf of Home America and the second certification on behalf of Taylor Bean as the lender (with Home America crossed out as the lender). SOF 40. On yet other files, such as FHA 105-387284, the post-closing manager for Taylor Bean signed the first certification on behalf of Home America and the

These certifications and duties extend to Hicks, in his official capacity as the principal corporate officer for Home America, and in his individual capacity as the loan officer on many of the fraudulent loans. *See Bernstein*, 533 F.2d at 797 ("The trial court in our view could have charged that [the FHA mortgagee] had commensurate duties as a matter of law, that [the] principal corporate officer did also, and that [the] officer in charge of processing mortgage loans and signing the mortgagee's necessary certification of the application as 'true and complete to the best of its knowledge and belief' did likewise."). Violation of these duties by Home America and Greg Hicks resulted in the submission of false claims to the Government and constitutes a violation of the FCA.

## B. Fraudulent Origination Of Loans Violates Defendants' Duty To The Government

The purpose of the False Claims Act is "broadly to protect the funds and property of the Government from fraudulent claims, regardless of the particular

---

second certification on behalf of Taylor Bean (with Home America crossed out as the lender). SOF 46.

[12] "After each loan is issued, the lender must make several certifications regarding its compliance with HUD regulations. For example, if the loan was underwritten using an FHA-approved automated underwriting system, the lender must certify to the integrity of the data inputted into the system to determine the quality of the loan, and it must certify that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id.* (internal quotations omitted).

form, or function, or the Government instrumentality upon which such claims were made." *Rainwater v. U.S.*, 356 U.S. 590, 592 (1958). The Act "was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *U.S. v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). Specifically, a person is liable under the False Claims Act if he, *inter alia*:

> (1) Knowingly presents or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or]

> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; …

31 U.S.C. § 3729(a) (2006), amended by Pub. L. No. 111-21, § 4(d), 123 Stat. 1617, 1624-25 (2009).

In the context of federally-insured mortgages, when a claim is submitted on a federally-insured mortgage, a defendant who knowingly created (or caused to be created) false statements or records in order to deceive HUD (or other federal agencies) into insuring the loan has violated 31 U.S.C. § 3739(a)(2). Once unqualified borrowers default on their mortgages and HUD is required to make payments on the loans, the same actions give rise to liability under § 3739(a)(1) because at that point (if not before) "the fraudulent course of conduct pursuant to which the mortgages were approved emerge in 'full vigor' and become a part

15

of those claims, which therefore constitute false claims within the meaning of the False Claims Act." *U.S. v. Island Park*, 888 F. Supp. 419, 440 (E.D.N.Y. 1995) (*citing U.S. v. McNinch*, 356 U.S. 595, 599 (1958)). Because the loans were obtained originally through false statements and fraudulent conduct, each claim submitted under those loans constitutes a false claim. *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943); *Wells Fargo*, at *82 ("[T]he Government alleges that Wells Fargo originated loans that did not meet the requirements upon which FHA insurance — and thus FHA insurance payments — are conditioned, but nevertheless submitted certifications to HUD stating that they did. If true, such conduct constitutes a legally false certification cognizable under the FCA.").

As HUD has already attested by using these files as the basis of its damages calculation, the false statements in the loan applications were "critical to eligibility for a loan" and bore "upon the likelihood of the applicant's meeting mortgage payments." *U.S. v. Hill*, 676 F. Supp. 1158, 1181 (N.D. Fla. 1987); *see also Wells Fargo*, at *85-86; SOF 106-108. Here, Defendants submitted (and caused to be submitted) loan applications to HUD for insurance that they **knew** did not meet eligibility because they would not have met HUD conditions were it not for

the inclusion of fraudulent information.[13]

In addition to the false certifications of compliance made on each of the loans, Hicks and Home America fraudulently induced the Government into providing loan guarantees by providing false information to the Government. *See Wells Fargo*, at *77-78 ("courts have repeatedly held that the 'use of fraudulent information to induce the Government to provide a loan guarantee' or other contract 'constitutes a false claim under the FCA'"; citing Ninth, Fifth, Fourth, Third, and Second Circuit decisions) (*quoting U.S. v. Eghbal*, 548 F.3d 1281, 1283 (9th Cir. 2008)). The claims born from this reckless origination scheme are false under the FCA:

> Turning first to the reckless underwriting and origination scheme, those claims can be understood as alleging that Wells Fargo fraudulently induced HUD to insure loans that were ineligible for such insurance. It did so, the Government alleges, certifying that the mortgages met certain requirements for FHA insurance that they did not, in fact, meet. For example, Wells Fargo applied for — and received — HUD insurance on mortgages for which the Bank failed to verify and document the borrower's investment in the property; failed to verify and document the borrower's income; or failed to verify and analyze the borrower's payment history of housing obligations and obtain written explanations of derogatory credit

---

[13] Dennis Moseley testified that Home America knew when it was originating a loan that would be government-insured, and knew that the information it was providing on the application and in the loan file would be submitted to the Government. SOF 96.

history. These failures rendered the loans ineligible for HUD mortgage insurance, and yet Wells Fargo — with knowledge or in reckless disregard of their ineligibility — certified the loans' eligibility. The Bank then submitted claims to HUD for those that defaulted or sold the loans to other entities that did so. If the Government's allegations are true, these claims, based on loan guarantees "induced by the [Bank's] fraud[ ]," constitute false claims under the FCA.

*Wells Fargo*, at *78-79.

Simply put, none of these files should have been submitted. Had Defendants not submitted them, HUD would not have insured them and the taxpayers would not have been assessed hundreds of millions of dollars for payment on defaulted loans. Each loan example is thus an independent and separate false claim, for which summary judgment is appropriate.

## C.  Hicks's Responsibility For The Fraud

Greg Hicks is liable for the fraud in two ways. First, Hicks is liable for the fraud he performed or which was performed on his behalf by the Hicks Team. Second, as the owner, president, and CEO, Hicks is liable for the fraud performed by Home America because it "can be imputed to him by virtue of the control he exerted over the company." *U.S. ex rel. Daugherty v. Bostwick Labs*., 2012 U.S. Dist. LEXIS 178641, at *40 (S.D. Ohio Dec. 14, 2012); *see also Almond v. McCranie*, 283 Ga. App. 887, 889 (2007) ("a corporate officer who takes part in the commission of a tort committed by the corporation is personally liable therefor").

1. **Greg Hicks Admits He Was Responsible For Every Loan Closed By The Hicks Team.**

Hicks admits that he is responsible for any bad loans that he originated or that were originated on his behalf. Hicks testified that the loan officer, among others, is responsible to make sure that a loan is not fraudulent. SOF 31, 81. Hicks further testified that the loan officer is responsible for deciding whether or not to accept a loan application, and that it is the loan officer who is responsible for entering accurate information into the application engines. SOF 68-69.[14]

In reality, Greg Hicks was the *de facto* loan officer for every loan closed by the Hicks Team. Hicks was unequivocal about this fact in his testimony. The loan officers on the Hicks Team were considered his "assistants," whom he hand-picked (SOF 25), and they originated the loans that were referred to him personally. SOF 70. Hicks explicitly distinguished the standard Home America originators from members of the Hicks Team, whom he considered to be

---

[14] Greg Hicks testified that when a customer states they have a certain amount of assets, the loan officer has a "duty" to ask for the source of funds, and has a "duty" to match up documents that trace the assets to the alleged source of funds. SOF 81. If the customer cannot show by documentation that it has the assets claimed or that it cannot trace the source of the assets, the loan officer has a "duty" to turn the customer down and not close the loan. *Id.*

"representative[s] of mine."[15] SOF 87.

In fact, according to Hicks, he was the top producer at Home America, originating approximately 10% of Home America's loans – about 80 to 100 loans each month. SOF 71. This was because, according to Hicks, even though he did not personally handle any applications himself after about 2004, the Hicks Team was originating the loans on his behalf. SOF 70. Consistent with the fact that these were Greg Hicks's loans and not their own, Hicks paid each of the Team members a salary (no other Home America loan officers were paid a salary) and a percentage of a commission based on the loans originated by the Team collectively rather than individually (unlike the other loan officers at Home America). SOF 72. Based on his own admission, Hicks was personally responsible for the origination of every one of the bad Hicks Team loans, no matter who actually typed the information into a computer.

Under his direction, the Hicks Team took shortcuts to close loans that did not meet FHA standards. For example, the Hicks Team regularly pushed loans through the closing process even if they lacked the documents required by FHA

---

[15] Hicks intended for the Hicks Team members to be his alter ego, at one point stating: "I didn't attend any of my closings for the last years nor did a representative of mine, for years, under the Hicks Team." SOF 87.

standards because Hicks wanted them closed. SOF 63; *c.f. Wells Fargo*, at *11 (lender "applied heavy pressure on loan officers and underwriters to originate, approve, and close loans" as part of reckless origination practices). Hicks is personally liable for every bad loan that the Hicks Team pushed through which resulted in a claim being submitted to the U.S.

Finally, Greg Hicks is listed as the loan officer on FHA No. 101-9696293, 105-1330789, 105-1674225, 105-2234179, and 105-2282276. SOF 36-39. For FHA No. 105-2234179, Greg Hicks personally certified compliance with HUD regulations and the accuracy of the information contained in the application. SOF 40. The fraud on these files can be attributed directly to Greg Hicks.

**2. Greg Hicks Recklessly Disregarded Fraud Being Committed With Regularity By Home America.**

As one court recently held, executive officers of residential mortgage companies can be liable under the FCA for "false statements in loan applications and other documents to procure home mortgage insurance on loans from the United States Department of Housing and Urban Development":

> Hodge argues that he should not be subject to FCA liability because he did not "personally" submit any claims or reports to the Government for payment. He contends that personal submission is required under the FCA... Hodge is simply incorrect. The FCA applies to anyone who "knowingly assist[s] in causing the government to pay claims grounded in fraud." *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 477 (5th Cir. 2012). "[A] person need

21

not be the one who actually submitted the claim forms in order to be liable." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) (citations omitted). Liability can attach to any defendant who cooperates, assists, or leads a fraudulent scheme. *See Gonzalez*, 689 F.3d at 477.

*U.S. v. Americus Mortg. Corp.*, 2013 U.S. Dist. LEXIS 128592, at *21-22 (S.D. Tex. Sept. 9, 2013).

The courts, including the Northern District of Georgia, "have not hesitated to disregard a corporation's separate legal identity when to do so would defeat public convenience, justify wrong, promote injustice or protect fraud." *Manhattan Constr. Co. v. K & E Constr. Co.*, 1988 U.S. Dist. LEXIS 16472, at *18 (N.D. Ga. 1988) ("justice and equity dictate that the separate corporate identity be ignored"); *see also Baillie Lumber Co. v. Thompson*, 279 Ga. 288, 290 (2005) (piercing corporate veil necessary where party uses corporate entity to perpetuate fraud"); *Bernstein*, 533 F.2d at 797. This includes in the context of False Claims Act actions. *See, e.g., Daugherty*, 2012 U.S. Dist. LEXIS 178641, at *40. Because Greg Hicks "controls the actions of the corporation to such a degree that the company has no separate mind from him," he is liable for the fraud perpetrated by Home America. *Id.*[16]

Greg Hicks and Taylor Bean each benefitted directly from closing

---

[16] In fact, Greg Hicks testified that as the owner of Home America, he was responsible for every loan that was originated by one of his loan officers. SOF 85.

federally-insured loans. To Hicks, it did not matter whether a loan was good or bad, or if the borrower was likely to default or not; he made money when any loan closed. SOF 94; *see Bernstein*, 533 F.2d at 781. To Taylor Bean, it mattered only that the loan was federally-insured.

Thus Hicks not only recklessly disregarded the fraud, but he encouraged it.[17] It was Hicks's motto, touted frequently at the Home America office, that he could get **any** loan closed. SOF 7. He would instruct the loan officers and underwriters to "do what you need to do" to get these loans closed, even if it meant not complying with FHA standards.[18] SOF 63. It became a game for Hicks, who bragged that he could get loans "in and out in a day," and instructed the Hicks Team and TBW underwriters to follow his lead. SOF 64. Home America was no more than an alter ego for Greg Hicks. This is sufficient for individual liability in even a criminal proceeding. *See Bernstein*, 533 F.2d at 797 (quoted above, at 6).

Hicks and Taylor Bean conspired to defraud the Government by getting

---

[17] Although Hicks controlled and directed the fraudulent schemes carried out by the company, the FCA standard for establishing knowledge explicitly does not require "specific intent to defraud." 31 U.S.C. § 3729(b).

[18] One example, Greg Hicks testified that he could assign a net worth of almost $58,000 to a homeless person based on the mere possibility they have assets in storage. SOF 90.

bad loans insured, resulting in false claims being paid, in violation of 31 U.S.C. § 3729(a)(1), (2), and (3). Because Hicks "personally directed and benefitted from the alleged fraud… he should not be permitted to hide behind a corporate form in order to perpetrate fraud." *Daugherty*, 2012 U.S. Dist. LEXIS 178641, at *41.

### D. The Corporate Identity Of Home America Was Disregarded

In order to pierce the corporate veil, Georgia law looks for "commingling of corporate funds or other disrespect for corporate formalities," much of which happened between Greg Hicks and Home America. *Exter Shipping, Ltd. v. Kilakos*, 310 F. Supp. 2d 1301, 1317 (N.D. Ga. 2004); *see also U.S. v. Jones*, 267 F. Supp. 2d 1349, 1354-1355 (M.D. Ga. 2003) ("Courts considering whether to pierce the corporate veil generally consider such issues as gross undercapitalization, failure to observe corporate formalities, absence of corporate records and 'whether the corporation is merely a façade for the operations of the dominant stockholder.'").

At Home America, Hicks was responsible for making every decision, instituting every policy, and had final say over who was hired and fired. SOF 61, 74. He even interviewed and hired (and fired) Taylor Bean underwriters who worked at the Home America office. SOF 24. There were essentially no corporate formalities. Before Dennis Moseley was promoted to President, thus necessitating the creation of the "CEO" title for Hicks, Home America had no

24

CEO, COO, or any other corporate titles. SOF 75. There was no issuance of stock – Greg Hicks was the sole shareholder. SOF 65. There were no corporate minutes. SOF 66. There were no shareholder meetings. SOF 67.

There was also commingling of Hicks's corporate and personal funds. Hicks used Home America as his own personal piggy bank, funding various corporations and personal investments,[19] including a Mexican restaurant and partial ownership in a private jet. SOF 109. Hicks also used Home America funds to purchase personal and recreational automobiles, including an RV, a Range Rover, a Chevy Avalanche, a trailer,[20] and a boat. SOF 113. Hicks even paid $38,460 to his wife Desirae Hicks in 2006 as a W-2 employee, but she did not work for Home America. SOF 111. Hicks also testified that he paid the corporate taxes of Home America out of his personal proceeds. SOF 88. Home America was "merely a façade for the operations" of Greg Hicks. *Jones*, 267 F. Supp. 2d at 1355. Relators should be permitted to pierce the corporate veil, and Greg Hicks should be liable for Home America's fraud.

---

[19] On July 1, 2008, Greg Hicks and his corporations – Hicks & Hicks, LLC; 20 Moon Partners; and Carlita's Mexican Restaurant, LLC – owed a combined $2,107,259 to Home America. SOF 109.

[20] The trailer is listed on Home America's expense reports as "Greg's Trailer." SOF 110. It was used to hold Greg's personal motorcycles. *Id.*

## IV. SPECIFIC FILES

The following examples are just 25 of the more than 400 files relied upon by HUD as damages against the corporate defendants.[21] For each, Relators will explain the issues with the file, the applicable regulations, and the damages to the taxpayers for having to pay the default. Each represents a toxic mortgage that drained the federal fisc.[22] SOF 107.

---

[21] As discussed above, HUD produced the files provided to it (or its servicers) by Taylor Bean and Home America as part of the regular practice of originating and processing government-insured home loans. HUD also provided the amount of actual damage HUD suffered for each of those loans, including the amount of the net insurance claim HUD paid.

[22] Materiality is established by binding precedent. *See U.S. v. Miller*, 645 F.2d 473, (5th Cir. May 20, 1981) (holding that the causation requirement was satisfied where the Government alleged that an application for FHA insurance contained false statements about, for example, the creditworthiness, net worth or debts of borrowers; "false statements regarding the ability of purchasers to afford housing could very well be the major factor for subsequent defaults" and thus the resulting payments); *accord Wells Fargo*, at *84-86; *see also Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (Decisions by the former Fifth Circuit issued before October 1, 1981, are binding as precedent in the Eleventh Circuit.). Moreover, each of false statements or omissions cited herein are material pursuant to HUD's own guidelines: "HUD provides a rating system by which lenders may evaluate the loans they review…. [M]ortgages with 'significant unresolved questions or missing documentation' are labeled a 'moderate risk to the mortgagee and FHA'; and mortgages that contain 'material violations of FHA or mortgagee requirements . . . . represent an unacceptable level of risk' and are labeled 'material risk' loans. Lenders are required to report to FHA in writing any 'material risk' mortgages they identify." *Wells Fargo*, at *9 (*quoting* HUD Handbook 4060.1 REV-2, ¶ 7-4). The United States also established materiality in its proof of claim against Home America. SOF 107-108.

- **FHA No. 101-9696293**, closed on February 28, 2001, claim submitted on November 18, 2008, **$176,937.98** paid. SOF 36. Greg Hicks was the loan officer on this file.[23] *Id.* Home America was the lender, and a representative of Home America signed the Lender's Certification on the HUD/VA Addendum that was submitted to the Government. *Id.* Hicks entered into LP that the borrower had $11,445.00 in assets, but the documentation shows that the borrower had $1,458 after closing, as shown in LP Finding G1. *Id.*; *see also* SOF 84.

- **FHA No. 105-1330789**, closed on June 30, 2003, claim submitted on December 15, 2006, **$193,095.50** paid. SOF 37. This file was a Refer risk class. *Id.* The Hicks Team prepared the file, Greg Hicks is listed as the interviewing loan officer, and Carl Wright was the closing attorney. The borrower claimed child support, but provided no documentation as to how long such payment would continue, as required by HUD 4155, Chapter 2, Section 2-7(F). *Id.*; *see also* SOF 103. The borrower had no assets, no checking account, no savings account and an incomplete Verification of Employment as required by HUD 4155, Chapter 2, Section 2-6. SOF 37; *see also* SOF 100, 102.[24] The borrower received $1,500 in cash back on the HUD-1 settlement document, but there was no documentation supporting that she had spent any money on the property, in violation of HUD 4155, Chapter 2, Section 2-10. SOF 37; *see also* SOF 104.

- **FHA No. 105-1674225**, closed on November 25, 2003, claim submitted on May 14, 2008, **$178,468.49** paid. SOF 38. Greg Hicks was the loan officer for this file, and Dennis Moseley signed for Home America. *Id.* Greg Hicks signed both lender certifications on the HUD Addendum as loan officer and on behalf of Home America as the lender. *Id.* In this case, Home America/Taylor Bean sought

---

[23] For the loans where it is stated that "Greg Hicks was the loan officer on the file," Greg Hicks's name was on the application for the loan as the loan officer. Insofar as there is any question of fact as to whether he personally handled these loans, at the very least these loans were prepared on his behalf by Hicks Team members.

[24] For each loan FHA insures, the lender must establish that the borrower has the ability and willingness to repay the mortgage debt. SOF 102. This decision must be predicated on sound underwriting principles consistent with the guidelines, rules, and regulations described throughout the HUD-4155 Handbook and must be supported by sufficient documentation. *Id.*

to obtain HUD insurance for the loan more than sixty days after closing. *Id.* Accordingly, they were required to provide a "late" letter showing that the borrowers had been timely with their payments up to that point. *Id.* The letter provided duly stated that the borrowers had been timely with their previous six payments – when in fact only two payments had been made. *Id.* Moreover, the direct deposit source changed on the borrower's statement just prior to the loan application, but there are no W-2's or pay stubs as of or after the date of this direct deposit, indicating that the borrower likely changed jobs, and failing to meet the requirements of HUD 4155, Chapter 2, Section 2-6. *Id.*; *see also* SOF 83, 100. Home America increased the down payment assistance amount three times, and correspondingly increased the sale price. SOF 38.

- **FHA No. 105-2282276**, closed on March 18, 2005, claim submitted on April 7, 2009, **$192,943.59** paid. SOF 39. Greg Hicks himself is listed as the loan officer on this file, and the closing attorney was Carl Wright. *Id.* A Home America mortgage officer signed both HUD Addendum Lender Certifications. *Id.* The application indicates that the borrower had four months of reserves which remained a part of the approval, but there was absolutely no supporting documentation in the file as required by DU ¶ 30. *Id.*; *see also* SOF 73. Moreover, this file was processed as an owner-occupied property pursuant to HUD 4155, Section 1-1, but pay stubs, including state income tax deductions, show that the borrower lived and worked in New Jersey. SOF 39. The file included a note from Home America employee Missy Hall suggesting that the borrower was transferring, but no such documentation verifying a transfer was in the file. *Id.* Moreover, the property was in Snellville, Georgia and the nearest office of the purchaser's employer was in Augusta, Georgia, over 135 miles away. *Id.*; *see also* SOF 82, 101.

- **FHA No. 105-2234179**, closed on February 28, 2005, claim submitted on July 9, 2009, **$182,916.84** paid. SOF 40. This file was a Refer risk class, and Greg Hicks is listed as the interviewing loan officer. *Id.* A Home America mortgage officer signed both HUD Addendum Lender Certifications. *Id.* The borrower had no assets beyond gift documentation for down payment assistance, no savings account, approximately $200/month in income after bills, and bad credit history, indicating the borrower lacked the ability to repay the mortgage debt per HUD 4155, Chapter 2. *Id.*; *see also* SOF 102. Moreover, the appraisal states that the property is in a flood zone, but no flood insurance was purchased for the property or appears on the HUD, and the cost of flood insurance was not

factored into the ratio. SOF 40.

- **FHA No. 105-2597460**, closed on February 16, 2006, claim paid in the amount of **$193,923.98**. SOF 41. The file was prepared by the Hicks Team. *Id.* The Mortgage Credit Analysis Worksheet ("MCAW") has no comments and is **unsigned**. *Id.* Large deposits in the borrower's file had no documentation of their source, contrary to HUD 4155 Section 2-10(B). *Id.*; *see also* SOF 98, 105. The file documentation actually shows that borrowers' income was $400 less than shown on the unsigned MCAW. SOF 41. The borrowers already had an FHA loan, with **no** documentation as to exceptional circumstances that would qualify them for a second FHA loan as per HUD 4155 Chapter 1, 1-1 through 1-2. *Id.* The borrowers had just refinanced the first FHA loan in November 2005, for which they would have had to remain owner-occupiers of the property, which should disqualify them from the second FHA loan for an owner-occupied property. *Id.*

- **FHA No. 105-2267834**, closed on March 23, 2005, claim submitted on October 9, 2008, **$181,119.84** paid. SOF 42. The loan officer on this file was Amy Hager, a member of the Hicks team, and Carl Wright was the closing attorney. *Id.* A Home America mortgage officer signed both HUD Addendum Lender Certifications. *Id.* The LP does not match the borrowers' documented income. *Id.*; *see also* SOF 100. The co-borrower was a 1099 employee with no tax returns in the file, in violation of HUD 4155, Chapter 3, Section 3-1(G), so his income should not have been included in ratio calculations. SOF 42; *see also* SOF 100. As a result, this file's back end ratio should have been 85, disqualifying the loan. SOF 42.

- **FHA No. 105-2580167**, closed on February 7, 2006, claim paid in the amount of **$233,135.20**. SOF 43. This Hicks Team file was a Refer risk class, but the MCAW had no comments written on it. *Id.*; *see also* SOF 99. Because it was a Refer risk class, the borrower should not have been allowed to have debts in collections as per HUD 4155, Section 2-3. As shown by the application, the borrower had multiple large debts in collections that needed to be paid off. SOF 43. Moreover, there is no documentation as to the source of the borrower's supposed assets or deposits as required by HUD 4155 Section 2-10(B). *Id.*; *see also* SOF 84. The file was missing all income documents, including thirty-day pay stubs and W-2s, required by HUD 4155, Chapter 2, Section 2-6. SOF 43; *see also* SOF 83, 100.

- **FHA No. 105-1709399**, closed on January 8, 2004, claim submitted on April

25, 2008, **$206,992.26** paid. SOF 44. This file was a Refer risk class. *Id.* Greg Hicks was the loan officer, and Carl Wright was the closing attorney. *Id.* Because the borrower did not have **any** credit history or credit score, he was supposed to have three "alternative" indicators of credit pursuant to HUD 4155, Chapter 2, Section 2-3. *Id.* The first was his power bill, but he provided only three months of history (rather than the requisite twelve months pursuant to HUD 4155, Chapter 2, Section 2-3). *Id.* Moreover, he had been late on two of the three payments that he did provide. *Id.* The second alternative credit indicator was a Verification of Rent, but the borrower paid an individual landlord and provided no proof that he had made timely payments pursuant to HUD 4155, Chapter 2, Section 2-3(A). *Id.* In this case, the seller also paid off the borrower's debts that were in collections, in violation of HUD 4155, Chapter 1, Section 1-6. *Id.*; *see also* SOF 102.

- **FHA No. 105-2403196**, closed on July 1, 2005, claim submitted on February 5, 2009, **$206,874.71** paid. SOF 45. This file was prepared by the Hicks Team. *Id.* A Home America mortgage officer signed both HUD Addendum Lender Certifications. *Id.* These borrowers had a preexisting FHA loan, and had been delinquent on at least one payment on that loan, with **no** documentation as to exceptional circumstances that would qualify them for a second FHA loan as per HUD 4155 Chapter 1, 1-1 through 1-2. *Id.* Home America calculated the borrowers' debt without including this first mortgage; the borrowers would have had an unacceptably high debt-to-income ratio of 66 if the first mortgage had been properly included. *Id.* A letter in the file stated that the first FHA loan now belonged to the borrower's ex-spouse as the result of a divorce, but (contrary to DU ¶ 20) there was neither a divorce decree or assumption agreement and deed as part of the file.[25] *Id.* There was no documentation of any assets in this file beyond gift documentation for down payment assistance. *Id.*; *see also* SOF 102.

- **FHA No. 105-1387284**, closed on July 11, 2003, claim submitted on January 18, 2005, **$4,837.00** paid. SOF 46. This file was a Refer risk class and Greg Hicks was the loan officer. *Id.* The appraisal on this file was falsified: this mobile home was purchased in August of 2002 for $49,000, but was sold in this transaction for $134,000 in June 2003. *Id.* The borrower had no assets or reserves, no checking or

---

[25] DU ¶ 20 states "A copy of the divorce decree ordering the other spouse to make the payments or an assumption agreement and deed indicating transfer of title must be obtained."

savings accounts, indicating the borrower lacked the ability to repay the mortgage debt per HUD 4155, Chapter 2. *Id.; see also* SOF 102. Even though no assets were shown, earnest money was supposedly paid (without documentation) in violation of HUD 4155, Chapter 2, Section 2-10. SOF 46, 104.

- **FHA No. 105-2410956**, closed on August 3, 2005, claim submitted on February 28, 2008, **$188,246.14** paid. SOF 47. A Home America mortgage officer signed both HUD Addendum Lender Certifications. *Id.* The MCAW was not signed. *Id.* There was no thirty day pay stub – in fact, the file indicates that the borrower had just started a new job – raising questions as to stability of income per HUD 4155, Chapter 2, Section 2-6. *Id.; see also* SOF 83, 100. The Verification of Employment required by HUD 4155, Chapter 2, Section 2-6 was incomplete, but still used to calculate income. SOF 47. There were no assets in the file or documentation to show that the borrower had any money at all, indicating the borrower lacked the ability to repay the mortgage debt per HUD 4155, Chapter 2. *Id.; see also* SOF 102. The borrower was given a $500 earnest money credit, but there was no documentation that the borrower ever paid any earnest money. *Id.* In fact, according to the HUD-1 settlement document, the borrower received the $500 back at closing, in violation of HUD 4155, Chapter 2, Section 2-10. *Id.; see also* SOF 104.

- **FHA No. 105-1331437**, closed on March 1, 2004, claim submitted on April 25, 2008, **$178,981.60**. SOF 48. The loan officer on this loan was Lisa Stocks, a member of the Hicks Team. *Id.* The borrowers' debt calculation failed to include the co-borrower's student loans, with no documentation that they were in deferral as required by HUD 4155 Chapter 2, Section 2-11(A). *Id.* Moreover, the file contained insufficient information to calculate the co-borrower's income - although the co-borrower was paid differently from month to month, ranging from as low as $400 to as high as $1300, the file indicated that he regularly earned $1,300 per month. *Id.; see also* SOF 100. Finally, there is no indication that the co-borrower, who is a member of the military, even knew that his credit was being used to purchase the property because a power of attorney used, in contravention of HUD 4155, Chapter 3, Section 3-5(A). SOF 48.

- **FHA No. 105-2288335**, closed on March 31, 2005, claim submitted on October 9, 2008, **$181,884.95** paid. SOF 49. A Home America mortgage officer signed both HUD Addendum Lender Certifications. *Id.* The borrower's income was calculated using a single pay stub and a W2 from 2003 in violation of

31

"Stability of Income" requirements under HUD 4155, Chapter 2, Section 2-6. *Id.*; *see also* SOF 100. There is no source documentation for a large ($3,600) deposit, in contravention of HUD 4155 Section 2-10(B). SOF 49; *see also* SOF 105.

- **FHA No. 105-2338693**, closed on May 25, 2005, claim submitted on March 24, 2009, **$220,044.16** paid. SOF 50. The loan officer on this loan was Misty Chrisopoulos, a member of the Hicks Team. *Id.* A Home America mortgage officer signed both HUD Addendum Lender Certifications. *Id.* All of the documents in this Hicks Team file indicate that the borrower lived and worked in Florida at the time of closing. *Id.* Nevertheless, it was processed as an owner-occupied property in Georgia in violation of HUD 4155, Section 1-1. *Id.*; *see also* SOF 101.

- **FHA No. 105-0507867**, closed on April 26, 2002, claim submitted on March 17, 2008, **$182,440.14** paid. SOF 51. In order to include two incomes in the ratio calculations, the borrower must have had both jobs for more than two years pursuant to HUD 4155, Chapter 2, Section 2-7(B). *Id.* This file included income from separate jobs at Taco Bell and McDonald's, **neither** of which the borrower had had for two years. *Id.* Using only one income makes the ratios too high to qualify for the loan. *Id.* Moreover, the W-2s in the file were not from either McDonald's or Taco Bell, and the employment dates did not match the borrower's representations, evincing a failure to verify the borrower's employment as required by HUD 4155, Chapter 2, Section 2-6. *Id.*; *see also* SOF 100.

- **FHA No. 105-2743651**, closed on July 31, 2006, claim submitted on October 8, 2008, **$192,531.68** paid. SOF 52. A Home America mortgage officer signed both HUD Addendum Lender Certifications. *Id.* This file was a Refer risk class, but the paperwork clearly showed that the borrower had five large debts in collection and bad credit, in violation of HUD 4155, Section 2-3. *Id.*; *see also* SOF 102. Moreover, although there was no documentation showing that the borrower spent any money for the purchase of the property, he was paid money on the HUD-1 settlement document in violation of HUD 4155, Chapter 2, Section 2-10. SOF 52; *see also* SOF 104.

- **FHA No. 105-1891084**, closed on April 28, 2004, claim submitted on December 5, 2008, **$182,191.23** paid. SOF 53. There is no documentation or attempted explanation as to how the co-borrowers are related. *Id.* One borrower

is married, and the other is single. *Id.* They live at different addresses. *Id.* There was a fraud alert issued with a co-borrower's credit report that raised questions as to the validity of her social security number that was never cleared, in violation of HUD 4155, Chapter 2, Section 2-2(B) and Chapter 3, Section 3-1(C). *Id.* The co-borrowers applied jointly and had their credit pulled jointly, but this should not have been allowed because they were not married, pursuant to HUD 4155, Chapter 2, Section 2-4. *Id.* There was no "borrower" identifying information on the bank statements, yet assets were used for down payment. *Id.; see also* SOF 84. Most income and asset documents were faxed from an unidentified source, in violation of HUD 4155, Chapter 3, Section 3-1. *Id.* All evidence points to this being a straw man purchase.

- **FHA No. 105-1860030**, closed on March 30, 2004, claim submitted on November 6, 2007, **$202,941.02**. SOF 54. This file was a Refer risk class and contained a large deposit with no documentation to indicate the source, contrary to HUD 4155, Chapter 2, Section 2-10(B). *Id.; see also* SOF 98, 105. This borrower had five instances of checks returned for non-sufficient funds with no explanation, in violation of HUD 4155, Chapter 2, Section 2-3. *Id.* There are no pay stubs in the file, and the borrower's income and deposits do not match, raising questions of stability of income pursuant to HUD 4155, Chapter 2, Section 2-6. *Id.; see also* SOF 83, 100.

- **FHA No. 105-1710193**, closed on December 30, 2003, claim submitted on April 1, 2009, **$184,491.44** paid. SOF 55. This borrower lacked a credit history or credit score, and so required three alternative indicators of credit pursuant to HUD 4155, Chapter 2, Section 2-3. *Id.* The borrower provided a Verification of Rent with no proof of timely payments pursuant to HUD 4155, Chapter 2, Section 2-3(A). *Id.* When calculating the front ratio (mortgage payments to monthly income), city taxes were included at $1/month instead of the $55/month that the city charged at that time. *Id.* The borrower had only $502 in his checking account, making it impossible for him to have paid the $1,000 earnest payment credit that is recorded on the HUD-1 (but not documented). *Id.* Notably, the borrower then received $793 cash back at closing, in violation of HUD 4155, Chapter 2, Section 2-10. *Id.; see also* SOF 104.

- **FHA No. 105-1696289**, closed on June 30, 2003, claim submitted on December 14, 2006, **$197,497.14** paid. SOF 56. Five large deposits have no documentation as to their source, contrary to HUD 4155 Section 2-10(B). *Id.; see*

*also* SOF 98, 105. Two years of employment was not documented, as required by HUD 4155, Chapter 2, Section 2-6, and the full Verification of Employment was not signed or dated by the employer as required by HUD 4155, Chapter 3, Section 3-1. *Id.*

- **FHA No. 105-1879361**, closed on April 22, 2004, claim submitted on December 13, 2007, **$177,882.51** paid. SOF 57. One of the co-borrowers used her maiden name on all of the application documents and for the credit report. *Id.* She had no credit history and a fraud alert was issued with the borrower's credit report, raising questions as to the validity of her social security number. *Id.* Yet there is no documentation indicating that this alert was cleared, in violation of HUD 4155, Chapter 2, Section 2-2(B) and Chapter 3, Section 3-1(C). *Id.* The borrower was asked by Home America to sign her maiden name to all of the documents even though she had been married for more than six months prior to the application. *Id.* Moreover, because she had no credit or assets, she added nothing to the application, indicating that this was likely a straw buyer. *Id.*

- **FHA No. 105-2237928**, closed on February 11, 2005, claim submitted on March 7, 2006, **$204,991.97** paid. SOF 58. This file was a Refer risk class. *Id.* The seller of the property and the loan officer for the borrower's file were the same person in violation of HUD 4155, Chapter 3, Section 3-1. *Id.* The file shows that the borrower had unpaid collections, in violation of HUD 4155, Section 2-3. *Id.* Regulations require that the file contain sixty day banking statements, but instead, this file had a single day's printout with a single large deposit, and no documentation indicating the source of the deposit, contrary to HUD 4155 Section 2-10(B). *Id.*; *see also* SOF 98, 105.

- **FHA No. 105-2147772**, closed on December 15, 2004, claim submitted on February 26, 2008, **$181,265.77** paid. SOF 59. A Home America mortgage officer signed both HUD Addendum Lender Certifications. *Id.* This file was a Refer risk class. *Id.* FHA guidelines require a front ratio (mortgage payments to monthly income) below 29, as per HUD 4155, Chapter 2, Section 2-12, but the file shows a front ratio of 42. *Id.* The borrower also was required to have $3,445 at closing per HUD 4155, Chapter 2, Section 2-10, but there was only $282 verified by the file. *Id.*; *see also* SOF 102.

- **FHA No. 105-2074777**, closed on September 29, 2004, claim submitted on November 12, 2008, **$217,056.42** paid. SOF 60. This file also contained a large, un-

34

sourced deposit in violation of HUD 4155 Section 2-10(B). *Id.*; *see also* SOF 107. The borrower also stated that he used a lease to offset the current mortgage payment, but the file contained no lease, failing to meet the requirements of HUD 4155, Section 2-7(M)(1). SOF 60.

Each of these examples stands alone – first, as to the false statements presented to HUD to get insurance as a violation of 31 U.S.C. § 3729(a)(2) and later, at default, as a violation of 31 U.S.C. § 3729(a)(1). Each claim should be trebled for damage calculations, and each claim is subject to a mandatory statutory civil penalty. *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1307-8 (11th Cir. 2002)(citing 31 U.S.C. § 3729(a)); 28 C.F.R. § 85.3(a)(9)(2008).

Accordingly, Relators ask that the Court award all relief appropriate under the Act, including damages and penalties as follows:

| FHA No. | Single Damages | Treble Damages | Penalty[26] | Total |
|---|---|---|---|---|
| 101-9696293 | $176,937.98 | $530,813.94 | $11,000 | $541,813.94 |
| 105-1330789 | $193,095.50 | $579,286.50 | $11,000 | $590,286.50 |
| 105-1674225 | $178,468.49 | $535,405.47 | $11,000 | $546,405.47 |
| 105-2234179 | $182,916.84 | $548,750.52 | $11,000 | $559,750.52 |
| 105-2282276 | $192,943.59 | $578,830.77 | $11,000 | $589,830.77 |
| 105-2597460 | $193,923.98 | $581,771.94 | $11,000 | $592,771.94 |
| 105-2267834 | $181,119.84 | $543,359.52 | $11,000 | $554,359.52 |
| 105-2580167 | $233,135.20 | $699,405.60 | $11,000 | $710,405.60 |
| 105-1709399 | $206,992.26 | $620,976.78 | $11,000 | $631,976.78 |
| 105-2403196 | $206,874.70 | $620,624.10 | $11,000 | $631,624.10 |
| 105-1387284 | $4,837.00 | $14,511.00 | $11,000 | $25,511.00 |
| 105-2410956 | $188,246.14 | $564,738.42 | $11,000 | $575,738.42 |
| 105-1331437 | $178,981.60 | $536,944.80 | $11,000 | $547,944.80 |
| 105-2288335 | $181,884.95 | $545,654.85 | $11,000 | $556,654.85 |
| 105-2338693 | $220,044.16 | $660,132.48 | $11,000 | $671,132.48 |
| 105-0507867 | $182,440.14 | $547,320.42 | $11,000 | $558,320.42 |
| 105-2743651 | $192,531.68 | $577,595.04 | $11,000 | $588,595.04 |
| 105-1891084 | $182,191.23 | $546,573.69 | $11,000 | $557,573.69 |
| 105-1860030 | $202,941.02 | $608,823.06 | $11,000 | $619,823.06 |
| 105-1710193 | $184,491.44 | $553,474.32 | $11,000 | $564,474.32 |
| 105-1696289 | $197,497.14 | $592,491.42 | $11,000 | $603,491.42 |
| 105-1879361 | $177,882.51 | $533,647.53 | $11,000 | $544,647.53 |
| 105-2237928 | $204,991.97 | $614,975.91 | $11,000 | $625,975.91 |
| 105-2147772 | $181,265.77 | $543,797.31 | $11,000 | $554,797.31 |
| 105-2074777 | $217,056.42 | $651,169.26 | $11,000 | $662,169.26 |
| **Total** | | | | **$13,495,669.05** |

---

[26] For purposes of summary judgment only, Relators are only requesting a single penalty per file.

## V. CONCLUSION

For the foregoing reasons, the United States and Relators seek summary judgment against Defendant Greg Hicks in the amount of $13,495,669.05.[27]

Respectfully submitted this 4th day of October, 2013,


___/s/ Jason Marcus_____
Mike Bothwell
Georgia Bar No. 069920
Julie Keeton Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
304 Macy Drive
Roswell, Georgia 30076
Ph: 770-643-1606
Fax: 770-643-1442
Mike@whistleblowerlaw.com
Julie@whistleblowerlaw.com
Jason@whistleblowerlaw.com

Attorneys for Relators

---

[27] Counsel certifies that this brief was prepared using Book Antiqua 13-point font.