# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. COMFORT FRIDDLE | ) | |
| and STEPHANIE KENNEDY | ) | |
| | ) | |
| Relators, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:06-CV-3023-JEC |
| TAYLOR, BEAN & WHITAKER | ) | |
| MORTGAGE CORPORATION; | ) | |
| HOME AMERICA MORTGAGE, | ) | |
| INC.; GREGORY HICKS; CARL | ) | |
| WRIGHT; and JOHN DOE | ) | |
| | ) | |
| Defendants. | ) | |

## RELATORS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Home America Mortgage, Inc. ("Home America") is a now-defunct mortgage company that, prior to bankruptcy, originated thousands of loans through various government-insured programs, resulting in damages to the United States that HUD estimated at $131,000,000.
   a. Exhibit D, Declaration of Allison Olson, at ¶ 2
   b. Exhibit E, Declaration of Stephanie Kennedy, at ¶ 3
   c. Exhibit F, Declaration of Comfort Friddle, at ¶ 4
   d. Exhibit B, U.S. Proof of Claim in Home America Bankruptcy, Case No. 3:09-bk-10023-JAF

2. Home America's loans were underwritten by Taylor, Bean & Whitaker Mortgage Corporation ("Taylor Bean").
   a. Exhibit E, Declaration of Stephanie Kennedy, at ¶ 7
   b. Exhibit O, March 6, 2007 letter from Greg Hicks

3. Taylor Bean is in bankruptcy, and the Government has filed a proof of claim against it for nearly $200,000,000.
   a. Exhibit C, U.S. Proof of Claim in Taylor Bean Bankruptcy, Case No. 3:09-bk-07047-JAF

4. Taylor Bean's principal owner, Lee Farkas, was indicted on June 15, 2010 and is now a convicted felon serving prison time for mortgage fraud in the Butner Correctional Complex in North Carolina.
   a. http://www.huffingtonpost.com/2011/04/19/lee-farkas-convicted-mortgage-fraud_n_851289.html, last visited on October 3, 2013
   b. http://www.nytimes.com/2011/04/22/business/22norris.html?pagewanted=all, last visited on October 3, 2013
   c. http://dealbook.nytimes.com/2011/06/30/mortgage-executive-receives-30-year-sentence/, last visited on October 3, 2013
   d. http://blogs.wsj.com/law/2012/03/02/farkas-to-government-dont-take-my-car/?mod=WSJBlog, last visited on October 3, 2013

5. Greg Hicks owned 90% of Home America and was Home America's principal operator.
   a. Exhibit G, Hicks Response to Request for Admission No. 36
   b. Exhibit H, Hicks Response to Interrogatory No. 6
   c. Exhibit E, Declaration of Stephanie Kennedy, at ¶ 4

6. Until 2004, Taylor Bean performed its own loan origination through a subsidiary, Taylor, Bean & Whitaker, Ltd. In 2004, Taylor Bean changed the name of its subsidiary to Home America Mortgage, Inc., and sold 90% of its ownership to Greg Hicks, retaining 10% of the ownership for itself.
   a. Exhibit X, Deposition of Greg Hicks, 41:3-14
   b. Exhibit X, Deposition of Greg Hicks, 42:10-16

7. Greg Hicks headed up "The Hicks Team," a sub-group at Home America made up of loan officers of Hicks's choosing, of whom Hicks boasted that they could "get any loan into closing."
   a. Exhibit D, Declaration of Allison Olson, at ¶¶ 4, 21-24
   b. Exhibit E, Declaration of Stephanie Kennedy, at ¶¶ 5-6
   c. Exhibit X, Deposition of Greg Hicks, 112:24-113:1

      d.  Exhibit X, Deposition of Greg Hicks, 114:13-20

8. Hicks sold his shares in Home America back to Taylor Bean on January 6, 2009 for $20,894,448 in consideration.
   a. Exhibit X, Deposition of Greg Hicks, 44:18-25
   b. Exhibit T, Greg Hicks Answer to Second Amended Complaint, 3:11-ap-00674-JAF (M.D. Fla. Bank.), at ¶ 4

9. In order to qualify for a HUD guarantee against default, borrowers must meet criteria established by the individual programs (such as Freddie Mac, Fannie Mae, the VA, etc.).
   a. Dkt. 120, ¶¶ 21-22

10. The first step is to input a vast amount of borrower/property information into an application engine to demonstrate that the loan is of sufficiently low risk to qualify for the program. For Freddie Mac loans, for example, the application engine is "Loan Prospector" or "LP." For Fannie Mae mortgages, the application engine "Desktop Underwriter" or "DU" is used.
    a. Dkt. 120, ¶ 23

11. The application engine evaluates the loan based on such factors as credit score, debt-to-asset-ratio, and income stream.
    a. Dkt. 120, ¶ 24

12. In some instances, Greg Hicks circumvented the safeguards provided by LP and DU by entering false information into the application engine or having Home America employees enter false information on his behalf.
    a. *See, e.g.*, HUD072712-HUD072853; HUD028040-HUD028173.
    b. Exhibit E, Declaration of Stephanie Kennedy, at ¶ 17
    c. Exhibit F, Declaration of Comfort Friddle, at ¶ 8
    d. Exhibit X, Deposition of Greg Hicks, 75:4-15
    e. Exhibit X, Deposition of Greg Hicks, 141:5-9

13. After the data is entered, the application engine may provide a list of "approval conditions" that must be met before the loan can be approved for the program.
    a. Dkt. 120, ¶ 26

14. In theory, the loan team would then work to meet those conditions – such as securing evidence to support the assets claimed by the borrower or further evidence as to employment.

    a. Dkt. 120, ¶ 27

15. At Home America, these conditions were often ignored or the necessary documentation was altered (or created whole cloth).

    a. Exhibit E, Declaration of Stephanie Kennedy, at ¶ 20

    b. Exhibit F, Declaration of Comfort Friddle, at ¶ 11

16. On higher risk loans, the application engine will return a "Refer risk class," meaning it has identified weaknesses in the borrower's credit reputation and/or capacity to repay and has rejected the loan.

    a. Dkt. 120, ¶ 29

    b. Exhibit W, FHA TOTAL Mortgage Scorecard User Guide, at 9-10

17. In some cases, Refer risk class is simply due to lack of data, such as cash-buyers without bank accounts or buyers with no credit history. In those rare cases, the safeguards may be manually overridden within very strict guidelines by having an FHA Direct Endorsement underwriter analyze the entire loan application to determine if the mortgage qualifies for FHA endorsement in accordance with the Online HUD Handbook 4155.1/4155.2.

    a. Dkt. 120, ¶ 30

    b. Exhibit W, FHA TOTAL Mortgage Scorecard User Guide, at 9-10

18. At Home America, Hicks often ordered Stephanie Kennedy or Ginny Poore (both of whom were FHA direct endorsement underwriters) to approve bad loans. Hicks threatened to fire Kennedy if she refused.

    a. Exhibit D, Declaration of Allison Olson, at ¶¶ 25-27

    b. Exhibit E, Declaration of Stephanie Kennedy, at ¶¶ 23-24

19. If Kennedy balked at approving bad loans, the loans were shifted to Poore or Home America employees would simply forge Stephanie Kennedy's electronic endorsement of the file by using her password without her knowledge or permission to close loans that Kennedy had previously refused to approve.

    a. Exhibit D, Declaration of Allison Olson, at ¶¶ 27-29

    b. Exhibit E, Declaration of Stephanie Kennedy, at ¶ 25

20. Kennedy discovered a FICO score in a Hicks Team loan file that had been "whited out" using correction fluid.
     a. Exhibit D, Declaration of Allison Olson, at ¶ 16
     b. Exhibit E, Declaration of Stephanie Kennedy, at ¶ 27

21. In or about July 2003, Allison Olson was underwriting a file from Hicks Team loan officer Justin Price when she discovered that Price had falsified the Verification of Deposit.
     a. Exhibit D, Declaration of Allison Olson, at ¶¶ 8, 10

22. Olsen reported Price's actions internally, but nothing was done.
     a. Exhibit D, Declaration of Allison Olson, at ¶¶ 11-12

23. When Hicks was shown blatantly fraudulent files, rather than punish those responsible, he would explain how the fraud should have been committed in order to avoid detection.
     a. Exhibit D, Declaration of Allison Olson, at ¶¶ 21-25

24. Hicks interviewed, hired, and fired Taylor Bean underwriters who worked at the Home America office. Those Taylor Bean employees attended Home America meetings, and Hicks held group meetings with the Taylor Bean underwriters. Some were told and believed they were Home America employees.
     a. Exhibit X, Deposition of Greg Hicks, 81:17-21
     b. Exhibit X, Deposition of Greg Hicks, 83:10-12
     c. Exhibit X, Deposition of Greg Hicks, 93:16-94:1
     d. Exhibit X, Deposition of Greg Hicks, 124:19-126:2
     e. Exhibit D, Declaration of Allison Olson, at ¶ 34
     f. Exhibit E, Declaration of Stephanie Kennedy, at ¶ 50

25. Greg Hicks personally picked the members of the Hicks Team.
     a. Exhibit X, Deposition of Greg Hicks, 112:24-113:1
     b. Exhibit X, Deposition of Greg Hicks, 114:20

26. On August 3, 2009, the FBI raided the corporate headquarters of Taylor Bean in Ocala, Florida.

     a. http://www.ocala.com/article/20090804/ARTICLES/908041012, last visited on October 3, 2013

27. On August 24, 2009, Taylor Bean declared bankruptcy.
     a. Taylor Bean Voluntary Petition under Chapter 11, Civil Action No. 3:09-bk-10023-JAF
     b. http://www.reuters.com/article/2009/08/24/us-taylorbean-bankruptcy-idUSTRE57N42T20090824, last visited on October 3, 2013

28. On November 25, 2009, Home America declared bankruptcy.
     a. Home America Voluntary Petition under Chapter 11, Civil Action No. 3:09-bk-07047-JAF

29. The U.S. government filed a $178 million proof of claim against Taylor Bean and a $131 million proof of claim against Home America for the very loan files at issue here.
     a. Exhibit B, U.S. Proof of Claim in Home America Bankruptcy, Civil Action No. 3:09-bk-07047-JAF
     b. Exhibit C, U.S. Proof of Claim in Taylor Bean Bankruptcy Civil Action No. 3:09-bk-10023-JAF

30. In connection with annual audits of Home America, Greg Hicks certified that "We acknowledge our responsibility for the design and implementation of programs and controls to provide reassurance that fraud is prevented and detected."
     a. Exhibit N, Home America audit certifications, ¶ 4

31. The loan originator is responsible for making sure that a loan is not fraudulent, and has the right to question the data given by a customer.
     a. Exhibit X, Deposition of Greg Hicks, 75:23-76:4
     b. Exhibit X, Deposition of Greg Hicks, 77:1-5

32. In response to a subpoena served upon HUD in this litigation, HUD produced documents Bates labeled HUD000001 through HUD080485 ("the Documents").
     a. Exhibit I, Declaration of Joel Foreman, at ¶ 3

33. The Documents consist of business records that Taylor Bean and Home America provided to HUD or the servicers of Home America/Taylor Bean loans as part of the regular practice of originating and processing government-insured home loans and were created contemporaneous with this practice. In the case of loans files provided to servicers, but not to HUD, HUD obtained copies of such documents in the normal course of its investigative functions.

    a. Exhibit I, Declaration of Joel Foreman, at ¶ 4

34. As part of the subpoena production, an attorney for HUD also compiled a list of damages to HUD for the loans contained in the Documents and attached thereto as "Exhibit A". The amount of the damages stated in Exhibit A was segregated by loan number and identifies the amount of the net insurance claim HUD paid under the heading "Conveyed" in Exhibit A. Exhibit A also identifies any subsequent damages HUD incurred in holding and selling the collateral properties, and any amounts received in mitigation.

    a. Exhibit I, Declaration of Joel Foreman, at ¶ 5

35. The information used to create Exhibit A was taken from HUD's computer systems, which assembled the information from documents submitted by the relevant mortgage servicer for each loan and HUD's asset management contractors. HUD stores this information as part of its regular practice as the insurer for the loans in question. This information is kept by HUD for the purpose of determining the cost to HUD of defaults on loans, including those described in the Documents. The HUD attorney compiled this list from data obtained from HUD computer systems, in the same fashion as any other list of damages would be in the normal course of compiling damages for loans insured by HUD.

    a. Exhibit I, Declaration of Joel Foreman, at ¶ 6

36. FHA No. 101-9696293, closed on February 28, 2001, claim submitted on November 18, 2008, $176,937.98 paid. Greg Hicks was the loan officer on this file. Hicks entered into LP that the borrower had $11,445.00 in assets, but the documentation shows that the borrower had $1,458 after closing, as shown in LP Finding G1. Home America was the lender, and a representative of Home America signed the Lender's Certification on the HUD/VA Addendum that was submitted to the Government.

    a. Exhibit A, HUD028040-HUD028173

      b.  Exhibit A, HUD028118-HUD028122

      c.  Exhibit A, HUD028144

37. FHA No. 105-1330789, closed on June 30, 2003, claim submitted on December 15, 2006, $193,095.50 paid. This file was a Refer risk class. The Hicks Team prepared the file, Greg Hicks is listed on the application as the loan officer, and Carl Wright was the closing attorney. The borrower claimed child support, but provided no documentation as to how long such payment would continue. The borrower had no assets, no checking account, no savings account and an incomplete Verification of Employment. The borrower received $1,500 in cash back on the HUD-1 settlement document, but there was no documentation supporting that she had spent any money on the property.

      a.  Exhibit A, HUD040826-HUD040972

38. FHA No. 105-1674225, closed on November 25, 2003, claim submitted on May 14, 2008, $178,468.49 paid. Greg Hicks was the loan officer for this file, and Dennis Moseley signed for Home America. Greg Hicks signed both lender certifications on the HUD Addendum as loan officer and on behalf of Home America as the lender. In this case, Home America/Taylor Bean sought to obtain HUD insurance for the loan more than sixty days after closing. Accordingly, they provided a "late" letter showing that the borrowers had been timely with their payments up to that point. The letter provided duly stated that the borrowers had been timely with their previous six payments – when in fact only two payments had been made. Moreover, the direct deposit source changed on the borrower's statement just prior to the loan application, but there are no W-2's or pay stubs as of or after the date of this direct deposit, indicating that the borrower likely changed jobs. Home America increased the down payment assistance amount three times, and correspondingly increased the sale price.

      a.  Exhibit A, HUD006529-HUD006685

      b.  Exhibit A, HUD006635-HUD006638 (HUD Addendum and Certifications; these pages also constitute Exhibit L)

39. FHA No. 105-2282276, closed on March 18, 2005, claim submitted on April 7, 2009, $192,943.59 paid. Greg Hicks himself is listed as the loan officer on this file, and the closing attorney was Carl Wright. A Home America mortgage officer signed both HUD Addendum Lender Certifications. The application indicates that the borrower had four months of reserves which remained a part of the

approval, but there was absolutely no supporting documentation in the file. Moreover, this file was processed as an owner-occupied property pursuant to HUD 4155, Section 1-1, but pay-stubs, including state income tax deductions, show that the borrower lived and worked in New Jersey. The file included a note from Home America employee Missy Hall suggesting that the borrower was transferring, but no such documentation verifying a transfer was in the file. Moreover, the property was in Snellville, Georgia and the nearest office of the purchaser's employer was in Augusta, Georgia, over 135 miles away.

     a. Exhibit A, HUD072712-HUD072853
     b. Exhibit A, HUD072802-HUD072805

40. FHA No. 105-2234179, closed on February 28, 2005, claim submitted on July 9, 2009, $182,916.84 paid. This file was a Refer risk class, and Greg Hicks was the loan officer. A Home America mortgage officer signed both HUD Addendum Lender Certifications. The borrower had no assets beyond gift documentation for down payment assistance, no savings account, approximately $200/month in income after bills, and bad credit history. Moreover, the appraisal states that the property is in a flood zone, but no flood insurance was purchased for the property or appears on the HUD, and the cost of flood insurance was not factored into the ratio.

     a. Exhibit A, HUD005502-HUD005684

41. FHA No. 105-2597460, closed on February 16, 2006, claim paid in the amount of $193,923.98. The file was prepared by the Hicks Team. The Mortgage Credit Analysis Worksheet ("MCAW") has no comments and is unsigned. Large deposits in the borrower's file had no documentation of their source. The file documentation actually shows that borrowers' income was $400 less than shown on the unsigned MCAW. The borrowers already had an FHA loan, with no documentation as to exceptional circumstances that would qualify them for a second FHA loan. The borrowers had just refinanced the first FHA loan in November 2005, for which they would have had to remain owner-occupiers of the property.

     a. Exhibit A, HUD076594-HUD077114

42. FHA No. 105-2267834, closed on March 23, 2005, claim submitted on October 9, 2008, $181,119.84 paid. The loan officer on this file was Amy Hager, a member of the Hicks team, and Carl Wright was the closing attorney. A Home America

mortgage officer signed both HUD Addendum Lender Certifications. The LP does not match the borrowers' documented income. The co-borrower was a 1099 employee with no tax returns in the file.

      a. Exhibit E, Declaration of Stephanie Kennedy, at ¶ 52
      b. Exhibit A, HUD009791-HUD009926
      c. Exhibit A, HUD009833-HUD009836

43. FHA No. 105-2580167, closed on February 7, 2006, claim paid in the amount of $233,135.20. This Hicks Team file was a Refer risk class, but had no comments on the MCAW. The borrower had multiple large debts in collections that needed to be paid off. Moreover, there is no documentation as to the source of the borrower's supposed assets or deposits. The file was missing all income documents including thirty-day pay stubs and W-2s.

      a. Exhibit A, HUD076107-HUD076593

44. FHA No. 105-1709399, closed on January 8, 2004, claim submitted on April 25, 2008, $206,992.26 paid. This file was a Refer risk class. Greg Hicks was the loan officer, and Carl Wright was the closing attorney. Because the borrower did not have any credit history or credit score, he was supposed to have three "alternative" indicators of credit. The first was his power bill, but he provided only three months of history and had been late on two of the three payments. The second alternative credit indicator was a Verification of Rent, but the borrower paid an individual landlord and provided no proof that he had made timely payments. In this case, the seller also paid off the borrower's debts that were in collections.

      a. Exhibit A, HUD020161-HUD020260

45. FHA No. 105-2403196, closed on July 1, 2005, claim submitted on February 5, 2009, $206,874.71 paid. This file was prepared by the Hicks Team. A Home America mortgage officer signed both HUD Addendum Lender Certifications. These borrowers had a preexisting FHA loan, and had been delinquent on at least one payment on that loan, with no documentation as to exceptional circumstances that would qualify them for a second FHA loan as per HUD 4155 Chapter 1, 1-1 through 1-2. Home America calculated the borrowers' debt without including this first mortgage. A letter in the file stated that the first FHA loan now belonged to the borrower's ex-spouse as the result of a divorce, but there was neither a divorce decree or assumption agreement and deed as part of

the file. There was no documentation of any assets in this file beyond gift documentation for down payment assistance.

     a. Exhibit A, HUD007356-HUD007513

     b. Exhibit A, HUD007496

46. FHA No. 105-387284, closed on July 11, 2003, claim submitted on January 18, 2005, $4,837.00 paid. This file was a Refer risk class and Greg Hicks was the loan officer. The post-closing manager for Taylor Bean signed the first certification on behalf of Home America and the second certification on behalf of Taylor Bean (with Home America crossed out as the lender). The appraisal on this file was almost certainly falsified: this mobile home was purchased in August of 2002 for $49,000, but was sold in this transaction for $134,000 in June 2003. The borrower had no assets or reserves. The borrower had no checking and no savings. Even though no assets were shown, earnest money was supposedly paid (without documentation).

     a. Exhibit A, HUD041139-HUD041237

47. FHA No. 105-2410956, closed on August 3, 2005, claim submitted on February 28, 2008, $188,246.14 paid. The MCAW was not signed. There was no thirty day pay stub – in fact, the file indicates that the borrower had just started a new job. The Verification of Employment was incomplete, but still used to calculate income. There were no assets in the file. There is no documentation to show that the borrower had any money at all. The borrower was given a $500 earnest money credit, but there was no documentation that the borrower ever paid any earnest money. In fact, according to the HUD-1 settlement document, the borrower received the $500 back at closing.

     a. Exhibit A, HUD007514-HUD007626

48. FHA No. 105-1331437, closed on March 1, 2004, claim submitted on April 25, 2008, $178,981.60. The loan officer on this loan was Lisa Stocks, a member of the Hicks Team. The borrowers' debt calculation failed to include the co-borrower's student loans, with no documentation that they were in deferral. Moreover, the file contained insufficient information to calculate the co-borrower's income - although the co-borrower was paid differently from month to month, ranging from as low as $400 to as high as $1,300, the file indicated that he regularly earned $1,300 per month. Finally, there is no indication that the co-borrower,

who is a member of the military, even knew that his credit was being used to purchase the property because a power of attorney used.

    a. Exhibit E, Declaration of Stephanie Kennedy, at ¶ 51

    b. Exhibit A, HUD040973-HUD041138

49. FHA No. 105-2288335, closed on March 31, 2005, claim submitted on October 9, 2008, $181,884.95 paid. A Home America mortgage officer signed both HUD Addendum Lender Certifications. The borrower's income was calculated using a single pay stub and a W2 from 2003. There is no source documentation for a large ($3,600) deposit.

    a. Exhibit A, HUD073010-HUD073151

50. FHA No. 105-2338693, closed on May 25, 2005, claim submitted on March 24, 2009, $220,044.16 paid. The loan officer on this loan was Misty Chrisopoulos, a member of the Hicks Team. A Home America mortgage officer signed both HUD Addendum Lender Certifications. All of the documents in this Hicks Team file indicate that the borrower lived and worked in Florida at the time of closing. Nevertheless, it was processed as an owner-occupied property in Georgia in violation of HUD 4155, Section 1-1.

    a. Exhibit A, HUD025392-HUD025512

51. FHA No. 105-0507867, closed on April 26, 2002, claim submitted on March 17, 2008, $182,440.14 paid. This file included income from separate jobs at Taco Bell and McDonald's, neither of which the borrower had had for two years. Using only one income makes the ratios too high to qualify for the loan. Moreover, the W-2s in the file were not from either McDonald's or Taco Bell, and the employment dates did not match the borrower's representations.

    a. Exhibit A, HUD032631-HUD032723

52. FHA No. 105-2743651, closed on July 31, 2006, claim submitted on October 8, 2008, $192,531.68 paid. A Home America mortgage officer signed both HUD Addendum Lender Certifications. This file was a Refer risk class, but the paperwork clearly showed that the borrower had five large debts in collection and bad credit. Moreover, although there was no documentation showing that the borrower spent any money for the purchase of the property, he was paid money on the HUD-1 settlement document.

    a. Exhibit A, HUD008013-HUD008114

53. FHA No. 105-1891084, closed on April 28, 2004, claim submitted on December 5, 2008, $182,191.23 paid. There is no documentation or attempted explanation as to how the co-borrowers are related. One borrower is married, and the other is single. They live at different addresses. There was a fraud alert issued with a co-borrower's credit report that raised questions as to the validity of her social security number that was never cleared. The co-borrowers applied jointly and had their credit pulled jointly. There was no "borrower" identifying information on the bank statements, yet assets were used for down payment. Most income and asset documents were faxed from an unidentified source. All evidence points to this being a straw man purchase.

    a. Exhibit A, HUD014902-HUD015049

54. FHA No. 105-1860030, closed on March 30, 2004, claim submitted on November 6, 2007, $202,941.02. This file was a Refer risk class and contained a large deposit with no documentation to indicate the source. This borrower had five instances of checks returned for non-sufficient funds with no explanation. There are no pay stubs in the file, and the borrower's income and deposits do not match.

    a. Exhibit A, HUD020054-HUD020160

55. FHA No. 105-1710193, closed on December 30, 2003, claim submitted on April 1, 2009, $184,491.44 paid. This borrower lacked a credit history or credit score. The borrower provided a Verification of Rent with no proof of timely payments. When calculating the front ratio (mortgage payments to monthly income), city taxes were included at $1/month instead of the $55/month that the city charged at that time. The borrower had only $502 in his checking account, making it impossible for him to have paid the $1,000 earnest payment credit that is recorded on the HUD-1 (but not documented). Notably, the borrower then received $793 cash back at closing.

    a. Exhibit A, HUD046096-HUD046225

56. FHA No. 105-1696289, closed on June 30, 2003, claim submitted on December 14, 2006, $197,497.14 paid. Five large deposits have no documentation as to their source. Two years of employment was not documented and the Verification of Employment was not signed or dated by the employer.

    a. Exhibit A, HUD020261-HUD020406

57. FHA No. 105-1879361, closed on April 22, 2004, claim submitted on December 13, 2007, $177,882.51 paid. One of the co-borrowers used her maiden name on all of the application documents and for the credit report. She had no credit history and a fraud alert was issued with the borrower's credit report. There is no documentation indicating that this alert was cleared. The borrower was asked by Home America to sign her maiden name to all of the documents even though she had been married for more than six months prior to the application. Moreover, because she had no credit or assets, she added nothing to the application, indicating that this was likely a straw buyer.
   a. Exhibit A, HUD051236-HUD051352

58. FHA No. 105-2237928, closed on February 11, 2005, claim submitted on March 7, 2006, $204,991.97 paid. This file was a Refer risk class. The seller of the property and the loan officer for the borrower's file were the same person. The file shows that the borrower had unpaid collections. This file had a single day's printout with a single large deposit rather than a sixty day statement, and no documentation indicating the source of the deposit.
   a. Exhibit A, HUD024740-HUD024833

59. FHA No. 105-2147772, closed on December 15, 2004, claim submitted on February 26, 2008, $181,265.77 paid. A Home America mortgage officer signed both HUD Addendum Lender Certifications. This file was a Refer risk class. The file shows a front ratio of 42. The borrower also was required to have $3,445 at closing, but there was only $282 verified by the file.
   a. Exhibit A, HUD074665-HUD074828

60. FHA No. 105-2074777, closed on September 29, 2004, claim submitted on November 12, 2008, $217,056.42 paid. This file also contained a large, un-sourced deposit. The borrower also stated that he used a lease to offset the current mortgage payment, but the file contained no lease.
   a. Exhibit A, HUD011732-HUD011870

61. During the time that he owned Home America, Hicks was responsible for making every decision at Home America, instituting every policy, and had final say over who was hired and fired.
   a. Exhibit G, Hicks Responses to Requests for Admission Nos. 36 and 38

      b.  Exhibit E, Declaration of Stephanie Kennedy, at ¶ 54

      c.  Exhibit F, Declaration of Comfort Friddle, at ¶ 28

62. Hicks and Kennedy never had a sexual relationship with each other.

      a.  Exhibit D, Declaration of Allison Olson, at ¶ 33

      b.  Exhibit E, Declaration of Stephanie Kennedy, at ¶ 49

63. Greg Hicks would instruct the loan officers and underwriters to "do what you need to do" to get loans closed, even if it meant not complying with FHA standards.

      a.  Exhibit E, Declaration of Stephanie Kennedy, at ¶ 55

      b.  Exhibit F, Declaration of Comfort Friddle, at ¶ 29

64. Greg Hicks bragged that he could get loans "in and out in a day," and he instructed the Hicks Team and TBW underwriters to follow his lead.

      a.  Exhibit E, Declaration of Stephanie Kennedy, at ¶ 56

      b.  Exhibit F, Declaration of Comfort Friddle, at ¶ 30

65. Home America never issued stock, and Greg Hicks was the sole shareholder of Home America.

      a.  Exhibit M, Home America 2005-2007 balance sheets

66. Home America did not keep corporate minutes.

      a.  Exhibit N, Home America audit certifications, ¶¶ 2b, 21

67. Home America did not hold shareholder meetings.

      a.  Exhibit N, Home America audit certifications, ¶¶ 2b, 21

68. A loan officer is responsible for deciding whether or not to accept a loan application.

      a.  Exhibit X, Deposition of Greg Hicks, 140:23-24

69. Home America loan officers were responsible for entering accurate information into DU and LP, and Home America loan processors were responsible for verifying the accuracy of the data.

      a.  Exhibit X, Deposition of Greg Hicks, 92:12-17

      b.  Exhibit X, Deposition of Greg Hicks, 115:5-12

  c. Exhibit X, Deposition of Greg Hicks, 116:13-25
  d. Exhibit X, Deposition of Greg Hicks, 140:25-141:6
  e. Exhibit J, Deposition of Dennis Moseley, 120:5-16
  f. Exhibit J, Deposition of Dennis Moseley, 135:22-136:2
  g. Exhibit J, Deposition of Dennis Moseley, 137:16-138:3

70. The loan officers on the Hicks Team were considered Hicks's "assistants," and they originated the loans that came in referred to him and entered the application into LP and DU on his behalf.
  a. Exhibit X, Deposition of Greg Hicks, 75:4-15
  b. Exhibit X, Deposition of Greg Hicks, 87:8-88:13

71. Greg Hicks was the loan officer for every loan closed by the Hicks Team, who originated the loans on his behalf. As a result, Hicks was the top producer at Home America every year, originating approximately 10% of Home America's loans – about 80 to 100 loans each month.
  a. Exhibit X, Deposition of Greg Hicks, 67:8-16
  b. Exhibit X, Deposition of Greg Hicks, 146:4-15

72. Hicks paid each of the Hicks Team members a salary, while no other Home America loan officers were paid a salary, and a percentage of a commission based on the loans originated by the Hicks Team collectively rather than individually (unlike the other loan officers at Home America).
  a. Exhibit X, Deposition of Greg Hicks, 61:16-62:8

73. HUD requires verification of all cash reserves available after closing that are submitted to the application engine.
  a. Exhibit W, FHA TOTAL Mortgage Scorecard User Guide, at 14-15

74. Home America's policies and procedures were set forth by its shareholders – Greg Hicks and Taylor Bean.
  a. Exhibit J, Deposition of Dennis Moseley, 27:2-18

75. Before Dennis Moseley was promoted to President, Home America had no CEO or COO or other corporate titles. From the time that Greg Hicks purchased Home America until Dennis Moseley was promoted to president in 2007, Greg Hicks

was president, and there was no CEO. After Dennis Moseley became president of Home America, Hicks named himself CEO.

    a. Exhibit X, Deposition of Greg Hicks, 56:23-57:13

    b. Exhibit X, Deposition of Greg Hicks, 64:14-18

76. Although Greg Hicks has heard the phrase "bad loan" before, he cannot define it and does not know the meaning of the phrase.

    a. Exhibit X, Deposition of Greg Hicks, 67:20-68:8

77. The HUD mortgage credit analysis handbook establishes the guidelines and loan criteria for FHA loans.

    a. Exhibit X, Deposition of Greg Hicks, 68:12-25

78. Greg Hicks is on an "exclusion list" for Freddie Mac, meaning he is not allowed to do business with Freddie Mac. He was put on this list after Freddie Mac audited Home America's files – none of which Hicks was familiar with despite coming from his own company – and found inconsistencies with those files. Freddie Mac determined that Greg Hicks had an "inability to manage."

    a. Exhibit X, Deposition of Greg Hicks, 72:8-10

    b. Exhibit X, Deposition of Greg Hicks, 160:17-161:11

79. Greg Hicks does not know what "Refer risk class" means.

    a. Exhibit X, Deposition of Greg Hicks, 73:20-74:8

80. About 55% of Home America's home loans were government-insured loans.

    a. Exhibit X, Deposition of Greg Hicks, 80:19-21

81. Greg Hicks testified that when a customer states they have a certain amount of assets, the loan officer has a "duty" to ask for the source of funds, and has a "duty" to match up documents that trace the assets to the alleged source of funds. If the customer cannot show by documentation that it has the assets claimed or that it cannot trace the source of the assets, the loan officer has a "duty" to turn the customer down and not close the loan.

    a. Exhibit X, Deposition of Greg Hicks, 103:16-104:18

82. If someone was purchasing a property that was not within a reasonable distance of their employment, that would be a warning signal for fraud. The loan officer

should ask for an explanation for this, but Greg Hicks testified that he had no duty to evaluate the reasonableness of this explanation.
  a. Exhibit X, Deposition of Greg Hicks, 105:19-107:25

83. A borrower's pay stub or verification of employment had to support the salary the borrower stated on his application, and the loan officer was responsible for screening this for accuracy.
  a. Exhibit X, Deposition of Greg Hicks, 110:24-111:3

84. A borrower's bank records had to support the assets the borrower stated on his application, and the loan officer was responsible for screening this for accuracy.
  a. Exhibit X, Deposition of Greg Hicks, 111:1-3

85. Greg Hicks testified that as the owner of Home America, he was responsible for every loan being entered by a Home America loan officer into DU and LP, and was responsible for every application being accurate.
  a. Exhibit X, Deposition of Greg Hicks, 115:13-116:11

86. Greg Hicks testified that there was no one better than Stephanie Kennedy, as head underwriter, to train Home America employees on abiding by the HUD guidelines.
  a. Exhibit X, Deposition of Greg Hicks, 117:15-18
  b. Exhibit X, Deposition of Greg Hicks, 118:20-119:4

87. Greg Hicks testified that Hicks Team members were representatives of him personally, but Home America loan officers were not: "I didn't attend any of my closings for the last years nor did a representative of mine, for years, under the Hicks Team…. I don't know about Home America. I don't know what the other loan officers did on their business."
  a. Exhibit X, Deposition of Greg Hicks, 139:24-140:6

88. Greg Hicks paid the corporate tax for Home America out of his own personal proceeds.
  a. Exhibit X, Deposition of Greg Hicks, 179:15-18

89. Greg Hicks testified that Home America originators did not have to follow the instructions on their own applications, and that it was the underwriters' responsibility to ask them to do so.
   a. Exhibit X, Deposition of Greg Hicks, 186:1-187:5

90. Even though the origination application said to itemize "other assets," Greg Hicks never did so and he testified that an originator was permitted to assume that a person with $500 in the bank has $50,000 in assets. According to Greg Hicks, he could assign a net worth of almost $58,000 to a homeless person based on the mere possibility they have assets in storage.
   a. Exhibit X, Deposition of Greg Hicks, 186:1-187:5
   b. Exhibit X, Deposition of Greg Hicks, 188:10-189:7
   c. Exhibit X, Deposition of Greg Hicks, 194:22-198:7
   d. Exhibit X, Deposition of Greg Hicks, 201:25-202:24

91. Home America was a third-party originator/"loan correspondent"/sponsored lender sponsored by DE Lender Taylor Bean. This meant that Home America could originate FHA loans as a DE Lender, but required Taylor Bean to "sponsor" it in order for the loans to be underwritten or insured.
   a. Exhibit J, Deposition of Dennis Moseley, 24:1-14
   b. Exhibit J, Deposition of Dennis Moseley, 88:11-15
   c. Exhibit J, Deposition of Dennis Moseley, 188:19-189:11
   d. Exhibit J, Deposition of Dennis Moseley, 190:9-12
   e. Exhibit J, Deposition of Dennis Moseley, 191:7-16
   f. Exhibit J, Deposition of Dennis Moseley, 201:11-17
   g. Exhibit O, March 6, 2007 letter from Greg Hicks

92. Home America had a responsibility to perform "sufficient due diligence" to prevent mortgage fraud, including "verifying through third parties a bulk of the information located on the mortgage loan application," as is required by the FHA, to abide by the HUD 4155 handbook (the minimum standards for a loan that is sent to HUD for insuring), and to make sure the loans delivered to Taylor Bean were of investment quality.
   a. Exhibit J, Deposition of Dennis Moseley, 28:6-29:8
   b. Exhibit J, Deposition of Dennis Moseley, 77:4-8
   c. Exhibit J, Deposition of Dennis Moseley, 81:2-9

93. Dennis Moseley testified that it is fraud to manufacture documents or alter documents for a mortgage loan.
   a. Exhibit J, Deposition of Dennis Moseley, 65:19-66:4

94. Home America made money on loans that closed. It did not make any money for originating a loan if the loan did not close.
   a. Exhibit J, Deposition of Dennis Moseley, 70:7-13

95. Dennis Moseley terminated a loan officer because the loan application said a borrower was getting funds from a different place than he actually got the funds because this would be fraud. According to Moseley, this was fraud by the loan officer even though the underwriters put the loan into closing. The loan was not government-insured.
   a. Exhibit J, Deposition of Dennis Moseley, 70:14-73:9

96. Home America knew when it was originating a loan that would be government-insured, and knew that the information it was providing on an application and in a loan file would be submitted to the Government.
   a. Exhibit J, Deposition of Dennis Moseley, 81:10-82:11

97. Home America would fund its loans through a warehouse line of credit until Taylor Bean purchased the loans pursuant to its commitment within the subsequent seven business days. Until Taylor Bean purchased the loan, Home America was the owner of the loan.
   a. Exhibit J, Deposition of Dennis Moseley, 150:2-151:4
   b. Exhibit J, Deposition of Dennis Moseley, 192:4-21
   c. Exhibit J, Deposition of Dennis Moseley, 193:21-195:20
   d. Exhibit J, Deposition of Dennis Moseley, 198:22-200:1
   e. Exhibit O, March 6, 2007 letter from Greg Hicks

98. HUD requires that when part of a down payment comes from "gift funds," the lender must document the gift funds by obtaining a gift letter, signed by the donor and borrower, that specifies the dollar amount of the gift, states that no repayment is required, shows the donor's name, address, telephone number and states the nature of the donor's relationship to the borrower. In addition, the lender must document the transfer of funds from the donor to the borrower pursuant to the procedures provided by HUD 4155. An unsubstantiated transfer

of gift funds or a gift letter that does not meet all of HUD's requirements may significantly increase HUD's insurance risk and must be disclosed to HUD during the application process.

    a. Exhibit K, HUD Handbook 4155.1 Rev-5, 2-25 – 2-26
    b. Exhibit W, FHA TOTAL Mortgage Scorecard User Guide, at 15
    c. Exhibit U, Form HUD-54118-MCR, at M18 and M26

99. HUD requires that the application package contain all documentation supporting the lender's decision to approve the mortgage loan. When standard documentation does not provide enough information to support this decision, the lender must provide additional explanatory statements, consistent with other information in the application, to clarify or to supplement the documentation submitted by the borrower.

    a. Exhibit K, HUD Handbook 4155.1 Rev-5, 3-1

100. HUD requires that a Verification of Employment and the borrower's most recent pay stub are provided. As an alternative to obtaining a Verification of Employment, the lender may obtain the original IRS W-2 Forms from the previous two years. HUD requires these and other documents (e.g., W-2s, 1099s, 1040s, two year employment history, recent pay stub) to support the income used for qualifying for the loan. Miscalculation of income amount or the income source is at best considered to be not acceptable by HUD, and may materially affect HUD's insurance risk.

    a. Exhibit K, HUD Handbook 4155.1 Rev-5, 3-1E
    b. Exhibit U, Form HUD-54118-MCR, at M31-M33
    c. Exhibit V, HUD005589, Mortgage Finance Fraud Warning Signals
    d. Exhibit W, FHA TOTAL Mortgage Scorecard User Guide, at 5 ("The lender is responsible for ascertaining that the income used in qualifying the applicant meets FHA's criteria for inclusion in the qualifying ratios.")
    e. Exhibit W, FHA TOTAL Mortgage Scorecard User Guide, at 10 ("The lender is responsible for documenting and verifying the accuracy of the amount of income being reported, and for determining if it can be considered as effective income in determining the payment-to-income and debt-to-income ratios.")

> f. Exhibit W, FHA TOTAL Mortgage Scorecard User Guide, at 11 (requiring verification of employment for current employment and employment history for Refer loans; most recent paystub required)
> g. Exhibit W, FHA TOTAL Mortgage Scorecard User Guide, at 12 (requiring tax returns to verify income)

101.   HUD will only insure principal residences. A principal residence is a property that will be occupied by the borrower for the majority of the calendar year. HUD will not insure a mortgage if it concludes that the transaction was designed to use FHA mortgage insurance as a vehicle for obtaining investment properties. Accordingly, where employment is not within reasonable distance of the property, it is considered a warning signal of possible mortgage fraud.

> a. Exhibit K, HUD Handbook 4155.1 Rev-5, 1-1
> b. Exhibit V, HUD005589, Mortgage Finance Fraud Warning Signals

102.   For each loan FHA insures, the lender must establish that the borrower has the ability and willingness to repay the mortgage debt. This decision must be predicated on sound underwriting principles consistent with the guidelines, rules, and regulations described throughout the HUD-4155 Handbook and must be supported by sufficient documentation.

> a. Exhibit K, HUD Handbook 4155.1 Rev-5, Foreword, 1

103.   HUD considers child support to be an unacceptable income source that significantly increases HUD's insurance risk. The borrower must prove that child support will continue for at least three years for Refer loans.

> a. Exhibit U, Form HUD-54118-MCR, at M40
> b. Exhibit W, FHA TOTAL Mortgage Scorecard User Guide, at 14

104.   Unusual credits or disbursements shown on the HUD-1 Settlement Statement are considered to be a warning signal for mortgage finance fraud.

> a. Exhibit V, HUD005589, Mortgage Finance Fraud Warning Signals

105.   HUD requires that substantial increases in debts or savings accounts be satisfactorily explained. Failure to do so may significantly increase HUD's insurance risk.

> a. Exhibit U, Form HUD-54118-MCR, at M20

> b. Exhibit W, FHA TOTAL Mortgage Scorecard User Guide, at 16 (requiring explanation and documentation for recent large deposits, including earnest money deposit)

106.   Home America was a mortgage lender approved by the FHA to originate mortgage loans for insurance by FHA, and so when originating loans insured by the FHA, Home America was required to follow FHA rules, regulations, and guidance.

> a. Exhibit B, U.S. Proof of Claim in Home America Bankruptcy, Case No. 3:09-bk-07047-JAF

107.   On each the 415 loans included in the United States's proof of claim against Home America, FHA endorsed the mortgage, the borrower(s) defaulted, the mortgage holder made claim(s) for insurance benefits to FHA, and FHA paid insurance benefits on the loans.

> a. Exhibit B, U.S. Proof of Claim in Home America Bankruptcy, Case No. 3:09-bk-07047-JAF

108.   On each the 415 loans included in the United States's proof of claim against Home America, FHA would not have endorsed the mortgages for insurance had it known of the fraudulence or falsity of the claims and/or the false information submitted to FHA that supported or otherwise was used to get the claims for mortgage insurance paid.

> a. Exhibit B, U.S. Proof of Claim in Home America Bankruptcy, Case No. 3:09-bk-07047-JAF

109.   Greg Hicks used Home America funds to fund various corporations and personal investments, including 20 Moon Partners, LLC; Hicks & Hicks Development, LLC; Carlito's Mexican Restaurant, LLC; and partial ownership in a private jet. All but Carlito's were interest-free loans. On July 1, 2008, Greg Hicks and his corporations – Hicks & Hicks, LLC; 20 Moon Partners; and Carlita's Mexican Restaurant, LLC – owed a combined $2,107,259 to Home America.

> a. Exhibit N, Home America audit certifications, ¶¶ 12 (March 29, 2007 letter) and 16 (July 1, 2008 letter)
>
> b. Exhibit P, Hicks 2005 personal tax return
>
> c. Exhibit Q, Home America 2008 balance sheet

110.    Greg Hicks used Home America funds to purchase personal and recreational automobiles, including an RV, a Range Rover, a Chevy Avalanche, a trailer for his motorcycles, and a boat.

      a.  Exhibit R, Home America property listings

      b.  Exhibit E, Declaration of Stephanie Kennedy, at ¶ 57

      c.  Exhibit F, Declaration of Comfort Friddle, at ¶ 31

111.    Home America paid Greg Hicks's wife, Desirae Hicks, $38,460 in 2006 as a W-2 employee, but Desirae Hicks did not work for Home America.

      a.  Exhibit S, 2006 W-2 of Desirae Hicks

      b.  Exhibit E, Declaration of Stephanie Kennedy, at ¶ 58

      c.  Exhibit F, Declaration of Comfort Friddle, at ¶ 32

112.    The HUD/VA Addendums to the Uniform Residential Loan Applications (HUD-92900-A) in the files at issue list Home America as the lender and Taylor Bean as the sponsor.

      a.  Exhibit L, HUD/VA Addendum to the Uniform Residential Loan Applications (HUD-92900-A), HUD006635, HUD006637

113.    The HUD/VA Addendum to the Uniform Residential Loan Applications (HUD-92900-A) includes a "Lender's Certification" signed by an officer of the lender that states in relevant part:

> The undersigned lender makes the following certifications to induce the Department of Veterans Affairs to issue a certificate of commitment to guarantee the subject loan or a Loan Guaranty Certificate under Title 38, U.S. Code, or to induce the Department of Housing and Urban Development — Federal Housing Commissioner to issue a firm commitment for mortgage insurance or a Mortgage Insurance Certificate under the National Housing Act.
> …
> B. The information contained in the Uniform Residential Loan Application and this Addendum was obtained directly from the borrower by a full-time employee of the undersigned lender or its duly authorized agent and is true to the best of the lender's knowledge and belief.
> …

D. The verification of employment and verification of deposits were requested and received by the lender or its duly authorized agent without passing through the hands of any third persons and are true to the best of the lender's knowledge and belief.
…
F. This proposed loan to the named borrower meets the income and credit requirements of the governing law in the judgment of the undersigned.

    a. Exhibit L, HUD/VA Addendum to the Uniform Residential Loan Applications (HUD-92900-A), HUD006635

114.    The HUD/VA Addendum to the Uniform Residential Loan Applications (HUD-92900-A) includes a "Lender's Certificate" signed by an officer of the lender that states in relevant part:

The undersigned certifies that to the best of its knowledge:

(a) The statements made in its application for insurance and in this Certificate are true and correct…;

(e) No charge has been made to or paid by the borrower except as permitted under HUD regulations…;

I, the undersigned, as authorized representative of [Home America Mortgage, Inc.], mortgagee at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

    a. Exhibit L, HUD/VA Addendum to the Uniform Residential Loan Applications (HUD-92900-A), HUD006637