# EXHIBIT X

1    UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF GEORGIA

3    ATLANTA DIVISION

4

5    UNITED STATES OF AMERICA ex rel.

6    COMFORT FRIDDLE and STEPHANIE KENNEDY,

7    Relators,

8                              CIVIL ACTION FILE

9    vs.

10                             NO. 1:06-CV-3023-JEC

11   TAYLOR, BEAN & WHITAKER MORTGAGE CORPORATION;

12   HOME AMERICA MORTGAGE, INC.; GREGORY HICKS;

13   DENNIS MOSELEY; CARL WRIGHT; and JOHN DOE,

14   Defendants.

15

16   DEPOSITION OF

17   JAMES GREGORY HICKS

18

19   February 6, 2013

20   10:25 a.m.

21

22   75 Fourteenth Street
     25th Floor
23   Atlanta, Georgia

24

25   Lisa Fischer, CCR-B-1277, RPR, CRR

```
 1                APPEARANCES OF COUNSEL

 2

 3   On behalf of Comfort Friddle and Stephanie

 4   Kennedy:

 5        JULIE K. BRACKER, Esq.

 6        JASON MARCUS, Esq.

 7        Bothwell Bracker

 8        304 Macy Drive

 9        Roswell, Georgia 30076

10        770-643-1606

11        Julie@BBV-Law.com

12        Jason@BBV-Law.com

13

14

15

16                      -  -  -

17

18

19

20

21

22

23

24

25
```

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1          APPEARANCES OF COUNSEL

2

3   On behalf of Defendants Gregory Hicks,

4   Dennis Moseley and Carl Wright:

5        BUDDY PARKER, Esq.

6        SALMEH FODOR, Esq.

7        Maloy Jenkins Parker

8        25th Floor

9        75 Fourteenth Street, NW

10       Atlanta, Georgia 30309

11       404-875-2700

12       parker@mjplawyers.com

13       fodor@mjplawyers.com

14

15   Also Present:  Anne Louise Shadinger

16                  Kathyrn Guzner

17                  Dennis Moseley

18

19

20

21                  - - -

22

23

24

25

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

# INDEX TO EXAMINATIONS

Examination                                      Page


Cross-Examination by Ms. Bracker              6
Direct Examination by Mr. Parker            209
Recross-Examination by Ms. Bracker          210

- - -

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

```
 1              INDEX TO EXHIBITS

 2
     Plaintiff's      Description              Page
 3

 4   Exhibit 1  Mortgage Finance Fraud
                Warning Signals                 97
 5
     Exhibit 2  Uniform Residential Loan
 6              Application                     183

 7

 8
         (Original Exhibits 1 and 2 have been
 9   attached to the original transcript.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1       James Gregory Hicks

2          February 6, 2013

3          MS. BRACKER:  Today is February 6,

4       2013, and this is the deposition by oral

5       examination of Gregory Hicks, pursuant to

6       Federal Rules of Civil Procedure 34 and

7       45, for all purposes appropriate under the

8       Federal Rules.

9          JAMES GREGORY HICKS,

10   having been first duly sworn, was examined and

11   testified as follows:

12              CROSS-EXAMINATION

13   BY MS. BRACKER:

14      **Q.   I am Julie Bracker, as you just**

15   **heard.  I represent Stephanie Kennedy and**

16   **Comfort Friddle, who are relators in an action**

17   **that they brought on behalf of themselves in**

18   **the United States.**

19          **Have you ever been deposed before?**

20      A.   Yes.

21      **Q.   Tell me when you've been deposed**

22   **before.**

23      A.   I was deposed several times during

24   different cases at Home America.

25      **Q.   How many times?**

1    A.   I've been deposed several times

2  in -- I don't remember exactly how many.  Two

3  or three times.

4    **Q.   What's the first time you were**

5  **deposed?**

6    A.   Over the ownership of the Home

7  America name after I bought it.

8    **Q.   And do you remember who represented**

9  **you at that time?**

10    A.   No.  Florida.

11    **Q.   It was in Florida?**

12    A.   Yes.

13    **Q.   In Florida.  Okay.  And you don't**

14  **recall who your attorney was.**

15    **Do you recall about what time that**

16  **was?  What year?**

17    A.   No.  2002.

18    **Q.   What was the next time you were**

19  **deposed, that you can recall?**

20    A.   A lawsuit for some turndowns or

21  something, Home America Mortgage.  I don't

22  remember what the exact case was.

23    **Q.   Do you recall who represented you?**

24    A.   Salmeh Fodor.

25    **Q.   And do you recall approximately what**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1  year that was?

2       A.    It was about ten years ago.

3       Q.    Was that in Georgia?

4       A.    It was.

5       Q.    Federal court, or do you know?

6       A.    I don't even know.

7       Q.    How about that first one about the

8  ownership of Home America?  Was that in

9  Georgia?  You said that --

10      A.    Florida.

11      Q.    -- was in Florida, right?  Do you

12 know if that was state or federal?

13      A.    It's got to be state.

14      Q.    What's the next time you remember

15 being deposed?

16      A.    A tenant sued in one of the shopping

17 centers that I had.

18      Q.    What shopping center was that?

19      A.    The one that houses the BodyPlex

20 that I have now on Highway 20 and Moon Road.

21      Q.    I heard Highway 20 but not the next

22 thing you said.

23      A.    Highway 20 and Moon Road.

24      Q.    Highway 20 in Georgia?

25      A.    Yes.

1      Q.    Who represented you in that

2   deposition?

3      A.    Salmeh.

4      Q.    And the deposition was in Georgia?

5      A.    Yes.

6      Q.    And about when was that?

7      A.    I don't know.  Six years ago or so.

8      Q.    When was the next time you were

9   deposed?

10      A.    My divorce.

11      Q.    And what year was that?

12      A.    '08, '09, something like that.

13      Q.    Who represented you in that?

14      A.    Judy King.

15      Q.    Was that in Georgia also?

16      A.    Yes.

17      Q.    Do you know what county that was?

18      A.    Gwinnett.

19      Q.    Have you been deposed any other

20   times that you can recall?

21      A.    No.  Or have I?  No.

22      Q.    Have you ever attended a deposition

23   where you were not the deponent before today?

24      A.    No.

25      Q.    You have an understanding of what a

1   deposition is, then, obviously, right?

2        A.   Obviously.

3        Q.   And you understand that you're under

4   oath.  She just sworn you in.  And I'm

5   guessing you know the routine pretty well,

6   that we're going to go slow.  We're going to

7   not talk over each other.  Ms. Lisa is trying

8   to take everything down that we say, which

9   makes it really important that you speak up

10  enough for her to hear you and that you use,

11  what I tell my four-year-old, use your words,

12  not uh-huh and huh-uh, because that's hard to

13  transcribe.

14       A.   That's okay.  I'm not your

15  four-year-old, though.

16       Q.   That is very obvious to me, but

17  thank you for pointing it out.

18            If at any time you don't understand

19  a question I put to you, then you need to let

20  me know, so I can rephrase it until we're sure

21  you understand.  Is that acceptable?

22       A.   I understand.

23       Q.   Is there any reason today why you

24  might not be able to give your best testimony?

25       A.   No.

1      Q.    So you were running pretty late

2  today.   That won't impact your testimony?

3      A.    No.

4           MS. BRACKER:   Will the witness read

5      and sign?

6           MR. PARKER:   Yes.

7      Q.    (By Ms. Bracker)  Do you have any

8  questions about my instructions?

9      A.    No.

10      Q.    And are you familiar with the matter

11 we're here for today?

12      A.    Do I fully understand?  Is that what

13 you're asking me?

14      Q.    No.  I asked if you're familiar with

15 it.  But you can explain to what degree you're

16 familiar with it, if you'd like.

17      A.    "Familiar" is a pretty vague word.

18 Yeah.

19      Q.    Tell me what your understanding of

20 it is.

21      A.    Your clients are suing me for making

22 false claims against the government on behalf

23 of mortgage loans that were originated and

24 funded with TBW.

25      Q.    Have you read the Complaint in this

1 action?

2       A.   I have.

3       Q.   Did you read our Motion for Summary

4 Judgment that was filed in this action about a

5 year ago?

6       A.   I did.

7       Q.   Are you familiar with the loans that

8 were addressed in that document?

9       A.   No.

10       Q.   Did you review the copies that we

11 provided to your attorney of those loans?

12       A.   No.

13       Q.   But it's your understanding that

14 they're TBW loans and not Home America loans?

15       A.   TBW submitted the claims, yes.

16       Q.   How did you reach that conclusion?

17       A.   I couldn't submit claims at Home

18 America.

19       Q.   Tell me what that means.

20       A.   I was not a full-service lender with

21 the FHA, which prevented me from ever making a

22 claim or insuring a loan.

23       Q.   So is it your understanding that the

24 false claims at issue are submitting the loans

25 themselves, the loan applications?

1    A.   I don't know what you're saying.

2    Q.   Okay.  When did you find out about

3    today's deposition?

4    A.   Couple days ago.

5    Q.   And what have you done to prepare

6    for your deposition?

7    A.   Nothing.

8    Q.   Do you understand that there's

9    portions of the Complaint that have to do with

10   the termination of Kennedy and Friddle?

11   A.   I have read that, yes.

12   Q.   Tell me, in your own words, your

13   understanding of those claims.

14   A.   Stephanie Kennedy is claiming that

15   she worked for me and I fired her.  And

16   Comfort Friddle is claiming she was fired.

17   Q.   Other than your attorney -- I'm not

18   interested in or asking about any

19   conversations you've had with your attorney.

20   But have you -- well, actually I need to back

21   up on that.

22        Does Ms. Fodor represent you?

23   A.   She does.

24   Q.   Have you ever had conversations with

25   anyone regarding this lawsuit, not about Home

James Gregory Hicks                     United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   America or the specific allegations in the

2   lawsuit, but about the fact that you've been

3   sued?

4       A.   Yes.

5       Q.   I want to go through each and every

6   conversation you can recall.

7       A.   I can't remember any of them now.

8       Q.   Then how do you know you had them?

9       A.   Because I remember talking about

10  them, but I don't remember what I said.

11      Q.   Do you remember who with?

12      A.   I probably can't remember everybody,

13  but I know I've talked to my sisters.

14      Q.   How many sisters do you have?

15      A.   Two.

16      Q.   Are they in Georgia?

17      A.   Yes.

18      Q.   What are their names?

19      A.   Christy Hicks and Lori Hollifield.

20      Q.   Who else?

21      A.   I've talked to various people over

22  the course of almost a decade here about it.

23      Q.   What do you mean "a decade"?

24      A.   Well, six years, since you filed it.

25      Q.   But it wasn't unsealed for a long

1   part of that time?

2        A.    Right.

3        Q.    So when did you first become aware

4   of the suit?

5        A.    I didn't become aware of the

6   actual -- this type of actual suit until it

7   got printed accidentally somehow or something

8   came up when it was disclosed.  But rumors

9   that they were suing me from different people

10  came from years prior to.  But I didn't know

11  it was a federal whistleblower lawsuit.

12       Q.    So when did you realize that it was

13  a federal whistleblower lawsuit?

14       A.    When it became public knowledge.

15       Q.    Have you had any conversations with

16  anyone regarding Stephanie Kennedy?

17       A.    I can't remember an actual

18  conversation word for word about it.  I try

19  not to talk about her at all.

20       Q.    So when you say you can't remember

21  it word for word, that's not really my

22  question.  My question is:  Have you talked

23  with anyone about Stephanie Kennedy, that you

24  recall?

25       A.    In what manner about

James Gregory Hicks                   United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Stephanie Kennedy?

2         Q.   Well, it would be a conversation

3    that included Stephanie Kennedy.  That's the

4    question.

5         A.   I'm sure, yes.

6         Q.   Give me an example.

7         A.   Well, I talked to my ex-wife, that

8    said she got a call from your office in the

9    last couple weeks.  I talked to Emily Myers,

10   who called me and said she got a call from

11   your office.  I talked to Joanne Patterson,

12   who asked me about it.

13        I've talked to -- one of our closers

14   called me last week, and I can't remember her

15   name, said she got a call from you-all.  They

16   asked me what was going on about it.

17        Q.   When you say "one of our closers,"

18   you mean --

19        A.   One of the closers that worked for

20   Taylor, Bean & Whitaker at the time.

21        Q.   Okay.

22        A.   I don't recall any other specific

23   conversations.  Maybe there was some; maybe

24   there wasn't.

25        Q.   So when you spoke with your ex-wife,

1   **tell me about that conversation.**

2        A.   She called me and said that -- I

3   believe she called me and said that you had

4   called her at work and asked her if she wanted

5   to participate or give any information and

6   that I was being sued by the government.

7        **Q.   And what did you tell her?**

8        A.   I didn't tell her anything.  I told

9   her she could talk to my attorney, if she

10  wanted to.  And if she called him, she called

11  him.  But I don't have a whole lot of

12  conversations with her.

13       **Q.   Do you know if she called your**

14  **attorney?**

15       A.   I don't know.

16       **Q.   Tell me about your conversation with**

17  **Emily Myers.**

18       A.   She called and said that somebody

19  had asked her if she wanted to participate in

20  this lawsuit.  And she had just called to tell

21  me she told them she didn't have no desire to

22  participate in anything like this.

23       **Q.   What did you tell her, or what did**

24  **you say?**

25       A.   I said okay.  There's not much to

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    it.  I didn't elaborate a lot.

2         Q.   And your conversation with

3    Joanne Patterson?

4         A.   I updated her, what's going on, a

5    couple weeks ago, that I was still going

6    through a lawsuit with Stephanie and Comfort.

7         Q.   So when the lawsuit was unsealed,

8    you were not surprised, correct?

9         A.   Yeah, I was surprised.

10        Q.   What was surprising to you?

11        A.   The allegations of the claims.

12        Q.   Tell me what you mean.

13        A.   That I defrauded the government by

14   making false claims on the government.

15        Q.   Have you spoken with anyone from the

16   government?

17        A.   Yes.

18        Q.   Who?

19        A.   Several U.S. attorney --

20             THE WITNESS:  What are they called,

21        Buddy?

22             MR. PARKER:  Assistant U.S.

23        attorneys.

24        A.   U.S assistant attorneys.  Spoke with

25   the head of the HUD Attorney General's Office

1  that was investigating the claims.  I spoke

2  with numerous attorneys in Washington, D.C.  I

3  spoke with HUD representatives in Washington,

4  D.C.

5  　　　　Q.　　(By Ms. Bracker)  This is after the

6  case was unsealed?

7  　　　　A.　　Correct.

8  　　　　Q.　　Did you have any conversations with

9  the government before the case was unsealed?

10  　　　　A.　　I did.

11  　　　　Q.　　Who with?

12  　　　　A.　　U.S. Attorney's Office.

13  　　　　Q.　　In the Northern District of Georgia?

14  　　　　A.　　Here in Atlanta, yeah.

15  　　　　Q.　　Do you recall that person's name?

16  　　　　A.　　Dan Caldwell.

17  　　　　Q.　　How long did you speak with

18  Mr. Caldwell?

19  　　　　A.　　Three or four hours.

20  　　　　Q.　　What did you tell Mr. Caldwell?

21  　　　　A.　　The truth.

22  　　　　Q.　　So you said, "Hi, Mr. Caldwell, I'm

23  Gregory Hicks, the truth," and that's all you

24  said?

25  　　　　A.　　I answered every question that they

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    had.

2        Q.   So did you initiate the meeting, or
3    did Mr. Caldwell?

4        A.   I initiated that first meeting.

5        Q.   Who attended the meeting with you?

6        A.   Buddy Parker.

7        Q.   Anyone else?

8        A.   No.

9        Q.   What questions were you asked that
10   you responded to truthfully?

11       A.   I don't know.  I can't remember all
12   the questions I was asked.  It was four hours'
13   worth of questions, and it was a couple years
14   ago.

15       Q.   Do you recall any of the questions
16   that were asked?

17       A.   They asked me if I'd made false
18   claims against the government, and I said no.

19       Q.   Do you remember anything else?

20       A.   Not really, not word for word that
21   would be correct.

22       Q.   Do you remember the gist of anything
23   else?

24       A.   No.  I'm sure you can get that from
25   them.

James Gregory Hicks                  United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    **Q.    Why do you say that?**

2        A.    Well, you can get a subpoena for it

3    probably.

4    **Q.    Why do you say that I can do that?**

5        A.    I would just imagine, since you're

6    representing the United States government

7    against me, that the government will be happy

8    to give you the information that they

9    obtained.

10   **Q.    I want to clarify.  I represent the**

11   **relators.  I don't represent the United States**

12   **government.  I don't want you to confuse --**

13       A.    When you made the phone call last

14   week to my ex-wife, you said you were

15   representing the United States government.

16   That's the words out of her mouth.  She said

17   the government is suing me.

18   **Q.    That's true.**

19       A.    You're sitting here saying you're

20   suing me.  You're representing the relators

21   that are suing me.

22   **Q.    Well, just as there's more than one**

23   **defendant, there's more than one plaintiff in**

24   **this lawsuit.  So the lawsuit is being brought**

25   **both by the United States and by the relators.**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   **I don't represent the government.**

2       A.   I know, because the government chose

3   not to be represented in this case, period,

4   against me.

5       **Q.   That's actually not true, Mr. Hicks,**

6   **but we really -- I'm not going --**

7       A.   Against me personally, it is true.

8       **Q.   I will have a dialogue with you**

9   **about it off the record, but we're not going**

10  **to have a conversation on --**

11      A.   Well, you bought it up.  Let's have

12  a dialogue now.

13      **Q.   My questions are ones that you**

14  **should answer.**

15      A.   I am answering.  It's just leading

16  into what you don't want to hear.

17          MS. BRACKER:  Would you like to

18      direct your witness, or would you like me

19      to direct your witness?  It's entirely up

20      to you.

21          MR. PARKER:  It's up to you.

22          MS. BRACKER:  Okay.  Then I would

23      prefer you to control your witness.

24      A.   I don't think I'm out of control.

25  I'm answering very calm --

1    Q.    (By Ms. Bracker)  Here is your next
2    question:  When did you meet Comfort Friddle?
3    A.    I don't remember the year I met her,
4    but it was several years prior to her coming
5    to work there.
6    Q.    Several years prior?
7    A.    I guess.  Maybe a year prior.  I
8    don't know how long she even worked there.
9    Q.    Where did you meet her?
10   A.    In the Home America office.
11   Q.    Why was she in the Home America
12   office?
13   A.    Applying for a job.
14   Q.    So she was not hired at that time?
15   A.    I don't remember.
16   Q.    When was the last time you saw
17   Comfort Friddle?
18   A.    A couple weeks before her
19   resignation letter.
20   Q.    I'm sorry?
21   A.    A couple weeks before she gave her
22   resignation letter.
23   Q.    So you didn't see her when she
24   delivered this letter to you?
25   A.    I did not.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.    Have you got a copy of that

2  resignation letter?

3    A.    I do not.

4    Q.    When did you last speak with her?

5    A.    A couple weeks before her

6  resignation letter.

7    Q.    When did you meet Stephanie Kennedy?

8    A.    When she applied for the position at

9  Taylor, Bean & Whitaker.

10   Q.    When was that?

11   A.    I don't remember the year, but I

12  imagine it was a few years, three or four

13  years, something like that, before her

14  resignation letter to Taylor Bean.

15   Q.    When was the last time you talked to

16  her?

17   A.    Personally talked?

18   Q.    What other kind is there?

19   A.    Well, there's text.

20   Q.    In any way communicated with her.

21   A.    The last communication I had with

22  her was by text about six months after, I

23  guess, six or seven months, something like

24  that -- I don't know the exact time -- she

25  departed Taylor, Bean.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.    What was the substance of that text?

2    A.    I told her if she didn't quit

3    hounding me and talking about me, I was going

4    to call her husband and tell him she had an

5    affair with me.

6    Q.    What was she doing to hound you?

7    A.    You know, this person would say

8    she's saying this.  This person would say

9    she's suing me.  This person would say she's

10   doing whatever.

11   Q.    Tell me more specifically who these

12   people are that were saying this.

13   A.    I can't remember who all said it

14   now.  It just got back through me.  Remember,

15   I had hundreds of employees.

16   Q.    Did she respond to that text?

17   A.    She said, I call a truce.

18   Q.    And then what did you say?

19   A.    That was it.

20   Q.    Have you ever talked to her husband,

21   John Kennedy?

22   A.    Yeah, I've talked to him.

23   Q.    When did you meet him?

24   A.    Well, first of all, it's not her

25   husband anymore.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   Q.   I'm aware.

2   A.   Ex-husband.

3   Q.   When did you first meet him?

4   A.   I don't remember.  Sometime after

5   she came to work.

6   Q.   Have you spoken with John Kennedy

7   since Stephanie Kennedy's termination?

8   A.   Yes.

9   Q.   When?

10   A.   At the mortgage convention in -- I

11   don't remember -- was it in Jacksonville or

12   St. Simons or Amelia Island or something?  It

13   was after her termination -- not termination,

14   after her resignation.

15        You-all keep saying termination.

16   She resigned.

17   Q.   Was she present for that

18   conversation?

19   A.   She was in the room, yeah.

20   Q.   But she wasn't standing where

21   you-all were talking?

22   A.   She was standing about here to the

23   bookcase when he walked up to me.

24   Q.   What was that conversation?

25   A.   There was really no conversation.

1   Q.   **Have you spoken with him any other**

2   **time since she was terminated?**

3   A.   Not me.

4   Q.   **I don't know what that means.**

5   A.   It means not me.

6   Q.   **You're saying someone else has?**

7   A.   I don't know, but I haven't.

8   Q.   **Have you texted him or e-mailed him?**

9   A.   I haven't.

10   Q.   **No phone calls, no nothing, no --**

11   A.   I haven't.

12   Q.   **-- communications?  Sorry.  No**

13   **communications?**

14   A.   Well, how many times do I need to

15   answer that?

16   Q.   **Until I stop asking the question.**

17   A.   Well, you can keep asking me for

18   seven hours.  I haven't talked to him or

19   spoken to him or texted him.

20   Q.   **Can you please state your full name**

21   **for the record.**

22   A.   James Gregory Hicks.

23   Q.   **And your date of birth?**

24   A.   ████ .

25   Q.   **And your current home address?**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1        A.   ███████████████, Braselton,

2   Georgia ██████.

3        Q.   **Have you ever been known by any**

4   **other names?**

5        A.   No, I don't think so.

6        Q.   **Have you ever served in the armed**

7   **services?**

8        A.   No.

9        Q.   **How many times have you been**

10  **married?**

11       A.   Once.

12       Q.   **And you're not currently married,**

13  **correct?**

14       A.   Correct.

15       Q.   **And your ex-wife's name?**

16       A.   Desiree Renee.  I don't know what

17  her last name is.  Phillips, I think, yeah.

18       Q.   **Where does she live now?**

19       A.   I don't know.

20       Q.   **What state does she live in now?**

21       A.   Georgia.

22       Q.   **Is there an order of support for the**

23  **court regarding your divorce?**

24       A.   No.

25       Q.   **No children?**

James Gregory Hicks          United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1      A.   Yes.

2      Q.   I asked a bad question.  Do you have

3  any children?

4      A.   Yes.

5      Q.   With Desiree?

6      A.   Yes.

7      Q.   What are their names?

8      A.   Devin Nicole Hicks.

9      Q.   Can you spell Devin.

10     A.   D-e-v-i-n.

11     Q.   How old is Devin?

12     A.   20.

13     Q.   Where does she live?

14     A.   University of Georgia.

15     Q.   Any other children with

16  Desiree Hicks, formerly Hicks?

17     A.   No.

18     Q.   Any other children with any other

19  women?

20     A.   No.

21     Q.   Any other relatives in Georgia other

22  than the two sisters you've identified and

23  your child?

24     A.   I mean, there's cousins and aunts

25  that I don't really know.

1    Q.    **What property do you own, Mr. Hicks?**

2    A.    What property do I own?

3    Q.    **Yes, sir.**

4    A.    I own my home.

5    Q.    **The Legends Drive home you just**

6    **identified?**

7    A.    Yes.

8    Q.    **Any other property?**

9    A.    I own 20 Moon, the property at 20

10   Moon.

11   Q.    **That's the BodyPlex thing you just**

12   **referred to?**

13   A.    That's right.

14   Q.    **And that's in Georgia, you said?**

15   A.    Yes.

16   Q.    **What city of Georgia is that?**

17   A.    Grayson.

18   Q.    **Any other property you own?**

19   A.    Florida, a house in Florida.

20   Q.    **What's the address of that property?**

21   A.    2896 Tomoka, T-o-m-o-k-a, Farms

22   Road.

23   Q.    **Is that a residence?**

24   A.    Port Orange.  It is.

25   Q.    **But your principal residence is**

1    **Georgia?**

2         A.    It is right now.

3         **Q.    Any other properties you own?**

4         A.    Personally?  I think almost

5    everything is sold now.  Yes, everything else

6    is sold, I think.  Yeah.

7         **Q.    What do you have an ownership**

8    **interest in, whether or not you solely own it**

9    **or own it personally?**

10        A.    20 Moon Properties.

11        **Q.    I would like to know what property**

12   **you have an ownership interest in, whether you**

13   **personally own it or not.**

14             MR. PARKER:  May I suggest you defer

15        that?  We're almost finalizing the

16        interrogatory responses, and you're going

17        to have an answer on all the corporate

18        entities.  I'll give it to you during the

19        day.

20             MS. BRACKER:  Okay.  We'll defer

21        that for the moment, then.

22        **Q.    (By Ms. Bracker)  Have you ever been**

23   **arrested, Mr. Hicks?**

24        A.    No.

25        **Q.    Have you ever been subject to**

1  disciplinary action?

2       A.    Yeah, with a belt.

3       **Q.    Anything else?**

4       A.    Like what?  Define "disciplinary

5  action."

6       **Q.    Well, what does it mean to you,**

7  **disciplinary action?**

8       A.    Well, corrective.  But, you know,

9  I'm 46 years old.  So I've been corrected a

10  lot in my lifetime.

11       **Q.    Other than by your parents, and**

12  **we'll exclude your childhood, who have you**

13  **been corrected by?**

14       A.    You want to go to high school and

15  all that too?

16       **Q.    Not particularly, no.**

17       A.    Well, then, ask the question that

18  you're asking.  What do you want to know?

19       **Q.    Let's start at 18.**

20       A.    I got reprimanded a lot on my first

21  job at the fire department.

22       **Q.    What for?**

23       A.    Well, sometimes being late.

24       **Q.    What fire department were you with?**

25       A.    Gwinnett County.

James Gregory Hicks                     United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1       Q.   How long were you with the fire
2   department?
3       A.   11 years.
4       Q.   Was that your first job out of high
5   school?
6       A.   Well, my first real job.
7       Q.   What high school did you graduate
8   from?
9       A.   Lithonia High School.
10      Q.   What year did you graduate?
11      A.   '84.
12      Q.   Did you attend college?
13      A.   Went to Mercer University for three
14  years.
15      Q.   But didn't graduate?
16      A.   I did not graduate.
17      Q.   So what did you do when you left
18  Mercer?
19      A.   Became a fireman.
20      Q.   What occasioned your leaving Mercer
21  and coming back to be a fireman?
22      A.   I was broke.
23      Q.   Do you recall any other time you've
24  been subjected to disciplinary action or, as
25  you said, corrected since 18, other than at

1   **your first job with the fire department?**

2      A.   Speeding tickets.

3      **Q.   Anything else?**

4      A.   Let me think how many times I've

5   been -- I guess it goes up to the -- Georgia

6   Banking Association disciplined me for hiring

7   practices at Home America.

8      **Q.   When was that?**

9      A.   I don't know.  2004, 2003, '2 maybe.

10     **Q.   So can you explain to me what the**

11  **allegations were.**

12     A.   Yeah.  I hired four employees that

13  came to work and started working but did not

14  give proper resignations to their past

15  employer, which constituted them working for

16  two employers at one time, which got me a

17  $5,000 fine.

18          Actually, they didn't get me.  I'm

19  sorry.  They got Home America.  So I shouldn't

20  have even said that because that's not me.  I

21  didn't get disciplined for it.

22     **Q.   Can you think of any other time when**

23  **you've been disciplined?**

24     A.   I was disciplined by Freddie Mac.

25     **Q.   Was that you or Home America?**

1    A.    Me and Home America both.

2    **Q.    What was the substance of that?**

3    A.    I was cut off from doing business

4  with Freddie Mac -- or I was put on the list

5  not to do with business with Freddie Mac.  I

6  never did business with Freddie Mac anyway

7  directly.

8    **Q.    And why was that?**

9    A.    Well, my cutoff letter said they

10  didn't have faith in my ability to manage.

11  Not fraud.

12    **Q.    Why do you think they did that when**

13  **you don't do any business with them?**

14    A.    I think they did that because of

15  your clients' testimonies of lies they told

16  them.

17    **Q.    Any other time you recall being**

18  **disciplined?**

19    A.    No.

20    **Q.    Any other time that Home America was**

21  **disciplined?**

22    A.    Home America got several write-ups

23  on FHA audits for minor situations.

24    **Q.    Several write-ups?  Is that what you**

25  **said?**

1     A.    Yeah, on audits.  All companies got

2   write-ups on audits.

3     **Q.    Why was FHA auditing Home America**

4   **when Home America didn't do business with**

5   **them?**

6     A.    Well, Home America was still the

7   originating factor on it.  So they look at the

8   originating part of the deal.

9     **Q.    So explain to me what an originator**

10   **is.**

11     A.    An originator obtains a person

12   that's willing and looking for a loan

13   application, takes the loan application,

14   processes that application, and submits it to

15   an approving entity that is capable of funding

16   and is capable of lending it.

17     **Q.    And that subjects you to review by**

18   **the FHA?**

19     A.    Yes.  Every company is reviewed.

20   Every broker, everybody that does any FHA loan

21   is subject to review by FHA.

22     **Q.    When you left the fire department,**

23   **what was your next employment?**

24        **I'm going to work it out out loud.**

25   **You graduated around the time you were 18 and**

1    you spent about three years at Mercer.  That's

2    around 21.

3         A.   Correct.

4         Q.   And you spent about 11 years with

5    the fire department.  That puts you around 32.

6    Does that sound right to you?

7         A.   Yes.

8         Q.   So around 32 you left the fire

9    department, and what did you do?

10        A.   See, while I was at the fire

11   department, I already started on my off days

12   of being in the mortgage business working for

13   a bank called the Bank of Loganville.

14        Q.   What was your position?

15        A.   Mortgage loan officer.

16        Q.   So '84 is graduation.  '87 is leave

17   Mercer.

18        A.   No, I think -- yeah, '89 is probably

19   when I started doing it on my off days.

20   Firemen work two days a week, off five days a

21   week.  So most of them took two jobs.

22        Q.   Were you married at this time?

23        A.   At which time?

24        Q.   At the time that you started, in

25   1989, when you started working at the Bank of

1   Loganville on your off days.

2          A.    Yes.

3          Q.    **Do you recall what year you got**

4   **married?**

5          A.    No.  No, I don't.  It was before '93

6   because that's when Devin was born.

7          Q.    **So you were full-time with the fire**

8   **department and part-time with the Bank of**

9   **Loganville until around when?**

10         A.    I don't know.  Until about 2000,

11  2001, 2000 maybe.

12         Q.    **And what happened then to change**

13  **that?**

14         A.    I left the Bank of Loganville and

15  went to work directly for the person that was

16  buying the loans for Bank of Loganville at

17  that time.

18         Q.    **Who was that?**

19         A.    Taylor, Bean & Whitaker.

20         Q.    **Who hired you at Taylor, Bean &**

21  **Whitaker?**

22         A.    Stan Kelly, president.

23         Q.    **What was your position?**

24         A.    I've already stated, loan officer.

25         Q.    **What were your job duties as a loan**

1  officer?

2      A.   To find willing and wanting people

3  in search of a mortgage origination to

4  purchase a home.

5      **Q.   How did you do that?**

6      A.   Always looking, talking to real

7  estate agents, getting real estate agents to

8  refer people to me, handing cards out, running

9  ads, talking with bank people that came in to

10 make their deposits or do their banking.  The

11 bank would refer them to me.

12     **Q.   How were you compensated during your**

13 **time at --**

14     A.   Commission only.

15     **Q.   What was the setup there?**

16     A.   60/40 of the profit generated on

17 each loan.

18     **Q.   I didn't understand the last part,**

19 **I'm sorry.**

20     A.   60 percent me, 40 percent to the

21 bank on the profit after all expenses were

22 paid on each loan.

23     **Q.   Do you know what your first year**

24 **with them would have been?  2002?**

25     A.   I want to state for the record I

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   don't know the exact years of any of this.

2        Q.   Sure.  When you had your first year

3   with TBW, were you successful, in your

4   opinion?

5        A.   What's your opinion of success?

6        Q.   I don't care.  I want to know your

7   opinion.  Do you consider --

8        A.   Well, my opinion of success, I was

9   happy.

10       Q.   Okay.  Do you recall what you made

11   that year?

12       A.   If that's what you wanted to know,

13   that's what you should have asked.

14       Q.   Well, I wanted to know both.  Did

15   you --

16       A.   I don't know.

17       Q.   You don't recall?

18       A.   I don't remember.

19       Q.   How about the year after?

20       A.   I don't remember.

21       Q.   Do you remember a ballpark?

22       A.   No.  $100,000 maybe, at the most,

23   something like that.

24       Q.   How long were you with TBW in the

25   position of loan officer?

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   Two or three years.

2    Q.   **And then what happened?**

3    A.   I tried to acquire a company called

4  Taylor, Bean & Whitaker, Limited, from Taylor,

5  Bean & Whitaker, which was the mortgage

6  origination part and not the lender part that

7  was already started.  And it had too many

8  investors and everything, and it did not work

9  out.  And they had changed their name to Home

10 America Mortgage.

11        So in the end, I started -- I had to

12 start a new corporation and a new mortgage

13 company, but I got that name of Home America

14 Mortgage from Taylor, Bean & Whitaker.

15   Q.   **Is that the deposition you referred**

16 **to earlier about the dispute over the name?**

17   A.   Correct.

18   Q.   **Who was in litigation with you about**

19 **that?**

20   A.   I don't remember the names of all

21 the people that were -- I think they had

22 people that had invested in Taylor, Bean &

23 Whitaker, Limited, and, you know, there was

24 going to be this big national lender that

25 didn't work out.  And I was going to take over

1  the company, but it wouldn't work out because

2  of the amount of investors and people wanting

3  so much money.  But they did sign off on the

4  name eventually, just let me have the name.

5      **Q.   Do you recall about when that was?**

6      A.   I guess it was about 2003, 2004,

7  maybe '4, something like that.  Yeah, maybe

8  2004.  I don't know.  Again, the dates you

9  can't hold me to because I don't know.

10     **Q.   So around 2004, around that time,**

11 **you became the owner of Home America Mortgage;**

12 **is that correct?**

13     A.   I became one of them.

14     **Q.   Who were the others?**

15     A.   Taylor, Bean & Whitaker at that time

16 owned 10 percent.

17     **Q.   How long did that stay true?**

18     A.   I don't know.  They took their 10

19 percent and divided it up between three

20 entities later down the line, and I don't know

21 when they did that.

22     **Q.   Which three entities?**

23     A.   Lee Farkas, Gary Garrett, and

24 Timothy Parker.

25     **Q.   Were they also TBW employees?**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1      A.    No.

2      Q.    **What was Lee Farkas's position at**

3   **that time?**

4      A.    He was a TBW employee, CEO.

5      Q.    **And Gary Garrett?**

6      A.    I think he was unemployed.  And

7   Tim Parker was retired.

8      Q.    **And you don't know when that**

9   **happened?**

10     A.    I don't know the exact dates on all

11  that.  I have no idea when they did that.

12  That was their stock.

13     Q.    **And the other 90 percent was yours?**

14     A.    Correct.

15     Q.    **When did you sell Home America**

16  **Mortgage?**

17     A.    I think the beginning of 2009.

18     Q.    **Why did you sell the business?**

19     A.    Well, it seemed like with the

20  Freddie Mac thing going on, even though that

21  did not put Home America out of business in

22  any way, shape, or form -- it was still in

23  good standings with Freddie Mac, FHA, VA,

24  Ginnie Mae, and almost every other lender out

25  there that I could have ever done business

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    with -- it just seemed like a good time to do

2    it.

3        Q.    I want to understand what you just

4    told me.  You were saying lenders you had done

5    business with, including Freddie Mac,

6    Ginnie Mae --

7        A.    I didn't say Freddie Mac.  I said I

8    was in good standings, other than with Freddie

9    Mac, I was in good standings with everybody

10   else that's in the industry.

11       Q.    I see.  I understand now.

12       A.    Which would not put Home America --

13   which Home America could have kept doing

14   business.

15       Q.    Then why did it seem like a good

16   time to get out of it?

17       A.    I was tired of it.

18       Q.    Who did you sell the business to?

19       A.    Taylor, Bean & Whitaker.

20       Q.    Do you remember when the sale was

21   consummated?

22       A.    Beginning of 2009.

23       Q.    Did you retain any ownership

24   interest?

25       A.    No.  I was fired.

James Gregory Hicks        United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1        **Q.   By whom?**

2        A.   I was fired at the closing table.

3        **Q.   By whom?**

4        A.   By the closing attorney.

5        **Q.   What was his name?**

6        A.   I don't remember.

7        **Q.   Who represented you in the sale?**

8        A.   I can't remember the name of that

9 law firm.

10           THE WITNESS:  What's that big law

11      firm, Buddy?  Do you know?

12           MR. PARKER:  Powell Goldstein?  Was

13      that it?

14           THE WITNESS:  No.  It was --

15        A.   Steve Dunlevie was the attorney.

16           THE WITNESS:  Dennis, do you

17      remember?

18        A.   Can I ask Dennis the name of the

19 attorney firm?

20        **Q.   (By Ms. Bracker)  Sure.**

21           MR. MOSELEY:  Womble Carlyle.

22           THE WITNESS:  See, there you go.

23        **Q.   (By Ms. Bracker)  And did you have**

24 **an accountant advising you for that sale?**

25        A.   I had many people advising me on

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    that sale.

2        Q.    Tell me who all advised you on that

3    sale.

4        A.    Many attorneys out of Womble

5    Carlyle.  I had probably four attorneys

6    working on it.

7        Q.    Who else?

8        A.    I had William Sammons, the

9    accountant.  And that's it.

10       Q.    Is William Sammons with a firm?

11       A.    Yeah.  I can't remember the name.  I

12   don't know the name of the firm now.  I

13   haven't talked to him in a while.

14       Q.    Do you recall who represented Taylor

15   Bean?  You said you don't recall --

16       A.    I don't remember.

17       Q.    -- the closing attorney.  You don't

18   remember?

19       A.    No, I don't remember.  We were in

20   their office.  It was right here, though.  I

21   know where the office is, but I don't remember

22   the attorney.

23       Q.    Who provided the valuation for Home

24   America when you sold it?

25       A.    It was an agreed-upon offer between

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   Lee Farkas of Taylor, Bean & Whitaker and

2   myself.  They did an audit, but I was not

3   privy -- I mean, they did an appraisal, but I

4   was not privy to the appraisal.

5        **Q.   And you don't know who conducted it?**

6        A.   No, I don't remember.

7        **Q.   So Lee Farkas had an appraisal done,**

8   **you were not privy to the appraisal, but as a**

9   **consequence of that, he offered you what for**

10  **your company?**

11       A.   It was basically $10 million from

12  the sale at closing.  It was a $10 million

13  deal at closing, $1 million down, everything

14  else paid over quarterly -- 9 million paid

15  over quarterly.  They bankrupted me on the

16  rest, if that's what you want to know.

17            About time to take a break?

18       **Q.   Sure.**

19            MS. BRACKER:  We'll go off the

20       record at 11:12.

21            (Whereupon a recess was taken from

22       11:12 a.m. to 11:21 a.m.)

23       **Q.   (By Ms. Bracker)  Have you ever**

24  **talked to John Kennedy about your alleged**

25  **affair with Stephanie Kennedy?**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1      A.   No.

2      Q.   **Have you ever talked to anyone else**

3   **about your alleged affair with**

4   **Stephanie Kennedy?**

5      A.   Dennis, my attorneys.

6      Q.   **Anyone else?**

7      A.   No.

8      Q.   **When did you meet Lee Farkas?**

9      A.   When I worked at the Community Bank.

10      Q.   **Is that Loganville?**

11      A.   Yes, Loganville, Bank of Loganville.

12      Q.   **How did you come to meet him?**

13      A.   Taylor Bean was the lender for that

14   bank.

15      Q.   **So you were selling him loans?**

16      A.   Correct.

17      Q.   **What was his position at that time?**

18      A.   CEO of Taylor Bean.

19      Q.   **Were you surprised when you were**

20   **fired at the closing table?**

21      A.   Yes.

22      Q.   **What were you expecting?**

23      A.   Well, the deal was they wanted me to

24   stay on, so nobody quit and everything.

25      Q.   **Did you have any subsequent**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1  conversations about being fired at the closing

2  table with Lee Farkas?

3      A.   No.

4      Q.   With anyone?

5      A.   No.

6      Q.   No one?

7      A.   I don't know if I did or not.  I

8  don't remember.  I don't remember who I had a

9  conversation with.

10     Q.   What did you do when you were fired

11 at the closing table, for a job, if anything?

12     A.   Define "job."  Is a job making

13 money?  That would be defined as a job, right?

14     Q.   Sure.

15     A.   Okay.  Well, I haven't made no

16 money.  So I haven't worked.

17     Q.   I'm going to broaden that definition

18 a little bit.

19     A.   I figured you would.

20     Q.   So where have you worked?

21     A.   I own the BodyPlex gym still.

22     Q.   Do you work there?

23     A.   No.  I say I own it.  I own 49

24 percent.

25     Q.   Who owns the rest?

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.    Cleve Long.

2    **Q.    How are you paid for that?**

3    A.    Well, that's what I just said.

4    Since the money I've taken out doesn't equal

5    to the money I've put in, I haven't been paid.

6         We defined a job as making money.  I

7    ain't made no money.

8    **Q.    Well, we broadened that, as you**

9    **expected.  So now I'm asking a completely**

10   **different question.**

11        **Do you get paid from your ownership**

12   **of the BodyPlex gym at all?**

13   A.    I do.  Dividends only, no paycheck.

14   **Q.    When are you paid dividends?**

15   A.    Quarterly.

16   **Q.    In what range are your dividends?**

17   A.    I refuse to answer anything on my

18   income now.  But it's not much.

19        MS. BRACKER:  Are you instructing

20   your client not to answer?

21        MR. PARKER:  He's choosing not to

22   answer.

23        MS. BRACKER:  Are you going to

24   direct him to answer or not to answer?

25        MR. PARKER:  No.  It's not relevant.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    If you get a judgment, you can get

2    discovery on your judgment.

3         MS. BRACKER:  Okay.

4    A.    I will give you the balances of --

5    **Q.    (By Ms. Bracker)  I'm sorry.  I'm**

6   **not interested in you piecemealing and giving**

7   **me what you choose to.  It's fine.**

8         MS. BRACKER:  If you want to stand

9    on that objection, you can stand on that

10   objection.  I just don't want to waste the

11   time asking all the little questions, if

12   you're going to direct him not to answer.

13   **Q.    (By Ms. Bracker)  Do you still keep**

14  **in touch with Lee Farkas?**

15   A.    No.

16   **Q.    Have you had any contact with him**

17  **since the closing table?**

18   A.    Yes.

19   **Q.    When?**

20   A.    We had a -- we opened -- I bought

21  part of a bar that he had here in Atlanta,

22  post-closing.

23   **Q.    What bar is that?**

24   A.    It was Primal.

25   **Q.    What part did you buy?  What**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    percentage?

2         A.   I don't remember exact percentages.

3    Somewhere between 40 and 50 percent.

4         Q.   Did he retain the rest of it, or did

5    you buy his share of it?

6         A.   He retained.

7         Q.   So you're still business partners?

8         A.   Not in the mortgage business.

9         Q.   Well, that's fine.  But you're still

10   business partners?

11        A.   I don't think he owned that

12   percentage actually.  I think it was held by a

13   corporation.  So, I mean, I don't know what

14   his ownership of the corporation is.  So I

15   can't answer that question, if me and him were

16   business partners or not.

17        Q.   Do you have any other business

18   interests in common with Lee Farkas or any of

19   his corporations that you're aware of?

20        A.   No.

21        Q.   Do you still have part interest in

22   the Primal club in Atlanta?

23        A.   No.

24        Q.   When did you divest yourself of that

25   interest?

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.    Two years ago or so.

2    **Q.    Did you sell it?**

3    A.    I just sold it.

4    **Q.    Who did you sell it to?**

5    A.    Their first names were Harry and

6    Sonny.  I don't know their last names.

7    **Q.    What did they pay you for it?**

8    A.    Like $200,000 on a note that they

9    didn't pay.

10   **Q.    So other than your ownership**

11   **interest in the BodyPlex gym, do you have any**

12   **other businesses you regularly take part in**

13   **now --**

14   A.    No.

15   **Q.    -- with or without being paid for**

16   **it?**

17   A.    No.

18   **Q.    What do you do with your days?**

19   A.    Whatever.

20   **Q.    That's not responsive.**

21   A.    Yeah, sure, it is.

22   **Q.    What are your hobbies?**

23   A.    I get up; eat breakfast, lunch, and

24   dinner; hang out during the day and then go to

25   bed at night.  That's my day.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1     Q.    Where do you hang out?

2     A.    At the house.

3     Q.    The Florida house or the Georgia

4  house?

5     A.    Whichever house I'm at.

6     Q.    About what percentage of the time do

7  you spend in Florida?

8     A.    35 percent maybe, 40, something like

9  that.

10    Q.    Does anyone else live in the house

11  in Florida?

12    A.    No.

13    Q.    Does anyone else live in the house

14  in Georgia?

15    A.    No.

16    Q.    What are your hobbies?

17    A.    I don't have any.

18    Q.    I've seen a lot of magazine articles

19  about you and motorcycles.  You don't do that

20  anymore?

21    A.    No.

22    Q.    When did you stop doing that?

23    A.    Two years ago.  I forgot about

24  Easyriders.

25    Q.    When you took over what started as

1  **Taylor, Bean & Whitaker, Limited, but**

2  **ultimately turned into Home America**

3  **Mortgage --**

4       A.    Correct.

5       **Q.    -- when you started --**

6       A.    Actually, it didn't turn into Home

7  America Mortgage because Taylor, Bean &

8  Whitaker, Limited, was not able to be bought.

9  So Home America Mortgage started over new.

10      **Q.    When it started new, who were the**

11 **employees?**

12      A.    I can't remember.  We had already

13 built up 60 employees.  I can't remember

14 exactly who.  But Dennis was there.  I mean, I

15 can give you a few, but I don't know --

16      **Q.    Sure.  Give me the ones you can**

17 **recall.**

18      A.    Sylvia, Ronnie Rice -- no,

19 Ronnie Rice wasn't an employee then.  Rice was

20 never an employee of mine.  Justin Price,

21 Dennis Moseley.  And when I took it over at

22 that time, I don't remember -- I can't

23 remember who all the employees were.  But I

24 know that them couple were there.

25 Christy Hicks, my sister, was there with us.

1    Q.    **When say you took it over, what do**

2  **you mean?**

3    A.    Well, I keep saying take it over,

4  but I didn't.  I started it.

5    Q.    **Well, that's my confusion.**

6    A.    Yeah.  But the plan was the whole

7  time on the year deal of trying to get this

8  deal from Taylor, Bean, Limited, to become

9  Home America, me purchasing it was a year-long

10  deal that never worked out, which ultimately

11  formed a new company from scratch.

12    Q.    **So the employees were in position**

13  **and working, and it wasn't clear which company**

14  **they would be part of until you finally just**

15  **said, I'm starting Home America Mortgage?**

16    A.    Correct.  They were Taylor Bean

17  employees.

18    Q.    **How did you know Justin Price?**

19    A.    He was my wife's brother.

20    Q.    **How did you meet Mr. Moseley?**

21    A.    He came in for an interview when he

22  was about 12, whatever, with a bowtie on.

23    Q.    **Did you have a position other than**

24  **owner?  Were you president?  Were you CEO?**

25  **What was your title at Home America?**

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.    I was president then, I believe.

2    Q.    And then at some point, Mr. Moseley

3  became president, correct?

4    A.    Correct.

5    Q.    Has anybody else ever been

6  president?

7    A.    No.

8    Q.    Do you remember approximately when

9  Mr. Moseley became president?

10    A.    I don't know.  '05, '06, something

11  like that, '07.  I don't -- maybe '07.  I

12  don't know.  Maybe '07, somewhere in that

13  neighborhood.

14    Q.    So why did you decide to have a

15  different president?

16    A.    To alleviate some of the duties off

17  of me alone.

18    Q.    So what duties were you engaging in

19  as president?

20    A.    Every duty that a president engages

21  in in a company, from financing, financials,

22  to the daily operations, to the bill-paying,

23  to the insurance, to -- you name it,

24  everything that goes into running a company.

25    Q.    So when you were president of Home

1  America Mortgage, were you in the office five

2  days a week?

3      A.    No.

4      Q.    How often were you in the office?

5      A.    Seven.

6      Q.    Full, regular business hours or

7  extended hours?

8      A.    About 20-hour days a lot of times,

9  sometimes.  15 hours was probably a standard

10 day.

11     Q.    When did The Hicks Team form?

12     A.    I don't remember the exact dates.

13 The Hicks Team is nothing more than what some

14 people inside the company called The Hicks

15 Team.  They were still nothing but Home

16 America employees.

17     Q.    Well, in driving around North

18 Fulton, I saw signs for The Hicks Team all

19 over the place.  So signage, I know.

20     A.    I know there's signage, yeah.

21     Q.    So who was on The Hicks Team?

22     A.    I'll defer that to the discovery

23 that you'll get.

24     Q.    Well, I want your answer now.

25     A.    Well, The Hicks Team ranged for a

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   few years, so we had a lot of different people

2   on it.  I'm going to have trouble remembering

3   everybody that worked on The Hicks Team or off

4   The Hicks Team.

5        **Q.    Well, if your response is less**

6   **complete than what you give me in the**

7   **interrogatory, I understand that, but I'd like**

8   **your recollection, so we can have a**

9   **discussion.**

10            **So who do you recall being on The**

11  **Hicks Team?**

12       A.    Justin Price.

13       **Q.    And he was serving as a loan**

14  **officer?**

15       A.    Yes.  Becky Wright.

16       **Q.    And her job was?**

17       A.    Loan officer.  Misty Chripholous.

18       **Q.    Her position?**

19       A.    Loan officer.  Lindsey Metzger, she

20  was a loan officer.  And I had a non-loan

21  officer assistant that helped answer the

22  phones and all, but I can't remember her damn

23  name.

24       **Q.    Anyone else?**

25       A.    That was the last group.  But over

James Gregory Hicks                  United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    the years, there's probably 20 other people

2    that was on or off it.

3        Q.   So was there any non-loan officers

4    who were part of The Hicks Team?

5        A.   No.

6        Q.   No processors dedicated to The Hicks

7    Team?

8        A.   They were processors, but they

9    processed for other people as well a lot.  So

10   there was a processor assigned to The Hicks

11   Team.

12       Q.   Who was that?

13       A.   Gwen was the last one.  But over the

14   years, there's been many.

15       Q.   Do you remember her last name?

16       A.   No.

17           THE WITNESS:  Dennis, do you

18       remember Gwen's last name?  It started

19       with a "G," didn't it, or something?

20       Gaston?

21           MR. MOSELEY:  You'll have to go with

22       that.  I don't recall.

23       A.   I don't remember Gwen's last name.

24   That was the last processor I know that

25   processed for The Hicks Team.  I don't

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   remember her name.

2        Q.   (By Ms. Bracker)  You've already

3   told me a loan officer's job is to locate

4   people who need a loan, residential loan, and

5   bring them in?

6        A.   Uh-huh (affirmative).

7        Q.   What responsibilities did a Hicks

8   Team loan officer have?

9        A.   Same responsibilities as any other

10  loan officer.  Take the application, submit it

11  for processing, and follow it to closing.

12       Q.   Did people who hired into The Hicks

13  Team go through you only?  Who did they

14  interview with?

15       A.   Yeah, to me.

16       Q.   And how were they paid?

17       A.   Salary, plus commission.

18       Q.   How was commission calculated?

19       A.   Volume of loans that were produced

20  through that group.

21       Q.   Through the group as a whole?

22       A.   Uh-huh (affirmative).

23       Q.   And what was the percentage split?

24       A.   Every one of them had a little bit

25  of different ones, but it was not that much of

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   a percentage split from the -- on the

2   commission.  So they only got -- I can't

3   remember exactly how it was structured, but

4   the group got a certain percent, like 10

5   percent, and then they divided that up between

6   them.  And the longer they were on The Hicks

7   Team, the percentage of the division was

8   greater.

9        Q.   **What would you say a loan officer on**

10  **The Hicks Team made on average as a salary?**

11       A.   You know, you ranged from -- so on

12  average.  Can I see a piece of paper?

13       Q.   **A range is fine, if you'd rather**

14  **give me a range.**

15       A.   You know, I can't tell you -- I

16  can't speak on their behalf.  You need to ask

17  them what they made, if you want to ask them.

18  That would be better.  I don't think I feel

19  right giving somebody else's personal

20  information out.

21       Q.   **Are you refusing to answer?**

22       A.   I think so.  Yeah, that's not my --

23  I can't speak on behalf of what another person

24  made.

25       Q.   **I'm not asking what they took home**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1  or their names.  That's why I asked on

2  average.  So you're not disclosing anyone's

3  personal information.

4       A.   And I can't give you an actual

5  average.

6       Q.   Well, I rephrased my question.  Give

7  me a range of what loan officers made on The

8  Hicks Team.

9       A.   Okay.  I'm going to answer this.  I

10 do not know what they made at the end, the top

11 person, and I don't know what the bottom

12 person made.  I know it's probably somewhere

13 in the range of $20,000 on the bottom to a

14 couple hundred thousand on the top, maybe not

15 even a couple hundred.  Maybe a hundred and --

16 see, I don't know.  I can't answer the

17 question.

18       Q.   Who did payroll?

19       A.   Payroll department.

20       Q.   Which was who?

21       A.   Christina Fishback, Lori Hollifield.

22            THE WITNESS:  What was the other

23 accountant's name, Dennis?

24       Q.   (By Ms. Bracker)  Is that

25 Lori Hollifield, your sister?

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   Yes.

2         MR. MOSELEY:   That would be payroll.

3         THE WITNESS:   I know.   But who was

4    the other accountant?

5         MR. MOSELEY:   He didn't do payroll.

6         THE WITNESS:   Oh, he didn't?

7    A.   That's it.   That's payroll.

8    **Q.   (By Ms. Bracker)   When you were in**

9    **your role as president and owner and then**

10   **later when you were just in the role of owner,**

11   **were you aware then what people made?**

12   A.   I don't understand what you just

13   said, in my role as just owner.

14   **Q.   Well, when Mr. Moseley became**

15   **president and you remained in the position of**

16   **owner, did you have another title at that**

17   **time?**

18   A.   CEO.

19   **Q.   So in your roles, various, at Home**

20   **America Mortgage, were you aware at that time**

21   **of what people made?**

22   A.   No, not really.

23   **Q.   Were you aware in a range of what**

24   **they made?**

25   A.   Not really.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1      Q.   Were you aware of who the top

2   producers were?

3      A.   Yes.

4      Q.   Who were your top producers?

5      A.   Well, what year?

6      Q.   Across time in general.

7      A.   It changed every year.  So I --

8      Q.   Okay.  We'll start with the first.

9      A.   I don't remember.

10      Q.   Tell me what you remember.

11           This is going to be a very long day

12   if we're going to chase our tails this way.

13   I'm kind of over it?

14      A.   You need want to be specific.

15      Q.   2002?

16      A.   I don't remember.

17      Q.   2003?

18      A.   I don't remember.

19      Q.   2004?

20      A.   I don't remember.

21      Q.   2005?

22      A.   I don't remember.

23      Q.   2006?

24      A.   I don't remember.

25      Q.   2007?

James Gregory Hicks                     United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   I don't remember.

2    Q.   **2008?**

3    A.   I don't remember.

4    Q.   **2009?**

5    A.   I don't remember.

6    Q.   **2010?**

7    A.   I wasn't there.

8    **Q.   Yeah, you're clearly not paying too**

9    **much attention by this point, but okay.**

10            **So now, you do recall some things**

11   **because --**

12   A.   I know the top producers of the

13   company, you know, which ones they were.  But

14   you asked me which was the top producer.  I

15   don't know.

16   **Q.   Well, my question was --**

17   A.   And I don't know what determines who

18   was the top producer.

19   **Q.   You're talking over me, so you need**

20   **to stop now.**

21           **Whatever question you can answer**

22   **about top producers, please answer it.**

23   A.   I don't know what you mean by "top

24   producers."

25   **Q.   Didn't you just tell me you knew the**

James Gregory Hicks                     United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   top producers for the company?

2      A.   Yes.

3      Q.   **Please tell me who --**

4      A.   So what's your definition of top

5   producer, and I'll answer it?

6      Q.   **Whatever you meant when you just**

7   **said it.**

8      A.   Me.  I was the top producer of the

9   company.

10      Q.   **Anyone else?**

11      A.   That's all I remember, for rankings.

12      Q.   **As far as rankings, you only know**

13   **that you were at the top?**

14      A.   I was at the top.

15      Q.   **Every year?**

16      A.   Every year.

17      Q.   **How did you not remember that about**

18   **2002?**

19      A.   Well, I forgot it until just then.

20      Q.   **Okay.  What is a bad loan?**

21      A.   I don't know.  I don't know what you

22   mean.

23      Q.   **You've never heard the phrase "bad**

24   **loan" before?**

25      A.   Yeah, but you'd have to give me a

1    definition of what a bad loan is and I'll tell

2    you.

3         **Q.    Mr. Hicks, I'm asking the questions.**

4         A.    I don't --

5         **Q.    And I'm asking you what your**

6    **understanding of the phrase "bad loan" is.**

7         A.    I don't know.  I have no idea what a

8    bad loan is.

9         **Q.    What about a fraudulent loan?**

10        A.    I guess a loan that would contain

11   fraud in it.

12        **Q.    Are you familiar with the HUD**

13   **mortgage credit analysis handbook?**

14        A.    I am.

15        **Q.    What is it?**

16        A.    I guess it's an SOP, operating

17   procedures, from HUD on lending practices.

18        **Q.    What's its purpose?**

19        A.    To give guidelines.

20        **Q.    For what?**

21        A.    For loan criterias.

22        **Q.    For all loans?**

23        A.    No.

24        **Q.    For which loans?**

25        A.    FHA loans.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.    What's a direct underwriter?

2    A.    An underwriter that's been endorsed

3    to make credit decisions on behalf of HUD.

4    Q.    Endorsed by whom?

5    A.    HUD.

6    Q.    What direct underwriters worked in

7    the Home America office building?

8    A.    During what years?

9    Q.    2002.

10   A.    Ronnie Snowden.

11   Q.    Any others?

12   A.    No.

13   Q.    2003?

14   A.    Ronnie Snowden.

15   Q.    Any others?

16   A.    No, I don't think so.

17   Q.    2004?

18   A.    Dee Wardlaw.  Ronnie -- see, again,

19   I don't know when Stephanie came and when

20   Ronnie left.  But I'll put them in 2004, but

21   they might not have been there together at

22   that time.

23   Q.    Is that Stephanie Kennedy?

24   A.    Stephanie Kennedy.  I'm not sure

25   when she came, but, you know --

James Gregory Hicks                       United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.   That's fine.   2005?

2    A.   Well, wait a minute.   We ain't done

3  with 2004.   You had Ronnie Snowden,

4  Stephanie Kennedy, Dee Wardlaw.   I think

5  that's it at that time.

6    Q.   2005?

7    A.   Janet Kelly, I believe, came around

8  that time.

9    Q.   Did the others stay, as far as you

10  can recall?

11    A.   Ronnie Snowden left at some point.

12    Q.   2006?

13    A.   The same.   Lynn Martin was there.

14    Q.   2007?

15    A.   Now, what was the -- ask me that

16  question one more time, though.   That worked

17  in the Home America office is what you're

18  saying, right?

19    Q.   Correct.

20    A.   You did not say worked for Home

21  America?

22    Q.   The office building is what I said.

23    A.   Okay.

24    Q.   Any others?

25    A.   I don't remember any others.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.    And I assume if I ask you who their

2    employer was, you will tell me it's TBW?

3    A.    It had to be.

4    Q.    Why must it be?

5    A.    Because that's where their DE was

6    assigned to.  You can only be assigned to one

7    lender.

8    Q.    Their DE is their direct

9    endorsement?

10   A.    Uh-huh (affirmative).  It's assigned

11   through HUD and you can see who it's assigned

12   to through the HUD Website.

13   Q.    What's a full eagle endorsement?

14   A.    It's a full endorsement by HUD to a

15   lender certifying that they are capable of

16   making FHA loans on behalf of HUD insurance

17   qualifications.

18   Q.    Was Home America a direct

19   endorsement lender?

20   A.    No.

21   Q.    Are you aware that they represented

22   that they were?

23   A.    No.

24   Q.    Did you ever have an FHA number,

25   yourself?

James Gregory Hicks        United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1     A.   No.

2     **Q.   Did you ever have a direct**

3 **endorsement, a DE?**

4     A.   No.

5     **Q.   What is an exclusion list?**

6     A.   A list not to be able to do business

7 with.

8     **Q.   And to date, do you know which**

9 **exclusion lists you appear on?**

10     A.   Freddie Mac.

11     **Q.   Any others?**

12     A.   No.

13     **Q.   How about Home America?  Do you know**

14 **what exclusion lists it appears on?**

15     A.   No, I don't know anything about it.

16 I don't look.

17     **Q.   What's a loan condition?**

18     A.   I don't understand what you're

19 saying.  I guess --

20     **Q.   You don't know what a loan condition**

21 **is?**

22     A.   I don't understand what a loan

23 condition is.  Are you speaking like in

24 mortgage terms?

25     **Q.   Yes.**

1    A.    So if you're saying a loan has a

2  loan condition -- is that what you're asking

3  me?  I guess that's a condition for -- to meet

4  the guidelines to close.

5    **Q.    And who tells you what the**

6  **conditions will be?**

7    A.    It will be FHA underwriters on the

8  FHA mortgage.

9    **Q.    Who did they give the conditions to?**

10    A.    Processors.

11    **Q.    Then what do the processors do with**

12  **that?**

13    A.    They try to meet the conditions.

14    **Q.    How would you meet a condition?  Can**

15  **you give me an example of a condition.**

16    A.    I don't know.  An additional pay

17  stub, you know, a more current pay stub.  And

18  the processor will call and get a more current

19  pay stub.  That would be a condition.

20    **Q.    What does refer risk class mean?**

21    A.    I don't know.  You'll have to be

22  more direct.

23    **Q.    I don't know what you mean by**

24  **"direct."**

25    A.    I don't know what you -- refer risk

1  class could mean a whole lot of things in a

2  lot of different industries.  If you ask me

3  the question the right way, I'll answer it.

4       **Q.   We're only going to talk about the**

5  **mortgage industry today unless I tell you**

6  **otherwise.  So in that context, what does a**

7  **refer risk class mean?**

8       A.   I don't know.

9       **Q.   Do you know what the application**

10 **engines are for Freddie Mac loans?**

11      A.   Yes.

12      **Q.   What?**

13      A.   DU and LP.

14      **Q.   What does that stand for?**

15      A.   Desktop Underwriter and --

16           THE WITNESS:  What's the other one?

17      **Q.   (By Ms. Bracker)  I just need your**

18 **answer right now.**

19      A.   I don't know.  Desktop Underwriter,

20 and I don't know what that other one is.

21      **Q.   And what is --**

22      A.   Loan Processor or something like

23 that.

24      **Q.   Who enters data into Desktop**

25 **Underwriter?**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   The loan officers.

2    Q.   **Who enters information into LP?**

3    A.   Loan officers.

4    Q.   **So did you enter things when you**
5  **were a loan officer into DU?**

6    A.   No.

7    Q.   **Why not?**

8    A.   I didn't know how to use the system.

9    Q.   **Who entered it on your behalf?**

10   A.   My assistant.

11   Q.   **The one whose name you don't recall?**

12   A.   No.  The assistant when we started
13  out with The Hicks Team, that's who entered
14  it.  Before The Hicks Team, my processor would
15  enter it for me.

16   Q.   **So the loan officer or his or her**
17  **assistant is who enters it into DU?**

18   A.   Yes.

19   Q.   **Same with LP?**

20   A.   Right.

21   Q.   **You never entered anything into LP?**

22   A.   No, not one time.

23   Q.   **In your opinion, based on your time**
24  **in the mortgage industry, who is responsible**
25  **to make sure that a loan is not fraudulent?**

1   A.   I think it's a shared responsibility
2   all the way across the industry, from the
3   originator to the underwriter, to the
4   underwriter and the closer.
5   **Q.   Who else does that cover besides the**
6   **originator, the underwriter, and the closer?**
7   A.   Oh, you want the closing attorney
8   too there.  Closing attorney.
9   **Q.   And who else?**
10  A.   Appraiser.
11  **Q.   So what responsibility does the**
12  **originator have?**
13  A.   To enter the data that's given to
14  him by the customer.
15  **Q.   Any other responsibilities?**
16  A.   To collect the data, the referring
17  data that's required for that loan, to turn it
18  in to processing.
19  **Q.   Anything else?**
20  A.   They're required to get the document
21  signed.
22  **Q.   Signed by whom?**
23  A.   The borrower.
24  **Q.   Anything else?**
25  A.   No.

James Gregory Hicks                     United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   Q.   Does an originator have any
2   responsibility to question the data given by a
3   customer?
4        A.   They have the right to ask them
5   about it, yes, sure.
6        Q.   Do they have any responsibility to
7   do so?
8        A.   I'm not sure what the handbook says
9   on that.
10       Q.   How about the underwriter?  What are
11  the underwriter's duties with respect to
12  stopping fraudulent loans?
13       A.   They are to evaluate the documents,
14  match up to the approval that was given by DU
15  or LP, or to manually override and underwrite
16  a loan based on criterias met in the HUD
17  handbook, to make a credit decision on behalf
18  of HUD, to review the appraisal to make sure
19  that the appraisal matches up with the
20  guidelines that the appraisal should match up,
21  to review each and every document to make sure
22  it matches up with what's given, the
23  information given, to make and modify
24  conditions based upon their knowledge of HUD
25  guidelines.  That's about it.

1    Q.   So they should know that handbook

2  really well, right?

3    A.   They should.

4    Q.   And you said things like "based on

5  HUD guidelines" several times, but that would

6  go for whoever was -- all loans are not HUD

7  loans, correct?

8    A.   No.  But this is referring to

9  defrauding the government, so the only

10 government loans here are HUD.

11   Q.   Well, that's why I'm trying to be

12 clear with you.  I haven't said anything about

13 government loans.  I'm just asking you about

14 the mortgage industry.

15   A.   Well, I'm answering because this is

16 a suit that I'm defrauding the government.

17   Q.   Well, I appreciate that, but I'm

18 still going to direct you answer as to the

19 mortgage industry.

20       So what happens when it's not a

21 government loan?  What guidelines do they

22 refer to?

23   A.   The guidelines on the loan, investor

24 guidelines.

25   Q.   What are some other kinds of loans

1   **besides government loans?**

2        A.   Well, the three categories are

3   government, conventional, and nonconventional.

4        **Q.   Who would write guidelines for**

5   **conventional loans?**

6        A.   Fannie Mae, Freddie Mac, Ginnie Mae,

7   and other certified entities that were

8   certified to sell conventional loans.

9        **Q.   And how about nonconventional?**

10        A.   Any investor across the country that

11   wishes to purchase mortgages.

12        **Q.   Did TBW fulfill that role?**

13        A.   As far as what?

14        **Q.   Purchasing mortgages.**

15        A.   They purchased mortgages, yes.

16        **Q.   Did they purchase nonconventional**

17   **mortgages?**

18        A.   Yes.

19        **Q.   What were their guidelines?**

20        A.   Their guideline book was about as

21   big as five of them big law books combined.

22   So each loan program has its own guideline.

23        **Q.   What were their programs?**

24        A.   Again, probably 500 programs.  I

25   don't know.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1      Q.    So you were telling me about the

2  duties of an underwriter to evaluate the

3  documents and to match conditions to the

4  approval required by DU or LP or manually

5  override them based on criteria in the HUD

6  handbook.

7            Is that -- I can have her read back

8  your word-for-word, but that's what I wrote

9  down.

10     A.    Sounds close.

11     Q.    Sound right?

12           Tell me about manual override.

13     A.    If a loan got denied by the DU or LP

14 system, the underwriter still could make a

15 credit decision based upon their knowledge of

16 the handbook and endorse it for HUD approval.

17     Q.    All underwriters could do that?

18     A.    Only DE.

19     Q.    What percentage of Home America

20 loans would you say were government loans?

21     A.    I think about 55 percent.

22     Q.    So who had the responsibility to

23 make sure the underwriters were doing their

24 job?

25     A.    Taylor, Bean & Whitaker.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   Q.   Why is that?

2   A.   Because they work for them.

3   Q.   And who at Taylor, Bean & Whitaker

4   was responsible for that?

5   A.   I don't know their bosses, but they

6   had a big chain of them.

7   Q.   Now, they did work in your office

8   building, correct?

9   A.   Correct.

10   Q.   And if you had an issue with them,

11   who would you call?

12   A.   I'd call Lee Farkas.

13   Q.   Directly you just called Lee Farkas

14   if you had an issue with a TBW underwriter?

15   A.   I never had many issues.  So it

16   wasn't many calls.

17   Q.   So which calls do you recall making?

18   A.   On underwriters, the call to remove

19   Stephanie Kennedy from the Home America

20   building and the call to remove Allison Paul

21   from the Home America building.  That's really

22   all I recall ever having issues with where I

23   had to call.

24   Q.   And both of those were straight to

25   Lee Farkas?

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.    Yes.

2    **Q.    Tell me the substance of that**

3    **conversation about Stephanie Kennedy.**

4    A.    There was rumors going around

5    everywhere.  I was hearing rumors from

6    employees that she was meeting with Brand

7    Bank.  She was going to be leaving.  They were

8    staying late at night, until 12:00, 1:00, her

9    and Allison Paul.  They were shipping out

10   documents by the hundreds and hundreds of

11   pages through the scanning system, but we

12   couldn't see what the actual documents were.

13   And I wanted her transferred out of my office.

14   **Q.    What did Mr. Farkas say?**

15   A.    He didn't say anything at that time.

16   And then a day or two later, he said he would

17   transfer her out.

18   **Q.    So did that conversation happen**

19   **before or after you first fired Ms. Kennedy?**

20   A.    I never fired Ms. Kennedy.

21   **Q.    But you're familiar with what she**

22   **says about it, right?**

23   A.    Yeah.  I couldn't fire her.  She

24   didn't work for me.

25              (Discussion ensued off the record.)

1    Q.    (By Ms. Bracker)  Do you know the

2    conversation that she refers to that you have

3    a disagreement about?

4        A.    Yes.

5        Q.    Did the call to Lee Farkas come

6    before or after that conversation?

7        A.    I don't remember.

8        Q.    Tell me about the conversation from

9    your point of view.

10       A.    I told Stephanie Kennedy not to come

11   back into the Home America office, that

12   Taylor, Bean would be contacting her.  So I

13   called Lee prior to -- now I remember it --

14   because he said he -- I told her they would be

15   calling her and telling her what her new

16   duties were, her assignments were.

17       Q.    At any point in time, did you tell

18   Stephanie Kennedy she was fired?

19       A.    No.

20       Q.    Never?

21       A.    I don't remember saying that.

22       Q.    Can you tell me the difference

23   between a VOE and a pay stub?

24       A.    A verification of employment sent to

25   the employer to fill out on an individual's

1  pay, and a pay stub is what you get when you

2  get paid.

3      Q.    Which one is more reliable, do you

4  think?

5      A.    In what respect?

6      Q.    In respect to the mortgage industry.

7      A.    I don't know.  The guidelines say

8  you can have either one.  It depends on the

9  guidelines of the loan.

10     Q.    How about for government loans?

11     A.    The guideline says you can have

12  either one.

13     Q.    The guidelines don't favor one over

14  the other?

15     A.    No.  Most of the time, it says DU

16  and LP or it says copy of pay stubs or obtain

17  a VOE on almost 90 percent of all government

18  loans that are approved.

19     Q.    So when you see that, do you see

20  that on the screen, or does someone give you a

21  printout?

22     A.    Comes over on paper.

23     Q.    Comes to you on a printout.

24            Can you tell me what a drive-by

25  appraisal is.

James Gregory Hicks        United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1     A.   It's when you send an appraiser out

2 to drive by a house to make sure it's there or

3 make sure work was done or whatever the case

4 is you're driving by for.

5     **Q.   And what's a desk appraisal?**

6     A.   Ordering an appraisal on the

7 property.  Every home has to have an appraisal

8 done for purpose of a mortgage.

9     **Q.   And you said every --**

10    A.   Every home.

11    **Q.   I think you said every home has to**

12 **have an appraisal done --**

13    A.   -- on a mortgage.

14    **Q.   On a mortgage.  Okay.**

15       **And is there any preference between**

16 **desk appraisals and drive-by appraisals for**

17 **government loans?**

18    A.   I don't know the guidelines on that.

19 Most of them require full appraisals, desk

20 appraisals, but not all of them.

21    **Q.   Is a full appraisal and a desk**

22 **appraisal the same thing?**

23    A.   No.  The drive-by is less detailed.

24 They don't enter the property, thus the name

25 drive-by.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.   That's less detailed than a desk

2  appraisal?

3    A.   That's right.

4    Q.   Do they enter the property on a desk

5  appraisal?

6    A.   They do.

7    Q.   The appraiser goes to the house and

8  goes in and --

9    A.   Well, they did.  I don't know if

10  they do now or not, but they did.

11    Q.   Where did the majority of your

12  customers come from when you were working at

13  The Hicks Team?  How did they find you?

14    A.   Referral-based, mostly.

15    Q.   And when someone came in and said, I

16  want a loan, who would they meet?

17    A.   Are you saying when they came into

18  the building?

19    Q.   Sure.

20    A.   Just off the street?

21    Q.   Sure.

22    A.   They could have met any loan officer

23  that the receptionist gave them to.

24    Q.   But most of them made appointments?

25    A.   Yeah.  When they made -- are you

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    talking about appointments with The Hicks

2    Team?

3        Q.    I guess.

4        A.    Well, I don't know where -- if they

5    made appointments.  I don't know.  I mean, we

6    did a thousand loans a month.  I don't know

7    where they all met.

8        Q.    How about your loans, since you were

9    the top producer?

10       A.    My loans?

11       Q.    Were most of them by appointment?

12       A.    Most of them were by appointment.

13       Q.    And did they meet with you when they

14   came in?

15       A.    They did, up until about 2004.

16       Q.    What about after that?

17       A.    They met with assistants only.

18       Q.    When you say "assistants," you mean

19   the other loan officers?

20       A.    Meaning The Hicks Team.

21       Q.    Okay.  Well, when we did the list of

22   The Hicks Team, you gave me mostly -- well,

23   you gave me all loan officers and said you had

24   an assistant who answered the phone, but you

25   couldn't remember that person's name.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1      A.    Yeah.

2      Q.    **Are you talking about someone**

3   **different than the people you listed?**

4      A.    No.

5      Q.    **So you're talking about a loan**

6   **officer?**

7      A.    That was still their job.  As a loan

8   officer, they took over the loan.  I never met

9   with the customer.

10     Q.    **But you still consider yourself a**

11  **top producer because they came in on your**

12  **referral?**

13     A.    Correct.

14     Q.    **Who took the majority of your**

15  **referrals for you?**

16     A.    They divided it up pretty evenly.

17     Q.    **Do you know how they divided it?**

18     A.    I don't remember how they did it.

19     Q.    **So imagine someone has made an**

20  **appointment with you, before 2004 and they're**

21  **sitting down with you personally.  What are**

22  **the steps you go through in that first**

23  **meeting?**

24     A.    Fill out the application, which I

25  did by hand.

1    **Q.    So you had like a printout?  You**

2    **wrote it down?**

3         A.    Uh-huh (affirmative).

4    **Q.    And then what?**

5         A.    Get them to fill out the required

6    documentation to authorize credit pulls and

7    things like that.

8    **Q.    What other things?**

9         A.    Collect the data from them.

10   **Q.    Is that when you would turn people**

11   **away sometimes?**

12        A.    Sometimes we turned them away then,

13   couldn't do it.  Most of the times they were

14   turned away by DU and LP, especially in the

15   later years.

16   **Q.    So give me an example of someone**

17   **that you would just stop the process at that**

18   **point on.  Not a name, but what's a situation**

19   **where you might say, I'm sorry, we can't help**

20   **you?**

21        A.    Okay.  Here's a situation:  A DU and

22   LP are run.  Loan officer's out there taking

23   the application like we talked about.  They

24   entered it into the DU and LP system, which

25   happened to be not my DU and LP system but

James Gregory Hicks        United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   Taylor Bean's DU and LP system.

2        **Q.     Did you have a DU and LP system?**

3        A.     I did not have a DU or LP number.

4        **Q.     No, that's not my question.   I'm**

5   **sorry.**

6        **Did Home America have a DU and LP**

7   **system?**

8        A.     We used Taylor Bean's DU and LP

9   system.

10       **Q.     So when people were --**

11       A.     I think.   We might have at the end

12   started using our own DU and LP system, but I

13   don't think so.

14       **Q.     So when your assistant entered the**

15   **information on your behalf, you --**

16       A.     -- submitted a loan to Taylor Bean

17   at that time that went through their DU and LP

18   system and the results would come back.

19       **Q.     So they had access to Taylor Bean's**

20   **system?**

21       A.     Uh-huh (affirmative).   Everybody

22   across the country that did business, all the

23   small banks, everybody did it the same way.

24   We entered it into their DU and LP system.   It

25   gave an approval or denial.   If you pull up a

1    DU and LP system, there's going to be three

2    times the number of loans that are actually

3    closed, if that's what you're thinking.

4         **Q.    I'm not thinking anything.**

5         A.    Well, I'm just saying that when you

6    look on a monthly DU and LP run on the Taylor

7    Bean system that was referred to by Home

8    America, there might be 4,000 DU and LPs run

9    and there might be 800 loans closed.  The rest

10   of the loans were denied.

11              If they didn't close within 30 days,

12   Taylor Bean would sent out a notice, since it

13   was applied on their system, saying they were

14   denied.  I didn't have to do it.

15        **Q.    So let me go back to my question.**

16   **You're talking about the DU and LP system of**

17   **TBW?**

18        A.    Right.

19        **Q.    Is that a government program that --**

20   **you said everybody has it.  So I'm getting**

21   **confused.**

22        A.    Yes, it was a widely used tool in

23   the mortgage industry, and it still is, from

24   my understanding, today, that everybody --

25   there were automated approval systems that you

1  entered a system and it would give you

2  approval for FHA.  It would give you approval

3  for a conventional.  It would not give you

4  approval for -- it would give you approval

5  for, at the end, for even nonconventional

6  loans that some of these entities had started

7  buying.

8      Q.    When you say "the end," you mean --

9      A.    Toward the end of my career there.

10     Q.    I see.

11     A.    It would even approve them.

12     Q.    Did the other loan officers enter

13 their data?

14     A.    They did.

15     Q.    Who checked to make sure they were

16 entering the data correctly?

17     A.    Processors would verify, and then

18 the underwriters had to make sure the data was

19 matched up to the documents that were there.

20 That's their responsibility.

21     Q.    And who was checking your data?

22     A.    Who was checking my data?

23     Q.    Yes.

24     A.    The underwriters checked all the

25 data all the way down.  And then we had audits

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    every year.

2         Q.    **When you had office meetings, did**

3    **the Taylor Bean employees attend?**

4         A.    Probably.

5         Q.    **Why?**

6         A.    They didn't attend some functions of

7    Taylor Bean, but sometimes when we had office

8    meetings -- and it depends on what you call

9    office meetings.  Taylor Bean didn't attend

10   all office meetings.  Sometimes it was office

11   meetings for just loan officers.  We had

12   meetings every month for training.  They

13   didn't attend.  If they did attend, they

14   attended on an instructor basis and not on a

15   participant basis.

16        Q.    **Did you ever hold underwriter**

17   **meetings?**

18        A.    I met with underwriters.

19        Q.    **As a group?**

20        A.    Yes.

21        Q.    **Why?**

22        A.    To find out what was going on, what

23   we needed, where we're lacking, what's

24   happening, where we need to be.

25        Q.    **Who is "we"?**

1    A.    Home America Mortgage.

2    Q.    **When you said you did a thousand**

3    **loans a month, were those Hicks Team loans or**

4    **Greg Hicks loans or for the whole company?**

5    A.    Whole company.

6    Q.    **So we were talking about all of the**

7    **roles, who had responsibility to be sure that**

8    **fraudulent loans didn't happen.  And we talked**

9    **about originators already and underwriters**

10   **already.**

11        **Let's talk about closers.  What were**

12   **their jobs that were -- what were their duties**

13   **and responsibilities to ensure that fraudulent**

14   **loans weren't put through?**

15   A.    You know, the closers didn't work

16   for me.  So I never really did figure -- you

17   know, after it came out of that, their

18   responsibilities were not -- they were just

19   making sure that the numbers were right and

20   the loans matched up to the loan approvals and

21   that the funds were sent, etcetera, and

22   prepared the closing documents.  I don't know

23   how they would be responsible for fraud other

24   than, you know, making sure everything matched

25   up properly.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1     Q.    Who did the closers work for?

2     A.    Taylor, Bean & Whitaker.

3     Q.    So when it came time to close a

4  loan, who would be sitting at the table?

5     A.    The buyer, the seller, the attorney.

6     Q.    The closing attorney?

7     A.    Yeah.

8     Q.    As their employer, what were Taylor,

9  Bean & Whitaker's obligations with respect to

10  making sure their underwriters were doing

11  their job?

12     A.    I don't know how that works.  That's

13  Taylor Bean's job.

14     Q.    So you had no understanding at all?

15     A.    I don't know what they did.  I don't

16  know how they did it.

17     Q.    But I'm asking what their duty was,

18  not what did they actually do.

19     A.    Ask me again.

20     Q.    What duty did Taylor, Bean &

21  Whitaker have with respect to their employees,

22  the underwriters?

23     A.    I don't know what their duty was,

24  Taylor Bean's duty.  I wasn't involved with

25  Taylor Bean.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.   Have you ever employed an

2  underwriter?

3    A.   Yes.

4    Q.   Who?

5    A.   No, actually I didn't.  We didn't.

6  We used some contract underwriting from United

7  Guaranty.

8    Q.   And when was that?

9    A.   I can't remember.  But it was just

10  for loans that we wanted to do outside of

11  Taylor, Bean & Whitaker.  And we didn't even

12  have them very long, but let's say '07.

13    Q.   Who is "we"?

14    A.   Home America Mortgage.  When I say

15  "we," I refer to Home America Mortgage from

16  now on.

17    Q.   So is it your understanding that

18  once the loan package is given to

19  underwriting, your job duties and Home

20  America's duties were executed, you were done?

21    A.   No.

22    Q.   Tell me what happened after that

23  that was still part of your responsibility.

24    A.   If their underwriter put conditions

25  on the loan, we had to go back and see if we

1    could meet the conditions, "we," Home America

2    Mortgage.

3          Q.    **Which of the people involved?**

4          A.    The processors would do that.

5          Q.    **And once the conditions had been met**

6    **and handed over -- another pay stub was the**

7    **example you gave me, here's another pay**

8    **stub -- then what additional responsibility**

9    **did you have?**

10         A.    That was it, after that point, for

11   me.

12         Q.    **How about Home America?**

13         A.    Home America as well.  I mean, once

14   it met conditions and signed off by the

15   underwriter of Taylor, Bean & Whitaker, they

16   closed it and my responsibility was to get the

17   package back to them.

18              (Plaintiff's Exhibit 1 was marked

19         for identification.)

20         Q.    **(By Ms. Bracker)  I'm going to mark**

21   **something as Plaintiff's Exhibit 1.  Take a**

22   **look at what's been marked as Plaintiff's**

23   **Exhibit 1.  Have you seen this document**

24   **before?**

25         A.    No.

United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.    Do you generally recognize the

2  subject matter?

3    A.    I guess -- when was this document --

4  it doesn't have a date on this document.

5    Q.    That's correct.

6    A.    So if this date is after the date I

7  left, this would be a different guideline than

8  the date that I worked off of.

9    Q.    Did you work off a document like

10  this?

11    A.    No.   This is an underwriter

12  work-off.

13    Q.    This is an underwriter work-off?

14    A.    I believe.   I mean, I've never seen

15  this document.   So it was never sent to me, or

16  I never reviewed a document that looked like

17  this.

18         Now, it may have came over in a

19  different form at the time that I was there.

20  This doesn't look -- I don't remember this

21  document at the time that I owned Home

22  America.

23    Q.    Do you recall ever receiving any

24  sort of guidelines as to what might be a

25  warning sign of fraud or a fraudulent loan?

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.    From HUD?

2    **Q.    From anyone.**

3    A.    I don't remember seeing a guideline,

4    what to look for, on fraud.

5    **Q.    If I could direct your attention to**

6    **the fifth bolded -- "Source of Funds Warning**

7    **Signals."  Could you read those out loud,**

8    **please, what the warning signals are.**

9    A.    New bank account; evidence of

10   white-outs, alterations, rounded dollar

11   amounts; illegible signatures with further

12   identification; recent large deposits; unusual

13   down payment source; stocks, bonds; and joint

14   bank accounts.

15   **Q.    You kind of skipped a lot of stuff.**

16   **Let's go back to recent large deposits,**

17   **"Recent large deposits without acceptable**

18   **identification."**

19   **Whose job was it to notice if a**

20   **potential borrower put down on their assets**

21   **$50,000, under other assets?**

22   A.    That's an underwriter's job to catch

23   that when it's turned in to them.  That's

24   their job.

25   **Q.    So you had no obligation as the**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    **originator or loan officer to --**

2         A.   We did.  And if a processor seen

3    that particular scenario, she could have

4    approached an underwriter and said, look, I've

5    got a large deposit of such and such.  What do

6    we do?

7              And the underwriter could either

8    give her a denial on it, say, look, they won't

9    do it, or they'd give them an estimation of

10   how they can justify it.

11        **Q.   Well, I understand that they could**

12   **do that.  Were they obliged to do that?**

13        A.   I'm sure they did.  On a thousand

14   loans a month, there was a lot of interaction

15   between the processors and the underwriters.

16   And I wasn't privy to one of the

17   conversations.

18        **Q.   Did you ever do that?**

19        A.   No.  It's not my job.  That's the

20   processor's job, once the data got turned in.

21        **Q.   So if a potential borrower is**

22   **telling you how to fill out the application**

23   **and you're doing that by hand and they say,**

24   **put down for other assets, $50,000, you have**

25   **no obligation --**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   I'm going to ask for the

2  documentation on the $50,000.

3    **Q.   You are?**

4    A.   Yeah.

5    **Q.   And if they don't have it, what are**

6  **you going to do?**

7    A.   Well, it depends upon the approval

8  of the loan.   That we can't approve on Desktop

9  underwriting.

10   **Q.   It hasn't gone to Desktop**

11 **underwriting.   So what do you do at that**

12 **point?**

13   A.   If I met with a customer or anybody

14 met with a customer after, especially, 2002,

15 it had already been to Desktop underwriting

16 before we even met with a customer.

17   **Q.   How?**

18   A.   Take the application on the phone.

19   **Q.   Oh, we didn't talk about that.**

20   A.   You didn't ask me.

21   **Q.   I did actually.   I asked you what --**

22   A.   No.   You said what were the

23 processes --

24   **Q.   Mr. Hicks, you're talking over me**

25 **again, sir.   I want you to stop.**

1          My question is, and I'll go back to

2    it, whether you had initial meetings in

3    person, did they come in off the street, were

4    they phone referrals.  We established that

5    most of yours were appointments and that prior

6    to 2004 you did them mostly yourself, that the

7    first step in that interview was to sit down

8    and take their information from the

9    application by hand?

10         A.   Correct.

11         Q.   In that instance, it hasn't been

12   through Desktop Underwriter.

13         A.   No, you're right.  You're right, up

14   until about -- until when I stopped doing it.

15   From 2004 to 2009, they had already been --

16   everybody had already been in the system prior

17   to.  So that's a two-part answer, then.

18         Q.   Well, I'm focusing on '04 when you

19   were the one doing it --

20         A.   Right.

21         Q.   -- and you were taking your

22   information by hand, so that it could be put

23   into Desktop Underwriter.

24              If someone told you, I have $50,000

25   in other assets, did you have any duty to

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   investigate that?

2       A.   I'm going to have to stop and I'll

3   have to readjust that again because in '04,

4   all my stuff did come in by phone.  When I had

5   an appointment, I met with them, and it was

6   already filled out.

7            But prior to me having assistants, I

8   met with them.  I had to meet with them.  And

9   I think that probably goes back to all the way

10  to 2002, before I actually did pencil

11  handwriting deals.

12      Q.   So going back to 2002, same

13  question.

14      A.   Okay.  Now, what's the question

15  again for 2002?

16      Q.   Someone tells you, I have $50,000 in

17  other assets.  What's your duty?

18      A.   To ask for the source of funds.

19      Q.   And if they don't have any?

20      A.   It's up to the underwriter.

21      Q.   So you don't have any duty, then?

22  You put it through?

23      A.   I don't know.  I don't know what

24  loan you're talking about.

25      Q.   I'm not talking about any particular

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    loan.  I'm asking you, if that situation

2    presented itself, did you or did you not have

3    a duty?

4         A.   I don't remember that situation ever

5    presenting itself with a $50,000 nontraceable

6    deposit.

7         Q.   Well, presumably you have some

8    understanding of what your duty would be or

9    otherwise you ought not be sitting there

10   taking the application?

11        A.   Right.

12        Q.   So what was your duty, if any?

13        A.   My duty is to match up the documents

14   that the customer told me they had.

15        Q.   And if he didn't have any, what was

16   your duty?

17        A.   I turned them down.  We couldn't do

18   the loan.

19        Q.   Under "Recent large deposits without

20   acceptable identification," it says, "Unusual

21   down payment source (i.e., sale of personal

22   property, rent credit, repayment of personal

23   loan, etcetera)."

24        A.   Correct.

25        Q.   When someone says that their down

1   payment source would be a gift, would that

2   fall under an unusual down payment source?

3        A.   Well, you know, we're working --

4   again, what year is this document?  When does

5   this document -- if this is a 2002 document,

6   then I would have to answer that question as a

7   2002 document.  You asked me if I've ever seen

8   this.  I said no.

9             When did this come out?  You handed

10  me something blank.

11       Q.   I'm asking you a question that is

12  not based on when this document came out.  I'm

13  asking you whether you would consider, based

14  on your years in the mortgage industry, a gift

15  for a down payment to be an unusual down

16  payment source.

17       A.   No.

18       Q.   Thank you.

19            If you'll look at the last section

20  of this document, it says, "Owner-Occupancy

21  Warning Signals."  The first one is

22  "Employment is not within reasonable distance

23  of property."  Then the last one is "Buyer

24  purchasing a principal residence but owns

25  rental properties nearby."

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1          **Did you ever see those situations?**

2          A.    I don't remember.

3          **Q.    Do you agree that if someone was**

4    **purchasing a property that wasn't within a**

5    **reasonable distance of their employment, that**

6    **that would be a warning signal?**

7          A.    It could be a warning signal

8    explained with an explanation.

9          **Q.    I don't understand.**

10         A.    Yeah, they could be buying a house

11   40 miles away and planning on getting

12   transferred within their company.

13         **Q.    And what duty did you have if**

14   **someone told you that?**

15         A.    I didn't have a duty.  I put it

16   down, documented that they're moving.  The

17   underwriter would look at it, know it was 40

18   miles away.  They would condition for it.

19   They would say, why is this person moving 40

20   miles away?  And then the borrower would give

21   their definition of why.  And if it was

22   suitable for the underwriter, it would close.

23         **Q.    So what duty did you have?**

24         A.    It says "warning signs," not --

25         **Q.    I'm sorry?**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   This says "warning signs."

2    **Q.   Sure.  I understand that.  I'm**

3  **asking if it would have raised a red flag for**

4  **you.**

5    A.   Yes, it would have raised a red

6  flag.

7    **Q.   And what would you have done?**

8    A.   I would have asked for a

9  verification of why.

10   **Q.   And what would you have thought**

11 **would be acceptable?**

12   A.   My acceptance -- my thinking of

13 acceptance didn't matter.  It was what HUD

14 thought.

15   **Q.   Well, you would be the one passing**

16 **it along.  What would you be willing to pass**

17 **along?**

18   A.   Whatever they gave me that says why

19 they were moving.

20   **Q.   So you didn't have any duty to**

21 **evaluate what they were giving you?  You just**

22 **passed it along?**

23   A.   I passed it along to the underwriter

24 and let them make a decision if it made sense

25 or not.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    **Q.   During the time period where you**
2  **were just taking meetings with people who had**
3  **already filled out applications over the**
4  **telephone, what happened in their meeting with**
5  **you?**
6        A.   That was only for a short period.
7        **Q.   I thought it was from 2002 to 2009?**
8        A.   No.  I didn't meet with a customer
9  after --
10       **Q.   I think you said 2004 before.**
11       A.   Yeah, probably 2004, 2005.  I didn't
12  meet with a customer again face to face.
13       **Q.   So from 2002 to 2004 or '5?**
14       A.   Right.  I would take the
15  application.  It was faster because they had
16  already filled it out.  I would get them to
17  sign the documents that were required.  I
18  would get them to sign their application, and
19  I would collect the documents that were
20  required for the loan.  And I would explain
21  the loan terms to the individual with the
22  payment amounts.
23       **Q.   How often in that period did you**
24  **turn people away at that stage?**
25       A.   Not much, because most of the time,

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   they were all ran through DU and LP and they

2   were DU and LP approved.

3        **Q.    How about in the time before that**

4   **when DU and LP had not been run?**

5        A.    A lot.

6        **Q.    About what percentage, would you**

7   **say?**

8        A.    Well, I never did it right then.

9        **Q.    Never did what?**

10       A.    I never turned them away right there

11  at that moment.  It was easier for me to call

12  them the next day.

13            So the percentage?  I don't know.

14  30, 40 percent.

15            Also now, it was not my decision or

16  my responsibility to make a credit decision on

17  them loans when I met with the people.  So

18  before I actually denied them, I would

19  actually put that loan into the system, no

20  matter how bad it was or how good it was, and

21  ask for a DU or LP approval.

22            DU and LP would approve things a lot

23  of times that I had no idea that they would

24  approve, that if I would have turned them

25  away, I would have missed the loan.  Somebody

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   else could have just did it.  They had a high,

2   you know, back ratio of 50, or they had, you

3   know, not enough money or their credit score

4   was below minimum what you would think that

5   the system would approve, but sometimes it

6   would still approve it.

7        Q.   What's a high back ratio of 50?

8   What does that mean?

9        A.   You take all your -- they have

10  guidelines of loan amounts for income-to-debt

11  ratios.  And manuals on that had a certain

12  amount on the back, which meant you took all

13  their debt, plus their new home, divide it by

14  their monthly income, and you come up to a

15  percentage.  That percentage could only be

16  such and such on a manual.  But on a Desktop,

17  it could exceed it if it wanted to.  It was up

18  to the system, not up to me.

19       Q.   So if I understand you correctly,

20  you didn't perform any screening, then?  You

21  just put it into the system?

22       A.   I put it into the system, yes.  I

23  screened it, you know.  I know I had to

24  have -- I know if they told me they made

25  $2,000 a month, their pay stubs had to match

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1  $2,000 a month on them.  I know if they said

2  they got $4,000 in the bank, the bank account

3  has got to show $4,000.  I screened it, but I

4  put it in the system and let the system make

5  the approval.

6          MS. BRACKER:  It's 12:30.  So let's

7     take a lunch break.

8          (Whereupon a recess was taken from

9     12:30 p.m. to 1:38 p.m.)

10    **Q.   (By Ms. Bracker)  I talked to you**

11 **earlier, Mr. Hicks, about when Dennis Moseley**

12 **started as president, and you said he was put**

13 **into that position to alleviate from you some**

14 **of the duties that you had on a daily basis?**

15    A.   Yes.

16    **Q.   What duties were delegated to**

17 **Mr. Moseley at that time?**

18    A.   Dealing with loan officers'

19 questions, reviewing any investor docs prior

20 to me.  He was the overall boss if I was out

21 of the office of everybody.

22    **Q.   Did you continue to work the 15- to**

23 **20-hour days you were working seven days a**

24 **week before that?**

25    A.   No.  I dropped way down to like 12.

James Gregory Hicks        United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1     **Q.   12 hours?**

2     A.   Probably so.

3     **Q.   Still seven days a week?**

4     A.   No, probably -- it depends upon what

5     year you're talking, but it went TO less and

6     less as the years went on.

7     **Q.   What were you doing instead of being**

8     **in the office?**

9     A.   Well, there was always meetings.

10    There was always review meetings.  There was

11    always conferences.  There was always

12    promotionals for Home America.  There was

13    meeting with accountants, everything else that

14    a CEO has to do as the company grows and

15    becomes -- I was getting over 300 phone calls

16    a day, and then Dennis started receiving 300

17    phone calls a day probably.

18    **Q.   You know those Hicks Team signs I**

19    **was referring to?  You know what I'm talking**

20    **about, right?**

21    A.   Yes.

22    **Q.   Who paid for those?**

23    A.   Home America probably.

24    **Q.   How did people get to be on The**

25    **Hicks Team?**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   I asked them.

2    **Q.   How did you choose who to ask?**

3    A.   They had to have a great

4  understanding of the mortgage business.  So

5  after somebody had been there a while -- not

6  necessarily been there a while.  I took some

7  people and started them fresh from the

8  beginning.  But I don't know.  It's a personal

9  choice.  Not everybody would want to be on The

10 Hicks Team.  They could make a lot more money

11 outside of it.

12    **Q.   How is that?**

13    A.   They could be on full commission.

14    **Q.   So you did have people on full**

15 **commission?**

16    A.   Where?

17    **Q.   I'm asking who you were talking**

18 **about.**

19    A.   Yeah, if you wasn't on The Hicks

20 Team and you was a loan officer, you was on

21 full commission.

22    **Q.   And what was that arrangement?  Was**

23 **it 100 percent or --**

24    A.   Every one of them was different.

25    **Q.   What was the lowest percentage that**

1    you can recall?

2          A.    I don't remember.    40 percent

3    probably.

4          Q.    **40 percent to the person?**

5          A.    Uh-huh (affirmative).

6          Q.    **So why do you think people did join**

7    **The Hicks Team?**

8          A.    Stable money.

9          Q.    **The salary part was the stable**

10   **money?**

11         A.    Uh-huh (affirmative).    Job security,

12   got a paycheck every week.

13         Q.    **Who hired people into The Hicks**

14   **Team?**

15         A.    You just asked me that.

16         Q.    **I don't think I did.    If I did, I**

17   **didn't understand it that way.**

18         A.    I did.

19         Q.    **That's what you answered --**

20         A.    I hired people into The Hicks Team.

21         Q.    **Okay.    I understood that people**

22   **moved over to The Hicks Team that you selected**

23   **and you also did all the hiring.**

24              **Did anybody else consult with you on**

25   **those decisions?**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   I might have consulted with the team

2    at that particular time, whoever was on the

3    team, if they thought that person was a good

4    fit.

5    **Q.   When you were explaining that**

6    **assistants entered data into DU and LP on your**

7    **behalf, did you check what they entered?**

8    A.   No.

9    **Q.   Then how do you know it was**

10   **accurate?**

11   A.   Because they entered it and became

12   responsible for it.

13   **Q.   So even though they were entering it**

14   **on your behalf, you did not have**

15   **responsibility for it?**

16   A.   I did as the company owner, like any

17   loan officer would under me.

18   **Q.   That sounds like two different**

19   **things, like --**

20   A.   No, because they started signing it.

21   **Q.   You have to wait on me.  I'm sorry.**

22   **But I want to make sure we're on the same**

23   **page.  I don't want to torture her any more**

24   **than we have to.**

25          So I thought you said like any loan

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   officer and like the owner of the company,

2   which seemed to me to be two very different

3   things.  So can you explain that.

4         A.   They were still employees of mine

5   under Home America either way, whether you

6   were a loan officer on The Hicks Team or off

7   The Hicks Team.

8         Q.   And you were responsible for what

9   they entered?

10        A.   Only as the company standard, not

11  personally responsible.  I couldn't look at

12  every -- a thousand files a month.

13        Q.   So what did you do to make sure that

14  people were entering things accurately?

15        A.   They went through the same process

16  of verification that any loan would go

17  through.

18        Q.   What is that process?

19        A.   Processing, underwriting, closing.

20        Q.   So in other words, if someone

21  entered an inaccuracy at the beginning, it

22  would be caught by processing or underwriting?

23        A.   Mistakes happen in the world.  I

24  don't know.  But theoretically, yes, it's

25  supposed to be caught.

James Gregory Hicks                        United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   **Q.   Did you do anything else as the**
2   **company owner to make sure that things were**
3   **being entered accurately?**

4       A.   No.  You have to rely on the people
5   that you got that's in place to do that for
6   you.

7   **Q.   So you didn't give them any kind of**
8   **direction on how to check it?**

9       A.   Sure.  They knew how to -- there was
10  copies of the DU and LP findings and each
11  finding they could go by, what they had to
12  check, what they didn't have to check.  There
13  was -- they had to understand the guidelines
14  as well.

15  **Q.   Did you do training on the**
16  **guidelines?**

17      A.   Absolutely.  There was three
18  training classes a month.

19  **Q.   Who conducted those?**

20      A.   Loan officer supervisors.

21  **Q.   Who was that?**

22      A.   There was -- Becky Wright moved over
23  to being a loan officer supervisor;
24  Joanne Patterson; Sandy Flack.

25  **Q.   Anyone else?**

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   Dennis Moseley was a loan officer
2  supervisor.
3    Q.   So did Becky Wright conduct training
4  from time to time?
5    A.   She did.
6    Q.   Did Joanne Patterson conduct
7  training from time to time?
8    A.   She did.
9    Q.   Did Sandy Flack conduct training
10 from time to time?
11   A.   As much as I can remember.
12   Q.   Did Mr. Moseley conduct training
13 from time to time?
14   A.   He participated in training events,
15 yes.
16   Q.   That's a different question.  Did he
17 conduct the training?
18   A.   I don't know if he conducted one or
19 not.
20   Q.   Did Stephanie Kennedy ever conduct
21 training?
22   A.   I don't know if she did or not.
23   Q.   Would it have been appropriate for
24 her to conduct training?
25   A.   I would think so.

James Gregory Hicks                          United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1      **Q.   Why is that?**

2      A.   Well, she was a head underwriter.

3  Who better to train people on what to look

4  for?

5      Taylor Bean conducted a lot of

6  training classes as well.

7      **Q.   At your office?**

8      A.   They sent people to my office, yeah.

9      **Q.   Who did they send to your office?**

10      A.   I can't remember.  They sent

11  different people out, came to different

12  events, different speakers at different

13  events.  So did the mortgage investment -- the

14  PMI companies.  So did other mortgage

15  companies, would send trainers.  So would the

16  insurance companies send trainers.  There was

17  a lot of guest speakers and things that came

18  to the training classes.

19      **Q.   Were they set training classes every**

20  **month?**

21      A.   There was a training schedule that

22  came up monthly.

23      **Q.   How many of those were you required**

24  **to attend if you were a Home America employee?**

25      A.   The way it read, they were required

1  to attend them all.

2       Q.   Did they attend them all?

3       A.   I doubt it.  The majority did,

4  though.

5       Q.   Did you attend the training

6  sessions?

7       A.   Sometimes, but not maybe for the

8  whole thing.

9       Q.   Was an attendance taken?

10      A.   Yes.

11      Q.   Who reviewed that?  Who reviewed the

12  attendance?

13      A.   The loan officer supervisors.

14      Q.   We also talked before the break

15  about a situation where gift funds might

16  provide a down payment?

17      A.   Yes.

18      Q.   What would you match that to in the

19  file?  You said you would match these things

20  to something in a file, like a pay stub to a

21  pay stub.  What --

22      A.   I would match it to whatever the

23  underwriter wanted to verify the gift funds

24  transaction.

25      Q.   So you wouldn't ask for anything

1  initially?  You would wait for underwriting to

2  come back?

3      A.   I wouldn't ask for nothing because I

4  didn't have personal contacts on the files.

5  So when you say I --

6      Q.   Thank you for the clarification.

7  What would Home America ask for?

8      A.   Home America would ask for what the

9  underwriter required as proof.

10     Q.   So nothing until --

11     A.   Most of the time the processors

12  understand their job.  They knew what they

13  were going to have to get.  It doesn't mean

14  they got it every time, but they knew what

15  they were supposed to have gotten, and they

16  would get whatever documents they thought that

17  was going to be required.

18          Now, if that was a document that the

19  underwriter required, that was one thing.

20  Maybe the underwriter required more, whatever.

21     Q.   So what would you expect them to

22  anticipate needing for a gift fund?

23     A.   You would have to have -- I would

24  anticipate a letter of a gift.

25     Q.   What does that look like?

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   From a person to the person of how

2   much.  And then for a period of time up to a

3   certain date, all you would have to do is show

4   the funds in their account.

5        Then after that, you would have to

6   verify the last couple years -- at Home

7   America, you had to verify that the giver had

8   the funds to give.  But that was not a

9   requirement the whole time.

10       **Q.   The office building where Home**

11  **America did business, when you came in the**

12  **front door, was there a reception area?**

13       A.   There was.

14       **Q.   Who sat at the reception area?**

15       A.   Chris Holmes was the last one.

16       **Q.   Do you remember any of the others?**

17       A.   Sylvia Oritone.  I don't know how to

18  spell that, I'm sorry.  She was a

19  receptionist.  And sometimes on lunch breaks,

20  they took turns swapping out.

21       **Q.   Was the reception closed off from**

22  **the rest of the offices, or was it all open**

23  **from there?**

24       A.   It was closed.

25       **Q.   So you had to go through another**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1  door to see --

2      A.   Not a door.  A corridor.

3      Q.   So no door, but you couldn't see

4  because there was a corridor in the way?

5      A.   Correct.

6      Q.   So when you proceed down the

7  corridor, what would you see when you came

8  into the next area?

9      A.   Left or right?

10     Q.   We'll start with left.

11     A.   A long hallway of offices.

12     Q.   And then to the right?

13     A.   You would walk into an open pit area

14  of cubes.

15     Q.   Is there any --

16     A.   Around the pit area of cubes was

17  offices.

18     Q.   Where was your office?

19     A.   To the left at the end, opposite

20  side of that.

21     Q.   Was that where most of The Hicks

22  Team was located?

23     A.   They were not in the same offices as

24  me.  They were in the office next door.

25     Q.   But still down the corridor to the

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   left?

2         A.    Uh-huh (affirmative).

3         Q.    **Did borrowers ever go back into the**

4   **office areas for meetings?**

5         A.    To the left corridor on the long

6   hallway, there was two conference rooms.

7   Throughout the rest of the building -- you

8   only asked me about left and right -- behind

9   there was a lot of offices that the individual

10  loan officers had.  If they took borrowers to

11  their office, that was their preference.

12        Q.    **I'm just asking whether they did.**

13        A.    I'm assuming they did.

14        Q.    **You don't know?**

15        A.    Sometimes.  It was probably easier

16  most of the time to use a conference room

17  because there's usually two loan officers per

18  office.

19        Q.    **Did you interview Stephanie Kennedy**

20  **before she was hired?**

21        A.    Yes.  I didn't interview her.  I

22  spoke with her, got her history and her

23  qualifications, and forwarded them to Taylor,

24  Bean & Whitaker, Sherry Dickerson.

25        Q.    **Sherry Dickerson at Taylor, Bean &**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   Whitaker?

2        A.   Yes.

3        Q.   What was her job?

4        A.   President.   She oversaw all the

5   underwriters.

6        Q.   Did you make a recommendation as to

7   whether Stephanie Kennedy should be hired?

8        A.   They told me to find another DE

9   underwriter in their area, to help them find

10  another DE underwriter in their area.   Taylor

11  Bean was located in Marietta.   So finding a DE

12  for me in Grayson, Georgia, was not going to

13  be easy for them, to work out of my office.

14       Q.   So do you mean to find a DE in your

15  area?

16       A.   That lived in my area that would be

17  willing to go to work for Taylor Bean.

18       Q.   So from the beginning, you

19  understood she would work in your office?

20       A.   Yes.

21       Q.   Did you make a recommendation about

22  hiring her?

23       A.   Well, I said this woman had applied

24  and this is the qualifications and she seemed

25  to be getting -- would be getting along good

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   with our company.  So I guess that's a

2   recommendation.

3        Q.   **What would you say her strengths**

4   **were?**

5        A.   She put in a lot of hours.  She got

6   along with people really good for the first

7   three-fourths of her career.

8        Q.   **People in the office, you mean?**

9        A.   She had a good knowledge of,

10  understanding of FHA loans, as well did all

11  the other DE underwriters that were in that

12  office.

13       Q.   **So if she told you a loan shouldn't**

14  **close, what would you do?**

15       A.   Well, just to answer that question

16  real quick, I cannot close a loan unless a DE

17  underwriter signed it.

18       Q.   **That's not my question.**

19            MS. BRACKER:  Could you read back my

20       question.

21            (The record was read by the

22       reporter.)

23       A.   And my answer is I cannot close a

24  loan unless a DE underwriter signed it.

25       Q.   **(By Ms. Bracker)  I don't understand**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   how you think that's responsive.

2           My question is:  If your underwriter

3   in the building, the DE underwriter, said this

4   loan can't close, what would you do, if you

5   were the originator of that loan?  What would

6   your next step be?

7       A.    And my response to that is if the DE

8   underwriter in the office said this loan

9   cannot close, Home America did not have the

10  ability to close the loan, period.

11      Q.    I understand that.  So what would

12  you do?

13      A.    I wouldn't close the loan, I guess,

14  or try to get another opinion.

15      Q.    Who might you ask for another

16  opinion?

17      A.    Another DE underwriter for a second

18  look.

19      Q.    Who were the other DE underwriters

20  you might ask for a second look?

21      A.    The DE underwriters that I named

22  earlier that was in our office, as well as

23  submit it to the head underwriter at Taylor,

24  Bean & Whitaker in Marietta.

25      Q.    Which was who?

1     A.    For a long time it was

2  Sherry Dickerson.   And then it became -- it

3  became somebody else.   I can't remember her

4  name.

5     **Q.   Did you know Stephanie Kennedy's FHA**

6  **number?**

7     A.    No.

8     **Q.   Did you purchase the Home America**

9  **business cards that Stephanie Kennedy had?**

10    A.    No, I didn't purchase -- all

11  business cards was on an automatic form in

12  which any employee could go and just purchase

13  what they needed.   So if a loan officer

14  wanted -- we bought all of them their first

15  set.   If they bought more than that, they had

16  to pay for them.   But any employee could go on

17  the line, on our supply line and order

18  anything they wanted.

19    **Q.   Even employees of TBW?**

20    A.    Well, if they went on there and did

21  it, the system wouldn't distinguish it.

22    **Q.   Why not?**

23    A.    It didn't have that capability.   It

24  wasn't that type of system.   It was very

25  small.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.   Why do you think Stephanie Kennedy

2   would print out Home America business cards?

3        A.   I don't know.  I got one that says

4   I'm the greatest lover, but I'm sure there's

5   two or three better than me out there.

6        Q.   I don't understand --

7        A.   Do you understand what I'm saying?

8        Q.   -- how that's responsive.  No, sir,

9   I don't.

10       A.   It's real simple.  I can put

11  anything I want on a business card, but what

12  does that mean?

13       Q.   I'm not asking you that at all.  I'm

14  asking you if you have any -- I can come up

15  with reasons why you might have a world's

16  greatest lover business card, although I don't

17  care to speculate.

18            Why do you think she would like to

19  have a business card with Home America on it?

20       A.   Ask her.  I don't know.  That's

21  speculation.

22       Q.   Are you objecting on speculation

23  now?

24       A.   Yeah.

25       Q.   All right.  You have no idea why she

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    would do that.

2              Did you ever see her hand out those

3    cards?

4         A.    No.

5         Q.    Were you aware she had them?

6         A.    No.   What did the business cards

7    say?

8         Q.    I'm sorry?

9         A.    What did the business cards say?

10        Q.    I don't have a sample for you.   I'm

11   sorry.   You've never seen them before?

12        A.    I don't know what card she had.

13        Q.    Did you ever promote

14   Stephanie Kennedy?

15        A.    I talked about what would happen in

16   the future.

17        Q.    What did you talk about?

18        A.    Stephanie Kennedy was talking about

19   leaving Taylor Bean and going somewhere else

20   and leaving the Home America office.   I didn't

21   want her to do that.   So this was after Dennis

22   had been promoted to president, which raised a

23   real feather, I guess, in her cap.

24              And I had a talk with her before she

25   turned her resignation notice in to Taylor

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Bean, that if we became a full eagle lender

2    and if we started the process of becoming a

3    full eagle lender, she could swap over to the

4    Home America pay side and she would become

5    vice president.

6          But at that time I was incapable of

7    moving her over to Home America Mortgage from

8    Taylor Bean due to the fact that she was

9    underwriting and the DE number is only good at

10   one company.

11        **Q.   Could it have been associated with**

12   **Home America?**

13        A.   Excuse me?

14        **Q.   I understand that the DE number is**

15   **only good at one company.**

16        A.   No, it could not.

17        **Q.   And you could not have it associated**

18   **with your company?**

19        A.   I could not.

20        **Q.   Why is that?**

21        A.   That's a full eagle lender.  I don't

22   have a full eagle lender license at Home

23   America.

24        **Q.   When you said Mr. Moseley became**

25   **president and that was a real feather in her**

James Gregory Hicks         United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   **cap, you mean it bothered her?**

2       A.    It appeared to me because that's

3   when she decided she was going to leave and go

4   to some other company to work.

5       **Q.    You mean it bothered her.   Okay.**

6       A.    Speculation, though.

7       **Q.    Feather in her cap usually means**

8   **something different to me, and I wanted to**

9   **make sure I understood what you meant.**

10       **When you had that discussion with**

11   **her, had you started the process of becoming a**

12   **full eagle lender?**

13       A.    I talked to her about it.   You had

14   to have a full -- you had to have a certified

15   DE underwriter that would do that.   So we got

16   the paperwork to start.   And once you start

17   the process, you cannot go back.   The process

18   never got started.   So we never got to that

19   stage of even attempting to become one.   No

20   paperwork got turned in.

21       **Q.    Why was it not started?**

22       A.    Well, to become a full eagle lender

23   is a very complicated situation, especially on

24   the size of Home America.   Every loan that you

25   do under FHA, under your eagle requirements as

1   you're becoming an eagle lender, requires you

2   to underwrite the loan of the DE that you have

3   in-house and send that loan for review to HUD.

4   You had to do a number of test cases, they

5   call them.

6          Well, HUD could sit on that loan for

7   two weeks.  And when you're closing, we just

8   established, you know, let's say 800 to 1,000

9   loans a month and you've got to send every one

10  of them to HUD for at least the first 50, it

11  will shut your whole company down.  So making

12  that transition to that was never a feasible

13  thing to do.  We wanted to.  We wanted to do

14  it.

15         But the process that goes along with

16  it -- the only other way to do it would be to

17  start another mortgage company, like I told my

18  lawyer, and then get a full eagle off of the

19  company and then merge that company into it.

20  And we never even went down that road either.

21  You just could not -- with the amount of loans

22  coming through, if I took all these loans and

23  we underwrote them and then they had to go to

24  HUD to get reviewed and re-underwrote, and

25  you're talking hundreds, and they take 14 days

1  to underwrite a loan, I backed them up by four

2  months and I got 30-day closings.  Okay?

3         And I could not -- once you start

4  that process, you couldn't say, we're going to

5  send you this loan to review, but we're going

6  to do this loan with Taylor Bean.  That's not

7  allowed.  Once you start down that loan as a

8  full eagle, that's.  It, every loan has got to

9  go through the process.

10        **Q.  What did you mean when you said "the**

11  **first 50"?**

12        A.   I think they required the first 50

13  FHA loans, under the requirement, to be

14  reviewed.  And then if you have any issues,

15  the review process could go on longer.  But

16  the first 50 would have backed up the next

17  800.

18        The requirements of becoming that

19  were almost -- at that point in time, with a

20  company that had grown to that level, it was

21  almost impossible unless they would make

22  exceptions to it, and they wouldn't.

23        **Q.  When did you realize how onerous the**

24  **process was going to be?**

25        A.   Well, I didn't realize how difficult

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1  it was going to be because I thought, well,

2  we'll just send them the first 50 loans real

3  quick and then we'd close the rest with Taylor

4  Bean.  But after we got into investigating it

5  and got into talking, and I sat on the phone

6  for hours with HUD, I could not close another

7  loan outside of Home America once I started

8  down that full eagle process, which meant I

9  was at the mercy of HUD to close every loan

10 under their review process, which, hey, may

11 have went really smooth, okay, but if it

12 didn't, it could have ruined the whole

13 business in one month.

14         Q.   **When did you figure that out?  After**

15 **the conversation with Stephanie Kennedy about**

16 **maybe her becoming a vice president?**

17         A.   Yeah.  That's why we never started

18 it.

19         Q.   **So she never was a vice president?**

20         A.   She couldn't have been a vice

21 president of the company, working for Taylor

22 Bean.

23         Q.   **Did you have a further conversation**

24 **with her once you realized it wasn't ever**

25 **going to be possible?**

1    A.   No.   The time period between that
2  conversation and the time period that she sent
3  her resignation letter in is pretty minimal.
4  It's not that long of a time period.
5       **Q.   We talked about the different jobs**
6  **earlier.  We talked about originators, loan**
7  **officers, processors, underwriters, closers.**
8  **But we didn't talk about closing attorneys.**
9       **What's the duty of a closing**
10  **attorney?**
11    A.   I don't know.  I'm not a closing
12  attorney.  I'm not sure what their
13  requirements are.
14       **Q.   Were you ever a processor?**
15    A.   No.
16       **Q.   Were you ever an underwriter?**
17    A.   No.
18       **Q.   Well, you talked extensively about**
19  **what they do.  So I'd like you to --**
20    A.   I understand that, but the processor
21  worked for me.  So I had to understand her
22  job.
23       **Q.   But an underwriter didn't work for**
24  **you, did they?**
25    A.   They did not.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.    You talked the most about the

2  underwriter.

3    A.    I talked about what they had to do

4  because I understood what they had to do to

5  get our loans cleared.  What goes into it, to

6  the actual closing attorney, all I know is

7  they do a title search and they verify the

8  funds and they transfer it and everybody

9  signs.  That's all I know.  Any other duty

10 than that, I don't know if they have other

11 duties than that.

12   Q.    Okay.  Well, that's more than none,

13 so let me go back through those with you

14 because I didn't get them all down.

15         You said they do a title search.

16 And then what were the other two things you

17 said?

18   A.    Transfer the funds, get the

19 paperwork signed.

20   Q.    You mean at the closing table?

21   A.    Yeah.

22   Q.    Who worked as closing attorneys on

23 Home America loans?

24   A.    The Home America loan approval list

25 for attorneys, there was probably 500 approved

1  attorneys.

2      Q.    **Why did you have an approved**

3  **attorney list?**

4      A.    It's required by Taylor Bean.  It

5  wasn't my approved attorney list.  It was

6  Taylor Bean's approved attorneys list.

7           Good point.  Thanks for --

8      Q.    **So who did Home America use for**

9  **closing attorneys, then?**

10     A.    Probably 200, really.

11     Q.    **So nobody more often than others?**

12     A.    No. 1 was probably Jackson Hardwick.

13  Morris, Manning & Martin.  Then Carl Wright

14  did a lot.  And then it goes on down the list.

15          Like I said, there's at least 200

16  people that have closed loans for Home America

17  under Home America's originated loans for

18  Taylor, Bean actually.

19          You know, the closing attorney -- I

20  do understand this:  The closing attorney

21  works for the lender at the table.

22     Q.    **Where do you get that understanding?**

23     A.    Because any closing I've ever been

24  to, he says, I represent the lender.

25     Q.    **Are you talking about closings**

1  you've been to for your personal closings?

2      A.   Or closings I went to when I was a

3  loan officer over the various years.

4      Q.   **Now, I went through who was at the**

5  **closing table, and you didn't say anything**

6  **about loan officers.**

7      A.   They don't have to be there.

8      Q.   **Are loan officers frequently there?**

9      A.   If they wish to go, they can go.

10     Q.   **Not my question.  Are they**

11 **frequently there?**

12     A.   Frequently?  I don't know.

13     Q.   **You left them off the first time.**

14 **So I'm trying to figure out why.**

15     A.   Well, I left off real estate people

16 too, but they're not required to be there

17 either.  The only people that's required to be

18 there are the buyer, the seller, and the

19 closer -- I mean, and the attorney.

20     Q.   **But I didn't ask who is required to**

21 **be there.  I asked who was typically there.**

22     A.   I don't know who's typically there.

23 It depends upon the closing.

24          I can tell you this:  I didn't

25 attend any of my closings for the last years,

1   nor did a representative of mine, for years,

2   under The Hicks Team.

3        Q.   Or Home America?

4        A.   I don't know about Home America.  I

5   don't know what the other loan officers did on

6   their business.

7        Q.   I thought they reported to you?

8        A.   They did.  But they don't report

9   where they are all day long.  One of them

10  might think it's important to go to a closing.

11  One of them might not think it's important to

12  go to a closing.  But none of them under Home

13  America requirements are required to go to a

14  closing.

15       Q.   Who is responsible for deciding

16  whether or not to accept a borrower's

17  application for a loan?

18       A.   Every borrower application for a

19  loan has to be accepted into the system.  Now,

20  it doesn't to have been approved.  It has to

21  be accepted by federal law, because that's

22  discrimination.

23       Q.   So who accepts it?

24       A.   The loan officer that took it.

25       Q.   And who is responsible for

1  **accurately entering the application**

2  **information into the application engine?**

3       A.   The loan officer or the person

4  that's taking the application.

5       **Q.   And I'm sorry.  What are the names**

6  **of the people who entered them for you?**

7       A.   Justin Price, Misty Chripholous,

8  Becky Wright, Lindsey Metzger.  That's the

9  last ones.

10      **Q.   Who is responsible for making sure**

11 **that the information is collected that is**

12 **required by the application engines?**

13      A.   The person that took the loan

14 application.

15      **Q.   The loan officer?**

16      A.   Yep.  If that's the person that took

17 the loan application, it is.

18      **Q.   Who else might take a loan**

19 **application?**

20      A.   That's it.  That would be the loan

21 officer because that would be the position.

22 But a processor might have the ability to

23 originate a loan themselves, which they did

24 not frequently do.  But we gave them the

25 ability, if they had a family member getting a

1  loan, that they could do that.  But they

2  couldn't process the particular loan.

3         We also had where accountants and

4  all these other salary people could refer a

5  loan in, but most of the time they didn't take

6  it.  They gave it to a loan officer to take

7  for them.

8         Q.   So once a DE underwriter has signed

9  off on a loan and it's ready to be put into

10 closing, there's a package of information that

11 exists, correct?

12        A.   I would guess so, yes.  Yes.

13        Q.   I don't want you to guess.  If I'm

14 saying it wrong, I want you to correct me.  So

15 what --

16        A.   There's a loan package, yes.

17        Q.   What happens to that package next?

18        A.   That package is copied and shipped

19 to the investor.  The originals are shipped to

20 the investor.

21        Q.   Who did the copying?

22        A.   Post-closing, there's a couple

23 people, Tracy Hobbs, and she had other people

24 help her from time to time.  I don't know.

25 It's not that hard of a job.

1    Q.   So she, Tracy Hobbs, or whoever was

2  helping her would take the completed package,

3  make a copy of it for Home America's records?

4    A.   Correct.

5    Q.   And ship the original to the

6  investor, which in the case of many of them

7  would have been TBW?

8    A.   Correct.

9    Q.   Where were the copies kept?

10    A.   In a file room at the Home America

11  office.

12    Q.   What steps were taken to make sure

13  that the completed package was copied

14  correctly?

15    A.   We would get -- you would get --

16  after review of the investor, if there was

17  something missing, they would send a request

18  for docs.

19    Q.   So before you sent it, was there any

20  review done?

21    A.   Not on the copy.

22    Q.   Was there any review done on the

23  original, post-closing, to make sure something

24  didn't get left on the closing table or

25  something like that?

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   I never saw a closing table.

2    **Q.   I didn't intend to suggest you did.**

3    **My question is:  Did anybody review**

4  **that package before it was copied and sent?**

5    A.   That was her job, to review it and

6  copy and send it.

7    **Q.   That was Tracy Hobbs' job?**

8    A.   Yes.

9    **Q.   And did anybody check her?**

10    A.   No.  The investor.

11    **Q.   So what steps did Home America take**

12  **to ensure that the complete package went to**

13  **the investor?**

14    A.   Like I told you, Tracy Hobbs would

15  check the package, put it in a stacking order,

16  copy it, and send it to the investor.  All of

17  it was scanned.

18    **Q.   Anything else?**

19    A.   That's it.  If they didn't have all

20  the copies or didn't have what they needed,

21  they would send a request for it.  But you

22  have to remember, the copy was for Home

23  America.  The original went to them.

24    **Q.   I understand.  That's why I've asked**

25  **about who checked the original rather than who**

James Gregory Hicks        United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   checked the copy.

2       A.   Right.

3       **Q.   You understand that's my question,**

4   **right?**

5       A.   Well, the original went to them.

6       **Q.   Did anyone check it before they sent**

7   **it?**

8       A.   They check over it and send it, yes.

9       **Q.   "They"?**

10      A.   Tracy and whoever helped her.

11      **Q.   And there were no other safeguards**

12  **other than Tracy and whoever helped her?**

13      A.   Well, there's no other safeguards

14  needed because the documents that are the most

15  important are signed at the closing table.

16      **Q.   Why did you hire Comfort Friddle?**

17      A.   To be a processor.

18      **Q.   Was she hired onto The Hicks Team?**

19      A.   No.

20      **Q.   Why not?**

21      A.   She was hired under Home America.

22      For the record too, the woman that

23  processed for The Hicks Team, Gwen, also

24  processed for other people too as well,

25  especially if The Hicks Team was slow.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.    So when you say 800 to 1,000 loans a
2  month, that's company-wide, right?
3    A.    Company-wide.
4    Q.    What percentage of that was Hicks
5  Team loans?
6    A.    10 percent.
7    Q.    How were you the top producer, if
8  The Hicks Team only had 10 percent of the
9  loans?
10    A.    I had 400 employees.  Divide that
11  up.
12    Q.    So you counted everybody's loans as
13  yours when you say you were the top producer?
14    A.    No.  I only counted what The Hicks
15  Team did.
16    Q.    So if The Hicks Team was responsible
17  for 10 percent of the 800 to 1,000 loans a
18  month, that's 80 to 100 loans a month?
19    A.    Correct.
20    Q.    And you're saying, well, the rest,
21  the 90 percent of them, was disbursed over a
22  lot of other people?  No other person
23  accounted for 10 percent --
24    A.    That's right.
25    Q.    -- or more?  I understand.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1      A.   Not quite that much.

2      Q.   **I understand now.  Anybody come**

3  **close?**

4      A.   Many times.

5      Q.   **Who?**

6      A.   I think James Hewitt did.  I believe

7  Mark Moore did.  Chris Drexler did good.

8  There's a lot of them.

9      Q.   **So Gwen was able to process**

10 **everything, the 10 percent, the 80 to 100 a**

11 **month herself, and still had time to work on**

12 **other people's loans as well?**

13     A.   Some months we didn't do that, I

14 said, when we were slow.

15     Q.   **So when The Hicks Team was slow, she**

16 **would help out in the other areas?**

17     A.   Correct.  One month we might do 150.

18 The next month we might do 50.

19     Q.   **But you didn't have any other**

20 **processors who worked on The Hicks Team?**

21     A.   That was the last one.  But over the

22 years, there was other people that had done

23 it.

24     Q.   **But one at a time?**

25     A.   Yes.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.    Did Stephanie Kennedy interview

2   Comfort Friddle?

3    A.    I don't remember.  I don't know.

4    Q.    Did she have any say in the hiring

5   of Comfort Friddle?

6    A.    I don't remember any of it on her

7   being hired or what the day was.  I mean,

8   we're talking about ten years ago.

9    Q.    Did you work with Comfort Friddle at

10  all?

11   A.    Comfort Friddle worked for me.

12   Q.    Did you work directly with her?

13   A.    No, but she worked directly for me.

14  So, yeah, in that respect, I did work with

15  her.

16   Q.    What were her strengths as an

17  employee?

18   A.    I don't remember.  I don't remember

19  enough about her.  I'd have to have the

20  personnel file.

21   Q.    When did you make the decision to

22  suspend Friddle?

23   A.    Upon a call by Taylor, Bean &

24  Whitaker, Lee Farkas, CEO, that there was a

25  pool of loans that had early defaults on them

1  by two loan officers, which is a very unusual

2  happening within the Home America corporation.

3       Q.   **Who were those loan officers?**

4       A.   Jermaine Smith and -- no, Andre --

5  one of them is White, and Smith.

6       Q.   **And who was involved in the decision**

7  **to suspend her, Comfort Friddle, that is?**

8       A.   After we got the call from Taylor,

9  Bean & Whitaker, Lee, that we had these number

10 of loans that appeared to be suspicious, Lee

11 came to Atlanta, and me and Lee got in a car

12 and we went around to these 18 or so

13 properties that had been raised in question

14 that was located in a certain -- all in a

15 certain area that was over by Turner Field.

16 We went and evaluated these loans because the

17 only thing that was coming up that was

18 suspicious on them was what the investor was

19 saying was the value.  Now, for the record,

20 none of these loans were FHA or government

21 loans.

22          So after we went around, some of

23 them did appear to be higher.  Some of them

24 appeared to be worth more.  The investor that

25 Taylor Bean was selling them to was not happy

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   with them.

2          So I asked Joanne Patterson, and I

3   asked if Stephanie Kennedy would help review

4   them files and let's see what pattern we had.

5   Before asking them to do that, I suspended

6   everybody that was involved on the files, the

7   two loan officers and Comfort, the processor.

8       **Q.   Was Joanne your employee?**

9       A.   She was.  She was a loan officer

10  supervisor, with a great -- with 25 years

11  knowledge, with her underwriting certification

12  and everything else.  She understood the

13  business well.

14      **Q.   And at the end of their**

15  **investigation, what did they tell you?**

16      A.   That there were some irregularities

17  the way the loans had been processed and that

18  Stephanie had recommended that Comfort be

19  terminated, as well as the two loan officers,

20  and it was concurred by Joanne Patterson.  And

21  that information was transferred to Dennis.

22  It was transferred to me.

23          And I gave Comfort -- I told Dennis

24  to give Comfort a call and talk to her and

25  give her an option of what she wanted to do.

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1  And she chose to resign instead of being

2  fired.

3      **Q.   If she hadn't resigned, would she**

4  **have been fired?**

5      A.   There's a good chance.

6      **Q.   I don't know what that means.  Was**

7  **it a choice of resign or be fired?**

8      A.   It was a good chance I was probably

9  going to fire her, yes.

10     **Q.   That was what Dennis was supposed to**

11 **communicate, would you prefer to resign or be**

12 **fired?**

13     A.   Yes.

14     **Q.   Did Stephanie or Joanne give you any**

15 **reasoning for why Comfort should be fired?**

16     A.   Yes.

17     **Q.   What was that?**

18     A.   Bypass chain of -- we had a -- when

19 a file went to underwriting, it went into a

20 pool and the next available underwriter would

21 pick it up.  She had made it a purposeful

22 event to make sure that a different

23 underwriter got a different file, if a

24 borrower was getting three loans.

25          Also, if a borrower came back and

1  got another loan, they were doing them

2  simultaneously, and she was raising the income

3  to meet the expectations of the new loan

4  amount without raising concerns.

5       Q.   How was she doing that?

6       A.   It's a non-income nonqualifying

7  loan.  So it's stated.  All the person has to

8  do is state how much money they make.

9            But to state that you made $100,000

10  and then to state the next month, you made

11  $200,000 is a little unreasonable and should

12  have been brought to our attention.  With a

13  different underwriter getting each one of the

14  different files, no one could follow that

15  chain.

16       Q.   How are processors compensated?

17       A.   Salary, plus bonus per file.

18       Q.   What's the bonus per file?

19       A.   It was different per processor.

20  Time, knowledge, production.

21       Q.   When did it pay?  When the loan

22  closed or when the loan --

23       A.   On their paychecks for the month, I

24  think.  I'm not sure how it paid.

25       Q.   You don't know when they got credit

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    for it?

2        A.   I'm not sure of the exact day they

3    got credit for it, no.

4        **Q.   You said earlier that Home America**

5    **was audited several times, that that was**

6    **common to be audited?**

7        A.   Yes.

8        **Q.   Can you think for me the first time**

9    **you recall being audited at Home America by**

10   **anyone.**

11       A.   FHA, I don't remember the year, but

12   I know during my stint, that there was three

13   audits by FHA.

14       **Q.   You know about what?  That there**

15   **were --**

16       A.   Three full audits.

17       **Q.   At the same time?**

18       A.   No, over my stint of owning Home

19   America.

20       **Q.   How far apart were they?**

21       A.   Pretty evenly spaced.

22       **Q.   Tell me what you mean by "full**

23   **audit."**

24       A.   They would come in and they would

25   pull a random number of file loans, anywhere

1  from 100 to 500, depending upon how many

2  people they brought to the audit.  They would

3  re-underwrite every one of them loans, look

4  for any origination mistakes, look to make

5  sure that we were in compliance with our

6  signing of our documents, make sure our hiring

7  practices were right, make sure our net worths

8  were correct, make sure our loan accounting

9  log was in order, etcetera.  And that's all I

10  know.  I mean, they did a lot more than that

11  too, but I don't know the full duties.

12      Q.   Was the audit in the spring of 2006

13  by Freddie Mac a full audit?

14      A.   No.

15      Q.   What was it, then?

16      A.   It was a request for documents, I

17  think.  I don't even remember if they came in

18  the office or if we sent them the 20 files

19  they asked for.

20           No, they reviewed nothing else.  So

21  it would not be considered a full audit.

22      Q.   Were those 20 files related to the

23  White and Smith --

24      A.   I don't remember what 20 files they

25  were, but the majority were not because they

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   were not Freddie Mac loans.  They were

2   investor, private label loans, 80/20.

3           **Q.   How long have you known Carl Wright?**

4           A.   Since -- he closed my first mortgage

5   as an originator.  So I guess back since '98.

6           **Q.   Was that in Loganville?**

7           A.   I don't remember what year.  I've

8   known him a long time.

9           **Q.   But you were at Loganville?**

10          A.   No.  He wasn't in Loganville then.

11  He was in Duluth.

12          **Q.   Are you aware of what the criminal**

13  **charges against him are?**

14          A.   I am.

15          **Q.   What are they, in your words?**

16          A.   I guess he committed some type of

17  mishandling of loan closings that resulted in

18  federal charges.

19          **Q.   That's the only understanding you**

20  **have of it?**

21          A.   Uh-huh (affirmative).

22          **Q.   Have you spoken with Mr. Wright in**

23  **the last two years?**

24          A.   Yes.

25          **Q.   When was the most recent time you**

1   talked to him?

2       A.   Sentencing date, the day he got

3   sentenced.

4       Q.   **Do you remember roughly when that**

5   **was?**

6       A.   A few months ago.

7       Q.   **What was the substance of that**

8   **conversation?**

9       A.   About his sentencing.

10      Q.   **What is his sentence?  Do you know?**

11      A.   I think -- I don't remember -- five

12  years, something like that, six years.  I

13  don't know.  I can't remember.

14      Q.   **Where is he serving his time?**

15      A.   I haven't been there.  I don't know.

16      Q.   **Did you talk about this lawsuit at**

17  **all?**

18      A.   No.  There's nothing I can talk to

19  him about this lawsuit.

20      Q.   **Who is Tim Halstead?**

21      A.   He was a former employee of Home

22  America Mortgage.

23      Q.   **What was his job title?**

24      A.   I think he was an overall -- like

25  loan officer supervisor.  I don't think he

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    ever obtained a, quote-unquote, title.  Maybe

2    he did.  I don't know.  But he was basically

3    in charge, before Dennis became president, of

4    helping loan officers with their needs,

5    training, things like that.

6         **Q.    Did he leave when Dennis took over?**

7         A.    He left after he was fired.

8         **Q.    Why was he fired?**

9         A.    He stole some money.

10        **Q.    What money did he steal?**

11        A.    We started Home America Lending,

12   which you'll find on that summary sheet, which

13   was basically a rehab program, when everything

14   was booming good, people were buying houses,

15   fixing them up and selling them.  That doesn't

16   meet any lender guidelines or anything, so

17   Home America would use its own money to let

18   the people buy these houses and fix them up.

19   And he had to oversee it.  So they made draws

20   as they repaired these homes.

21             And for the most part, the program

22   worked, except for Tim, who went out and

23   bought four houses and drew all the repair

24   money out but didn't do the repairs.

25        **Q.    How did you find out?**

1    A.    I figured it out when his wife got a
2  brand-new car, a new boob job, and bought a
3  new house and they were headed to the Bahamas
4  for ten days.
5    **Q.    And what did you do?**
6    A.    I called him to come to the office,
7  and I went and got that account and I found
8  out that he had four files and that was never
9  disclosed to me.   I went and looked at the
10 houses that he said he had already rehabbed 80
11 percent, and they were just -- hadn't been
12 touched.
13   **Q.    Were you able to recoup the money?**
14   A.    No.
15   **Q.    Did you rehire him later?**
16   A.    I didn't rehire him.
17   **Q.    Who did?**
18   A.    Esplezz rehired him, which was a
19 mortgage training school that I was going to
20 be involved with but did not.   I backed out of
21 it.
22   **Q.    Can you spell that for me, please.**
23   A.    E-s-p-l-e-z-z, I think.
24   **Q.    Where was that supposed to be?**
25   A.    Well, it was supposed to be all

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    over, to train new loan officers for Taylor

2    Bean, for Home America, etcetera, for banks.

3    An actual mortgage school, that's what it was,

4    if you want to know the truth.

5         Q.   Whose idea was that?

6         A.   A guy named Colin Daymude's, which

7    was the head of our personnel at that time.

8         Q.   Head of Home America personnel?

9         A.   Uh-huh (affirmative), personnel

10   director.

11        Q.   So who all was going to be involved

12   in the mortgage school?

13        A.   Colin Daymude was going to take the

14   largest percentage of it because he wanted to

15   go out on his own and start a company.  He

16   wanted to hire Tim Halstead, which at first I

17   greatly protested, but as long as he wasn't in

18   my company and didn't have access to a

19   checkbook, I didn't care.  He was a very

20   knowledgeable mortgage individual.

21             Lee Farkas and me -- before it got

22   started, though, I backed out of the deal.  I

23   just couldn't get along with Colin and Tim.

24   So I relinquished my shares.

25        Q.   Did you ever put any money up?

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1      A.    No.

2      Q.    **Was the school ever founded, to your**

3   **knowledge?**

4      A.    Yeah.   They ran for -- I don't know.

5   I don't know how long it ran.   They ran it for

6   a little while.   Home America used it a couple

7   times and sent some new recruits through that

8   we recruited out of the colleges.

9      Q.    **Who is Ginny Poore?**

10     A.    Ginny Poore is an FHA underwriter

11  too.   She was another one at Taylor Bean.   I

12  didn't try to disguise her.   I forgot her.

13     Q.    **Did she ever do any of The Hicks**

14  **Team loans?**

15     A.    She did a majority of The Hicks Team

16  loans.

17     Q.    **What led to you and Home America**

18  **being put on the exclusion list for Freddie**

19  **Mac?**

20     A.    To this day, I cannot give you a 100

21  percent answer to that.   They did the 20-loan

22  audit.   They said they found inconsistencies

23  in the 20 loans, which 20 loans are really --

24  how did they find them 20 loans out of the

25  100,000?   I'm pretty sure it came from your

1  clients.  I was not even familiar with the

2  loans that they audited.

3          They never used the word "fraud" to

4  me.  They never used the word "theft."  They

5  never used the word "crook," anything.  They

6  said irregularities.

7          We appealed it.  It took them over a

8  year, year-and-a-half to decide on the appeal.

9  And the final result came back that we're

10  going to put you on the exclusionary list due

11  to your inability to manage.  Not one time did

12  they use the word "fraud."  So not --

13      **Q.    What do you think that means,**

14  **"inability to manage?"**

15      A.    Let me finish, please, too.

16      **Q.    Oh, I'm sorry.  I thought you were.**

17      A.    So not one time did they ask us to

18  buy back a loan, have they ever asked us to

19  buy back a loan, have they charged us with

20  fraud, have they gone and sued us for any

21  loans that Home America ever originated.

22      **Q.    Were you in business at the time?**

23      A.    At the time of what?

24      **Q.    At the time that you were put on the**

25  **exclusionary list.**

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   Sure.

2    Q.   **How much longer were you in**

3    **business?**

4    A.   I was in business the whole -- I was

5    running the company the whole year-and-a-half

6    during the appeal process.  And when Taylor

7    Bean bought it was right after the

8    exclusionary period.

9    Q.   **What do you think it means,**

10   **"inability to manage"?**

11   A.   That's a good question.  I don't

12   know because I ran a pretty -- I thought I ran

13   a pretty good company.  And the person that

14   told me I didn't have the ability to manage

15   lost $100 trillion of the United States'

16   money.  So I don't know what inability to

17   manage is under them type of terms.

18   Q.   **Who is the person you're talking**

19   **about?**

20   A.   Freddie Mac.

21   Q.   **Oh, the entity?**

22   A.   They told me I didn't know how to

23   manage, but yet they lost a hundred trillion

24   bucks.

25            MS. BRACKER:  I'm going to take

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   about a ten-minute break.  We can go back

2   on the record in about ten minutes.

3            (Whereupon a recess was taken from

4   2:42 p.m. to 3:11 p.m.)

5       Q.   (By Ms. Bracker)  Mr. Hicks, have

6   you ever spoken with anyone at Brand Bank

7   Mortgage?

8       A.   Greg Shumate.

9       Q.   Who is Mr. Shumate?

10      A.   I don't know what his position is

11   over there now.

12      Q.   Do you know what it was when you

13   spoke to him?

14      A.   I think it was head of their

15   mortgage.

16      Q.   What did you speak to him

17   concerning?

18      A.   Them -- Stephanie and Allison,

19   Sandy -- going to work over there, recruiting

20   all my employees, telling everybody that I was

21   being sued and going to jail.  And I called

22   him and told him he better stop it.

23      Q.   What did he say?

24      A.   "I didn't say anything."

25      Q.   You didn't?

James Gregory Hicks                     United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1       A.    That was what he said, "I haven't

2    said anything."

3          Q.    I'm confused.

4       A.    That's what he said.  You said, what

5    did he say?

6             He said, "I didn't say anything."

7          Q.    Oh, I see.  I got you.  So you said,

8    you better stop it.  And he said, I haven't

9    said anything?

10      A.    Uh-huh (affirmative).

11         Q.    And you said what?

12      A.    That was the end of it.  I hung up

13   on him.

14         Q.    What did you tell him was going to

15   happen if he didn't stop it?

16      A.    I don't remember the whole

17   conversation or anything.

18         Q.    Sandy is Sandy Flack?

19      A.    Sandy Flack.

20         Q.    What is Sandy Flack's -- what was

21   her position with Home America?

22      A.    Loan officer supervisor.

23         Q.    Was she terminated or resigned?

24      A.    She resigned.

25         Q.    Why did she resign?

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   I don't remember.

2    **Q.   When did she resign?**

3    A.   I don't remember that either.

4    **Q.   And Allison is Allison Paul?**

5    A.   Yes.

6    **Q.   And what was Allison's position?**

7    A.   She was a DE underwriter for Taylor,

8    Bean & Whitaker.

9    **Q.   Who worked in your office?**

10   A.   Yes.

11   **Q.   That was the other call you remember**

12   **making to Lee Farkas?**

13   A.   Correct.

14   **Q.   And what was the circumstances of**

15   **that?**

16   A.   She had filed a -- after Stephanie

17   left, she had filed a restraining order on a

18   loan officer/her lover that she says she was

19   pregnant with, yet both of them were married.

20   And when she filed that restraining order,

21   seeing how she was not my employee, she was

22   Taylor Bean's employee and she had restrained

23   an employee of mine that was my employee, I

24   asked Taylor Bean to move her out of the

25   office.

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.    Did they do so?

2    A.    They offered her that.  And she said
3    she was going to sue them for sexual
4    harassment or something.  So she met with
5    counsel for Taylor, Bean & Whitaker, and they
6    gave her some money to resign.

7    Q.    And who shared this information with
8    you?

9    A.    Jeff Cavender, the counsel for
10   Taylor, Bean & Whitaker.

11        He also shared a fact that Stephanie
12   sent that letter that you referred to, that
13   Allison Paul told him that Stephanie made the
14   letter sent to my wife.  And you know the
15   letter I'm talking about.

16   Q.    I'm glad you brought it up because I
17   don't know if we're all talking about the same
18   letter.  We've had a lot of exchanges about
19   the letter.

20        Tell me what letter you're referring
21   to?

22   A.    There was a letter sent to my wife
23   that said, you need to know that your
24   husband's had five affairs and he has
25   currently fathered a child.  And it was made

1   up, like a crazy person, with cutout letters

2   of like articles in People magazine and pasted

3   together.  And it must have took them hours to

4   do.

5        **Q.   Have you seen the letter?**

6        A.   I've seen it.

7        **Q.   Do you remember about when it was**

8   **sent?**

9        A.   About the time of Stephanie's

10  leaving, right before, a week before.

11       **Q.   What do you think her motivation**

12  **would have been in sending such a letter?**

13       A.   I can't speculate on her motivation,

14  but she -- I'm just telling you that

15  Allison Paul told counsel that Stephanie made

16  that letter and sent it.

17       **Q.   And you don't deny you had a lot of**

18  **affairs?**

19       A.   Oh, I deny I had a lot of affairs.

20  What do you consider a lot?  And what do you

21  consider an affair?

22       **Q.   You get to define it, since I'm**

23  **asking the question.  What do you consider --**

24       A.   I deny, then.

25       **Q.   What do you consider an affair to**

1   be?

2       A.   It's not my -- I'm not asking the

3   questions here.  I don't know.

4       **Q.   I just asked you one.  You just have**

5   **to give me an answer.  What do you consider an**

6   **affair to be?**

7       A.   I would consider it to have a sexual

8   relation outside of marriage or outside of a

9   person being married.

10      **Q.   How many affairs have you had under**

11  **that definition?**

12      A.   Two.  But, for the record, one of

13  them I was separated during the time of that.

14      **Q.   Do you remember who the person was**

15  **that was supposed to be having your baby when**

16  **the letter was sent?**

17      A.   It didn't say.

18      **Q.   It didn't say?  It just said he's**

19  **having an affair and --**

20      A.   -- he's fathered a child.  But I --

21  I think some calls went out to Tracy Hobbs,

22  and rumors got back to me that it's supposed

23  to be Tracy Hobbs.

24      **Q.   Calls went out to Tracy Hobbs?**

25      A.   I think your office called

1    Tracy Hobbs, if I'm not mistaken, or she

2    called your office, one or the other.  She

3    called upset, saying that --

4          Q.    Called me upset or called --

5          A.    She called me upset, saying that

6    this vicious lie that's circulating everywhere

7    of me having your kid is going to cause me

8    major issues with my life.

9                And I told her to tell her husband

10   to call me.  I didn't care.  I don't -- so the

11   gist of it is supposed to be Tracy Hobbs.

12         Q.    And you did not have an affair with

13   Tracy Hobbs?

14         A.    I did not.

15         Q.    Who did you have an affair with?

16         A.    Amanda Alexander, Stephanie Kennedy.

17         Q.    In your earlier discovery responses,

18   you indicated you have no proof whatsoever of

19   the encounters that you supposedly had with

20   Stephanie Kennedy; is that right?

21         A.    I don't think I have proof, but I

22   think -- you know, you talk about them phones,

23   you know, some of them text messages, you

24   know, where she wanted me to meet her in the

25   school or meet her in my office.  I know it's

1  on them phones.  I just haven't been able to

2  locate it yet.

3       Q.    What have you done to try?

4       A.    I looked for them but -- I got them.

5  I got four or five phones in my house.  And

6  then I got to get a battery for them and

7  charge them up and I haven't done it.

8       Q.    Do you have any time frame on that,

9  because the lawsuit, as you have pointed out,

10 has been around a really long time?

11      A.    I'll get around to it as soon as I

12 can get them opened up.

13      Q.    But you're sure they exist?

14      A.    I'm not sure they exist.  I said I

15 think I got all the phones, but I haven't

16 turned them on to look.

17      Q.    I'm not talking about the text

18 messages.  You're sure you have four or five

19 phones at your house?

20      A.    Yes.

21      Q.    And you have not delivered those to

22 your attorney?

23      A.    Not delivered them because I can't

24 open them up.

25      Q.    And you don't know where they are in

1    your house?  They're just in your house

2    somewhere?

3         A.    Uh-huh (affirmative).

4         Q.    And if you were able to open them

5    up, your belief is that they would show

6    Stephanie texting you to meet her somewhere

7    for a rendezvous?

8         A.    There was a couple.

9         Q.    Was that the gist of them, though,

10   meet me somewhere?

11        A.    Yes.

12        Q.    And then you --

13        A.    And then the one that I told her I

14   was going to tell her husband about our affair

15   and where she called a truce.  She asked for a

16   truce.  That was prior to me knowing that she

17   had filed this.

18        Q.    So you only told us in your

19   discovery responses of two times that you

20   actually had an encounter with

21   Stephanie Kennedy.  You say one was in your

22   car?

23        A.    One was in the car --

24        Q.    And one was in Orlando?

25        A.    -- one was in Orlando and one was in

1   my office.  There's three times.

2       Q.   And all of those you don't have any
3   proof of, correct?

4       A.   Not at this particular time, no.

5       Q.   Is there proof somewhere that --

6       A.   Not that I've found yet.  But the
7   whole system -- Home America is wired and
8   videod.  I just don't have the video DVR in my
9   hand.  The bankruptcy attorneys do.

10      Q.   So there's videotape of all the
11  offices at Home America?

12      A.   That's right.

13      Q.   And you didn't tell me that in your
14  discovery responses?

15      A.   I told you I videotaped the whole
16  office, everything, the doors and everything,
17  the whole office.  Every office in that place
18  was videod, but I don't have the video.

19      Q.   Have you ever reviewed it?

20      A.   No, I haven't reviewed it.  Again, I
21  don't have it.

22      Q.   No.  I mean, prior to the end of the
23  company, you never reviewed the videotapes?

24      A.   No.

25      Q.   So you're speculating that

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1  somewhere, there may be a videotape that may

2  or may not have recorded you and

3  Stephanie Kennedy in your office?

4      A.   Correct.

5      Q.   And you were married at the time

6  also?

7      A.   I was separated.

8      Q.   What period of time were you

9  separated?

10     A.   I was separated for two-and-a-half

11  years prior to the date of the final divorce.

12     Q.   Why did you separate from your wife?

13     A.   Because she took all my money and

14  left and married another guy.  Pretty simple.

15  Cleaned the bank accounts out.

16     Q.   When was that?  Two-and-a-half years

17  before your divorce was final?

18     A.   Yes.

19     Q.   So 2007?

20     A.   If that's two-and-a-half -- no, it

21  was before that.  When was my divorce final?

22  I don't even know.  It was a long, long

23  separation before we ever --

24     Q.   You're saying she remarried before

25  she divorced you?

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.   No, she didn't remarry before she

2  divorced me.  She remarried shortly after.

3    **Q.   So she took all your money, she ran**

4  **away with someone else, then there's a**

5  **two-and-a-half year separation, and then**

6  **you're divorced?**

7    A.   No, that divorce got final.  That's

8  why it got final, so she could get married.

9    **Q.   That's what finally caused it to get**

10 **finalized?**

11   A.   That's right.

12   **Q.   So who is Amanda Alexander?**

13   A.   Former employee.

14   **Q.   What was her position?**

15   A.   Loan officer.

16   **Q.   On The Hicks Team?**

17   A.   No.

18   **Q.   How long was your affair with her?**

19   A.   A year.

20   **Q.   Did she accompany you back and forth**

21 **to Orlando?**

22   A.   Not Orlando, no.

23   **Q.   Who is Mary Hicks?**

24   A.   My sister.

25   **Q.   I thought you only had two?**

1    A.    Mary Christen.

2    **Q.    Oh, Christy Hicks is also**

3  **Mary Hicks?**

4    A.    Uh-huh (affirmative).

5    **Q.    What about Clarence?**

6    A.    Clarence who?

7    **Q.    Clarence Hicks.**

8    A.    I don't know.

9    **Q.    What are your parents' names?**

10    A.    James and Judy.

11    **Q.    Are they living?**

12    A.    No.

13    **Q.    So I'm about to ask you some**

14  **questions relating to your interrogatory**

15  **responses that your attorney just provided me**

16  **with a draft of.  Have you had a chance to**

17  **review these yourself?**

18    A.    I did.

19    **Q.    Are they complete?**

20    A.    I guess so.

21    **Q.    They're, to the best of your**

22  **knowledge, complete now?**

23    A.    To the best of my knowledge.  It

24  depends upon which one you're asking, but I'm

25  pretty sure I answered everything that I could

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   remember.

2        Q.   Have you done anything other than

3   base it on your recollection to answer these

4   questions?

5        A.   No.

6        Q.   Did you talk to anybody else to make

7   sure you had as much detail as you could get

8   on these answers?

9        A.   On which question?

10       Q.   Your discovery in general.  Have you

11   talked to anybody for any of the questions?

12       A.   No, I didn't talk to nobody about

13   it.

14       Q.   So I'm looking at your list of

15   companies and corporations.

16       A.   Yes.

17       Q.   Do you remember that one, No. 9?

18   And I'm guessing that's one of the ones you --

19   just based on what I heard you say going out,

20   you want to make sure they're all here?

21       A.   Yeah.  I tried a lot of different

22   things.

23       Q.   So Hicks & Hicks, Inc., 50 percent

24   ownership, this is the second thing listed.

25   Do you recall Hicks & Hicks?

1      A.    Yes.

2      **Q.    Who had the other 50 percent**

3  **ownership?**

4      A.    Stephen Hicks.

5      **Q.    Who is that?**

6      A.    He was a friend of mine.  He's not

7  related.

8      **Q.    Odom Green, Inc., you have 50**

9  **percent ownership.  Who is the other 50**

10 **percent?**

11     A.    Stephen Hicks.

12     **Q.    Evans Family Development, you have**

13 **33.3 percent ownership.  Who has the other**

14 **percentages?**

15     A.    The two sisters listed.

16     **Q.    Listed where?  Oh, that you've**

17 **already told me about?**

18     A.    Uh-huh (affirmative).

19     **Q.    Lori and Christy?**

20     A.    Correct.

21     **Q.    Same for Home America Insurance,**

22 **Inc.?**

23     A.    Yes -- no.  No.  No.  That was

24 Taylor Bean and me.

25     **Q.    Taylor Bean had the rest of the**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    ownership and you had 33.3?

2        A.   No.  There might be a

3    miscommunication there.  I was left with 33

4    percent when I sold it.

5        Q.   20 Moon Properties, 50 percent

6    ownership, we already talked about that?

7        A.   Yeah.

8        Q.   BodyPlex, Grayson, 49 percent

9    ownership, we already talked about that?

10       A.   Yes.

11       Q.   Home America Mortgage, Inc.,

12   previously owned 90 percent.

13            There have been bankruptcy

14   proceedings against you in connection with the

15   bankruptcy of Home America and TBW, correct?

16       A.   Yes.

17       Q.   Now, in your discovery responses, in

18   the TBW bankruptcy, you stated that you

19   received approximately $20 million in

20   consideration for the sale of Home America to

21   TBW?

22       A.   I think -- I didn't receive any $20

23   million.

24       Q.   What did you receive?

25       A.   At the time of the closing, I got

James Gregory Hicks                         United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    $1 million and a note.  How about them apples?

2        Q.   Well, according to the documents

3    that you produced, starting at GH001 through

4    296, you indicated you received a wire

5    transfer, in your name, to Colonial Bank for

6    $1.8 million.

7        A.   Was it 1.8?

8        Q.   That's what it says.  And a wire --

9        A.   I thought it was just 1 million.

10       Q.   And a wire to Community Bank for 1.1

11   million.

12       A.   That was one of the payments.

13   That's why I said they bankrupted on 90

14   percent of the note.  They paid me 10 percent

15   of it, outside the closing table.  1.8, I did

16   receive, but I had to pay the corporate tax

17   out of my proceeds for Home America for the

18   year.  That added up to about $800,000.

19       Q.   And 9 million to satisfy a

20   promissory note dated 9-15-08 to be paid on

21   closing on 1-6-09?

22       A.   Right.

23       Q.   And then another $9 million

24   promissory note, unsecured, nonnegotiable,

25   subordinated, delivered at closing.  I assume

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1  that's the 9 million they bankrupted you out

2  of?

3       A.   Yes.

4       Q.   **What about the $9 million promissory**

5  **note?**

6       A.   It was on properties and things like

7  that I had and money I owed and some money I

8  had taken out to buy some loans back from

9  Taylor Bean when I -- for some income

10 purposes.

11      Q.   **I thought you were not ever asked to**

12 **buy back any loans?**

13      A.   No government entity has ever asked

14 me to buy back a loan, and Taylor Bean has

15 never asked me.  I asked them, for business

16 purposes.

17      Q.   **What business purposes?**

18      A.   Income-producing, for the money, and

19 because the tax audits required me to --

20 holding that much cash, wanted me to take cash

21 out of my company and pay tax on it.  So we

22 purchased some loans back.

23      Q.   **So you approached Taylor, Bean &**

24 **Whitaker.  Who at Taylor, Bean & Whitaker?**

25      A.   Lee Farkas.

James Gregory Hicks                     United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.   And you asked him to buy back some
2  loans?
3    A.   Correct.
4    Q.   Why?
5    A.   I just told you.
6    Q.   I didn't understand you.
7    A.   Tax purposes mainly.
8    Q.   How many loans did you buy back?
9    A.   I don't remember.  30 or 40.
10   Q.   About what did they total?  How much
11 did they total?
12   A.   What the note amount was.
13   Q.   $9 million?
14   A.   Yeah.
15   Q.   So you transferred $9 million to
16 Taylor, Bean & Whitaker?
17   A.   Correctamundo.
18   Q.   I didn't hear you.
19   A.   Yes.
20   Q.   Correct till Monday?
21   A.   Correctamundo, that's what I did.  I
22 transferred --
23   Q.   Correctamundo.  I see.  Okay.
24        So you transferred $9 million to
25 them to buy back these loans.  When did that

1  happen?

2      A.   Before the sale, a year before the

3  sale or so.

4      Q.   **And then you took a promissory**

5  **note -- actually took $9 million at closing?**

6      A.   No, not at the closing, I didn't.

7      Q.   **I think that's what your discovery**

8  **responses say.  So you now say your discovery**

9  **responses are incorrect?**

10     A.   I don't know.  I'm not sure what

11  you're saying.  But at the closing table, I

12  did not get no $9 million.

13     Q.   **Was $9 million transferred to**

14  **someone who you owed money to?**

15     A.   No.  I had a transfer of $8 million

16  prior to the closing, way prior to the

17  closing.

18     Q.   **To whom?**

19     A.   To me.

20     Q.   **For what?**

21     A.   Repurchase of them loans.

22     Q.   **So you've got 1.8 coming into your**

23  **Colonial Bank account, you've got 1.1 coming**

24  **into Community Bank, and you've got 8 million**

25  **coming into you in advance of the sale?**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    A.    Correct.

2    Q.    And then you have a $9 million

3  promissory note?  That's your testimony today?

4    A.    Yeah, that's what happened.

5          (Plaintiff's Exhibit 2 was marked

6  for identification.)

7    Q.    (By Ms. Bracker)  I will show you

8  what's been marked as Plaintiff's Exhibit 2.

9  Take a minute to look at it.  Do you recognize

10 this type of document?

11   A.    I do.

12   Q.    Where did it come from?

13   A.    That's a standard application for a

14 mortgage.

15   Q.    And it says Home America, Inc., at

16 the top.  So this is Home America's standard?

17   A.    It's everybody's standard.

18   Q.    And it's the one Home America used?

19   A.    It is.

20   Q.    What's that Ocala address at the

21 top?

22   A.    I guess that's Taylor Bean's office,

23 because it actually -- we originated off of

24 their system too.  So it's probably come off

25 of their docs.

1    **Q.   So if you turn to the third page, is**

2  **that your signature?**

3        A.   It's not.

4        **Q.   Who has signed that for you?**

5        A.   I don't know.

6        **Q.   Does that disturb you to know**

7  **someone signed for you?**

8        A.   Well, they should have asked me to

9  sign it, but somebody didn't because that's

10  not my signature.

11       **Q.   Do you know whether they signed it?**

12       A.   No.  I don't even know this loan.  I

13  don't know anything about this documentation,

14  who this is or anything about it.

15       **Q.   I didn't expect that you would**

16  **remember much about it, if anything, since it**

17  **was so long ago.**

18            **But you're telling me you do**

19  **remember and that you didn't have anything to**

20  **do with it?**

21       A.   I'm saying I don't know this

22  documentation, this letter, this nothing.  I

23  don't know anything about this file.

24       **Q.   So you don't know whether someone**

25  **got your permission to sign your name?**

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1       A.   No, I don't remember.

2       Q.   **Was it common for people to sign**

3  **your name?**

4       A.   No.

5       Q.   **Take a look on the first page.  I'm**

6  **going to point because it's easier.  Right**

7  **about here, "Source of down payment,**

8  **settlement charges and/or subordinate**

9  **financing (explain)."  That says, "Gift**

10 **funds."**

11          **Anything about that that would raise**

12 **red flags for you?**

13      A.   I don't know anything about it.  I

14 didn't talk to this person.

15      Q.   **You definitely did not talk to this**

16 **person?**

17      A.   I don't think so.  I don't remember

18 them, if I did.

19      Q.   **Well, those are two different**

20 **answers.**

21      A.   I don't remember talking to the

22 person.

23      Q.   **You don't remember whether you did**

24 **or didn't?**

25      A.   Yeah.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.    Look on the second page.   At the

2    bottom, "Other Assets (Itemize)," $50,000.

3            Any idea who put that down or what

4    that meant?

5        A.    I have no idea.

6        Q.    Because this is a person with $500

7    in the bank.

8        A.    Yeah.   But you know what, the other

9    items right here, other assets of $50,000,

10   let's add up their TVs, their cars, their

11   phones.   Let's add up their clothing.   Let's

12   add up the tires on their cars.   Let's add up

13   every asset they got.   And, of course, anyone

14   with $500 in the bank would probably have

15   $50,000 worth of assets.

16       Q.    Well, I'm sure that's true, but it

17   says itemize.   They're supposed to write down

18   their car, their TV.   They're supposed to tell

19   me what's that's being based on, right?

20       A.    The underwriter should have asked

21   for it to be itemized, if they wanted it to.

22       Q.    I think that's what it's asking

23   here, itemize.

24       A.    That's the underwriter's job.   If

25   she wanted that itemized, she should have

1   asked for it.

2         Q.   So you do not think there was

3   anything wrong with it being filled out the

4   way it was filled out?

5         A.   No.

6         Q.   Turn to the next page where your

7   signature appears at the bottom with

8   face-to-face interview checked.  Your

9   testimony is that that is not your

10  signature --

11             MS. FODOR:  You don't happen to have

12        one more, do you?

13             MS. BRACKER:  I do not.

14        Q.   (By Ms. Bracker)  -- that you don't

15  recall this loan.

16             What is the purpose of the signature

17  there on "To be Completed by Interviewer"?

18  What's your understanding of that purpose?

19        A.   I guess to say everything that they

20  heard, they put down.

21        Q.   And it doesn't seem wrong to you

22  that someone should put down your name when

23  it's not you?

24        A.   That's not my signature.

25        Q.   That's not my question.  Do you

1  think that's okay to put down somebody else's

2  name there?

3      A.    No, probably not.

4      Q.    And, again, we have the name and

5  address of the interviewer's employer, Home

6  America Mortgage, Inc., in Ocala, Florida.

7            But that's not right either, is it?

8      A.    Yeah, because Home America was a

9  Florida corporation.

10     Q.    But based on your understanding of

11 the loan industry and how long you've been

12 involved in it, you don't see anything wrong

13 with this application as filled out?

14     A.    The $50,000 in "Other Assets

15 (Itemize)," if the underwriter wanted them

16 itemized, she should have asked for it.  It's

17 pretty plain and simple.  They only have $500.

18 And the underwriter is going to look at it and

19 see that, hey, you only have 500 bucks here.

20 The 50,000 is not listed as to what items they

21 are.

22            So what kind of factor can that

23 person give to it?  Probably none, if you're

24 an underwriter.  And so you know all the other

25 facts of the case here, being what it is.

1      So I understand that we got a

2 signature situation here, but we also only

3 have a declaration of $500 of total liquid

4 funds.  I doubt very seriously there's a lie

5 here.

6      Q.   **You doubt very seriously --**

7      A.   -- that there's any lies.

8      Q.   **But I'm asking something very**

9 **different.  I'm asking you whether you think**

10 **that application is an appropriately**

11 **filled-out application.**

12      A.   Up to the signature, yes.

13      Q.   **Up to the signature, yes?**

14      A.   Yes.

15      Q.   **I'm going back to your discovery**

16 **responses because I was about to deny you the**

17 **opportunity to tell me what Hog Bid, LLC, is**

18 **and I'm very curious.  What's Hog Bid, LLC?**

19      A.    It was a little Internet site that

20 sold motorcycles, and I was involved -- I was

21 going to do it, but we never did a thing with

22 it.

23      Q.   **And Ham Air, LLC?**

24      A.   That was my old airplane.

25      Q.   **Does it still have the airplane as**

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   an asset?

2         A.   No.   It's gone.

3         Q.   **What about Edge Funding, LLC?**

4         A.   It's a deal I set up -- a company I

5   set up to try to put on a few little concerts

6   down in Florida, nothing major.   It's not

7   active, not open, no bank account.

8         Q.   **And Buzz Entertainment Group?**

9         A.   It's part of the marketing for the

10  nightclub I owned with Lee Farkas.

11        Q.   **And Action Promotions, Inc.?**

12        A.   Was the Easyriders event stuff that

13  I bought into.

14        Q.   **Bought into from whom?**

15        A.   A guy named John Green.   I bought

16  his shares out.

17        Q.   **So who is the other 50 percent?**

18        A.   Melissa Penlin.   I don't own it now.

19  It's been gone.

20        Q.   **Who owns it now?**

21        A.   I gave my shares all up to

22  Melissa Penlin for no consideration and walked

23  away from it.

24        Q.   **When was that?**

25        A.   About a year ago, when we owed about

1   $700,000 in debt.

2        Q.    "We," Action Promotions?

3        A.    That's right.

4        Q.    Why did you owe $700,000 in debt?

5        A.    Royalties to the magazines for the

6   use of the names, $600,000, and we was

7   $100,000 short on bills.

8        Q.    And TWBS, LLC?

9        A.    Actually, Melissa Penlin doesn't

10  known that Action Promotions anymore, I don't

11  think.  I think it was all taken back by the

12  royalties of the magazine, executed their

13  royalties and took over that Action Promotions

14  company, if I'm not mistaken, how it happened.

15       Q.    Which magazine would that be?

16       A.    It wasn't a bank.  It was the

17  magazine.

18       Q.    Right.  Which magazine was that?

19       A.    Easyriders magazine.

20       Q.    Do you still own any motorcycles?

21       A.    One.

22       Q.    What kind?

23       A.    Harley.

24       Q.    TWBS, LLC, what's that?

25       A.    I can't remember what it's for.  I

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1  don't remember.  I can't even remember that

2  company.  I'm not sure.

3          Oh, that's a bar.  That's what it

4  was.  It was a bar in Daytona that I owned

5  40 -- or 30-something percent of.

6      Q.   Still?

7      A.   No.  It's gone.

8      Q.   **Who owned the rest of the**

9  **percentage?**

10     A.   Bruce Rossmeyer, that owned the

11 Harley dealer in Daytona.  They own it all

12 now.  He got killed.  His family took it all

13 back.

14         MS. BRACKER:  I think I'm very close

15     to done, or possibly done, but I want to

16     look through, because we've had so many

17     papers added in, I want to take a minute

18     off the record and look through.

19         (Whereupon a recess was taken from

20     3:43 p.m. to 3:51 p.m.)

21     Q.   **(By Ms. Bracker)  Do you have any**

22 **domain names registered to you, Website domain**

23 **names?**

24     A.   I'm not sure.  If I did, somebody

25 registered them for me.  Like Hog Bid, I'm

1    sure, was registered.  I'm not sure if it

2    still is or not, things like that.

3        Q.    I'm going back to your draft

4    interrogatory responses.  The interrogatory

5    that we asked was:  Identify every instance

6    you were made aware of of documents being

7    altered for a loan file by a Home America or

8    TBW employee, including what alteration was

9    made, why the alteration was made, who made

10   the alteration, whether or not you gave

11   approval to make the alteration.

12            Your response is:  I interpret the

13   words altered and alteration, as used above,

14   to be broad.  And given thousands of loans,

15   I'm unable to specifically and directly

16   respond.

17            So fortunately that's what

18   depositions are for.  Do you understand what I

19   mean by alter or alteration?

20       A.    No.  Define it for me.

21       Q.    No.  I would like you to define it

22   for me.  You may choose your definition.

23       A.    Changed.

24       Q.    Do you ever recall documents being

25   changed in a loan file by a Home America

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   employee?

2        A.   No, I don't know specifics on

3   documents being changed or swapped or, you

4   know, if you get a bank statement and they

5   don't have enough money to close and they got

6   to wait until their payday to get a new bank

7   statement and that document gets changed out.

8   I don't know about being changed or altered in

9   the sense of criminal alterations.

10       Q.   You don't know of any occurring --

11       A.   I don't know.

12       Q.   -- in the criminal alteration sense?

13       A.   No.

14       Q.   And by "criminal alterations," you

15   mean improperly changing documents?

16       A.   Let me just state for the record

17   too, I have never changed a document.

18       Q.   And are you aware of any TBW

19   employee changing a document --

20       A.   No.

21       Q.   -- improperly?

22            I'm going to look back quickly at

23   Plaintiff's Exhibit 2.  I want to look at the

24   second page, Other Assets (Itemize).  Is that

25   a number that the lender typically gives you,

1  or is that a number that whoever is writing it

2  down generates that number?

3       A.   That's the number they ask them, how

4  much all the assets you have are worth.

5       Q.   And then they tell you $50,000?

6       A.   Yes.

7       Q.   And are you supposed to ask, what's

8  that based on?

9       A.   No, because this actually doesn't

10 enter into the underwriting criteria of DU and

11 LP.

12      Q.   I'm sorry?

13      A.   This doesn't enter into the criteria

14 of DU and LP unless it's liquid.

15      Q.   I don't understand what you just

16 told me.

17      A.   This particular line does not enter

18 into.

19      Q.   You're saying --

20      A.   You put it in there, but it doesn't

21 factor into it.

22      Q.   I'm asking you something entirely

23 different, and you're now telling me something

24 entirely off of what I'm talking about.  But

25 I'm happy to let you explain what you have

1  apparently learned from your attorneys during

2  the break in just a second.

3       A.   No, we didn't talk about that.

4       Q.   But tell me about your other assets

5  (itemize).  So if a borrower comes in and

6  speaks with a loan officer and says, I have

7  $50,000 in other assets, that's a number that

8  you just take and put down?

9       A.   Yeah.

10       Q.   You don't need to ask -- you don't

11  need to, as it says, itemize?  You don't ask

12  that?

13       A.   If you run it through the system and

14  it asks you to give them an itemized thing,

15  then you have to go back and get it itemized,

16  what are these assets.

17       Q.   But I'm talking about this interview

18  time.  Like this is a face-to-face interview,

19  it says.

20       A.   How long are you going to take to

21  put down their socks?

22       Q.   I don't know.  I don't do this.

23  That's why --

24       A.   How long to take down their socks

25  and their ring and their jewelry and their

1    watch and their tires and their car?

2        **Q.   Well, tires and cars are both**

3    **covered under automobiles, right?**

4        A.   Well, I don't know.  Is it?  Maybe;

5    maybe not.

6        **Q.   How would it not be covered by**

7    **automobiles?**

8        A.   If they have a second car.

9        **Q.   That wouldn't go under automobiles?**

10       A.   No.  They usually just ask what car

11   you got.

12       **Q.   Well, it's plural.**

13       A.   Or if they got an old-timey

14   collector car or something like that.

15       **Q.   So it says automobiles owned,**

16   **plural, but you're telling me that when you**

17   **filled out applications, you just put one car**

18   **there and you put --**

19       A.   Whatever they said their car was.

20       **Q.   I need to finish my question.  And**

21   **you put the other car information in itemized**

22   **assets?  That was your practice?**

23       A.   I didn't put any -- I didn't ask

24   them anything.  I said, what is your other

25   assets worth?

1    **Q.   And you didn't ask if they had any**

2  **other cars?**

3      A.   No.   I never was in-depth on that

4  particular line, not one time ever.

5      **Q.   Which particular line?**

6      A.   The line you're talking about with

7  the $50,000 worth of assets put in.

8           Furthermore, out of the three HUD

9  audits, not one time did that get raised as a

10  question either.

11     **Q.   What didn't get raised as a**

12  **question?**

13     A.   "Why don't you itemize these?"

14     **Q.   I thought they didn't give you any**

15  **information from the audits?**

16     A.   They gave me information on the

17  audits.

18     **Q.   Tell me about the information they**

19  **gave you, then.**

20     A.   I don't remember what the

21  information was.   I mean, Home America, over

22  the course of three audits, incurred about

23  $7,000 in fines for whatever the case is,

24  whether it's not keeping the logbook up or

25  whatever.   I don't know what the fines were

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    for.

2         But $7,000 for a fine when you're

3    the largest FHA lender in the state of Georgia

4    is not even a significant finding.  They did

5    tell me that I needed to lend to more

6    minorities.

7         **Q.   And these are HUD audits, yes?**

8         A.   That's right.

9         And we got wrote up for not keeping

10   good enough employee record files, which

11   improved over the years.  But Home America on

12   these FHA audits never obtained a fine for any

13   fraudulent activities, never obtained a

14   suspension, probation, or even a warning.

15        **Q.   You mean until you were put on the**

16   **exclusionary list?**

17        A.   I was not put on the exclusionary

18   list by FHA.

19        **Q.   Oh, okay.  So Freddie Mac is the**

20   **exclusionary list?**

21        A.   The FHA list, I did not get a

22   finding for it.

23        **Q.   But you weren't a direct insured**

24   **lender?**

25        A.   No.

1      **Q.   So why would they have put you on**
2   **their exclusionary list when you weren't --**

3      A.   Because a direct insured lender is
4   not a Freddie Mac deal.  You're talking about
5   two different entities, ma'am.

6      **Q.   Well, I realize that.**

7      A.   A direct insured entity is HUD, the
8   government.  Freddie Mac is not the
9   government, at least at that time.

10     **Q.   So when you talk about HUD audits,**
11  **you're saying HUD audits never resulted in you**
12  **being put on any exclusionary list?**

13     A.   That's right, probations,
14  suspensions, disciplinary action, etcetera.

15     **Q.   That was just Freddie Mac?**

16     A.   That was just Freddie Mac.

17     **Q.   Now, you were telling me that that**
18  **line -- and I think you're talking about the**
19  **other assets -- that you've had a revelation**
20  **about that, that that does not get entered**
21  **into DU and LP.  Go ahead and tell me what you**
22  **were telling me.**

23     A.   Unless it's a liquid asset, it
24  doesn't factor into the loan consideration
25  under the DU and LP.  It might factor into an

1   underwriter's consideration on a manual, but

2   it doesn't factor in on a DU and LP

3   consideration.

4          **Q.    Can you tell from this application**

5   **which kind this was?**

6          A.    No.

7          **Q.    Why do you gather this information?**

8          A.    Why do I gather what information?

9          **Q.    The line we're talking about, other**

10  **assets.**

11         A.    Because it asks you to put something

12  there.

13         **Q.    Well, it asks you to itemize it, but**

14  **you don't do that.**

15         A.    No.

16         **Q.    So why do you do it at all?**

17         A.    Well, that was -- like I said,

18  there's absolutely no way to itemize

19  everything that a person owns.

20         **Q.    Have you been through a bankruptcy,**

21  **Mr. Hicks?**

22         A.    Not yet.

23         **Q.    I assure you there's a way to**

24  **itemize everything a person owns.**

25                **What factors do go into assets on**

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    **the DU and LP?**

2         A.    Liquid.

3         **Q.    Is that it?**

4         A.    Pretty much, yes.

5         **Q.    And what is that compared against?**

6         A.    500 bucks on this loan and the gift

7    funds on this loan.

8         **Q.    So net worth is not entered into**

9    **DU --**

10        A.    No.

11        **Q.    Net worth is not entered into DU and**

12   **LP?**

13        A.    Their net worth is $58,000 with

14   their gift funds.  I mean, come on.  You're

15   going to say this is mortgage fraud on this

16   particular loan with somebody putting down

17   their net worth of $58,000?  You can almost

18   get a homeless person on the street to get a

19   net worth of $58,000.

20        **Q.    How would you do that?**

21        A.    Well, I'm sure their family member's

22   holding something of theirs in storage

23   somewhere or somebody's got something in

24   storage.  I mean, come on.  Please tell me you

25   have something a whole lot better than this

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   that you're going to come in and accuse me of

2   loan fraud.  Please tell me you have a lot

3   more than this.

4       Q.    Would you like to go through all the

5   loan files one by one?

6       A.    I've seen the loan files.  I went

7   and looked at them.

8       Q.    When did you look at them?

9       A.    I went to Washington and looked at

10  all of them.

11      Q.    When was that?

12      A.    Prior to you receiving them.

13      Q.    Because you didn't tell me that when

14  I asked if you'd reviewed the loan files.  You

15  said you had not reviewed the loan files to

16  this day.

17          MR. PARKER:  Excuse me.  You said in

18      a specific question as to the documents

19      you gave to me, if he had reviewed those.

20          MS. BRACKER:  I've asked the

21      question --

22          MR. PARKER:  No.  Excuse me.  I'm

23      going to correct this statement.

24          MS. BRACKER:  Okay.  I believe --

25          MR. PARKER:  You didn't ask the

1    question whether he reviewed all of the

2    HUD loan files.  Ask it, and he'll answer

3    it.

4         MS. BRACKER:  You're right, I did

5    not ask that question.  I asked if he

6    reviewed the loan files specifically that

7    are in my Complaint, in my Motion for

8    Summary Judgment.

9         MR. PARKER:  No.  Ask it in terms of

10   the document -- the disc you gave me.  Has

11   he reviewed the loan files of HUD before

12   you got them in discovery?

13        MS. BRACKER:  I asked the

14   question --

15        MR. PARKER:  Ask that question, and

16   you'll get that answer.

17        MS. BRACKER:  Mr. Parker, if you

18   continue to interrupt me, I'm going to ask

19   that we take a brief break.  I'm really

20   not enjoying being interrupted.  You're

21   louder than me, but that doesn't make you

22   right.

23        Can you please go back in the

24   transcript to the questions that I asked

25   earlier concerning the loan files that

1    Mr. Hicks supposedly had reviewed or not

2    reviewed.

3        THE WITNESS:  That's what I thought

4    she was referring to.

5        (The record was read by the

6    reporter.)

7        MS. BRACKER:  That's enough.  That's

8    the question to which I'm referring.  That

9    didn't address your disc or anywhere else

10   he's --

11       MR. PARKER:  Well, continue to read.

12       MS. BRACKER:  That's the question

13   that I'm referring to.

14       MR. PARKER:  All right.  Then follow

15   up on that.

16       MS. BRACKER:  When he answered that

17   question, there was nothing pending

18   about --

19       MR. PARKER:  You can either follow

20   up on it or I will follow up on it.

21       MS. BRACKER:  You are more than

22   welcome to do whatever you feel you need

23   to do.

24       MR. PARKER:  Thank you.

25   **Q.   (By Ms. Bracker)  Mr. Hicks, after**

1    you went to D.C. to look at loan files for

2    HUD, have you looked at loan files at any

3    point since then?

4         A.    No, I haven't looked at them.

5         Q.    And when you reviewed the loan files

6    at HUD, were you convinced that there was no

7    fraud in those files?

8         A.    Absolutely, not on my behalf.

9         Q.    That's not my question.  So listen

10   to my whole question.

11             Did you believe there was no fraud

12   in those files?

13        A.    I only looked for fraud that I would

14   have done.  I didn't look for fraud anybody

15   else may have done.

16        Q.    Where would you have found fraud

17   that you did?

18        A.    Just within the documentation of the

19   loan files themselves, of the applications.

20        Q.    I'm sorry.  I'm confused, because so

21   far today you've told me, you didn't input the

22   data.  You didn't check that it was input

23   correctly.

24        A.    Right.

25        Q.    You're not aware who signed your

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    name.

2          A.    Right.

3          Q.    **Where were you looking for your**

4    **fraud?**

5          A.    I just looked through the

6    application process to look for what type of

7    loans they were that we were looking at.

8          Q.    **And you found no evidence of fraud?**

9          A.    No.

10         Q.    **No suspicious applications?**

11         A.    Absolutely not.

12         Q.    **Thank you.**

13               **Can you tell from that application**

14   **what the person was given, who applied, as to**

15   **Exhibit 2?**

16         A.    What they were given?

17         Q.    **For their loan.**

18         A.    How much?

19         Q.    **Yes.**

20         A.    Well, you know, the problem with

21   this one is this might be the first scratch

22   app.  The final app for what the actual loan

23   amount was was worked off of the true numbers

24   and signed at the closing table.  I don't know

25   if this was the closing table signed one or if

James Gregory Hicks                 United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   it was a scratch-out one.  But it looks like

2   the loan amount was 179,188.

3        **Q.   Is that pretty standard for issuing**

4   **to a homeless person?**

5        A.   I didn't say he was homeless.

6        **Q.   I think we said assets of $50,000**

7   **would be about right for a homeless person.**

8        A.   Yeah, but this person was not

9   homeless because they had a house for two

10  years -- or a residence for two years at 2255

11  Satellite Drive.

12       **Q.   Oh, okay.**

13       A.   The homeless reference was for -- in

14  general, as a general statement, stating

15  somebody to have $50,000 worth of net worth is

16  probably not very hard to come up.

17       **Q.   Yes, that you would be comfortable**

18  **finding a net worth of $50,000 for any**

19  **homeless person, I think, is what you said.**

20       A.   No, I didn't say that.  I said a

21  homeless person probably could come up with

22  $50,000 worth of net assets.  I didn't say

23  all.

24       **Q.   I don't think I have any more**

25  **questions at this time.**

```
 1              MR. PARKER:  I just have a few
 2        follow-ups.
 3                  DIRECT EXAMINATION
 4   BY MR. PARKER:
 5        Q.   Mr. Hicks, did you, in fact, have an
 6   affair with Stephanie Kennedy?
 7        A.   I did.
 8        Q.   And what is the proof of that?
 9        A.   The proof is I did it.
10        Q.   Personal knowledge?
11        A.   I'll stand up, I'll testify in
12   court, I had an affair with Stephanie Kennedy.
13        Q.   The files you reviewed up in
14   Washington were at the counsel's office for
15   HUD, correct?
16        A.   Yes.
17        Q.   And who else was present with you?
18        A.   Buddy Parker and Dennis Moseley.
19        Q.   And we had access to all of the
20   files, correct?
21        A.   Correct.
22        Q.   And you and Mr. Moseley and myself
23   reviewed those files, correct?
24        A.   Correct.
25        Q.   Were those files files of Taylor,
```

1   **Bean & Whitaker?**

2        A.   They were Taylor, Bean & Whitaker's

3   file copies, yes.

4        **Q.   While you were the president and/or**

5   **CEO of Home America, did Home America**

6   **Mortgage, Inc., ever make a claim with FHA,**

7   **HUD, or any other U.S. government agency for**

8   **insurance payments on any mortgage**

9   **origination?**

10       A.   No.   They're not capable of doing

11  that.

12       **Q.   I have no further questions.**

13            MS. BRACKER:   I have a brief

14       follow-up on your questions.

15                 RECROSS-EXAMINATION

16  BY MS. BRACKER:

17       **Q.   Can you explain to me what the**

18  **relevance of your alleged affair with**

19  **Stephanie Kennedy is to this lawsuit.**

20       A.   No relevance.   You asked me on the

21  deposition if I had -- who I had a sexual

22  affair with, and I told you.   So you tell me

23  what the relevance is.

24       **Q.   Well, you brought her up first.**

25       A.   No.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.    You brought her up in your discovery

2    responses.   From the beginning of the lawsuit,

3    you have brought that up.  So I'd like to

4    understand why you think that's relevant.

5         A.    No.   You brought it up.

6         Q.    If you're only saying it's relevant

7    because I asked a question of you today, then

8    I'll accept that answer.  Is that your

9    answer --

10        A.    Yes.

11        Q.    -- it's irrelevant except for my

12   questions?

13        A.    Irrelevant.

14        Q.    Thank you.

15             When did you go to D.C. to review

16   these files?

17        A.    Right after the government made

18   them -- I don't know the dates.  Right after

19   the government made them available for

20   release.

21        Q.    And you just testified that they

22   were TBW file copies, correct?

23        A.    Correct.

24        Q.    And if I understood your earlier

25   testimony correctly, that was the copy -- or

1    that was the original that was made as the

2    loan package and sent by -- was it

3    Tracy Hobbs -- is that the person --

4           A.    Uh-huh (affirmative).

5           Q.    -- who sent that over to TBW; is

6    that correct?

7           A.    No.  Tracy Hobbs makes the copy,

8    sends the original to Taylor Bean.  Taylor

9    Bean makes a copy, sends it to HUD insurance.

10   HUD insurance has a copy of the original file

11   that we sent to Taylor Bean.  And that's what

12   you seen, and that was what was there, was

13   Taylor Bean's copy of what they had in their

14   documents or what they copied of what they had

15   in their documents.

16          Q.    And what significance do you attach

17   to that exactly?

18          A.    As far as what?

19          Q.    As far as anything.

20          A.    Which part of the significance are

21   you talking about with my statement?

22          Q.    Everything you just said.

23          A.    Well, the copy of that, I read some

24   of your summary judgments saying I'm missing

25   documents.  This shouldn't have closed without

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   that.  That thing had been copied, and I don't

2   know how many times it got copied and sent to

3   HUD.  HUD copied it and sent it to you.  I

4   don't know who missed copies in between the

5   two steps.

6            So missing documents are irrelevant

7   because they may be in the original file.  And

8   you need the original file to make sure the

9   missing documents are not in it.

10       **Q.   So you're talking about the ones**

11  **that are missing something as opposed --**

12       A.   Yeah, missing something or whatever,

13  correct.

14       **Q.   -- as opposed to your signature?**

15       A.   Well, they said other loans closed

16  without this documentation.  I don't know if

17  it closed without that documentation.  It

18  might be in the original file.

19       **Q.   But you're not contending that TBW**

20  **added your signature later, are you?**

21       A.   They couldn't add my signature.

22       **Q.   They couldn't have?**

23       A.   Oh, they could have, yes.  You know,

24  actually, yes, TBW could have added my

25  signature.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    Q.    Why would they do that?

2    A.    I guess it's a requirement for HUD.

3  I don't know if it got missed in my office.

4    Q.    Anything else that you think could

5  present a problem by this chain of custody

6  with the government?

7    A.    Nothing.

8         I can tell you one thing, you did --

9  you have thrown up all these ideas of why

10 these are false claims on these files in your

11 past summary judgment.  But I haven't seen any

12 write-up from the government saying what they

13 say is false claims for.

14        And when we asked for them, they

15 refused to give us what they think the reason

16 for their false claims are.  And I think all

17 of your false claims and judgments are just

18 based on your clients' personal beliefs that

19 maybe this was the cause of a false claim.

20 But I haven't seen proof that that was the

21 cause of a false claim yet.

22    Q.    That what was the proof?

23    A.    I haven't seen the government's

24 response on anything saying why it was a false

25 claim or why it was denied for claim.

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1      **Q.   Are you aware of the fact that**

2   **creating a false document in order to get a**

3   **claim paid is a violation of the False Claims**

4   **Act?**

5          A.   I don't -- well, I don't know, no.

6          **Q.   You don't know.   Okay.**

7          MS. BRACKER:   I think I'm done.   Do

8      you have any follow-up?

9          MR. PARKER:   No.

10          (Deposition concluded at 4:12 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    USA vs. Taylor Bean

2

3          The preceding deposition was taken

4    in the matter, on the date and at the time and

5    place set out on the title page hereof.

6

7          It was requested that the deposition

8    be taken by the reporter and that same be

9    reduced to typewritten form.

10

11         It was agreed by and between counsel

12   and the parties that the deponent will read

13   and sign the transcript of said deposition.

14

15         Said jurat is to be returned within

16   30 days following receipt of the transcript to

17   the following address:

18

19         Elizabeth Gallo Court Reporting, LLC

20         2900 Chamblee Tucker Road

21         Building 13, First Floor

22         Atlanta, Georgia 30341

23

24

25

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1    STATE OF GEORGIA:

2    COUNTY OF COBB:

3

4           I hereby certify that the foregoing

5    transcript was reported, as stated in the

6    caption, and the questions and answers thereto

7    were reduced to typewriting under my

8    direction; that the foregoing pages represent

9    a true, complete and correct transcript of the

10   evidence given upon said hearing, and I

11   further certify that I am not of kin or

12   counsel to the parties in the case; am not in

13   the employ of counsel for any of said parties;

14   nor am I in any way interested in the result

15   of said case.

16

17

18

19

20

21           _____

22                   Lisa Fischer, CCR-B-1277

23

24

25

1          Disclosure Pursuant to Article 8(B)

2    of the Rules and Regulations of the Board of

3    Court Reporting of the Judicial Council of

4    Georgia, I make the following disclosure:

5

6          I am a Georgia Certified Court

7    Reporter, here as a representative of

8    Elizabeth Gallo Court Reporting, LLC, to

9    report the foregoing matter.  Elizabeth Gallo

10   Court Reporting, LLC, is not taking this

11   deposition under any contract that is

12   prohibited by O.C.G.A. 15-14-37 (a) and (b).

13          Elizabeth Gallo Court Reporting,

14   LLC, will be charging its usual and customary

15   rates for this transcript.

16

17

18

19

20

21

22

23

24

25

James Gregory Hicks                United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

Case 1:06-cv-03023-RWS  Document 213-7  Filed 10/04/13  Page 220 of 222

1                        CERTIFICATE

2    STATE OF
     COUNTY/CITY OF
3

4            Before me this day personally
     appeared James Gregory Hicks, who, being duly
5    sworn, states that the foregoing transcript of
     his/her deposition, taken in the matter, on
6    the date and at the time and place set out on
     the title page hereof, constitutes a true and
7    accurate transcript of said deposition.

8

9                              James Gregory Hicks

10           SUBSCRIBED and SWORN to before me

11   this _____ day of            2013

12   in the jurisdiction aforesaid.

13

14

15   My Commission Expires        Notary Public

16

17

18       []    No changes made to the Errata Sheet;

19   therefore, I am returning only this signed,

20   notarized certificate.

21

22       []    I am returning this signed,

23   notarized certificate and Errata Sheet with

24   changes noted.

25

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

1   DEPOSITION ERRATA SHEET

2   Deponent:  James Gregory Hicks

3   Deposition Date:  February 6, 2013

4   To Reporter:

5           I have read the entire transcript of

6   my deposition taken in the captioned matter or

7   the same has been read to me.  I request that

8   the following changes be entered upon the

9   record for the reasons indicated.  I have

10  signed my name to the Errata Sheet and

11  appropriate certificate and authorize you to

12  attach both to the original transcript.

13

14  Page No.        Line No.

15          Change to:

16          Reason for Change:

17

18          Page No.        Line No.

19          Change to:

20          Reason for Change:

21

22  Page No.        Line No.

23          Change to:

24          Reason for Change:

25

James Gregory Hicks                    United States of America, et al. vs. Taylor, Bean & Whitaker, et al.

```
 1            Deposition of James Gregory Hicks

 2

 3    Page No.          Line No.

 4            Change to:

 5            Reason for Change:

 6

 7            Page No.          Line No.

 8            Change to:

 9            Reason for Change:

10

11            Page No.          Line No.

12            Change to:

13            Reason for Change:

14

15            Page No.          Line No.

16            Change to:

17            Reason for Change:

18

19            Page No.          Line No.

20            Change to:

21            Reason for Change:

22

23

24            Signature:

25    Date:              James Gregory Hicks
```