**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. COMFORT FRIDDLE and | ) | |
| STEPHANIE KENNEDY, | ) | |
| | ) | |
| Plaintiff-Relators, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO. 1:06-cv-03023-RWS |
| | ) | |
| TAYLOR, BEAN, AND | ) | |
| WHITAKER MORTGAGE | ) | |
| CORPORATION; HOME | ) | |
| AMERICA MORTGAGE, INC.; | ) | |
| GREGORY HICKS; CARL | ) | |
| WRIGHT, and JOHN DOE, | ) | |
| | ) | |
| Defendants. | ) | |

**CLAIMANT'S RESPONSE TO MOTIONS REGARDING ATTORNEY'S**
**LIEN AND CASE FILES (DOCKET NOS. 246 - 248)**

Non-party Bracker & Marcus, LLC has turned what should have been a

relatively simple lien dispute into something completely different and unnecessary. A

bit of context is likely necessary and will hopefully assist. The baseline dispute here

is what amounts are owed to predecessor counsel for the Relators, under an attorney's

lien. The much more involved contentions raised in the instant Motion are something

of a lawsuit in themselves, or in waiting – all the ramifications of a nasty law firm

breakup. The brief in support of both Motions before the Court tells one side of the

story, but there is much more. Whether it means that a mini-trial is required as part of this action, or even something larger, is still unknown. What is clear, though, is that the Relators – and really, their "new" counsel, Bracker & Marcus – are overreaching in the relief sought, and even as to the issues actually in play. The various Motions here are either moot, or should simply be denied.

## **INTRODUCTION**

Back in 2006, the Relators in this case, **Comfort Friddle** and **Stephanie Kennedy** initially engaged the law firm Bothwell & Harris, P.C. to represent them.[1] That firm is the same firm now known as the **Bothwell Law Group, P.C**., and had been counsel of record in this case from the outset until very recently. To memorialize their attorney-client relationship, Friddle and Kennedy entered into a written Engagement Agreement that provided for a straightforward method of computing the fee owed to that Firm, should Kennedy and Friddle terminate the relationship before a settlement or verdict was obtained. Docket 248-4, 248-5 (separate but identical engagement letters for Relators). That much is hardly unusual,

---

[1]     Bothwell Bracker, P.C., was previously named Bothwell, Bracker & Vann, P.C. (2008-2010); Bothwell Harris, P.C. (2006-2008); Bothwell Simpson, P.C. (2005-2006); and Mike Bothwell, P.C. (1996-2005) (collectively "Bothwell" or "Firm"). Exhibit A, Declaration of Mike Bothwell, at ¶¶ 13-15. At the beginning of the year, following the departure of Julie Bracker and Jason Marcus, the firm changed its name again to the Bothwell Law Group. Notably, none of those entities were partnerships; each was solely owned and operated by Mike Bothwell. *Id.* At no point in **any** of those collaborations did Bothwell elect another lawyer to be an equity partner, or otherwise share in the profits or losses of the Firm. *Id.*

or a real basis for dispute.

Some **eight years** into that representation – after nearly three thousand hours of Firm time on the case, a nine-digit settlement by some of the Defendants, and a pending summary judgment that might produce many more millions of dollars of recovery, the landscape turned upside down. In 2014, Bothwell Bracker finally realized the fruits of another, even lengthier False Claims Act Litigation. That settlement meant significant fees for the Firm, the well-earned product of almost sixteen years of litigation. Though the Firm was not a partnership, but a "mere" P.C., Firm principal **Mike Bothwell** awarded all his employees, including **Julie Bracker** and **Jason Marcus,** bonuses that would make most Wall Street lawyers envious. Bracker, a "Partner" in name that had for eight years been compensated on a straight salary basis, was given a bonus amounting to nearly **500**% of her base salary. Marcus, a more junior associate, was also rewarded handsomely, as he received a bonus that nearly **quadrupled** his base salary. Flush with cash, then, Bracker and Marcus put into action an apparently longstanding plan to pull off a coup.

What Bothwell did not know is that Bracker and Marcus were planning on leaving, raiding the Firm in the process. While still employed by the Firm, Bracker – now claiming in this latest Motion to be a full-on Partner in the Firm, entitled to half the profits – recruited nearly every single one of the Firm's clients to abandon it, in

rather clear (really, almost admitted) violation of her fiduciary duties. Marcus was ready to assist, performing much of the pragmatic work in downloading tremendous amounts of data from the Firm servers and then covering his tracks by deleting vast portions of native data on those same computers.

The defection was complete when Bracker and Marcus resigned. Their resignation letters of January 4, 2015 were accompanied by a raft of form letters from clients, requesting transfer of case files. Each of those client form letters was procured prior to Bracker and Marcus' resignation. Those letters asked that files be transferred straightaway, even though like most FCA cases the matters were largely in holding patterns, and even though the firm had seen its workforce cut in half.[2] After his "resignation," Marcus remained in the Firm offices late into that Sunday night and into early Monday morning, downloading yet more files onto at least one encrypted "thumb drive."   That particular storage device includes software that essentially covers the user's tracks, making it impossible to determine what files were transferred or deleted. That same night and early morning, Bracker was also downloading files onto a thumb drive from an office computer.

Bracker and Marcus immediately formed a new firm, **Bracker & Marcus, LLC**, and started aggressively trying to collect fees in cases that they had just appropriated from their former employer. To protect his interests, Bothwell sent out

---

[2]     Bracker & Marcus, LLC has also taken an additional employee of the Firm.

letters to his former clients, reminding them of their obligations under the various engagement agreements. Just as importantly, those letters raised the issue of whether or not Bracker/Marcus had divulged the possibility that clients might be exposed to fee obligations to **two** sets of lawyers – the former Bothwell Bracker Firm, and the new Bracker & Marcus firm. Several "former" clients contacted Bothwell and revealed that Bracker and Marcus has misled them about their fee obligations, and had trashed Bothwell personally in that process. Some of those clients renounced their choice of Bracker & Marcus and returned to Bothwell, their original counsel.

The Relators here were not members of that group. Friddle and Kennedy "chose" Bracker & Marcus as their counsel, terminating Bothwell Bracker's role in their representation. Through counsel, Bothwell sent both Friddle and Kennedy letters reminding them of their fee obligations to their former lawyer, per the terms of their agreement. That correspondence expressly invited Friddle and Kennedy to explore alternative payment options, should that be necessary.

No response followed. When a partial payout in this matter became available, and one day after Bracker & Marcus, LLC formally entered an appearance, Bothwell filed a Notice of Claim of Lien for Attorneys' Fees on January 23. Docket No. 242.

Joined by their lawyers Bracker & Marcus, the Relators filed the instant Motion soon thereafter. *In toto*, the Motions seek to declare Bothwell's engagement

agreement unconscionable and illegal – the same agreement **Bracker and Marcus themselves practiced under** for years, downloaded before departing, and now themselves apparently utilize. Further, the Relators seek to cut off Bothwell's right to **any** fee under *quantum meruit* principles, pointing to alleged ethical violations as proof that Bothwell deserves nothing. Finally, the Motion seeks the transfer of the "case file" in this matter. These requests for relief draw upon a wide range of foreign and irrelevant authority; Georgia courts (and law) have yet to embrace the principles espouse by the Relators here. As the relief sought is moot, unnecessary, or unjustified, the Motion should be denied.

## I.      The Genesis of This Dispute: Factual and Procedural Underpinnings

### A.  The History: Bothwell Bracker, and This Litigation

Mike Bothwell started his own practice in 1996, forming a Georgia professional corporation. Since then, the Firm has changed its name several times, as lawyers came and went. Exhibit A, Bothwell Declaration at ¶¶ 13-15; Exhibit B, Burchfield Dec. at ¶¶ 3-4. No new entities have been formed, nor have any predecessor entities been dissolved – there was no need, as the only shareholder in any of these various PCs was Bothwell. Exh. B, Birchfield, at ¶¶ 3-4; Exhibit C, Declaration of George Menden, at ¶ 7.

When the entity was known as Bothwell & Harris, P.C., Relators Comfort

Friddle and Stephanie Kennedy approached the firm and engaged it to be their lawyers in a potential False Claims Act case. Docket 248-4, 248-5. Those agreements were contingent, as is typical. And, given the inherent risks in FCA litigation, the agreements had express provisions as to how to calculate attorney's fees, should the Relators terminate the agreement and retain other counsel. *Id.* Given those agreements, the Relators and their counsel litigated this matter for the better part of a decade, as evidenced by the hundreds of entries on the Court's docket.

During that time frame, the Bothwell organization changed names to add Julie Bracker to the letterhead, first as part of Bothwell, Bracker & Vann, and then as Bothwell Bracker P.C. Exh. C, Menden Decl. at ¶ 7. Called a "partner" for advertising purposes (and because she asked, to aid her status with family and friends), Bracker was paid via straight salary and, occasionally, with a discretionary bonus. Exh. A at ¶¶ 5-6, 16, 18; Exh. B at ¶¶ 11-12; Exh. C. at ¶¶ 8-9. At no time was Bracker paid from firm profits, based upon some "formula" tied to firm income or profits, or with any equity-based interest. Exh. A at ¶¶ 5-6,14-16; Exh. B at ¶¶ 3-4; Exh. C at ¶¶ 7, 10-11.[3]  Instead, employee bonuses were discretionary – a factor long

---

[3]     The decision to make Bracker a non-equity partner was a carefully considered one. Bothwell consulted a transactional attorney on the issue, and in the process reaffirmed that firm equity was simply not in play, nor was responsibility for firm losses or expenses. Exh. A, ¶¶ 13-16; Exh. C, Menden, at ¶¶ 11-14. Bracker bore none of the usual marks of partnership, including a written partnership agreement,

griped about by Bracker, who repeatedly complained of "not having any control over the amount of her bonus."  Exh. B, ¶ 12.

B. Bracker and Marcus Defect, Along with Nearly Every Client.

In late 2014, Bothwell Bracker settled several cases, including one of Bothwell's longest-lived matters, a massive FCA litigation that had been around for sixteen years. Bracker and Marcus received discretionary bonuses that essentially quintupled their income for the year; curiously, they demanded – and got – the bonuses paid in certified funds on December 30, 2014. Exh. A, Bothwell, ¶ 42 ($400,000 and $250,000 bonuses); Exh. B, Birchfield, ¶ 6.

Otherwise, the end of the year was notable for Marcus's naked diversion of a Bothwell Bracker opportunity. In late November and early December, the firm had accepted a new False Claims Act case to be filed in the Middle District of Georgia; Bothwell instructed Marcus to file the case, who did not. Exh. A, ¶¶ 44-45. Bothwell ran into Marcus in late December at the office; Marcus explained that the only reason he was there was so that he could make changes to his 401K account. The problem was, he never had one with the firm – it was never set up. *Id.* During that encounter, Bothwell reminded Marcus about the need to file the Middle District case; Marcus excused his inaction by claiming that the Middle District Courthouse was closed for

---

certificated shares, receipt of K-1s, compensation via fixed formula or percentage of profits, responsibility for a line of credit, or anything similar. . Exh. A, ¶¶ 5-9, 11-12.

the last few business days of the year. *Id.* That was false; instead of filing the case

while in Bothwell's employ, Marcus solicited the referring attorney to give the case

to his new firm, and ultimately filed the case under a Bracker Marcus signature. *Id.*

When Bothwell and Birchfield, the office manager, returned to the office on

January 5, 2015, the client and lawyer coup was near complete: Bracker and Marcus

had resigned, and taken just about every firm client with them – or at least, that is

what Bracker's resignation letter claimed. Exh. A, ¶¶ 19-22. Bracker's office was

completely stripped – not a pencil nor paperclip remained. Marcus' office was more

chaotic, as he had left piles of random papers around, including several documents

indiscriminately thrown away in a trash can. Exh. A, ¶ 37; Exh. B, ¶ 7.

Bracker's own resignation letter certainly did not sound like she was leaving as

an equity partner and affecting a firm dissolution. Contrary to the full partnership

status she now claims, she stated she was "resigning my employment **with your

firm**," and asking that her name be removed "from your business," but "having been

in **your employ** for two previous name changes," noted that the process could be

time consuming. Exh. A. ¶ 20. Marcus' resignation was rather terse, amounting to "I

quit effective immediately."  *Id.* ¶ 19. The letters were, importantly, dated January 4,

a Sunday. Bothwell has always had a personal policy of not working on Sundays, in

accordance with his religious beliefs. It appears that Bracker and Marcus had loaded

up their office files and whatever else they took on that Sunday, since they knew that Bothwell would be absent. Exh. A, ¶ 19.

Later that same morning, Bothwell learned that Sheri Lang, a paralegal, was also leaving with Bracker and Marcus. Exh. A, ¶ 19.

Later forensic examination revealed that Bracker and Marcus had certainly been busy before their departure. Marcus sent key firm forms to Bracker's personal email address, and then deleted the emails to decrease the likelihood of discovery. Exh. A, ¶ 46m. More comprehensively, and using downloads to thumb drives and cloud-based storage, both Bracker and Marcus downloaded **huge** chunks of data from Bothwell's servers before leaving. Exh. A, ¶ 46a-d. Some of those downloads came **after** Bracker and Marcus resigned, in the wee morning hours of January 5. Exh. A ¶ 46a-b. As to one download, Marcus used a "U3"-technology equipped thumb drive, a specially encrypted thumb drive that wipes its own tracks, making it absolutely impossible to determine what files were downloaded or taken. *Id*. ¶ 46i.

That same night, and after claiming she no longer had website passwords or access, Bracker also accessed the firm website and altered it. *Id.* ¶ 46c. Before that time, Bracker and Marcus deleted mass amounts of data from their respective hard drives, again complicating the analysis of what exactly they did, and what files they took. *Id.* ¶ 46e. Marcus certainly tried to frustrate any investigation into what he was

doing in the days before he left, as he deleted all of his internal chat program data;

wiped his internet browsing history; performed a "system restore" for his computer,

effectively resetting the hard drive; and deleted thousands of emails from his system.

*Id*. ¶ 46e, g-h, j. Even Sheri Lang, the paralegal who accompanied Bracker and

Marcus, got in on the act; before she left, she also mass-deleted files before leaving,

including all intra-office texts between her and Bracker. *Id.*¶ 46f.[4]

C.  The Post-Departure Disputes

Though the resignation letters had been accompanied by various firm-election

notifications, the first real call for case files came on January 9, 2015 – near midnight,

on a Friday. Exh. A ¶ 23. The following Monday – the next business day – Bracker

sent a courier to her former office to pick up the files. Since the files were made up of

dozens of banker's boxes and a dozen gigabytes of sometimes thoroughly intermixed

electronic files, that courier was turned away. *Id*. ¶ 24. The initial demand for files

was indiscriminate, though later, three files were noted as high-priority, identified

(because of FCA seals), as Cases A, B and C. Exh. A, ¶ 25. Case A had upcoming

depositions; Case B had an intervention deadline, which requires no action at all by

relators; and Case C had an upcoming mediation that likely would require no short-

---

[4]      It may be impossible to ever know what files were taken or deleted. Once
Bracker and Marcus were gone, a call came in from a potential referral source; a
subsequent search for that person's pre-existing contact information revealed that it,
too, had been deleted, along with other referral source contact information. Exh. A, ¶
47.

term attention. *Id.* **The instant case** (Friddle/Kennedy) was listed **last** in priority in the category of "Bigger file size, may take longer."  Exh. A, ¶¶ 25, 37.

Case A, or about 90% of it, was produced in six business days, and required almost three full employee days to organize and compile. Exh. A, ¶ 30; Exh. B, ¶ 8d (first file was one of the largest). The remainder of the Case A file was transferred a few days later. *Id.* Case B preparation began immediately afterward; when that process was near completion, the intervention deadline was moved back several months, relieving any short-term need for the file. Exh. A, ¶ 30. The firm's attention turned to Case C, which consumed almost an entire employee week of time – that is, over 30 hours of nothing but file organization and sorting, at the expense of all other tasks. Exh. A, ¶ 32. That file was completed for transfer on February 6, 2015, but was **not** transferred, for good reason. As it turns out, the clients had decided, after being strung along for several weeks by Bracker and Marcus about fees, to return to Bothwell's firm. In fact, subsequent communications with the Case C Relators revealed that they had **never** formally retained Bracker & Marcus; neither Relator had ever agreed to the terms of any representation agreement offered them by Bracker & Marcus; and Bracker and Marcus' representations to the contrary were inaccurate at best. Exh. A, ¶ 32 (details of client return); Exhibit D, Declaration of "RB," Relator in Case C, at ¶ 3-7; Exhibit E, Declaration of "JW," additional Relator

in Case C, at ¶¶ 4-12. As Case C was never really Bracker and Marcus' in the first place, the file demand was premature and wasted more time. Exh. A, ¶ 32.

One good thing that did come from the debacle over "Case C" was strong evidence that Bracker & Marcus' instant claims about unenforceability, unconscionability, and excessiveness are all hypocritical. In Bracker & Marcus' communications with the Case C Relators, they forwarded the Relators an engagement agreement. One provision sounds awfully familiar – likely because it is largely a word-for-word lift from the Bothwell & Harris engagement agreement that Bracker & Marcus attack here. The termination provision provides

> **Termination**. Both parties will at all time have the right to terminate services upon written notice to that effect. However, in the event you terminate our services prior to any recovery, we shall be entitled to the reasonable value of all legal services we rendered on your behalf through the termination date. To the extent possible, such value will be based on the amounts to which we are entitled pursuant to the terms of this Agreement. **Otherwise, such value will be calculated by multiplying our reduced hourly billing rate of $350 by the number of hours spent representing you through the date of termination, or our percentage of any recovery made within six months of termination, whichever is higher.** We shall also be entitled to recover from you any and all expenses advanced on your behalf through the date of termination. Additionally, we **shall have a lien for costs and fees incurred by our office on any recovery obtained, whether obtained by settlement or court action, whether obtained prior or subsequent to the commencement of litigation, and whether obtained by this office or not.**

Exh. E, Decl. of "JW" at Exh. D (page 4/7) (emphasis added).[5]

---

[5] That means that Bracker and Marcus would have a lien on their hourly contributions on any recovery, whether their firm assisted in obtaining that recovery, or not. Bracker and Marcus have refused to produce a copy of their Engagement

Needless to say, the revelation that Bracker & Marcus likely never had the authority to demand the Case C file in the first place complicated further efforts. A request for proof that the "asked for" files were for clients that actually signed engagement agreements with Bracker & Marcus was declined. Exh. A, ¶ 33.

The file transfer process – for all nineteen case files originally demanded – has been hampered by Bracker and Marcus in other ways. Most pertinently, when asked what files they already had, Bracker and Marcus refused to say, citing a rather difficult to understand "attorney client privilege." Exh. A, ¶ 31. Of course, identifying the files they had already taken would have gone a long way towards minimizing the need for wholesale organization and production. *Id.*

More globally, Bracker long had a process of "bulk moving" her emails into electronic case folders, with no careful regard as to accuracy. As such, numerous clients' emails were mixed together. Exh. A, ¶ 26; Exh. B., ¶¶ 8-9. Also, because Bracker would often send e-mails regarding multiple cases in a single message, simply filing such an e-mail in a single case file would leave other files incomplete, or, alternatively, risk a seal violation from production. *Id.* As a result, emails had to be reviewed carefully, since some cases ultimately stayed, and some did not. *Id.*

Agreement with these Relators. Perhaps this termination provision is why, or perhaps it is that in conjunction with another provision that outlines that Bracker and Marcus would not regularly send a bill of services provided – a point complained of here. Exh. D, Declaration of JW, at Exhibit D (page 3/7) ("Billing Disputes").

Other factors, many of them predictable, further complicated file collection, copying, and organization, including:

- A severely reduced office staff;

- Additional demands in other areas, including firm name changes, website alterations, business name changes, email protocol modifications, notices to courts and various state bars, and similar firm-transition tasks;

- Hiring of independent counsel to guide the ethical minefield that presented itself;

- Hiring of computer forensics experts, to preserve the evidence of what Marcus and Bracker did before and after they left;

- Modification of the firm payroll and retirement account systems;

- Working around physical renovations occurring at the office during the first weeks of the year;

- Design of new letterhead, business cards, and other firm identifiers;

- Necessary recruiting and review of replacement lawyers and staff;

Exh. A, ¶¶ 26-29; Exh. B., ¶¶ 8-9.

It was only after all of the efforts on Cases A through C that Bracker instructed that **this** case should be top priority. Exh. A, ¶ 36. This file is also one of the largest, including over eight years' worth of documents, emails, pleadings, discovery, correspondence, billing, research, attorney notes, and other papers to review. The electronic file includes 20 electronic folders, with 60 subfolders. There are 30 folders

of hardcopy documents. The total number of Gigabytes dedicated to this matter, including databases, exceeds 12 gigabytes of information that has to be reviewed in at least some respect.

The file, split between tow staff, was stored in more than one office, generally. Exh. A, ¶ 37. Other papers were in the office of a paralegal that quit; given that, and Bracker, Marcus and Lang's unplanned exits, not all files were where they should have been, and each office and desk drawer had to be searched for any pertinent documents. Each of the attorney offices (including Marcus' paper-strewn one) was also checked to make sure that all attorney notes and documents were included. *Id.*

Once all of the physical documents were obtained and collected, those documents were compared to the electronic file. Many times a signed version of a document had not been saved to the electronic file, especially in older cases such as this one. Sometimes, emails printed to the file were absent in the electronic file, likely having been deleted once printed. If a document were not already part of the electronic file, it was scanned and then saved in the appropriate electronic folder. Exh. A, ¶ 39. The file is now complete and ready for transfer as of March 6. *Id.*

To date, the **total** file transfer process has consumed over 250 employee hours – over six weeks of full-time work – for an office staffed by one attorney and two staff (or, put another way, about one-half of the available staff hours, total). Exh. A, ¶

26; Exh. B, ¶ 8.[6]  This file alone has taken 140 hours to complete. Exh. A, ¶ 39.

In this case, an interim settlement payment of approximately $100,000 has been made, and awaits disbursement.  Accordingly, Bothwell sent letters to both Relators reminding them of their contractual obligations but stressing – repeating – that the communication was not part of any effort to coerce a return to the Bothwell fold. Docket 248-11, 248-12. Receiving no response, Bothwell then filed a lien notice in this action. Docket 242.  The Notice of Claim, under O.C.G.A. § 15-19-14, did not specify an amount demanded. *Id.*

The Relators, joined by their counsel, then filed a Motion seeking two distinct forms of relief: transfer of the case file, and adverse determinations as to Bothwell's lien. No order is justified or necessary, on either front.

## II.      The Lien is Valid as to the Relators

### A. <u>Bothwell Bracker's Engagement Agreement contains an enforceable framework for determining a proper fee.</u>

The Relators' first and primary argument is that the "termination clause" in the

---

[6]      Bracker's claim as to just how easy it is to transfer files, especially electronic ones, gives pause – if it is so easy to "drag and drop" an entire client file, then Bracker and Marcus certainly could have done so in the many days before their departure that they apparently spent downloading massive amounts of data from firm computers.

But, to be sure, Bracker's claims seem inaccurate at least some levels. As but one example, she estimated the total "physical" files at the Bothwell offices as being contained within four or five banker's boxes, an estimate off by about an order of magnitude. Exh. A, ¶ 26.

Relators' engagement agreement is contrary to Georgia public policy, and thus void. In support, the Relators essentially claim that the termination clause is a penalty that neuters any right to the counsel of one's choosing.

The facts here, and Georgia law, simply do not support the Relators' contentions. In the absence of a specific agreement, an attorney who is terminated from a contingency-fee agreement prior to the happening of the contingency generally is entitled to receive the reasonable value of his services under the doctrine of *quantum meruit* ("as much as he deserves"). *E.g.*, *Morrow v. Stewart*, 197 Ga. App. 689, 689 (1990). **But** where "the parties h[ave] **expressly agreed upon the compensation to be paid to [the attorney] in the event of his dismissal** or withdrawal" prior to the contingency, the attorney is entitled to fees due him under the terms of the agreement. *Id*. (emphasis added); *Joseph H. King, Jr., P.C. v. Lessinger*, 276 Ga. App. 145, 146 (2005) ("**Absent express contractual provisions addressing fees in the event of termination**, the discharged attorney is limited to pursuing the equitable remedy of quantum meruit.").

Here, the Relators originally entered into a written contingency-fee agreement with Bothwell & Harris, which changed its name twice to become Bothwell Bracker. The agreement explicitly sets out the compensation to be paid in the event of termination prior to a recovery:

> You will at all times have the right to terminate my services upon written notice to that effect. However, in the **event you terminate** my services prior to any recovery, **you agree to reimburse me at a reduced rate** of $350.00 per hour or my percentage of any recovery made within six months of termination, whichever is higher. I shall have at all time the right to terminate my services upon written notice to that effect in which case you will owe nothing for my fees.

Doc. 248-4 at 3; Doc. 248-5 at 5 (emphasis added).

Although the Relators expend much ink discussing the law of "[o]ther jurisdictions . . . [where] clauses materially identical to the clause at issue in this case are unenforceable as a matter of law" Doc. 248 at 20, such foreign law is inconsistent with well-established Georgia law. In fact, Georgia courts have repeatedly upheld termination clauses like the one at issue here.[7] *Hill v. Centennial/Ashton Properties Corp.*, 254 Ga. App. 176, 177 (2002) (affirming award of attorney's fees under termination clause of contingency fee agreement based on hours of legal services rendered at terminated attorney's hourly rate); *Morrow*, 197 Ga. App. at 690 (affirming fee award when "the parties . . . expressly agreed upon the compensation to be paid to [the attorney] in the event of his dismissal or withdrawal")*; Gilbert v. Richardson*, 193 Ga. App. 593, 593 (1989) (affirming enforcement of "the parties'

---

[7]    Perhaps the well-established enforceability of such agreements in Georgia would explain why Bracker Marcus' current employment agreement includes a termination clause that is **almost word-for-word the same** as the one at issue here. *See* Exh. E, at Exhibit D (page 4/7). Far from uncommon, such termination clauses are part and parcel of attorney-client agreements in qui tam litigation (not to mention other, less risky litigation). Exhibit F, Declaration of Edward Buckley, at ¶¶ 16-18.

written express contract [that] specifically provided that appellant was to be compensated at the rate of $65 per hour in the event that his legal representation of appellee [client] was terminated before she secured a recovery."); *Howe & Assoc., P.C. v. Daniels*, 274 Ga. App. 312, 313, (2005) (affirming award based on attorney's hourly fees where "[the attorney] had a contingency fee contract with the [client] that called for him to be paid on an hourly basis if he were discharged from the case.")

For example, in *Morrow*, a personal injury claimant entered into a contingency-fee agreement for legal services, which provided

> I understand that I may dismiss my attorney at anytime, for any reason, **upon** written notice to him and **payment of** unpaid expenses and **services rendered** to the date of the receipt of such notice; payment to be based upon time devoted to my case at any hourly rate of $ 80.00 per hour, or the applicable percentage of fee due him under the terms of this agreement of any offers which have been made by any adversary or collateral party, whichever is greater.

197 Ga. App. at 689 (emphasis added). When he was terminated more than eighteen months later, the attorney filed an attorney's lien for $30,000 pursuant to the termination clause – an amount representing forty percent of a settlement offer received at the time of his termination (and an amount greater than the specified hourly rate of compensation). *Id.* at 689-90. Four months after terminating his original attorney, the client represented by new counsel settled his claims for $80,000.  The trial court ultimately awarded the terminated attorney his requested

$30,000 in attorney fees.  In affirming, the Georgia Court of Appeals rejected the client's argument that any recovery was limited to the reasonable value of services under *quantum meruit* because "[p]ursuant to the plain and unambiguous terms of the employment contract, Stewart was entitled to receive forty percent (the applicable percentage) of [$75,000] in compensation for services he rendered to Morrow." *Id.* at 690.

*Hill v. Centennial/Ashton Properties Corp.* – a case cited in the Relators' brief - further demonstrates the enforceability of the termination clause at issue here. There, termination by either party triggered payment obligations, based upon an hourly rate.[8] *Id.* at 176. The original counsel was terminated. *Id.* at 177. Upon learning that the client and new counsel settled the case, the original attorney filed,

---

[8]     The *Hill* agreement provided, in pertinent part, that

> Should such right of termination be exercised by either of us prior to the judgement [sic] or verdict or that which is paid in satisfaction of any ultimate judgement [sic], payment shall revert to quantum meruit (at the attorney's hourly rate determined on the date of the written notice of termination, for services rendered as calculated by the hour).

*Id.* at 176. As discussed further below, the Relators' contention that the termination clause at issue here constitutes an unenforceable penalty is undercut by *Hill*. The agreement held enforceable there required the client to pay fees for services rendered even if the attorney unilaterally terminated the agreement. By comparison, the agreement in the present case only requires the client to reimburse the attorney for services rendered upon the client's election to terminate. See Doc. 248-4 at 3; Doc. 248-5 at 5  ("I shall have at all time the right to terminate my services upon written notice to that effect in which case you **will owe nothing for my fees**.") (emphasis added).

and the trial court enforced, an attorney's lien for $40,530. *Id.* In affirming the fee award and upholding the express terms of the agreement, the Georgia Court of Appeals echoed the parties freedom to contract, holding that the "parties were **free to set the manner in which attorney fees would be calculated.** The agreement unambiguously states that fees would be calculated **based on [the attorney's] hourly rate for the work** that she had done prior to the agreement being terminated. *Id.* at 177-78 (emphasis added).[9]

Georgia courts' enforcement of termination clauses such as the one here is no surprise, really, given the public policy of this State. In general, Georgia courts are loathe to find **any** contract unenforceable as a matter of public policy, recognizing that "[t]he power of the courts to declare a contract void for being in contravention of a sound public policy is a very delicate and undefined power. . . ." *Edwards v. Grapefields, Inc.*, 267 Ga. App. 399, 403 (2004). In comparison, "[i]t is the paramount public policy of this State that courts will not lightly interfere with the

---

[9]     The Relators appear to suggest that *Hill* is somehow distinguishable from the present case given the inclusion of the term *"quantum meruit"* to modify the formula for computing compensation for services rendered. Doc. 248 at 22. The court's express finding that "[t]he use of the words 'quantum meruit' in the agreement does **not** change the fact that the parties agreed to a **clear method by which fees would be calculated**," *Hill*, 254 Ga. App. at 177-78 (emphasis added), would seem to undercut the Relators' position. The Relators' suggestion that the *Hill* agreement was only valid because it purportedly allowed attorney's fees only "after [the] client achieve[d] a recovery in excess of the claimed fee," Doc. 248 at 22, is creative, but unsupported. There is simply no mention in *Hill* of the timing of any recovery, or even the amount, as impacting the enforceability issue. 254 Ga. App. at 176-78.

freedom of parties to contract on any subject matter, on any terms, unless prohibited by statute or public policy, and injury to the public interest clearly appears."[10] *Kothari v. Tessfaye*, 318 Ga. App. 289, 298 (2012).

Given this backdrop, "[i]t is well settled [under Georgia law] that contracts will not be avoided by the courts, as against public policy, except where the case is **free from doubt**, and where an injury to the public interest clearly appears." *Phenix Ins. Co. v. Clay*, 101 Ga. 331, 28 S.E. 853, 854 (1897) (punctuation omitted) (emphasis added). It hardly can be said that that the termination clause at issue here undoubtedly violates Georgia's public policy rendering the provision void where Georgia courts repeatedly have enforced similar agreements.  And notwithstanding the Relators' suggestion to the contrary, Georgia Rule of Professional Conduct 1.5's admonishment that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee" does not provide support for the Relators' "void under public policy" argument either.

> The fact that this case involves an attorney-client relationship does not mean that the rules of professional conduct preempt statutory law and case law regarding contracts. It is true that Cooney was bound to abide by standards of

---

[10]     Not to mention, the Relators' effort to deprive Bothwell of a well-earned fee implicates important public policy issues concerning the leverage afforded successful *qui tam* relators, the stability and enforceability of contingent fee arrangements and the importance of compensating counsel who risk taking on representations on a contingent fee basis where recovery is uncertain, but significant public health, safety, and fiscal interests are at stake.

professional conduct. However, it is also true that cases involving attorney-client relationships are very often decided based solely upon the terms of the contract, applicable statutes and appellate court decisions, without reference to the rules or standards of the State Bar of Georgia.

*William J. Cooney, P.C. v. Rowland*, 240 Ga. App. 703, 705 (1999).

The Relators' reliance on *Aflac, Inc. v. Williams*, 264 Ga. 351 (1994) to support their "unenforceable as a matter of public policy" argument is equally unhelpful. *Aflac* is readily distinguishable from the present case because it exclusively addresses non-refundable retainers for **services never rendered** and **not** contingency-fee agreements such as the one here.[11]

In *Aflac*, an attorney procured a one-sided, sweetheart deal when he entered into a seven-year agreement with the company's then-CEO to receive a monthly retainer to provide services on an "as needed" basis while allowing for "additional

---

[11]    Georgia courts' differential treatment of non-refundable retainer fees and contingency fees makes sense. In a contingency contract, unlike a retainer fee arrangement, counsel assumes tremendous risk. This is particularly true for attorneys who litigate under the False Claims Act. The contingency attorney must invest a great deal of upfront work investigating the facts, developing case strategies, interviewing witnesses, expending costs, and surviving motions for dismissal or summary judgment, just to name a few. Because a client typically cannot afford to finance complex litigation, contingency fee contracts (with termination clauses) are the prevailing type of contract used. Indeed, the primary purpose of contingency-fee contracts is to allow parties who cannot otherwise afford an attorney to obtain legal services. Under contingency contracts, the attorney personally finances the litigation at the risk of nonpayment if the case is lost. To offset the risks involved, it is permissible (and not at all uncommon) in Georgia for parties to agree to an alternate method of payment in the event of termination. *See, e.g., Morrow*, 197 Ga. App. at 690; *accord* Exh. F, Buckley Decl. at ¶¶ 16-18.

compensation" for work requiring "an 'extraordinary' amount of his time." *Id.* at 352. The agreement would automatically renew for an additional five years unless terminated. But if the company terminated the attorney, it would be required to "pay . . . as **damages** an amount equal to 50 percent of the sums due under the remaining terms, plus renewal of the agreement." *Id.* (emphasis added).

The *Aflac* court held that the non-refundable retainer provision constituted a penalty because it sought liquidated damages for services never rendered and, as such, unduly coerced the client to stay in the contract. *Id*. at 353. The *Aflac* court also made clear that its decision applied only to non-refundable retainers as it stated the only issue before it was "whether a client must pay legal fees to an attorney under a long-term retainer contract after terminating the contract." *Id.* at 351. Applying contract principles, the *Aflac* court further concluded that the "peculiar language of the provision demonstrates that the parties **intended** to deter AFLAC from discharging [the attorney] and **to punish** the company if it did." *Id.* at 354. By contrast, the contingency-fee agreement at issue here does not provide for damages for breach of the agreement, but merely seeks fair compensation for services previously rendered. Doc. 248-4 at 3; Doc. 248-5 at 5 ("[I]n the event you terminate my services prior to any recovery, you agree to **reimburse** me at a **reduced rate** of $350.00 per hour or my percentage of any recovery made within six months of

termination, whichever is higher.") (emphasis added); *see also* O.C.G.A. § 15-19-

14(a) ("Attorneys at law shall have a lien on all papers and money of their clients in

their possession **for services rendered to them**.") (emphasis added). There simply is

no penalty clause here.[12]

---

[12]     As pointed out by the Relators, there are foreign cases (Florida, Virginia) that invalidate **as a matter of law** termination clause requiring immediate payment, calculated on a hourly rate. Docket 248 at 20-21. Those cases are hardly unanimous, however. A comprehensive survey of jurisdictions weighing in on the issue demonstrates that the issue is hardly so black-and-white. Many jurisdictions allow a discharged contingent fee attorney to bring suit immediately, whether or not a settlement or verdict has been secured or paid out. *E.g.*, *In re Estate of Callahan*, 578 N.E.2d 985, 988 (Ill. 1991) ("[A]n attorney can bring a cause of action for the reasonable value of his services immediately after the client terminates the contingent-fee contract. [T]he client cannot make the attorney's recovery dependent upon a contract term when the client has terminated the contract. The contract no longer governs their relationship. [And], the value of the first attorney's services cannot be measured by the result obtained by another."); *Trenti, Saxhaug, Berger, Rouche, Stephenson, Richardson & Aluni, Ltd. v. Nartink*, 439 N.W.2d 418, 421 (Minn. Ct. App. 1989) ("Once a contingent fee agreement is terminated by the client, the attorney, like any workman or supplier, is entitled to prompt payment for the reasonable value of services performed."); *Lai Ling Cheng v. Modansky Leasing Co.*, 539 N.E.2d 570, 573 (N.Y. 1989) ("Inasmuch as the amount of the recovery played no part in evaluating that fee, there was no point in delaying payment of it."); *Dill v. Public Util. Dist. No. 2*, 475 P.2d 309, 312 (Wash. 1970) (same).
            Even termination provision that results in a client owing **more** than is ultimately recovered runs afoul of no ethical rule. After all, a client that discharges an attorney years into a litigation knows that the fees owed at that point might be hefty; that client cannot choose another lawyer, have the case go south, and then claim that no or little money is owed. *See, e.g., Hoddick, Reinwald, O'Connor & Marrack v. Lotsof*, 719 P.2d 1107, 1112 (Haw. Ct. App. 1986) ("Under the Code, a fee based on hourly rates or quantum meruit may exceed the amount of the client's recovery. Likewise, in cases where the value of the recovery is less than the value of the ethically permissible fee, a contingent fee of 100% or more than 100% of the client's recovery is ethically permissible.").

As a related, and important, aside, assuming that the **specific** designation of hourly rates to use in determining a fee is somehow improper, that hardly ends the inquiry. Should the governing rates be unenforceable, that would not **in and of itself** imperil Bothwell's right to *quantum meruit* relief, generally. Setting aside for just a moment the Relators' argument that an excessive **demand** defeats any entitlement to *quantum meruit* – an argument unsupportable under Georgia case law – the existence/nonexistence of the termination clause itself does not impact the *quantum meruit* arguments. If part of the contract itself is invalid, that does not mean that Bothwell and those in his employ have not provided valuable services, with an expectation of payment. In such a scenario, *quantum meruit* would otherwise be appropriate. Because there is an enforceable valuation provision in the contract, *quantum meruit* is likely not implicated; if that provision is unavailable, though, *quantum meruit* still remains, generally.

B. The lien is proper, and not excessive.

The second major line of attack Relators bring is that the lien/fee demand is excessive.  The Relators' additional arguments against enforcement that relate to the amount and timing of the attorney lien are equally unavailing.  As an initial matter, the Relators' mantra that Bothwell is demanding almost 50 times the 45% contingency fee, while undoubtedly catchy, is based upon the misleading premise that

each of the Relators' total recovery in the underlying *qui tam* litigation is no more

than $53,728.58. *See* Doc. 248 at 16; *id.* at 23 ("[E]ach Relators' total recovery in this

matter barely exceeds $50,000."). At best, this tells only a portion of the story.

As the Relators acknowledge elsewhere in their brief and as Bracker admits in

her declaration, the U.S. Government announced a settlement with Taylor Bean &

Whitaker in January 2014 for **320 million dollars**. Doc. 248 at 12; Docket 248-1

(Bracker Decl.) at ¶¶ 21-22; Exh. A at ¶ 52.  Indeed, pending before this Court is a

motion for partial summary judgment against another independent defendant, Greg

Hicks, seeking an additional $13.5 million, based only on twenty-five of the more

than four hundred files relied upon by HUD as damages against the corporate

defendants. Docket 213-1; Exh. A at ¶ 53. By statute, since that action is non-

intervened, the Relators would share between 25-30% of any award; the Relators'

counsel would, naturally enough, receive a healthy cut of that amount. Exh. A, ¶ 53.

And given that the partial summary judgment motion is based on only a sample of

files, the Relators' share of damages could be exponentially higher.[13]

Viewed in its proper context, therefore, Bothwell Law Group's claim for over

$1 million in legal fees under the termination clause is well within the bounds of

reasonableness. Exh. F, Buckley Decl. at ¶¶ 12-15, 19; Exhibit G, Declaration of

---

[13]     Both Bracker and Marcus signed off on a characterization of this $13.5 million
dollar portion as "a drop in the bucket of actual damages" available in this matter.
Docket No. 213-1 at 2.

James Helmer, at ¶¶ 18-19 (hours spent, fees charged, and amounts sought all reasonable for scope of the case and work necessary to advance it).[14]   Since engaging the Relators more than eight years ago, the Bothwell Law Group has invested over 2,700 timekeeper hours litigating this matter which has over 250 entries on the docket, while navigating motions to dismiss, substantial discovery battles, two affirmative motions for summary judgment, and a response to the defendants' motion for summary judgment, just to name a few. Exh. A at ¶ 49-50.[15]  The Relators' premise, then – that excessiveness is to be determined by comparison to **a** payout from one set of defendants (when another payout is likely) and when another liquid defendant has millions in exposure, to be determined – is based on creative but inaccurate math.

In addition to grossly undervaluing the client's expected recovery, the Relators take the absolute opinion – while, again, relying exclusively on foreign law – that an

---

[14]    James Helmer is without question one of the foremost experts in the world on False Claims Act and *qui tam* litigation, and has literally "written the book" on the subject in addition to leading the bar in this area of the law. Exhibit G, Helmer, at ¶¶ 2-16 (establishing credentials). Helmer's opinion is that the fee at issue here, if anything, is likely on the low side. *Id.* at ¶¶ 18-19, 21.

[15]    Cynical observers would question what Bracker & Marcus are really doing here. In a dispute they characterize as concerning something like $45,000 in attorneys' fees, the cost of motions practice on the lien alone would consume that recovery. Instead, Bracker & Marcus also seek to sever their former employer's right to **any** fee in this matter, leaving them as the only lawyers standing that might earn a fee. Given that there are potentially still millions of dollars at stake, the real motive here seems clear.

immediate demand for payment, in excess of the possible contingency recovery, is
*per se* excessive and unenforceable. But Georgia law would seem to suggest
otherwise.[16]  Although the case facts do not indicate whether an immediate demand
for payment was actually made, the express terms of the fee contract upheld in
*Morrow* called for the client to pay the $30,000 immediately upon termination, even
going so far as conditioning the client's right to terminate "upon written notice . . .
**and payment** of unpaid expenses and services rendered to the date of the receipt of
such notice."  *Morrow*, 197 Ga. App. at 689 (emphasis added). By contrast, the terms
of the Friddle/Kennedy fee agreements do not demand immediate payment under the
termination clause – nor do they mention a timeframe for payment. Doc. 248-4 at 3;
Doc. 248-5 at 5. Moreover, The Bothwell Group's invitation for the Relators "to
discuss alternate payment terms for the amount currently due" Doc. 248-11 at 3, and
position that its fees are due "immediately upon the **distribution** of the relator's share
of the settlement proceeds," Doc. 248-10 at 2, hardly implies the existence of an
onerous penalty interfering with the Relators' "right to continue with their counsel of
choice" as they suggest. Doc. 248 at 24.[17]

---

[16]    The discussion in the preceding section is equally applicable on this point. *See
supra note* 14 (foreign cases on immediate payment)

[17]    The plain language of the Relators' engagement documentation cuts against
their argument here, as well. In the Relator's Share Agreement, each Relator agreed
that

Moreover, whether the termination clause ultimately results in attorneys' fees greater than those originally anticipated under the contingency agreement will not void an otherwise enforceable termination clause.[18]  Although not a "termination clause" case, *Rowland*, 240 Ga. App. at 703-04 is instructive because it demonstrates that an attorney-client fee agreement can be valid and enforceable even if it ultimately results in legal fees in **excess of the client's recovery**. *Id.* (finding attorney-client fee agreement authorizing more than $26,000.00 in interest and resulting in "the firm's recovery [being] larger than [the client's]" was "not unconscionable" and "does not violate public policy").

---

[u]nless otherwise agree upon by all parties in writing, all fees shall be paid at the time of settlement or when sums **are first disbursed**, whichever occurs first, even if a settlement is paid over time or if other additional relief is to be granted at a later date.

Docket 248-4 at p. 5 (Friddle contract; emphasis added).

[18]    As noted in *Aflac*, "[t]he critical time for examining the parties' intent is when they entered into the contract . . . ." 264 Ga. 351 at 354 n.5; *see also Rowland*, 240 Ga. App. at 704-705 ("[U]nconscionability is determined based on the circumstances existing at the time the contract was made, rather than those existing years later, when one party seeks to enforce the terms of the agreement. Thus, the fact that a large amount of interest accrued over the ten-year period does not make the contract unconscionable.") (citation omitted). In other words, where an "fee agreement . . . was not unconscionable [or unenforceable as a matter of public policy] when entered into . . . it is not unenforceable today." *Rowland*, at 705. It is probably a safe assumption that the Relators would be seeking to **enforce** the termination clause if, under circumstances similar to those in *Gilbert*, attorneys' fees computed under *quantum meruit* were **higher** than the contract amount. *Gilbert*, 193 Ga. App. 593, 593 (1989) (denying attorney's attempt to recover under *quantum meruit* where an express agreement provided the hourly rate).

In *Rowland*, the client sought to void a fee agreement on the ground that it violated the Georgia Professional Rule of Conduct prohibiting "excessive fees," given that "the firm's recovery would be larger than his, which, he says, would be an outrageous result." *Id.* at 705. The Georgia Court of Appeals rejected this argument as "completely without merit," because the ethical rules do not necessarily trump "statutory law and case law regarding contracts." *Id.* at 705. The termination clauses here are commonplace in FCA and other areas of the law, Exhibit F, Buckley Decl. at ¶¶ 16-18, and are hardly onerous (by utilizing a dramatically reduced hourly rate, for example). Georgia law does not reach the extreme positions that the Relators urge.

## C.  The Termination Clause Applies here

The Relators champion several other arguments in an attempt to escape from the rather clear contractual language of their engagement with the Bothwell firm. Docket 248 at 24-28, 33-36.

Perhaps most strained of these arguments the Relators' claim that they did not terminate "Bothwell Bracker, P.C." as their attorneys, but instead "elected, as is their right, to continue being represented by Bracker following the breakup of Bothwell Bracker." *Id.* at 4, 24-25. At best, this is a matter of semantics; at worst, Bracker and Marcus confuse what it means to actually dissolve a law firm with what it means to tortiously destroy one.

The Relators' argument misconstrues what they actually did, which was to terminate representation by one firm in favor of another. The Relators have made clear that they no longer employ Bothwell, Bracker as their counsel, and have instead have chosen a new, breakaway firm – Bracker & Marcus, LLC. While Julie Bracker, the lawyer, may still be Relators' counsel, Bracker's former firm  (the contracting entity) is assuredly not. *Accord* 248-4 at p.2 (engagement agreement; confirming hire of "Bothwell & Harris, P.C." as counsel, with Bothwell to be "primarily responsible for the litigation work rendered").[19]  Bothwell Bracker did not "dissolve" nor did Bracker "withdraw" from that entity – she quit, under the cover of night, and set up a competing shop stocked with clients that defected. The only change in the entity was when Bothwell changed the name of his old firm; there have been no "dissolution" proceedings because no such event ever took place.[20]  Bracker delivered no notice of withdrawal from any partnership. Even if she had been a partner, her departure would not have affected a dissolution of the professional corporation.

Also confusingly, Bracker and Marcus claim that since Bracker was indeed a full-fledged, equity partner in her former firm, her (illegal) departure somehow

---

[19]     If the Relators did not "terminate" or move on from the Bothwell firm, then the engagement agreements would still govern the financial relationship between the parties.

[20]     Even if the Relators /Bracker and Marcus were correct on this point, *quantum meruit* fees would still be owed, regardless of the enforceability of the termination provision.

stripped Bothwell Bracker of its right to *quantum meruit* because the firm was then

"dissolved."  Docket 248 at 25-28. Perhaps this is where the Relators' brief is most

sidetracked. Whether or not Bracker was an equity partner is completely irrelevant to

whether the predecessor entity is owed a fee under the termination provision. Even if

she were – which, to be crystal clear, is completely incorrect – then Bracker's

departure most certainly "terminated" the Relators' contract with Bothwell Bracker,

triggering the rights under the termination clause. The Relators' error here is in

construing a termination of one firm and "following" a lawyer to a new firm as

exclusive options, when both are fair characterizations of the same event.

Bracker raises three arguments as to why her departure was a "dissolution" –

that she was indeed a partner, compensated by a share of the profits; that the Firm

used her name; and that (apparently, as an "alternative" fact) she was part of a joint

venture. None of those arguments have even colorable basis in law or fact.

**ACTUAL PARTNERSHIP**: The arguments as to why Bracker was **not** an

equity partner could themselves fill hundreds of pages of briefing. In sum, though,

they are:

- Bracker was never party to a written partnership agreement;

- She never received a K-1 from the firm;

- Bracker never received any stock certificates or other indicia;

- She always worked on a straight salary basis, and received discretionary bonuses only, not distributions;

- Bracker's bonuses are, well, all over the place, and not determined by any "formula" as Bracker has represented;

- Bracker has never once contributed a dime to firm expenses, nor shared in any firm losses;

- Bracker has never been responsible for the firm line of credit;

- Bracker complained to just about anyone – at least before this dispute – that she **wasn't** entitled to firm profits as an equity partner;

- Bracker has never paid any "buy in" to the firm;

- Even Bracker's resignation letter repeatedly references that it was Bothwell's firm and Bothwell's employ that she was leaving.

In a fair use of the word, it is incomprehensible that Bracker now swears she was an equity partner, compensated based upon some formula related to firm profits. That is simply not true.[21] But for purposes of deciding this lien and this Motion, the Court need not conclude one way or the other. Even if Bracker was an "equity partner" in the professional corporation of Bothwell Bracker, that is irrelevant for adjudication of the validity of the termination clause, lien, or *quantum meruit* entitlement of the **old**

---

[21]     Bracker was a non-equity partner, a common form of employment in which a lawyer is referred to as a "Partner" for marketing and other purposes, but nevertheless does not share in profits or losses, or possess any other traditional hallmarks of equity partnership. Exh. F, Buckley Decl. at ¶¶ 9-11 (describing non-equity partnerships); Exh. C, Menden Decl. at ¶¶ 7, 9-12 (describing Bracker's non-equity role in the Bothwell firm); Exh. A, Bothwell Decl. at ¶ 18 (origin of Bracker's non-equity role)

firm. At most, Bracker's **share** of whatever the old firm may be entitled to is in

dispute, but the old firm's entitlement to fees is not.

**PC NAME**: Bracker's name on the firm door changes nothing. Bracker &

Marcus improperly resort to the Ethical Rules on this point.

> In addition, any denial by Bothwell that Bracker was a co-principal of
> Bothwell Bracker would contradict Bothwell's obligations under the Georgia
> Rules of Professional responsibility. As an ethical matter, a firm must avoid
> "actual or potential client confusion" with what entity the client is hiring. Ga.
> Formal Advisory Opinion 97-2. For that reason, "[a] lawyer shall not hold
> himself out as having a partnership with one or more other lawyers unless they
> are . . . partners." *Id.* (emphasis added) [sic] (internal quotation marks omitted)
> (alteration and omission in original). Lawyers may state or imply that they
> practice in a partnership or other organization only when that is the fact. Ga. R.
> of Prof'l Conduct 7.5(d). Thus, Bothwell is prohibited from denying that the
> Relators engaged a law firm comprised of both Bothwell and Bracker that
> dissolved upon Bracker's withdrawal.

Docket 278 at 26-27. A more detailed look at the cited authority is in order.

Advisory Opinion 97-2 governs whether an attorney simultaneously may

practice in more than one law firm, **not** how dissolution, *quantum meruit*, or fee

disputes are governed (or, as proffered here, reverse-engineered). At base, that

Opinion would apply had Bracker remained with Bothwell, **and simultaneously**

practiced with Bracker & Marcus. Otherwise, there is little to be garnered from that

Opinion.[22]  To be sure, there is no application here, since it was abundantly clear to

Friddle and Kennedy with whom they were dealing; as of January 1, 2015, the

---

[22]     The actually quoted portions of the Advisory Opinion are really from Georgia
Standard of Conduct 10, which no longer exists.

Relators terminated Bothwell Bracker and retained Bracker & Marcus, LLC.

Ga. R. of Prof. Conduct 7.5, "Firm Names and Letterheads," is of even less help. The relied-upon provision from that Rule establish that ""[l]awyers may state or imply that they practice in a partnership or other organization only when that is a fact." Rule 7.5(d). That does not mean that every lawyer, then entitled "Partner," is entitled to an equity share of profits. It merely means that, for example, the undersigned cannot claim to work with Bothwell Law Group, P.C., or Bracker & Marcus, LLC, because that relationship is not one supported by fact. Rule 7.5, Comment 1 ("Therefore, lawyers sharing office facilities, but who are not in fact partners, may not denominate themselves as, for example, "Smith and Jones," for that title suggests partnership in the practice of law.").

If a lawyer could preclude her former firm from any *quantum meruit* award merely by departing – even tortuously – and then claiming such illegal efforts "dissolved" the Firm otherwise entitled to such a quasi-contractual remedy, then there is no end to the mischief that law firm breakups might produce. And Bracker/Marcus's take unnecessarily clouds the issue. The relators owed whatever fee they owed to the predecessor firm; that Bothwell Bracker does not exist does not mean that the **Relators'** obligation vanished; it merely means that what entity or lawyers entitled to that fee is in dispute.

**APPARENT AGENCY/JOINT VENTURE**: The Relators finally argue that Bothwell Bracker, P.C. was a joint venture, and as such, it must have "dissolved" when Bracker took firm clients and went elsewhere. That syllogism fails. The cases cited stand for the proposition that an entity that allows an individual to be marketed as a principal, partner or the like may be liable in apparent agency to a third party. That concept is irrelevant here. For one, binding "Bothwell Bracker" as to the Relators is one thing; extrapolating that the firm was **actually** a partnership that dissolved upon Bracker's defection is another. The actual corporate form matters here for contractual rights purposes, and there is no dispute that the Bothwell entity has, and always has had, but one owner. And, the Relators certainly could not have relied upon any partnership representations **in 2006**, when they signed the governing engagement agreements. Put another way, they can show no reliance on any such apparent partnership. That is dispositive, as even the Relators' own cases demonstrate. *Andrews v. Messina*, 206 Ga. App. 742, 746 (1992) (dismissing claim; "appellants did not act in reliance on appellee's alleged partnership [] when they entered into the agreements that form the basis of their breach of contract claim.").[23]

---

[23]     The Relators' remaining scattershot attacks fare no better. The Relators contend that the termination clause is "fatally vague, defective and ambiguous." Docket No. 248 at 34-35. Hardly – the clause and entire engagement concern the hiring, termination, and fees as relate to Bothwell & Harris, P.C. The **entity** is the focus, as even a casual reading reveals. Likewise unavailing is the Relators' clipped citation to an Assignment they signed, which purportedly means that "attorneys' fees

At base, Bracker and Marcus' actions can be fancifully characterized or imagined as many things, but what it really was is quite clear: lawyers seemingly fed up over money or control, while still employees, took clients and set up a competing shop. The clients that departed terminated Bothwell's employ; the contract at issue and the law require those clients (and likely, the departing lawyers) to own up to the implications of those acts.

        D. <u>This lien demand does not extinguish entitlement to *quantum meruit* relief.</u>

The Relators also argue that under the circumstances of this case, the lien demands such an excessive fee that **no fee whatsoever** should be awarded, whether under *quantum meruit* or otherwise. Docket 248 at 28-33. Boiled down, the Relators argue that the Bothwell firm should receive no fee, at all, despite nearly 2,700 hours of work; an Engagement Agreement that was apparently acceptable as long as

---

would only be paid out of settlement proceeds in the case." *Id.* at 35. The relied-upon language does not purport to limit the source of any attorneys' fees, or contain any sort of exclusivity language. And the Assignment makes abundantly clear that it provides no limiting factor, though, as the Assignment "does not affect the amount of fees due and owing by me to my attorneys pursuant to the attorneys' fee agreement described above or any subsequent contract." Docket 248-4 at p. 6. Next, the Relators warn of mysterious "double billing," based upon the preexisting settlement of a portion of this case with TBW. But that dire description is wholly unwarranted. The statutory fees from that mini-settlement were disbursed, and amounted to just a few hundred dollars, which was credited to the Relators' bill already. Exh. A, Bothwell Dec. at ¶ 25. Finally, the Relators' claim is that there is no basis for holding them jointly responsible for any fee demand. But the language of the **lien** does not demand a specific amount, and obviously applies to the **case** in its entirety.

Bracker and Marcus were working on the case while they were employees of

Bothwell Bracker, but not apparently afterwards (even though they use the same

clause); the necessity of such a lien, at the risk of waiver; and the express offer to

Relators to discuss alternative payment concepts.[24]

First and foremost, since the lien itself demands no specific figure, the

Relators' claims have no basis. Second, there is nothing "excessive" about the lien,

period. Exh. F, Buckley Dec. at ¶¶ 12-15, 19; Exh. G, Helmer Dec. at ¶¶ 18-19. For a

case of this magnitude, even a million dollar fee is entirely reasonable, given the

---

[24]   Bracker and Marcus claim that prior to their setting up of their own shop, they communicated with an unidentified "prominent ethics expert," "ultimately determin[ing] that advance notification was in the clients' best interest, particularly given the risk they perceived that Bothwell would react to their departure inappropriately." Motion at 12 n.5. One wonders if the anonymous "ethics expert" advised Bracker & Marcus that "**[t]o the extent practical**, a joint notification by the law firm and the departing attorney to the affected clients of the change is **the preferred course of action** for safeguarding the client's best interests." Formal Advisory Opinion 97-3 (emphasis added). That preferred course would have avoided the *status quo*, in which Bracker & Marcus have refused to reveal which case files they, in fact, **already have** because they downloaded them from Firm servers after deciding to leave.

Similarly, that same Advisory Opinion outlines that a "departing attorney may also owe certain duties to the firm which may **require** that the departing attorney should advise the firm of the attorney's intention to leave the firm and the attorney's intention to notify clients of his or her impending departure, **prior to informing the clients of the situation**. Specifically, the departing attorney should not engage in professional conduct which involves "dishonesty, fraud, deceit, or willful misrepresentation" with respect to the attorney's dealings with the firm." *Id*. Almost certainly beyond the scope of the dispute here, Bracker, at least, faces a jury on her breach of fiduciary duties to the Firm for soliciting clients before leaving, disparaging Bothwell in the process, and diverting Firm opportunities.

efforts expended, the risk of nonrecovery, the results obtained (including a $320,000,00 settlement, and a pending $13.5 million dollar summary judgment claim), and comparatively modest hourly rate involved. There is nothing offensive about the fee demand.

Second, there is no Georgia case supporting Relators' extreme position, but *Greer v. Yetman*, 269 Ga. 271, 274 (1998) at least hints the Georgia Supreme Court would go in a different direction if asked. There, under the same lien statute as would be relevant here, the discharged lawyer sought to enforce a contingency fee based upon a rather typical engagement agreement. The lawyer had litigated and obtained a final judgment, but was discharged during the pendency of post-trial motions. When the client entered into settlement talks with the defendant, those overtures were "hampered by GKD's insistence on receiving attorney fees based on the full amount of the judgment rather than the amount of any settlement in which it had not participated." 269 Ga. at 272. Later, the client settled the matter for less than the judgment amount, but the discharged lawyer continued to assert a lien amount based upon the **original** judgment, in excess of the "actual" money on the table.

Despite that seemingly *9er se* excessive demand by the discharged lawyer, the Supreme Court **affirmed** an award under *quantum meruit* principles. 262 Ga. at 274 (reiterating that "[w]here there is a contingent fee arrangement between a client and

an attorney and the client prevents the contingency from happening, the attorney is entitled to reasonable attorney's fees for services that have been rendered on behalf of the client. Thus, although prevented from recovering under the contract, the attorney still has a remedy in quantum meruit.") (internal punctuation omitted). Admittedly, although there was no enumerated challenge as to the excessiveness of claiming a fee based upon monies that were not collected, the issue was certainly in play at the Supreme Court, as a two-Justice concurrence dwelled almost entirely on the ethical rules about excessiveness. 262 Ga. at 274-75 (Fletcher, P.J., and Sears, J., concurring in the judgment and specially). Far from rejecting the discharged attorney's fee claim out of hand, or going further and also barring a *quantum meruit* recovery, the *Greer* Court signaled a willingness to award fees "as much as the lawyer deserves" despite a claim for monies in excess of what was actually collected and available.[25]

---

[25]     Also illustrative of the Georgia courts' take on the issue is *Ellerin & Assocs. v. Brawley*, 263 Ga. App. 860 (2003). There, a trial court awarded fees to a discharged attorney, but also expressly excluded certain "outrageous" costs and some expert expenses – that is, the discharged attorney sought reimbursement for unreasonable and excessive services and costs. *Id.* at 864. The Georgia Court of Appeals reversed, finding the underlying engagement agreement unenforceable – but remanding for a *de novo* determination of a proper *quantum meruit* award. *Id.* The discharged attorney, thought apparently seeking fees and costs that were unreasonable *per se* nevertheless was permitted to go forward and put a number on his *quantum meruit* claim.

     Also in accord is *Eichholz Law Firm, P.C. v. Tate Law Group, LLC*, 310 Ga. App. 848, 852-853 (2011), which also explicitly held that a *quantum meruit* award was available, despite a terminated firm's attempts to enforce a fee agreement that violated public policy and would have brought with it an illegal fee.

All the Relators' precedent on this point is either inapplicable or a severe

mismatch to the unique facts in this matter. *Davis v. Findley*, 262 Ga. 612, 612 (1992)

was, of course, a Georgia Supreme Court case addressing a single question: was a

violation of the ethical prohibitions against excessive fees sufficient, standing alone,

to support a claim for legal malpractice?  The unanimous high court held that it was

not, and seemingly also **foreclosed** the substantive remedy sought by relators, here:

> The Preamble to the Code of Professional Responsibility provides that its
> purpose is to guide the "conduct and motives of the members of our profession
> so as to merit the approval of all just men." The State Bar Rules limit the
> remedies for a violation of the standards of conduct to "disciplinary action
> and/or punishment," Rule 4-102 (a); and in a long line of cases the disciplinary
> nature of the sanctions applied is apparent. Thus, while the Code of
> Professional Responsibility provides specific sanctions for the professional
> misconduct of the attorneys whom it regulates, it does not establish civil
> liability of attorneys for their professional misconduct, **nor does it create
> remedies in consequence thereof**.

*Davis v. Findley*, 262 Ga. 612, 613 (1992) (internal punctuation omitted; emphasis

added). The Relators seek to create just such a remedy, though, arguing that because

of an alleged ethical impropriety, they are no longer liable in contract or *quantum*

---

> The [terminated attorneys] seek to enforce the fee-splitting agreements
> in a manner that would **contravene public policy**, by allowing the
> [terminated] firm to receive a portion of legal fees even though its clients
> terminated the [terminated] firm's representation before any contingency
> giving rise to the fees occurred. As a matter of law, the fee-splitting
> provisions **cannot be enforced in this manner; however**, the
> [terminated] firm may seek to recover in quantum meruit for services it
> provided.

(emphasis added).

*meruit*. *Davis*, at least, cuts against that construction of Georgia law.

And the three foreign cases the Relators cite are similarly unhelpful. *White v. McBride*, 937 S.W.2d 796, 803 (Tenn. 1996) is likely the most cited, and strongly worded. But *White* involved a contingency fee contract on circumstances wholly different than those here – that case involved the legal equivalent of shooting fish in a barrel, and any contingency fee was accordingly unjustified because of the lack of any real risk to the engaging lawyer. Courts have not hesitated to limit *White*, based upon this straightforward distinction. Specifically, *White* has been subsequently limited by Tennessee courts as involving "circumstances [that] were unusual" since the engagement agreement at issue was not **really** a contingency agreement, meaning the risk of non-recovery was essentially zero. *Cooper v. Estate of Weisberger*, 224 S.W.3d 154, 163-64 (Tenn. Ct. App. 2006); *Fell v. Rambo*, 36 S.W.3d 837, 853 (Tenn. Ct. App. 2000) ("The lawyer in *White v. McBride* undertook to represent the husband of the deceased in an **uncontested** probate proceedings in which there was **never a doubt** that the husband would recover one-third of the estate. In contrast, when [these lawyers agreed to represent the plaintiffs] on a contingency basis, they faced a vigorously contested case involving extensive discovery, a novel question of law, and a very real possibility that [the plaintiffs] would not recover at all. In *White v. McBride*, the trial court found the contingency fee arrangement was clearly

excessive; however in this case, the trial court implicitly found that the fee contract was not clearly excessive because it determined that [the discharged lawyer] was entitled to a quantum meruit fee award.") (emphasis added).

*Licciardi v. Collins*, 536 N.E.2d 840, 847-48 (Ill. Ct. App. 1989) is of no great help, either, as that case just established that Illinois' purported rule on the availability of *quantum meruit* is an outlier. 536 N.E.2d at 848 (citing *Geunard* and *Wiley*); *compare Guenard v. Burke*, 443 N.E.2d 892, 895 (Mass. 1982) (allowing *quantum meruit* fee despite illegality of contingency fee contract from the outset; "Denying enforcement of the contingent fee agreement achieves that object. Representation of the client was not illegal; only the contingent fee agreement was. The loss to the defendant of a reasonable fee and the windfall to the plaintiff in being relieved of the obligation to pay any attorney's fee for the defendant's proper services indicate that denial of a fair fee would be unreasonable in the circumstances."); *Wiley v. Silsbee*, 36 P.2d 854, 855 (Cal. App. 1934) (same; "[F]or benefits received under a void contract, not prohibited by law, the recipient will be held responsible on an implied contract for payment of the reasonable value thereof."). *Leoris v. Dicks*, 501 N.E.2d 901, 904 (Ill. Ct. App. 1986) stands on similar footing. Like *Licciardi*, that case involved an engagement agreement that **itself** was illegal, unlike the garden-variety contingency agreement here. *Much Shelist Freed Denenberg & Ament, P.C. v.*

*Lison*, 696 N.E.2d 1196, 1201 (Ill. App. Ct. 1st Dist. 1998) ("*Licciardi* and *Leoris* are distinguishable because in those cases it was prohibited for the attorneys to enter into the agreements at issue; the fee agreements themselves violated public policy. . . [Other cases] have permitted *quantum meruit* recovery even where the attorneys violated statutes concerning the attorney-client agreement or concerning fees.").

Bothwell is simply unaware of a case holding that an attorney is entitled to no fee whatsoever for work **indisputably already done**, without client complaint, when the fee represents a term agreed to by all parties. That is likely because such relief is simply unavailable, and this Court should not be the first to hold otherwise.[26]

### III.    A FILE TRANSFER ORDER IS UNNECESSSARY AND UNJUSTIFIED.

Briefly, the Relators ask the Court to order Bothwell to transfer the "case file" for this matter. Docket 248 at 38-40. No such Order is necessary, but, again, a bit of context is.

---

[26]    The ominous motivations attributed to the lien/demand by the Relators are simply not the product of a careful examination of the available correspondence. For example, the letter to Kennedy **expressly** informed her that it "concerns the legal service agreement you terminated with BLG and is **not intended** to affect your representation by BM **or to persuade you to change representation**." Docket 284-12 at p.2 (emphasis added). That "coercive" letter also urged the Relators to seek independent advice from an independent attorney, and to discuss alternative payment options for any amounts due. Again reminding the Relator that the purpose of the letter was not to "persuade you to terminate your relationship with Bracker & Marcus," the correspondence closed by "[r]espectfully" asking for a brief opportunity to discuss what actually happened. *Id.*, at p. 2-3. That hardly sounds like the type of correspondence one might term a threat.

First, the Relators' request is moot, as the "case file" has been made available. Exh. A, Declaration of Mike Bothwell, at ¶ 39. At the risk of being obvious, no such order on this front is thus necessary.

Second, the Relators likely **already had** the file, and this latest request was intended as a bit of cover, for the real purpose of the ink spilled on the issue – to impugn Bothwell's character. At length, the Relators explain how simple and easy it is to transfer a case file – noting that "transferring the majority of the client's electronic file is a [sic] simply as a *single click* of the mouse."  Docket 248 at 40. The post-departure forensic evidence from Bracker and Marcus' computers establishes that they spent considerable periods of time downloading **massive** amounts of files onto portable thumb drives. Exh. A, ¶ 46. Perhaps tellingly, Bracker & Marcus have adamantly refused to reveal what files they already have, which of course complicated all of the file productions and made the other efforts less efficient. *Id.* ¶ 31.

Third, Bracker & Marcus themselves help push the file transfer here back, putting this case **dead last** in a list of "big cases" that needed preferential treatment. They instead put sealed "Case A," first, because of a looming set of depositions; production of that file took the better part of a week. Their choice of "Case B" as a second priority seemed odd, given that only an intervention decision was coming up;

nevertheless, that file was collected and nearly complete when the intervention date moved (as is often the case). Efforts then shifted to Case C, which again took many days, until it became clear that because of Bracker and Marcus' misrepresentations, "Case C" was returning to Bothwell. In the end, those Relators **never** had formally retained Bracker, making the file transfer request highly improper in the first place.

When Bracker and Marcus reassigned a top priority to this case, Bothwell's staff spent almost 140 hours collecting and organizing the file, left in at least some disarray by Bracker's own work habits. Those efforts can hardly be characterized as slow-rolling the production, or slacking in any way.

Fourth and finally, it is not as if the Relators' file transfer request took place in a vacuum, or was the product of some orderly transition between professionals. Instead, Bracker and Marcus

- solicited clients before their departure (in violation of Georgia law, and ethical precepts);

- took virtually every single client of Bothwell Bracker with them (at least some via highly questionable representations);

- demanded every single file, immediately, regardless of relative importance; and

- did so knowing that the manpower at their old firm was gutted.

When Bothwell attempted to inquire as to what portions of this matter's "case file" was already in Bracker and Marcus' possession, the response was "we're not

telling," understandably raising the suspicion level more than a bit. [27]   This case has had more than its share of finger-pointing already, and it is not Bothwell's intent to continue down that path; however, it is worth noting that had Relators' counsel done things the right way – approached Bothwell above-board, transparent – none of this would have been necessary.

### IV.   A FEE-SHIFTING AWARD IS UNSUPPORTED.

Lastly, Bracker and Marcus – not the Relators – ask for their fees based on imagined "bad faith" by Bothwell. As characterized, Bracker and Marcus claim that

> Bothwell's conduct in connection with this Motion – including asserting a lien on *all* of the settlement proceeds, demanding over $1.1 million from each of this former clients to coerce them away from the counsel of their choice, and intentionally refusing to transfer their case files without any legal justification, constitutes bad faith.

Docket 248 at 41. As outlined already, none of those arguments bear scrutiny. Bothwell has an objective valid and proper lien, in the amount stated. It was his contractual right to ask for such a fee; there was nothing "coercive" about it – after all, the termination provision had been in place for years prior to Bracker's illegal fleecing of her old firm's clients. And the file transfer is a much more complicated story that Bracker's incomplete recitation would have it. There is simply nothing

---

[27]    That suspicion was quite justified. In addition to this case file, Bracker and Marcus also represented that other Relators/clients had elected to terminate Bothwell Bracker as counsel, and as such, required those case files as well. The evidence is now clear that Bracker and Marcus **never** represented at least one of those clients. Exh. D, Declaration of "RB," at ¶¶ 3-7.

"frivolous" or improper about attempting to orderly and correctly address a

multifaceted, chaotic situation that was all brought about by Bracker and Marcus'

own off-radar approach.[28]  "Due to the scope of the inherent powers vested in federal

courts, however, it is necessary that such courts exercise caution in invoking their

inherent power." *Thomas v. Tenneco Packaging Co*., 293 F.3d 1306, 1320 (11th Cir.

2002) (internal punctuation omitted). A cautionary approach is more than warranted

here, and compels a finding that no bad faith has been demonstrated.

## <u>CONCLUSION</u>

For the foregoing reasons, Mike Bothwell and the Bothwell Law Group, P.C.

respectfully request that the Court deny the Motions.

Respectfully submitted this 6th day of March 2015.


<u>/s/ Darren Summerville</u>
Darren Summerville
Georgia Bar No. 691978

THE SUMMERVILLE FIRM, LLC
400 Colony Square, Suite 2000
1201 Peachtree Street, NE
Atlanta, GA 30361
T: 770.635.0030
F: 770.635.0029
E: darren@summervillefirm.com

---

[28]     Not to overstate things, but the entire picture of Bracker & Marcus's departure, and relationship with their predecessor firm, will almost certainly be the subject of an entire and separate litigation, with a full suite of discovery. To decide the "bad faith" issue on this very limited record seems, respectfully, improper and unnecessary.

## LR 5.1 CERTIFICATION

This document has been prepared in compliance with Local Rule 5.1(C) -

Times New Roman, 14 point font.


## CERTIFICATE OF SERVICE

This is to certify that I electronically filed this Claimant's **Response To**

**Motions Regarding Attorney's Lien And Case Files (Docket Nos. 246 - 248)** with

the Clerk of Court using the CM/ECF system which will automatically send email

notification of such to counsel of record.

This 6th day of March, 2015.

/s/ Darren Summerville
Darren Summerville
Georgia Bar No. 691978

THE SUMMERVILLE FIRM, LLC
400 Colony Square, Suite 2000
1201 Peachtree Street, NE
Atlanta, GA 30361
T: 770.635.0030
F: 770.635.0029
E: darren@summervillefirm.com
