**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| *ex rel.* COMFORT FRIDDLE and | : | |
| STEPHANIE KENNEDY, | : | |
| | : | |
| Relators, | : | CIVIL ACTION NO. |
| | : | 1:06-CV-03023-RWS |
| v. | : | |
| | : | |
| TAYLOR, BEAN & WHITAKER | : | |
| MORTGAGE CORPORATION, *et* | : | |
| *al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

**ORDER**

This case comes before the Court on Relators' Motion for Summary

Judgment Against Greg Hicks [213] and Defendants Greg Hicks and Carl

Wright's Motion for Summary Judgment [214]. After reviewing the record, the

Court enters the following Order.

**Background**

Relators bring this action under the False Claims Act ("FCA"), 31 U.S.C.

§ 3729 et seq., alleging that Defendants engaged in a scheme to induce the

United States government to insure bad mortgage loans, resulting in around

$131,000,000 in damages to the United States.  Defendants in this case originally included two corporations: Home America Mortgage, Inc. ("Home America"), which originated mortgage loans, and Taylor, Bean & Whitaker Mortgage Corp. ("TBW"), which was Home America's alleged co-conspirator and the underwriter for the mortgage loans Home America originated.[1] (Relators' Statement of Material Facts ("SMF"), Dkt. [213-2] ¶¶ 1-2, 6.)  The remaining individual Defendants are Greg Hicks, who owned 90% of Home America and was Home America's principal operator from 2001 to 2009 (id. ¶ 5; Hicks Aff., Dkt. [214-3] ¶ 2), and Carl Wright, who was an Atlanta-area attorney who closed real estate transactions financed by Home America (Defs.' SMF, Dkt. [214-2] ¶ 12).

Hicks headed up the "Hicks Team," a group within Home America made up of loan officers Hicks chose.  (Relators' SMF, Dkt. [213-2] ¶ 7.)  Relators assert that those loan officers originated Home America loans as a third-party originator ("TPO") for TBW, a Federal Housing Administration ("FHA")-approved sponsoring mortgagee known as a Direct Endorsement Lender ("DE

---

[1]Home America and TBW settled with the U.S. Government and were dismissed from this action on June 13, 2014.  (Dkt. [239].)

AO 72A
(Rev.8/82)

Lender").  (Id. ¶ 91.)  Home America admits it knew these loans would be insured by the government and that the information on the loan applications would be submitted to the government.  (Id. ¶ 96.)  After closing the loans, Home America sold them to TBW within seven days.  (Id. ¶ 97.)  In the meantime, Home America funded its loans through a warehouse line of credit. (Id.)  TBW was the underwriter for the loans and, after purchasing them, submitted the application for federal mortgage insurance to the U.S. Department of Housing and Urban Development ("HUD").  (Relators' Br., Dkt. [213-1] at 7.)

In order to qualify for a HUD guarantee, a borrower must meet certain criteria established by individual government programs.  (Relators' SMF, Dkt. [213-2] ¶ 9.)  Relators contend that Home America employees input borrower and property information into an application engine to verify whether the loan was low-risk enough to qualify for a given program.  (Id. ¶ 10.)  The application engine evaluated the loan based on factors including credit score, debt-to-asset ratio, and income stream.  (Id. ¶ 11.)  After entering all the information, the program either approved the application or provided a list of approval conditions that had to be met, such as obtaining evidence to support the assets

3

claimed by the borrower or to verify employment.  (Id. ¶¶ 13-14.)  On higher-

risk loans, the application engine returned a designation of "Refer risk class,"

meaning that the engine rejected the loan because it identified weaknesses in the

borrower's credit or ability to repay the loan.  (Id. ¶ 16.)  Sometimes, loan

applications were rejected because they lacked enough data.  For example, a

cash-buyer without a bank account or someone without credit history might be

rejected.  (Id. ¶ 17.)  But in rare circumstances, the safeguards could be

manually overridden in accordance with very strict guidelines by having an

FHA DE underwriter analyze the entire loan application to determine if the

mortgage qualified under HUD guidelines.  (Id.)

Relators contend that employees of Home America committed fraud in

four ways: (1) they entered false information into the application engine; (2)

they ignored conditions that were required to be met for approval; (3) they

altered or fabricated required documentation; and (4) they overrode the

safeguards on rejected loan applications.  (See Relators' Br., Dkt. [213-1] at 5-

6.)  In these ways, Relators argue Defendants originated bad loans for TBW to

underwrite and for the government to insure.  (Id. at 8-9.)  Furthermore,

Relators stress that Hicks is personally liable for this fraud because he (1)

4

personally participated in or directed employees to commit fraud, and (2) abused Home America's corporate form for his own ends.

Based on these allegations, Relators brought this *qui tam* action under the FCA on December 12, 2006.  On August 3, 2009, the Federal Bureau of Investigation raided the corporate headquarters of TBW in Ocala, Florida.  (Relators' SMF, Dkt. [213-2] ¶ 26.)  On August 24, 2009, TBW declared bankruptcy, followed by Home America on November 25.  (Id. ¶¶ 27-28.)  The federal government then filed a $178 million proof of claim against TBW and a $131 million proof of claim against Home America based on the loans at issue in this case.  (Id. ¶ 29.)

The remaining claims include FCA violations against Hicks and Wright and a breach of contract claim against Hicks.  Both sides move for summary judgment.

## Discussion

## I.      Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a).  "The moving party bears 'the initial responsibility of informing the . . .

court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact.' "  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259

(11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)

(internal quotations omitted)).  Where the moving party makes such a showing,

the burden shifts to the non-movant, who must go beyond the pleadings and

present affirmative evidence to show that a genuine issue of material fact does

exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at

248.  A fact is not material if a dispute over that fact will not affect the outcome

of the suit under the governing law.  Id.  An issue is genuine when the evidence

is such that a reasonable jury could return a verdict for the non-moving party.

Id. at 249-50.

In resolving a motion for summary judgment, the court must view all

evidence and draw all reasonable inferences in the light most favorable to the

non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th

Cir. 2002).  But, the court is bound only to draw those inferences which are

reasonable.  "Where the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, there is no genuine issue for trial."

Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations

omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met

its burden under Rule 56(a), the nonmoving party "must do more than simply

show there is some metaphysical doubt as to the material facts").

        Finally, the filing of cross-motions for summary judgment does not give

rise to any presumption that no genuine issues of material fact exist.  Rather,

"[c]ross-motions must be considered separately, as each movant bears the

burden of establishing that no genuine issue of material fact exists and that it is

entitled to judgment as a matter of law."  Shaw Constructors v. ICF Kaiser

Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004).

**II.     Analysis**

Defendants Hicks and Wright argue that they are entitled to summary judgment because, stated broadly, Relators fail to show that (1) they intended to submit a false claim to the federal government, or (2) any false information was material to HUD's decision to insure the loans or caused the government's losses.  Relators, on the other hand, argue that they have established as a matter of law all the elements of the alleged FCA violations in relation to 25 loans, and that Hicks is liable for these violations personally.

Hicks also argues that Relators' breach of contract claim fails.  That claim is based on Hicks's alleged promise of a job and certain bonuses to Relator Stephanie Kennedy, a Home America employee.  Hicks insists he did not make such an offer.  After providing an overview of the FCA and discussing the parties' arguments about the FCA claims, the Court addresses the breach of contract issue.

A.     False Claims Act

"The FCA is designed to protect the Government from fraud by imposing civil liability and penalties upon those who seek federal funds under false pretenses."  United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist., 739

8

F.3d 598, 600 (11th Cir. 2014).  To that end, § 3730(b)(1) of the FCA allows

private-citizen plaintiffs—relators—to bring a civil action in the name of the

United States to expose fraud committed by third-parties against the

Government.  31 U.S.C. 3730(b)(1).

     To succeed on a claim under the FCA, a relator must prove: "(1) a false

or fraudulent claim; (2) which was presented, or caused to be presented, by the

defendant to the United States for payment or approval; (3) with the knowledge

that the claim was false."  United States ex rel. Walker v. R & F Props. of Lake

Cnty., Inc., 433 F.3d 1349, 1355 (11th Cir. 2005) (citing 31 U.S.C. § 3729(a)(1)

(2006)).  Liability also extends to anyone who "knowingly makes, uses, or

causes to be made or used, a false record or statement to get a false or

fraudulent claim paid or approved by the Government."  31 U.S.C. §

3729(a)(2).  Moreover, courts impose a materiality requirement for the alleged

false or fraudulent claim.  See, e.g., United States ex rel. Stephens v. Tissue Sci.

Labs., Inc., 664 F. Supp. 2d 1310, 1316 (N.D. Ga. 2009) (noting that "[w]hile

not every circuit has adopted the materiality requirement, no circuit has rejected

it outright").

AO 72A
(Rev.8/82)

B.      Relators Produce Evidence that Defendants Intended to Make
        False Material Statements that Caused the Government's Losses

Hicks and Wright argue that they did not intend to submit any false

claims to the government because TBW, not Home America, "underwrote the

loans, owned the loans and caused any federal insurance to be placed."  (Defs.'

Br., Dkt. [214-1] at 15.)  Furthermore, Defendants stress that to the extent any

loans went into default, TBW was the one who later filed claims based on FHA

insurance, so Home America did not cause the government's losses.  (Id. at 19.)

Defendants focus on the "presentment" requirement under 31 U.S.C. §

3729(a)(1), which "imposes liability on a person who 'knowingly *presents, or

causes to be presented,* to an officer or employee of the United States

Government . . . a false or fraudulent claim for payment or approval.' "  Hopper

v. Solvay Pharm., Inc., 588 F.3d 1318, 1325 (11th Cir. 2009) (quoting 31

U.S.C. § 3729(a)(1)).  But Relators also allege liability under 31 U.S.C. §

3729(a)(2), and as the court in Hopper pointed out, "Subsection (a)(2) does not

contain a presentment clause.  It imposes liability on any person who

'knowingly makes, uses, or causes to be made or used, a false record or

statement to get a false or fraudulent claim paid or approved by the

Government." Id. at 1327 (quoting 31 U.S.C. § 3729(a)(2)).[2]  The court went

on to hold that under this provision,

> a plaintiff must show that (1) the defendant made a false record or
> statement for the purpose of getting a false claim paid or approved
> by the government; and (2) the defendant's false record or
> statement caused the government to actually pay a false claim,
> either to the defendant itself, or to a third party.

Id.  There is thus no requirement that a defendant itself "present" a claim

directly to the government if these two prongs are satisfied.

As for the first prong, Defendants argue that there is no evidence that

---

[2]Relators note, as the Eleventh Circuit did in Hopper, that in May 2009
Congress amended 31 U.S.C. § 3729(a)(2) (2006), replacing the words "to get a false
or fraudulent claim paid or approved by the government" with the words "material to
a false or fraudulent claim."  Fraud Enforcement and Recovery Act ("FERA"), Pub. L.
No. 111-21, § 4, 123 Stat. 1617, 1621.  Relators argue that this standard is broader
because it removes the requirement that a defendant make a false statement for the
purpose of getting a claim paid.  FERA also stated that this amendment "shall take
effect as if enacted on June 7, 2008, and apply to all claims . . . that are pending on or
after that date."  Id. § 4(f)(1), 123 Stat. 1625.  The Hopper court interpreted the term
claim in this context "to mean 'any request or demand . . . for money or property'
[submitted to the United States], as defined by 31 U.S.C. § 3729(b)(2)(A) (as amended
May 2009)."  588 F.3d at 1327 n.3.  Thus, while this case was pending before June 7,
2008, "[t]he Eleventh Circuit has ruled that FERA is retroactive to claims for payment
submitted to the federal government pending on or after June 7, 2008, regardless of
when the litigation was filed."  United States ex rel. Bibby v. Wells Fargo Bank, N.A.,
906 F. Supp. 2d 1288, 1295 (N.D. Ga. 2012).  Relators point out that 11 out of the 25
claims were submitted after June 7, 2008, and thus FERA applies to these claims.
(Relators' Resp., Dkt. [222] at 7.)  While the newer standard may be broader, the
Court cites to the pre-FERA standard for clarity and finds that all claims here satisfy
either standard for the purposes of these motions.

they made any false statements *for the purpose* of getting a false claim paid or approved by the government.  But the parties do not dispute that Home America knew these loans would be insured by the government and that the information on the loan applications would be submitted to the government.  (Relators' SMF, Dkt. [213-2] ¶ 96.)  What is more, "a subcontractor violates § 3729(a)(2) if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim."  Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662, 671 (2008).  Here, there is evidence that Defendants submitted false information in the loan applications and that TBW submitted those files to the government to obtain insurance coverage.  Viewing the facts in Relators' favor, it is a logical inference that Home America's purpose was for the false statements to be used in this manner due to Home America and TBW's business model: as a TPO, Home America originated loans while TBW, an FHA-approved DE Lender, bought the loans after closing and obtained FHA mortgage insurance.  Hicks acknowledged that if the DE underwriters at TBW did not approve the loan as qualified for FHA mortgage insurance, then the loan could not close.  (Hicks Depo., Dkt. [213-7] at 128:2-14.)  This evidence

12

supports Relators' argument that Home America and TBW made these false statements to obtain insurance on bad loans, thereby shifting the risk to the U.S. government.  There is thus evidence that Defendants made false statements or records for the purpose of getting FHA insurance for bad loans.

Turning to the second prong from <u>Hopper</u>, Relators also present evidence that these false statements could have caused the government to actually pay a false claim.  Defendants insist that they could not have caused the government's losses because they never directly applied for mortgage insurance or submitted claims to HUD, but case law does not draw such a fine distinction.  Indeed, in enacting the FCA, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.' " <u>Cook County v. United States ex rel. Chandler</u>, 538 U.S. 119, 129 (2003) (quoting <u>United States v. Neifert-White Co.</u>, 390 U.S. 228, 232 (1968)).  In <u>Allison Engine</u>, the Supreme Court held,

> It is not necessary to show that the conspirators intended the false record or statement to be presented directly to the Government, but it must be established that they agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim.

553 U.S. at 673.  Therefore, a defendant need not have submitted a false claim directly to the government as long as the false statements are material.

In that regard, cases addressing fraud on HUD have emphasized that false information in loan applications could have a material effect on HUD's decision to insure mortgages.  For example, the former Fifth Circuit noted in United States v. Miller, a *qui tam* case involving FHA mortgage-insurance fraud, that "false statements regarding the ability of purchasers to afford housing could very well be the major factor for subsequent defaults."  645 F.2d 473, 476 (5th Cir. Unit A 1981).[3]  Other courts agree and have "found that false statements regarding the credit worthiness of purchasers to afford housing establish the required causal connection" in cases involving HUD-insured defaulted mortgages.  United States v. Eghbal, 548 F.3d 1281, 1284 (9th Cir. 2008); see also United States v. Veneziale, 268 F.2d 504, 505 (3d Cir. 1959) ("[T]he fraudulent statement in the loan application as to the purpose of the borrowing was an essential inducement to the Federal Housing Administration guaranty upon which the government has now had to pay.  Thus the wrong of the

---

[3]The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit decided before October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

14

defendant was an important, even an essential factor in subjecting the government to an enforceable demand for money."). Because there is evidence of fraudulent statements on loan applications, these statements could have caused the government to pay a false claim.

Furthermore, it does not matter that TBW was the entity that later filed the actual claims for insurance coverage, or that Defendants did not induce the borrowers to default. As stated above, in Hopper the Eleventh Circuit held that under § 3729(a)(2), a plaintiff is required to show that "the defendant's false record or statement caused the government to actually pay a false claim, either to the defendant itself, *or to a third party*." 588 F.3d at 1327 (emphasis added). So, even if TBW filed the claim and received insurance proceeds, Home America or its employees could be liable under the FCA for making false statements or records that caused the government to pay a false claim to TBW. And, while Defendants did not induce buyers to default, the Court is not persuaded that this distinction matters. In Eghbal, in which the defendants were accused of fraudulently paying purchasers' down payments in violation of HUD rules, the Ninth Circuit rejected the same argument:

> [The defendants] contend that the Government failed to show that their false statements set into motion a false claim, because they sought only to fraudulently induce HUD to insure the mortgage, not to have the buyers default or cause the mortgage holders to make claims on HUD.  It is true that [the defendants] were not parties to the actual claims presented to HUD, made after the buyers defaulted, which resulted in monetary payments by the Government.  However, liability under the FCA nevertheless attaches, because the false statements were "relevant to the government's decision to confer a benefit."  United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1173 (9th Cir. 2006). The plain language of the FCA contemplates liability not only for fraudulently causing the Government to pay a claim, but also for causing the Government to *approve* a claim.  31 U.S.C. § 3729(a)(1).

Eghbal, 548 F.3d at 1283 (emphasis in original).  The same is true here.

Finally, Defendants argue that Wright, the closing attorney, is entitled to summary judgment because he "was a sub-contractor to a sub-contractor," and thus "there is no evidence that he created and/or made any 'false record or statement' *intending* that it 'be material to the Government's decision to pay or approve the [alleged] false claim.' "  (Defs.' Br., Dkt. [214-1] at 14 n.4) (emphasis in original.)  This is the only specific argument Defendants make about Wright.  Defendants do not make any other legal arguments or cite any evidence to show that Wright is entitled to summary judgment on the FCA claims.  Defendants do not even mention Wright (aside from stating who he is)

16

in their Statement of Material Facts.  (See generally Dkt. [214-2].)  Relators, in

contrast, produce evidence that Wright was the closing attorney on several of

the loans at issue bearing false information.  (See Relators' SMF, Dkt. [213-2]

¶¶ 37, 39, 42, 44.)  Therefore, the Court finds that Wright has failed to carry his

burden of having " 'the initial responsibility of informing the . . . court of the

basis for [his] motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which [he] believes demonstrate the absence of a genuine

issue of material fact.' "  Hickson Corp., 357 F.3d at 1259 (quoting Celotex

Corp., 477 U.S. at 323 (internal quotations omitted)).

　　For these reasons, Hicks and Wright's arguments that they are entitled to

summary judgment fail.

　　C.　　Hicks Has Created a Factual Dispute Concerning His Personal
　　　　　Liability

　　Relators in turn argue that they are entitled to summary judgment against

Hicks because he either personally participated in fraud or is liable due to his

role as CEO of Home America, the control he exerted over the company, and

his disregard of its corporate form.  (Relators' Br., Dkt. [213-1] at 19-26.)

17

### 1.     Personal Participation in Making False Claims

"[A] corporate officer who takes part in the commission of a tort committed by the corporation is personally liable therefor." Almond v. McCranie, 643 S.E.2d 535, 537 (Ga. Ct. App. 2007).  Relators assert that Hicks headed up the Hicks Team, which was made up of loan officers whom he personally picked and considered his assistants.  Relators state that the Hicks Team originated loans on his behalf, and that Hicks instructed loan officers and underwriters to "do what you need to do" to close loans.  (Relators' SMF, Dkt. [213-2] ¶ 63.)  He also bragged that he could get loans "in and out in a day," and Relators argue he was responsible for the accuracy of every loan application.  (Id. ¶¶ 64, 85.)  For these reasons, Relators additionally argue that Hicks is at least liable for recklessly disregarding Home America's fraud.

For his part, Hicks denies he ever "knowingly created a false record or statement in any documentation for any loans."  (Hicks Aff., Dkt. [214-3] ¶ 6.) He states that he never submitted false statements to TBW, never intended any record or statement from Home America to be used by TBW in any false or fraudulent manner, and never intended that any record or statements he made to be submitted to the government as a false claim.  (Id.)  More to the point, Hicks

18

even asserts that Home America "never presented a claim to FHA, HUD or any other U.S. government agency seeking any federal monies."  (Id. ¶ 2.) Construing the facts in Hicks's favor, the Court finds a genuine issue of material fact regarding whether Hicks personally committed, directed, or otherwise knew about any fraud, or recklessly disregarded false statements of Home America employees.  While Relators insist Hicks personally participated in fraud and should be held liable, Relators and Hicks produce conflicting evidence, and therefore a jury must resolve that factual dispute.

### 2.   *Corporate Veil-Piercing*

Relators further argue that Hicks is personally liable due to his role as the owner, president, and CEO of Home America and because he disregarded the corporate form.

> [A]n officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor, but an officer of a corporation who takes no part in the commission of a tort committed by the corporation is not personally liable unless he specifically directed that particular act to be done or participated or co-operated therein.

Smith v. Hawks, 355 S.E.2d 669, 675 (Ga. Ct. App. 1987) (internal quotation marks and citation omitted).  "[H]olding a corporate officer or owner personally

liable for her own tortious conduct is a distinct and separate claim from piercing the corporate veil." Pazur v. Belcher, 659 S.E.2d 804, 807 (Ga. Ct. App. 2008). In contrast to liability based on direct participation in wrongdoing, corporate veil-piercing focuses on "the abuse of the corporate form, *not* the personal participation of the officer in the tortious conduct at issue." Id. To pierce the corporate veil, one must "show that the shareholders disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist." Id. at 808 (quoting Baillie Lumber Co. v. Thompson, 612 S.E.2d 296, 299 (Ga. 2005)).

Relators argue that there were no corporate formalities and that Hicks was the sole shareholder and was responsible for every decision at Home America. (Relators' Br., Dkt. [213-1] at 25-26.) As the Georgia Court of Appeals has held, however, "[s]ole ownership of a corporation by one person or another corporation is not a factor, and neither is the fact that the sole owner uses and controls it to promote his ends. There must be evidence of abuse of the corporate form." Pazur, 659 S.E.2d at 808 (internal quotation marks and citation omitted). In that regard, "[e]vidence of such abuse can be shown by a

20

commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control." Id. (internal quotation marks omitted).

Relators assert that Hicks treated Home America like "his own personal piggy bank" by funding other corporations or investments, purchasing personal and recreational automobiles, and paying his wife in 2006 even though she did not work for Home America. (Relators' Br., Dkt. [213-1] at 26.) Relators also argue that Hicks paid Home America's corporate taxes out of his personal proceeds. (Id.)

Hicks disputes this evidence and has produced a declaration of William Sammons, who was an accountant for Hicks and his companies. (Sammons Decl., Dkt. [219-4] ¶ 2.) Sammons states that the companies Home America invested in "provided their year-end balances for accounts due to Home America," kept their own records and sets of books, and reconciled their accounts on an annual basis. (Id.) In 2008, Sammons states that "the companies reported the accounts due to Home America as debt forgiveness income." (Id.) Also in 2008, "the amount due from Greg Hicks on Home America's books was recognized as a dividend to Mr. Hicks who reported it as income on his 2008 individual tax return." (Id. ¶ 4.) The Georgia Court of

AO 72A
(Rev.8/82)

Appeals has declined to disregard the corporate form even when a sole shareholder borrows money from a corporation if those loans are identified in the corporate checkbook.  See Stewart Bros., Inc. v. Allen, 377 S.E.2d 724, 725-26 (Ga. Ct. App. 1989).  So, even if Hicks borrowed money from Home America, there is evidence he recorded those debts on Home America's books and otherwise respected the corporate form in investing in and operating other companies.  See Pazur, 659 S.E.2d at 808 ("[L]oans between a corporation and its owner, without evidence of actual abuse of the corporate form, do not support piercing the corporate veil."); id. at 809 (observing that "any action taken on behalf of a closely-held corporation by an officer-shareholder which results in a benefit to the corporation necessarily benefits the officer-shareholder" but does not necessarily show abuse of the corporate form).

In much the same way, Relators' evidence that Hicks purchased automobiles for his personal use creates a factual dispute but does not entitle them to summary judgment.  In Pazur v. Belcher, for example, the Georgia Court of Appeals held that evidence a defendant used a company credit card and a company car did not establish abuse of the corporate form when the defendant recorded these items as part of her compensation on her W-2 form

22

and the plaintiff failed to show they were not legitimate business expenses or were not authorized as part of the defendant's compensation.  Id.  Similarly, here Relators have not shown as a matter of law that Hicks abused the corporate form by purchasing these vehicles.  Viewing the evidence in his favor, Hicks has shown that he records his debts to Home America, and there is no undisputed evidence that this was not the case for proceeds used to purchase these vehicles as well.  And, even though Relators insist that Hicks's wife was not seen on Home America's premises and did not work there, (Kennedy Aff., Dkt. [213-3] at 55, ¶ 58) the wife's W-2 indicates otherwise.  In sum, whether Hicks abused the corporate form such that Relators may pierce the corporate veil turns on factual disputes a jury must resolve.  Because there is a dispute about an essential element of Hicks's personal liability for Relators' FCA claim, Relators are not entitled to summary judgment.

C.    Breach of Contract Claim

Hicks also moves for summary judgment on Relator Kennedy's breach of contract claim against him.  Kennedy alleges that Hicks offered her a position as a vice president at Home America in addition to increased compensation, sales options, and bonuses if she declined to take a job with SunTrust Bank.

23

(Relators' Resp., Dkt. [222] at 24.)  She further contends that she accepted Hicks's offer and that he changed her title but failed to pay her the agreed upon bonuses or sales options.  (Id.)

The elements of a breach of contract claim are (1) a valid contract, (2) breach of that contract, and (3) damage caused by the breach.  Budget Rent-A-Car of Atlanta, Inc. v. Webb, 469 S.E.2d 712, 713 (Ga. Ct. App. 1996).  Hicks argues he is entitled to summary judgment because Kennedy was employed as a DE underwriter at TBW, and so any job offer was an offer for her to work at Home America as an underwriter if HUD ever approved it as a DE Lender. (Defs.' Br., Dkt. [214-1] at 20-22.)  He also insists that he never offered Kennedy a personal job to work for him on a personal basis.  (Id. at 22.)  The testimony of Kennedy and Hicks is directly in conflict, as they disagree over the nature and terms of the purported job offer.  Therefore, genuine disputes of material fact exist, and Hicks is not entitled to summary judgment on Kennedy's breach of contract claim.

### Conclusion

For the foregoing reasons, Relators' Motion for Summary Judgment Against Greg Hicks [213] and Defendants Greg Hicks and Carl Wright's

Motion for Summary Judgment [214] are **DENIED**.  The parties shall submit a

proposed consolidated pretrial order within 30 days of the entry of this Order.

      **SO ORDERED**, this  11th  day of March, 2015.


**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)